## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| FREEDOM NETWORK USA,<br><br>    Plaintiff,<br><br>v.<br><br>PRESIDENT DONALD J. TRUMP, OFFICE OF MANAGEMENT AND BUDGET, DIRECTOR OF THE OFFICE OF MANAGEMENT AND BUDGET RUSSELL VOUGHT, U.S. DEPARTMENT OF JUSTICE, OFFICE OF JUSTICE PROGRAMS, OFFICE FOR VICTIMS OF CRIME, ATTORNEY GENERAL OF THE U.S. DEPARTMENT OF JUSTICE PAMELA BONDI,<br><br>    Defendants. | Case No. 1:25-cv-12419<br><br>Judge: Hon. Matthew F. Kennelly<br><br>JURY TRIAL DEMANDED |

## MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................1

FACTUAL BACKGROUND ..............................................................................3

    A.    CONGRESS PROVIDED FUNDS THROUGH THE TVPA TO
COMBAT THE TRAFFICKING OF DIVERSE GROUPS OF
PEOPLE ..........................................................................................3

    B.    FREEDOM NETWORK USA EFFECTUATES CONGRESS'S
GOALS IN AUTHORIZING TVPA FUNDS TO NONPROFITS
TO PROTECT SURVIVORS, PREVENT TRAFFICKING, AND
PROSECUTE TRAFFICKERS ..........................................................4

    C.    EXECUTIVE ORDER 14151 AND EXECUTIVE ORDER 14173
DECLARE THE END OF ALL DEI. .................................................7

    D.    THE GOVERNMENT TARGETS WHAT IT CLAIMS IS DEI.........................8

    E.    THE GOVERNMENT CENSORS AND INTERFERES WITH
FREEDOM NETWORK'S FEDERALLY FUNDED WORK ..........................9

    F.    THE GOVERNMENT HAS APPLIED THE EOS TO
INTERFERE WITH AND CONSTRAIN FREEDOM
NETWORK'S PRIVATELY FUNDED WORK .............................................12

LEGAL STANDARD AND STANDING................................................................15

ARGUMENT ......................................................................................................16

I.    THE EXECUTIVE ORDERS VIOLATE SEPARATION OF POWERS
AND THE SPENDING CLAUSE....................................................................16

II.    THE EXECUTIVE ORDERS VIOLATE THE FIRST AMENDMENT ......................18

    A.    THE EXECUTIVE ORDERS ARE OVERBROAD.........................................18

    B.    THE GOVERNMENT IS REGULATING PRIVATE SPEECH .......................19

    C.    THE EXECUTIVE ORDERS REGULATE ONLY CERTAIN
VIEWPOINTS.................................................................................19

    D.    THE CERTIFICATION PROVISION CURTAILS ADVOCACY ....................20

III.    THE EXECUTIVE ORDERS VIOLATE THE FIFTH AMENDMENT
BECAUSE THEY ARE UNCONSTITUTIONALLY VAGUE ......................21

IV.    FREEDOM NETWORK WILL BE IRREPARABLY HARMED ABSENT RELIEF ................................................................................................................21

V.    THE BALANCE OF HARMS AND THE PUBLIC INTEREST WEIGH IN FAVOR OF AN INJUNCTION .................................................................................22

VI.    FREEDOM NETWORK IS ENTITLED TO COMPLETE RELIEF AS TO THE CERTIFICATION AND TERMINATION PROVISIONS ...................................23

CONCLUSION...........................................................................................................................25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*ACLU of Ill. v. Alvarez,*
  679 F.3d 583 (7th Cir. 2012) ...................................................22

*Agency for Int'l Dev. v. All for Open Soc'y Int'l, Inc.,*
  570 U.S. 205 (2013)..............................................................8, 19

*In re Aiken County,*
  725 F.3d 255 (D.C. Cir. 2013) ...............................................17

*Bevis v. City of Naperville,*
  85 F.4th 1175 (7th Cir. 2023) ................................................15

*Brown v. Kemp,*
  86 F.4th 745 (7th Cir. 2023) .............................................16, 18

*Chicago Women in Trades v. Trump,*
  778 F. Supp. 3d 959 (N.D. Ill. 2025) ............................... *passim*

*City & Cnty. of San Francisco v. Trump,*
  897 F.3d 1225 (9th Cir. 2018) ...............................................17

*City of Chi. v. Noem,*
  No. 25-cv-12765, 2025 WL 3251222 (N.D. Ill. Nov. 21, 2025) ............17

*City of Chi. v. Sessions,*
  888 F.3d 272 (7th Cir. 2018) .................................................17

*City of Chic. v. Barr,*
  961 F.3d 882 (7th Cir. 2020) .................................................17

*Ctr. for Individual Freedom v. Madigan,*
  697 F.3d 464 (7th Cir. 2012) .................................................21

*Chicago Women in Trades v. Trump,*
  No. 25-cv-2005, 2025 WL 3034056 (N.D. Ill. Oct. 30, 2025) .........23, 24

*Ezell v. City of Chi.,*
  651 F.3d 684 (7th Cir. 2011) .................................................21

*F.C.C. v. Fox Television,*
  567 U.S. 239 (2012)............................................................21

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972) .................................................................................21

*Gresham v. Peterson,*
    225 F.3d 899 (7th Cir. 2000) ...................................................................21

*Int'l Ass'n of Fire Fighters, Loc. 365 v. City of E. Chi.,*
    56 F.4th 437 (7th Cir. 2022) ...................................................................21

*Koala v. Khosla,*
    931 F.3d 887 (9th Cir. 2019) ...................................................................20

*Martin Luther King, Jr. Cnty v. Turner,*
    785 F. Supp. 3d 863 (W.D. Wash. 2025) ................................................17

*Mass v. EPA,*
    549 U.S. 497 (2007) .................................................................................16

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump,*
    767 F. Supp. 3d 243 (D. Md. 2025) ........................................................16

*Nat'l Endowment for the Arts v. Finley,*
    524 U.S. 569 (1998) .................................................................................20

*Nat'l Rifle Ass'n of Am. v. Vullo,*
    602 U.S. 175 187 (2024) ..........................................................................20

*Nat'l Urb. League v. Trump,*
    783 F. Supp. 3d 61 (D.D.C. 2025) ..........................................................16

*Nken v. Holder,*
    556 U.S. 418 (2009) .................................................................................22

*PFLAG, Inc. v. Trump,*
    769 F. Supp. 3d 405 (D. Md. 2025) ........................................................17

*Reno v. Am. Civil Liberties Union,*
    521 U.S. 844 (1997) .................................................................................18

*Rosenberger v. Rector and Visitors of Univ. of Va.,*
    515 U.S. 819 (1995) .................................................................................20

*San Francisco A.I.D.S. Found. v. Trump,*
    786 F. Supp. 3d 1184 (N.D. Cal. 2025) .............................................16, 17

*Speech First, Inc. v. Killeen,*
    968 F.3d 628 (7th Cir. 2020) ...................................................................16

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014) ................................................................16

*Thakur v. Trump*,
   148 F.4th 1096 (9th Cir. 2025) ................................................20

*Trump v. CASA, Inc.*,
   606 U.S. 831 (2025) ................................................................24

*United States v. Williams*,
   553 U.S. 285 (2008) ................................................................21

**Statutes**

22 U.S.C. § 7101 (Supp. V 2008) ..............................................4

22 U.S.C. §§ 7101-11 ..................................................................4

22 U.S.C. § 7101(a) ....................................................................3

22 U.S.C. §7101(b)(2)(A) ..........................................................4

22 U.S.C. § 7101(b)(4) ...............................................................3

22 U.S.C. § 7105(b)(2) (Supp V. 2013) ....................................4

22 U.S.C. § 7105(b)(2)(B)(ii) .....................................................4

Pub. L. No. 117-103, 136 Stat. 124, 125 (2022) .......................6

Pub. L. No. 117-382, 136 Stat. 4534, 4535 (2022) ...................5

**Other Authorities**

U.S. Const. Art. I, sec. 8, cl. 1 ..................................................16

U.S. Const. Art. I, sec. 9, cl. 7 ..................................................16

## INTRODUCTION

The Executive Branch cannot usurp Congress's Power of the Purse to force its favored viewpoint on organizations that receive federal funding.  Nor can the Executive Branch outright censor private speech not funded by Congress.  And yet the enactment and enforcement of two Executive Orders by the Defendants run roughshod over these fundamental constitutional principles, depriving Freedom Network USA of its constitutional rights, damaging its business relationships nationwide, and causing it irreparable harm.

Two Executive Orders—issued on the President's first two days in office—seek to coerce federal grantees and contractors to accept a worldview in which all DEI ("Diversity, Equity and Inclusion") is illegal and immoral.  The enforcement of these Executive Orders by the Defendants, including the Department of Justice, demonstrates that its interpretation of what is illegal DEI for federal grantees is overbroad, diverges from Congress' intent and is contrary to existing law, leaving the terms unclear and compliance uncertain.  The enforcement of the Executive Orders both unlawfully *silences* and *binds* Freedom Network.  Freedom Network is silenced because it has been ordered to censor words that are central to the lived experiences of trafficking survivors.  Freedom Network is bound because the Executive Orders restrict Freedom Network's ability to effectuate the intent of Congress in funding grant programs through the Trafficking Victims Protection Act ("TVPA"), enacted to fight human trafficking and address the harms caused by this modern-day slavery, for all trafficking victims, regardless of race, gender, or identity.

Under the thinly veiled threat of termination based on Executive Order 14151, entitled "Ending Radical and Wasteful Government DEI Programs and Preferencing," and Executive Order 14173, entitled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity"

(collectively, the "EOs"), the government has subjected Freedom Network to extensive censorship. This censorship includes the government forbidding Freedom Network from using specific words, both as to matters funded through the TVPA and as to matters that are privately funded because those words are claimed to violate the EOs.[1] The list of forbidden words includes some of the same words that Congress used in expressing its intent in the TVPA, including, "discrimination," "race," "sexual orientation," and "gender."[2] The government has also required words like "disabilities," "hearing, and/or vision loss" to be removed from Freedom Network's material as they too apparently violate the EOs. And the government has demanded that the term "oppression" not be used in a presentation by survivor leaders[3] at a conference funded by private monies without once attempting then, or now, to explain why.

Our Constitution does not allow this. Freedom Network, fearful of losing its federal funding, has complied with some of the government's requests. Other times, Freedom Network has refused. In either case, the government's actions violate the Separation of Powers and the Spending Clause because the Executive is placing conditions on spending that Congress did not give the Executive Branch authority to do. Additionally, the government's application of the EOs violates Freedom Network's First Amendment rights. The EOs are viewpoint specific; they

---

[1] *See* DOJ's Office for Victims of Crime List of Forbidden Words, Declaration of Jean Bruggeman, dated December 18, 2025 ("Bruggeman Decl.") ¶ 52 (Ex. 2).

[2] *See* Appendix A.

[3] Survivor leaders are individuals with lived experience of trauma (like human trafficking, abuse, or oppression) who leverage their expertise to drive systemic change, advocate for others, develop trauma-informed policies, and provide crucial insights in fields such as social justice, anti-trafficking, and victim support. *See, e.g.*, U.S. Dep't of State, <u>Survivor Engagement: Promising Practices for Governments</u>, https://2021-2025.state.gov/survivor-engagement-promising-practices-for-governments/ (last visited December 19, 2025).

impose unconstitutional conditions; they are vague and overbroad. And because they are vague, they also violate the Due Process Clause.

Freedom Network is injured not only because the government is trying to control what Freedom Network can and cannot say and whether or not it remains federally funded; but also because Defendants have now created a situation where others fear association with Freedom Network, even as to Freedom Network's privately funded activities.

Congress granted funds to Freedom Network based on its ability to convene stakeholders nationwide, develop survivor-led programing, and adhere to its core mission of building a transformative approach to human trafficking on a national scale that is grounded in anti-racism and anti-oppression. The EOs unconstitutionally censor Freedom Network. They also thwart the intent of Congress in authorizing TVPA grants and trample the Separation of Powers and the Power of the Purse that is reserved for the Legislative Branch.

For these reasons, Freedom Networks requests a preliminary injunction.

## FACTUAL BACKGROUND

### A.   CONGRESS PROVIDED FUNDS THROUGH THE TVPA TO COMBAT THE TRAFFICKING OF DIVERSE GROUPS OF PEOPLE

Congress intended for the TVPA to create a comprehensive U.S. strategy against modern slavery, combating human trafficking by focusing on the "3 Ps": **P**rotecting survivors, **P**rosecuting traffickers, and **P**reventing trafficking. 22 U.S.C. § 7101(a). When enacted, Congress understood that "[t]raffickers primarily target women and girls, who are disproportionately affected by poverty, the lack of access to education, chronic unemployment, discrimination, and the lack of economic opportunities in countries of origin . . . ." 22 U.S.C. § 7101(b)(4). While still true, Congress over time also recognized that women and girls are not the only victims. It expanded the scope of the TVPA to include "men, women, and children who

are *diverse with respect to race, ethnicity, and nationality* . . . ." 22 U.S.C. § 7101 (Supp. V 2018) (emphasis added); *see also* 22 U.S.C. § 7101 (Supp. V 2008); 22 U.S.C. § 7105(b)(2) (Supp V. 2013); 22 U.S.C. § 7105(b)(2)(B)(ii)) (Supp V. 2022).

To effectuate its purpose, Congress "provides grants to nonprofit, nongovernmental victims' service organizations to develop, expand, or strengthen victim service programs for victims of human trafficking." 22 U.S.C. §7101(b)(2)(A). Congress signaled the importance of these grants by designating the funds "to remain available until expended . . . for victims' services programs for victims of trafficking." 22 U.S.C. §§ 7101-114.

B. **FREEDOM NETWORK USA EFFECTUATES CONGRESS'S GOALS IN AUTHORIZING TVPA FUNDS TO NONPROFITS TO PROTECT SURVIVORS, PREVENT TRAFFICKING, AND PROSECUTE TRAFFICKERS**

Freedom Network is the nation's largest anti-trafficking coalition that works to prevent human trafficking and protects trafficking survivors by providing training and technical assistance to thousands of public and private stakeholders as well as direct services to trafficking survivors in at least 48 states. *See* Declaration of Jean Bruggeman, dated December 18, 2025 ("Bruggeman Decl.") ¶¶ 3, 5, 7, 8, 14.

Seventy percent of Freedom Network's funding comes from the federal government through congressionally appropriated TVPA funds. *Id.* ¶¶ 26, 88. Freedom Network's federal grants are administered by DOJ's Office for Victims of Crime and fund three nationwide programs. Freedom Network is the sole provider of these programs. *Id.* ¶¶ 26, 29, 37, 41, 99.

***The Housing Training and Technical Assistance Program Grant.*** The Housing Training and Technical Assistance Program provides training and technical assistance to housing providers that have been awarded grants through Office of Victims of Crime's Housing Grant program. The grant's funding expires on September 30, 2027. *Id.* ¶ 40. Congress appropriated

the funding for this grant in the Consolidated Appropriations, 2023, Public Law 117-328, which provides "$2,416,805,000, to remain available until expended . . . ." Pub. L. No. 117-382, 136 Stat. 4534, 4535 (2022).

Freedom Network received the grant to train housing providers "to implement housing models that provide survivors with 'safe, stable housing and appropriate trauma-informed, victim-centered, and culturally responsive housing policies and practices that prioritize the autonomy and protect survivors' confidentiality and safety." Bruggeman Decl. ¶ 40–41. Freedom Network has routinely used words like "accessibility," "immigration," "culturally competent," "race," "gender," "equity," and "inclusion" in its training materials to address why housing providers must prioritize survivor confidentiality, safety, and autonomy and to communicate the unique needs of survivors. *Id.* ¶¶ 8, 70; *see also id.* ¶¶ 131, 140.

***The Survivor Reentry Project.*** The Survivor Reentry Project provides criminal record relief for trafficking survivors across the country and is funded through September 30, 2026. *Id.* ¶ 12, 14, 32. Congress appropriated the funding for the Survivor Project in the Consolidated Appropriations Act of 2023 which directs "$2,416,805,000 to remain available until expended. . . ." Pub. L. No. 117-328, 136 Stat. 4534, 4535 (2022).

The funding awarded to the Survivor Project is intended to expand the availability and quality of specialized services, such as legal services and criminal record relief. Bruggeman Decl. ¶ 12–13. Freedom Network regularly uses words like "race," "equity," and "discrimination" in their Survivor Project trainings to explain how and why survivors require criminal record relief, and why Black women, due to biases embedded in the criminal justice system, are more likely to have criminal convictions resulting from trafficking despite constituting a smaller percentage of survivors. *Id.* ¶¶ 12, 13, 131; *see also id.* ¶ 140.

***The National Standard of Care Program.***  The Office for Victims of Crime administers the National Standard of Care Program whose purpose is to "promote uniform service standards that will ensure consistent quality of care and reduce potential harm to trafficking survivors . . . [across] a comprehensive array of direct services, including case management, housing, legal, behavioral health, economic empowerment, and other services."[4]  Congress appropriated the funds for this grant in the Consolidated Appropriations, 2022, Public Law 117-103, which provides "for grants, contracts, cooperative agreements, and other assistance authorized by . . . the Victims of Trafficking and Violence Protection Act of 2000 (Public Law 106-386) . . . [in the amount of] $2,213,000,000, to remain available until expended . . . ."  Pub. L. No. 117-103, 136 Stat. 124, 125 (2022).

The Office for Victims of Crime requires Freedom Network to have a technical work group comprised of a "diverse cadre of [survivors] with lived experience" to ensure that the standards of care reflect the needs and lived experiences of survivors of all backgrounds.[5]  The technical working group routinely use words like "race," "culture," "gender," "diversity," "equity," and "inclusion" in developing the standard of care in services for survivors. Bruggeman Decl. ¶ 16, 68; *see also id.* ¶ 38.

***Freedom Network as Subrecipient and Subcontractor.***  Freedom Network is also a subrecipient of a federal grant awarded to the Coalition Against Slavery and Trafficking ("CAST") under the Human Trafficking Training and Assistance Program.  Bruggeman Decl. ¶ 30.  This program provides support to attorneys and social service providers who assist

---

[4] Office for Victims of Crime, https://ovc.ojp.gov/program/human-trafficking/standards-of-care (last visited December 19, 2025).

[5] Office for Victims of Crime, https://ovc.ojp.gov/sites/g/files/xyckuh226/files/media/document/o-ovc-2022-171283.pdf (last visited December 19, 2025).

trafficking survivors with legal needs. CAST subcontracts with Freedom Network to provide the training and technical assistance developed under the purview of Freedom Network's Survivor Project. *Id.* ¶¶ 44–46.

Finally, Freedom Network was a subcontractor to the Inner City Fund on its Technical Assistance Collective awarded by the Office for Victims of Crime. This contract recently expired but was impacted by the EOs while it was active, as set forth below. *Id.* ¶ 31.

Freedom Network also receives non-federal funds through a variety of non-federal sources. *See Id.* ¶¶ 27–28. Freedom Network's privately funded programs include stakeholder-specific training and technical assistance and its flagship annual conference, which generates revenue for Freedom Network. *Id.* ¶¶ 28, 109, 126.

## C. EXECUTIVE ORDER 14151 AND EXECUTIVE ORDER 14173 DECLARE THE END OF ALL DEI.

On January 20, 2025, President Trump signed Executive Order 14151 ("J20 EO") declaring programs promoting diversity, equity, and inclusion "illegal and immoral discrimination." J20 EO § 1. Freedom Network seeks a preliminary injunction as to Section 2(b)(i) of the J20 EO ("Termination Provision"), which instructs the Director of the Office of Management and Budget and heads of agencies to terminate all "equity-related grants and contracts."

On January 21, 2025, President Trump signed Executive Order 14173 ("J21 EO", and together with the J20 EO, the "EOs"). The J21 EO declares programs supporting diversity, equity, and inclusion "dangerous, demeaning and immoral." J21 EO § 1. Like the J20 EO, the J21 EO does not define "DEI," "DEIA," "diversity," "equity," "equity-related," "inclusion," or "accessibility. Freedom Network seeks a preliminary injunction as to Section 3(b)(iv) ("Certification Provision"), which requires a certification that Freedom Network does not operate

any programs promoting DEI because it orders all executive agencies to "include in every contract or grant award" a certification, enforceable through the False Claims Act ["FCA"], that the contractor and grantee "does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." Additionally, Freedom Network seeks a preliminary injunction as to Section 3(c)(iii) of the J21 EO ("J21 Termination Provision), which orders the OMB Director, with the assistance of the Attorney General, to "[t]erminate all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities, as appropriate."

Freedom Network also challenges any other provision of the EOs that the government asserts justifies its actions alleged in the Complaint.

### D.   THE GOVERNMENT TARGETS WHAT IT CLAIMS IS DEI

On February 5, 2025, the DOJ announced that pursuant to the J21 EO, *all* DEI and DEIA is illegal and that "'diversity, equity, and inclusion' ('DEI') and 'diversity, equity, inclusion, and accessibility' ('DEIA') violate the text and spirit of our longstanding Federal civil-rights laws." Mem. from Att'y Gen. Pam Bondi, *Ending Illegal DEI and DEIA Discrimination and Preferences* 1 (Feb. 5, 2025) [available at https://perma.cc/KH9Y-A2VQ] ("February 5 Memo"). The February 5 Memo states that DOJ "will investigate, eliminate, and penalize illegal DEI and DEIA preferences, mandates, policies, programs, and activities in the private sector and in educational institutions that receive federal funds," but fails to define "DEI" or DEIA. *Id*.

On May 19, DOJ issued a second memorandum designating "DEI programs that assign benefits or burdens [based] on race, ethnicity, or national origin" as unlawful, but DOJ still failed to define DEI or "illegal DEI." Mem. from Todd Blanche, Deputy Att'y Gen., to DOJ Offices,

Divisions, and U.S. Attorneys, *Civil Rights Fraud Initiative* 1 (May 19, 2025) [available at https://perma.cc/3W6K-FGHA] (the "May 19 Memo").

On July 29, the DOJ issued a third memorandum asserting that "the application of federal antidiscrimination laws to programs or initiatives that may involve discriminatory practices, including those labeled as Diversity, Equity, and Inclusion ('DEI') programs" without defining DEI.  It also explicitly states that "recipients of federal funds should ensure federal funds do not support third-party programs that discriminate" while designating the term "cultural competence" as an example of "unlawful proxy discrimination."  Mem. From Att'y Gen. Pam Bondi, *Guidance for Receipts of Federal Funding Regarding Unlawful Discrimination* 2 (July 29, 2025) [available at https://www.justice.gov/ag/media/1409486/dl (last visited Dec. 19, 2025)] (the "July 29 Memo").

### E.     THE GOVERNMENT CENSORS AND INTERFERES WITH FREEDOM NETWORK'S FEDERALLY FUNDED WORK

The government's implementation of EOs has significantly constrained Freedom Network's ability to fulfill the goals of its federal grants.  For example, the July 29 Memo designates "cultural competence" as an example of unlawful discrimination if used as a proxy; however, "cultural competency" is an outright requirement in the notice of funding opportunities, scope of approved work, and award letter for each of Freedom Network's three federal grants. Bruggeman Decl. ¶¶ 62, 86.

On January 31, 2025, an Inner City Fund subcontractor sent to Freedom Network a list of 50 words that "cannot appear on Office for Victims of Crime materials" due to the EOs.  *Id.* ¶¶ 52–53 (Ex. 2).

On February 19, 2025, the Office for Victims of Crime demanded that any reference to pronouns be deleted in a Survivor Project training. The Office for Victims of Crime's response to

Freedom Network's request for clarification was that "[they] do not have any additional guidance to share at this time." *Id.* ¶ 63 (Ex. 8). It had never previously made such a request prior to the EOs. *Id.* ¶ 63.

On February 21, 2025, on a call with Inner City Fund and Freedom Network, the Office of Justice Programs stated that subcontractors must be cautious of specific terminology used in light of the EOs. *Id.* ¶ 56.

On February 27, 2025, CAST informed Freedom Network that the Office for Victims of Crime directed CAST to remove specific training and technical assistance materials from their website that were produced through any federal funding (both past and current grants). The Office for Victims of Crime told CAST that the materials were not in compliance with the EOs because they mentioned race, equity, DEIA, and restorative justice. *Id.* ¶ 57.

On March 6, 2025, the Office for Justice Programs formally paused the Inner City Fund's Catalyst training series due to the EOs. The goal of the series was to provide all Office for Victims of Crime grantees training on having a trauma-informed, victim centered approach to working with victims of crime. *Id.* ¶ 58.

On March 7, 2025, the Office of Justice Programs sent a mass email to its grantees stating that grantees could not use previously approved public-facing materials until the Office of Justice Programs reviewed and approved the material to ensure alignment with the EOs. When Freedom Network asked how its public-facing materials did not align, it received no response. *Id.* ¶ 59–60.

On April 17, 2025, the Office for Victims of Crime sent an email to Freedom Network's staff demanding to review and approve the list of attendees, the goals of the summit, the questions for group discussions, and the precise language for the invitation and save the date for

an upcoming Housing Summit in Minneapolis, Minnesota scheduled for May 29, 2025. *Id.* ¶ 71. The Office for Victims of Crime had never made such a request. *Id.* ¶ 71. The Office for Victims of Crime told Freedom Network by phone that it was reviewing these materials to ensure that Freedom Network was protected in light of the EOs. *Id.* ¶ 73. The Office for Victims of Crime also conveyed that immigration and "DEI- related" topics "could not be entertained" due to the EOs. The Office for Victims of Crime did not explain what it meant by "DEI-related" topics. *Id.* ¶ 74.

On April 18, 2025, the Office for Victims of Crime directed Freedom Network to delete terms from a Housing Training and Technical Assistance assessment form pursuant to the EOs. The Office for Victims of Crime ordered Freedom Network to delete sections of the form that used the following terms: "ethnic groups," "disabilities," "hearing, and/or vision loss," and "cultural responsiveness." These words help Freedom Network assess if a housing provider's policies and procedures are reaching all survivors that come to their door seeking shelter, regardless of their race, gender, and identity. *Id.* ¶ 70.

On June 11, 2025, Freedom Network tried to confirm by phone with the Office for Victims of Crime if equity-oriented language (like diversity, equity, inclusion, and accessibility) used in the final National Standards of Care Project product would need to change to comply with the EOs. The Office for Victims of Crime said that it could not provide any guidance. *Id.* ¶ 69.

On, June 23, 2025, Freedom Network discussed with the Office for Victims of Crime that its housing grantees requested a webinar on housing for immigrant survivors, which would require discussing the topics of race and gender equity. The Office for Victims of Crime stated this was not possible because of the political climate and the EOs. *Id.* ¶ 75.

On July 10, 2025, CAST asked the Office of Victims of Crime why the Survivor Project training for the Freedom Network conference was denied for failing to comply with the EOs when a similar Survivor Project training for a different conference had been approved. Both Survivor Project trainings were under the same CAST-Freedom Network subcontract, were reviewed by the same grant administrator, and used the same equity-focused content and terminology. *Id.* ¶ 64. The Office for Victims of Crime said that it permitted the second Survivor Project training because it would be facilitated by a presenter who would not discuss pronouns or diverse identities. The Office for Victims of Crime also said that they did not want CAST to put anything in writing. *Id.* ¶ 65.

On December 3, 2025, OVC officially denied approval for the November 2025 and Fall 2026 topics for the Peer Learning Community, which were on "Policy Shifts Impacting Housing Services," and "Immigration & Housing-know your rights." Both topics required an overview of recent policy changes impacting the work of Office of Victims of Crime Housing Grantees, including the EOs. The Office for Victims of Crime noted that "[a]ny future topics will need to be discussed and approved before any planning or engagement occurs." *Id.* ¶ 77 (Ex. 12).

On December 4, 2025, Freedom Network asked why the topics had been denied and the Office for Victims of Crime stated that that they would follow up with leadership for an answer but also that "priorities change with each administration." *Id.* ¶ 78.

## F. THE GOVERNMENT HAS APPLIED THE EOS TO INTERFERE WITH AND CONSTRAIN FREEDOM NETWORK'S PRIVATELY FUNDED WORK

Freedom Network's National Annual Anti-Trafficking Conference is one of the largest anti-trafficking conferences in the country and is funded through exhibitor fees, registration fees paid by the participants, and private sponsorship. The conference is open to the public, with a significant number of participants attending through support from non-federal dollars. *Id.* ¶ 109.

12

The 2025 conference "Sharing Power: Building Inclusive Communities" was held virtually from Washington D.C. on March 26-27, 2025. The conference was meant to lift the voices of subject matter experts, survivor leaders, and to elevate evidence-based approaches tailored to the unique needs of survivors with diverse identities, experiences, and challenges. Topics discussed included best practices for case management, legal updates in immigration anti-trafficking laws, the fundamentals of non-immigrant status, identifying male survivors in labor trafficking, and centering equity in trauma informed anti-trafficking work. *Id.* ¶ 110.

On February 25, 2025, the Office for Victims of Crime ordered CAST and Freedom Network to censor a survivor-led presentation regarding the Survivor Project at the conference. The Office for Victims of Crime demanded that the terms "colonial systems" and "oppression" be removed, and the term "restorative justice" be replaced with "alternative programming," to ensure that the presentation did not run afoul of the EOs. *Id.* ¶ 111 (Ex. 13). When asked for further clarification on how the terms might conflict with the EOs, the Office for Victims of Crime informed Freedom Network that "in the absence of Office for Victims of Crime leadership and clear direction, we've been told to ensure these items fall within the scope." *Id.* (Ex. 13).

The Office for Victims of Crime also required CAST and Freedom Network to guarantee that the presentation speakers (who were survivor leaders) would "stick to the notes and not answer questions that might fall out of line with the Executive Orders." *Id.* ¶ 112 (Ex. 13). Freedom Network refused to comply with this order because the survivor leaders were either former clients of the Survivor Project or had been entangled in the criminal legal system because of their trafficking experiences. Controlling their speech would compromise their autonomy and mimic the dynamics of power and control of a trafficker. *Id.* ¶113.

13

Because Freedom Network would not silence the survivor leaders, the Office for Victims of Crime "determined the best course of action at this time is to withdraw the [Survivor Project] presentation from Freedom Network's conference." *Id.* ¶ 113 (Ex. 14). Although Freedom Network repeated these concerns to the Office for Victims of Crime in a phone conversation on March 23, 2025 (two days before the Conference), the Office for Victims of Crime refused to change its position. *Id.* ¶ 115.

Beginning as early as January 21, 2025, several stakeholders who had already paid the full conference fee informed Freedom Network that they could no longer attend the conference for fear of being associated with Freedom Network's equity-driven mission and having their federal funding terminated under the EOs. Freedom Network reimbursed the full conference fee to any stakeholder that paid in full but could not attend. *Id.* ¶ 121.

Several conference attendees relayed that their federal funders (such as DOJ, Department of Homeland Security, and Health and Human Services) discouraged or outright disapproved their attendance at the conference because the term "inclusion" was in the title and could target their federal funding for scrutiny under the EOs. *Id.* ¶ 122. Several attendees also relayed that their private funders discouraged them from attending the conference for fear that the organizations with whom they were affiliated could have their federal funding targeted under the purview of the EOs. Others did not attend because they were required to report all trainings and conferences attended to both the Office for Victims of Crime and private funders and feared that being associated with an equity-driven conference would derail opportunities for future funding. *Id.* This conference had the lowest attendance in Freedom Network's recent history and generated less than half of the revenue of past conferences. *Id.* ¶¶ 124, 126.

The EOs have also already negatively impacted Freedom Network's 2026 National Annual Anti-Trafficking Conference, titled "We Keep Us Safe: Collective Action in a Resilient Anti-Trafficking Movement." The 2026 National Conference is being designed to strengthen the knowledge and skills of professionals working in the anti-trafficking field and adjacent sectors by highlighting promising practices and emerging trends. Topics will include the fundamentals of legal services, screening for forced criminality and immigration relief under T Visa, promising practices for housing survivors, trauma-informed service delivery for anti-trafficking programs, youth labor exploitation, confidentiality and ethical service provision, and approaches to centering equity in meeting survivor needs. *Id.* ¶ 127. Potential attendees who receive grants under the TVPA have already voiced concerns to Freedom Network about attending the conference. And the Office for Victims of Crime has informed its grantees that they will need to obtain formal approval from the Office for Victims of Crime to attend the conference, which Freedom Network and the grantees anticipate will be denied based on the EOs. *Id.* ¶ 128.

Finally, two board members, based in Florida and Virginia, whose employers rely on federal funding, resigned from Freedom Network's board of directors because they believed their association with Freedom Network placed their employers' federal funding at risk. *Id.* ¶¶ 90, 95. And two subcontractors terminated their subcontracts because Freedom Network resisted the government's censorship. *Id.* ¶ 95.

### LEGAL STANDARD AND STANDING

To obtain a preliminary injunction, Freedom Network must establish standing and demonstrate that (1) it is likely to succeed on the merits, (2) it will be irreparably harmed absent an injunction, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. *Bevis v. City of Naperville*, 85 F.4th 1175, 1188 (7th Cir. 2023). This Court and others have already concluded that preliminary injunctions are warranted in challenges to the EOs. *See*

15

*Chicago Women in Trades v. Trump*, 778 F. Supp. 3d 959 (N.D. Ill. 2025) ("*CWIT*"); *San Francisco A.I.D.S. Found. v. Trump*, 786 F. Supp. 3d 1184 (N.D. Cal. 2025) ("*SFAF*"); *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d 243 (D. Md. 2025) ("*NADOHE*").[6] As explained below, an injunction is warranted in this case as well.

Freedom Network has standing to challenge the Termination and Certification Provisions of the EOs. To establish standing, a plaintiff must show that (1) it has "suffered a concrete and particularized injury that is either actual or imminent," (2) "the injury is fairly traceable to the defendant," and (3) "it is likely that a favorable decision will redress that injury." *Mass v. EPA*, 549 U.S. 497, 517 (2007).

Freedom Network has demonstrated a particularized injury because the government has enforced the EOs specifically as to Freedom Network. Moreover, the threat that any association with Freedom Network may cause the government to terminate federal funds of other organizations causes injury to Freedom Network. That is enough for standing. *Susan B. Anthony List v. Driehaus,* 573 U.S. 149, 158 (2014); *Brown v. Kemp*, 86 F.4th 745, 761 (7th Cir. 2023); *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020); *CWIT*, 778 F. Supp. 3d at 979; *SFAF*, 786 F. Supp. 3d at 1211; *NADOHE*, 767 F. Supp. 3d at 269-70; *Nat'l Urb. League v. Trump*, 783 F. Supp. 3d 61, 84–85 (D.D.C. 2025).

## ARGUMENT

### I. THE EXECUTIVE ORDERS VIOLATE SEPARATION OF POWERS AND THE SPENDING CLAUSE

The Constitution commits the spending power to Congress, not the President. *See* U.S. Const. Art. I, sec. 9, cl. 7 (Appropriations Clause); U.S. Const. Art. I, sec. 8, cl. 1 (Spending Clause). Congress's authority under the Spending Clause is broad and cannot be usurped by the

---

[6] Appeals are pending as to each of these cases.

President via executive action by unilaterally placing conditions on grants. *See, e.g.*, *City of Chi. v. Sessions*, 888 F.3d 272, 283 (7th Cir. 2018). The EOs violate these bedrock constitutional principles.

Congress provided for Freedom Network's grants under the TVPA. Congress imposed the conditions that accompany those grants. None of those conditions prohibit "DEI"-related topics, the promotion of "DEI," or 50 specific words considered to be "DEI." To the contrary, Congress itself used many of the words now forbidden by the Executive Branch in the statutory language and legislative history of the TVPA.[7] Indeed, under the meaning and scope of the EOs attributed by the government, Freedom Network would be prohibited from providing training materials on the TVPA's nondiscrimination provisions, because such training would necessarily include the used of words like "discrimination," "gender identity," and "race"—words that Congress not only used, but that describe mandates under the TVPA. Nor did Congress delegate to the Executive its legislative authority to add or change the conditions attendant to TVPA grants. And yet, that is exactly what the EOs have done. *See* Factual Background §§ E, F.

As such, the EOs are unconstitutional because they exceed the authority granted to the Executive Branch. *See, e.g., City of Chic. v. Barr*, 961 F.3d 882, 931 (7th Cir. 2020) (affirming grant of preliminary injunction); *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1233 (9th Cir. 2018) (same); *CWIT*, 778 F. Supp. 3d at 990; *City of Chi. v. Noem*, No. 25-cv-12765, 2025 WL 3251222 (N.D. Ill. Nov. 21, 2025) (granting preliminary injunction as to the EOs at issue in this case); *Martin Luther King, Jr. Cnty v. Turner*, 785 F. Supp. 3d 863, 885-88 (W.D. Wash. 2025) (granting preliminary injunction); *SFAF*, 786 F. Supp. 3d at 1229–30 (same); *PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405, 432-41 (D. Md. 2025) (same)*; see also In re Aiken*

---

[7] See Appendix A.

*County*, 725 F.3d 255, 259 (D.C. Cir. 2013); *CWIT*, 778 F. Supp. 3d at 979 ("To abide by

separation of powers, the Executive Branch must respect congressional appropriations; it lacks

the authority to condition the payment of grants on its political priorities, except when Congress

has delegated such authority.").

## II.     THE EXECUTIVE ORDERS VIOLATE THE FIRST AMENDMENT

### A.     THE EXECUTIVE ORDERS ARE OVERBROAD

The EOs are unconstitutionally overbroad.  "Vague rules are overbroad because their

scope is uncertain and . . . they tend to produce large chilling effects." *Kemp*, 86 F.4th at 771; *see

also Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 871-72 (1997).  Demonstrably, the EOs

"fail[] to provide people of ordinary intelligence a reasonable opportunity to understand what

conduct [they] prohibit."  *Kemp,* 86 F.4th at 772.  Demonstrably, "they "authorize[s] . . . arbitrary

and discriminatory enforcement." *Id.*

The government has made no attempt to define what is or is not prohibited by the EOs.

The government has informed Freedom Network that it could not include "DEI- related" topics

at a housing summit, but it did not explain what that means.  It censored and prohibited the use

of words one uses in everyday conversation but has made no attempt to explain how these

everyday words run afoul of the EOs.  It has prohibited the use of pronouns without explanation.

It has censored and prohibited survivor leaders from using their own words at privately funded

conferences while demanding they stick to an Executive Branch-approved script and not answer

questions in a way that might "fall out of line with the Executive Orders."  When asked for an

explanation, the government responded that it did not have any additional guidance to share at

this time.  *See* Factual Background §§ E, F.

As for whether the EOs authorize arbitrary and discriminatory enforcement, that is

demonstrated most plainly by the two identical presentations—one approved, the other not

approved. The only difference appears to be a promise by one presenter not to discuss pronouns. *See* Factual Background § E.

### B. THE GOVERNMENT IS REGULATING PRIVATE SPEECH

The government's actions also infringe Freedom Network's First Amendment rights because the government is regulating speech that is not funded by federal dollars. This is true as to both Termination Provisions and the Certification Provision.

The government is using the Termination Provisions to control the content and character of Freedom Network's privately funded activity. The Certification Provision is not limited to federally funded conduct. *See CWIT*, 778 F. Supp. 3d at 984 (noting the government's concession that the "Certification Provision attempts to regulate grantees' speech outside of their federally-funded programs").

Whatever latitude afforded the government with respect to federally funded programs, the government may not regulate or seek to influence speech outside the government funded program. *See, e.g., Agency for Int'l Dev. v. All for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 217 (2013) (herein "*AIDS*"); *CWIT*, 778 F. Supp. 3d at 983. "[L]everag[ing] funding to regulate speech outside of the contours of the federal program itself" is a violation of the First Amendment. *AIDS*, 570 U.S. at 206.

### C. THE EXECUTIVE ORDERS REGULATE ONLY CERTAIN VIEWPOINTS

The EOs infringe on the First Amendment because they discriminate on the basis of viewpoint—both as to federally funded speech and private speech. They prohibit promoting or encouraging diversity, equity, or inclusion.

As to Freedom Network's privately funded programming, "[i]n the realm of private speech or expression, government regulation may not favor one speaker over another."

*Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995); *see also Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175 187 (2024) (noting that "[a]t the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society"). Yet that is the effect of the EOs because Freedom Network is unable to convene stakeholders, present at conferences, or publish material that the Executive Branch considers pro-DEI or somehow violative of the EOs without fear of being accused of violating the EOs.

As for the federally funded programming, "even in the provision of subsidies, the government may not 'ai[m] at the suppression of dangerous ideas.'" *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998) (quoting *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 550 (1983)); *see also Koala v. Khosla*, 931 F.3d 887, 898 (9th Cir. 2019) (analyzing case law). Other courts have found that grant terminations pursuant to the EOs constituted viewpoint discrimination. *See, e.g.*, *Thakur v. Trump*, 148 F.4th 1096, 1108 (9th Cir. 2025) (finding that "DEI [and] DEIA ... are not merely neutral topics" and "convey the viewpoint that the exclusion of historically disadvantaged groups is undesirable," in violation of the "bedrock principle" that the government cannot "leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints"). The EOs make clear that the government now views diversity, equity and inclusion as "illegal and immoral,"[8] but it may not suppress those views merely because it fears or disfavors them.

### D. THE CERTIFICATION PROVISION CURTAILS ADVOCACY

As this Court has already concluded, the Certification Provision also violates the First Amendment because it prohibits advocacy. "The J21 Order's reference to 'programs promoting

---

[8] J20 EO §1; J21 EO § 1.

DEI,' [ ] is fairly read as an *express* reference to First Amendment-protected speech and advocacy. Even if the Certification Provision is limited to promoting whatever the government may now contend is 'illegal DEI,' it is a bedrock First Amendment principle that advocating for violation of the law cannot be proscribed unless it rises to incitement." *CWIT*, 778 F. Supp. 3d at 984 (quoting *Virginia v. Black*, 538 U.S. 343, 359 (2003)).

## III.   THE EXECUTIVE ORDERS VIOLATE THE FIFTH AMENDMENT BECAUSE THEY ARE UNCONSTITUTIONALLY VAGUE

The EOs violate the Due Process Clause because they are vague. They do not let Freedom Network "know what is required of them so they may act accordingly." *F.C.C. v. Fox Television*, 567 U.S. 239, 253 (2012); *see also Gresham v. Peterson*, 225 F.3d 899, 907 (7th Cir. 2000) (The void-for-vagueness doctrine forbids the enforcement of a law that contains "terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application."). To state it another way, the "indeterminacy of precisely" what falls within the ambit of the EOs renders them unconstitutionally vague. *United States v. Williams*, 553 U.S. 285, 306 (2008). As demonstrated by the government's actions, the EOs' vagueness allows for "arbitrary and discriminatory enforcement." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972); *see also Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 478–79 (7th Cir. 2012).

## IV.   FREEDOM NETWORK WILL BE IRREPARABLY HARMED ABSENT RELIEF

"When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Ezell v. City of Chi.*, 651 F.3d 684, 699 (7th Cir. 2011) (citation omitted). This is especially true when First Amendment rights are at issue. *See Int'l Ass'n of Fire Fighters, Loc. 365 v. City of E. Chi.*, 56 F.4th 437, 450-51 (7th Cir. 2022) (Under Seventh Circuit law, irreparable harm is presumed in First Amendment cases.).

Freedom Network has shown that it is likely to succeed on its First Amendment and other constitutional claims and therefore has demonstrated irreparable harm.

In addition, both the threat of grant termination and the possibility of having to certify that it is not promoting DEI have injured Freedom Network. The government has censored Freedom Network's speech, dictating the disfavored words Freedom Network cannot use, even though those very same words were used by Congress in enacting the statute pursuant to which the grant money was appropriated. It has also chilled Freedom Network's speech in that Freedom Network works in a state of fear and uncertainty as to what will or will not be considered a violation of the EOs. It has hampered Freedom Network's obligation to carry out the purpose of Congressional grants. The EOs have negatively impacted Freedom Network's work from coast to coast. *See* Factual Background §§ D, E, F.

Finally, were the grants terminated, there would be an even deeper injury nationwide. Freedom Network could not continue the three federally funded programs, which are nationwide in their scope, leaving hundreds of trafficking survivors without legal assistance, means of obtaining housing, or access to the services afforded by the TVPA. Given that Freedom Network is in all these instances the largest—and often only—provider of this assistance, survivors will be left with none of the benefits intended for their benefit by Congress. *See* Factual Background §§ D, E, F.

## V. THE BALANCE OF HARMS AND THE PUBLIC INTEREST WEIGH IN FAVOR OF AN INJUNCTION

The final two injunction factors (the balance of equities and whether an injunction is in the public interest) merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "[I]njunctions protecting First Amendment freedoms are always in the public interest." *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 590 (7th Cir. 2012) (citation omitted). The "same

may be said of injunctions protecting the separation of powers." *CWIT*, 778 F. Supp. 3d at 993

(citing *City of Chic. v. Barr*, 961 F.3d 882, 918 (7th Cir. 2020)).  Accordingly, the balance of

harms and public interest factors support an injunction.

## VI.    FREEDOM NETWORK IS ENTITLED TO COMPLETE RELIEF AS TO THE CERTIFICATION AND TERMINATION PROVISIONS

The basic nature of Freedom Network's work requires it to convene stakeholders and

receive referrals from a wide range of stakeholders representing different fields and agencies,

such housing providers, law enforcement agencies, social service agencies, and many grantees

funded by other Executive Branch departments. *See*, Bruggeman Decl. ¶¶ 8, 22, 23, 132–134,

137.  Stakeholders receiving federal funds are required to report activities and attendance to

events to their federal grant managers (including at agencies beyond DOJ).  *Id.* ¶ 133.  Freedom

Network's ability to convene stakeholders will remain severely limited if relief is afforded only

to Freedom Network because stakeholders will still fear implicating the EOs by associating with

Freedom Network.  The common thread between the historically low attendance at Freedom

Network's 2025 National Annual Anti-Trafficking Conference, the abrupt departure of some of

its board members, and the termination of certain subcontracts is the concern that associating

with Freedom Network would jeopardize the federal funding of other organizations.  *See* Factual

Background §§ E, F.

This Court has already concluded that a nationwide injunction as to the Certification

Provision is necessary to provide complete relief to a federal grantee in order to protect its ability

to collaborate with other grantees and contractors.  *CWIT*, 778 F. Supp. 3d at 994-96; *Chicago

Women in Trades v. Trump*, No. 25-cv-2005, 2025 WL 3034056 (N.D. Ill. Oct. 30, 2025).  The

facts here similarly justify nationwide relief: entities and persons across the country have

indicated that they fear continued association and collaboration with Freedom Network as a result of the EOs.  *See* Factual Background §§ E, F.

Nationwide relief is also warranted to enjoin Defendants from enforcing the Termination Provisions against TVPA grants and contracts.  The government has used the EOs and their threat to inhibit attendance at Freedom Network's privately funded annual conference.  Those who had already paid for the conference fee withdrew because they did not want to be associated with Freedom Network and thereby risk the termination of grants under the EOs.  Several were discouraged by their federal and private funders from attending because Freedom Network used the word "inclusion."  *See* Factual Background §§ F, G

What this Court feared would happen were the Certification Provision not enjoined nationally is exactly what is happening to Freedom Network by way of the Termination Provision as well.  The Executive Branch is leveraging its claimed authority over TVPA funds to suppress Freedom Network's First Amendment rights to carry out its mission, consistent with the congressional intent of the TVPA.  Factual Background §§ F, G.  In addition to suffering a deprivation of its constitutional rights, Freedom Network has suffered financially.

And not to lose sight of the purpose of the TVPA and the grants Congress authorized, survivors across the country have and will bear the costs of being stuck in a vicious cycle of vulnerability, exploitation, and trafficking if Freedom Network's work cannot reflect the voices and lived experiences of survivors.  To obtain full and complete relief for Freedom Network, a nationwide injunction is appropriate.  *Trump v. CASA, Inc.*, 606 U.S. 831 (2025); *CWIT*, 778 F. Supp. 3d at 994-96; *CWIT*, 2025 WL 3034056, at *2–3.

## CONCLUSION

For the foregoing reasons, Freedom Network respectfully requests that the Court grant its motion for a preliminary injunction.

Dated: December 19, 2025                    Respectfully Submitted,

/s/ *Jason P. Stiehl*                        /s/ *Anuj Vohra*
Jason P. Stiehl                              Anuj Vohra
CROWELL & MORING LLP                         Keith J. Harrison*
455 N Cityfront Plaza Dr.                    CROWELL & MORING LLP
Suite 3600                                   1001 Pennsylvania Avenue, NW
Chicago IL 60611                             Washington, DC 20004
Tel: (312) 840-3108                          Tel: (202) 624-2500
jstiehl@crowell.com                          avohra@crowell.com
                                             kharrison@crowell.com

/s/ *Warrington Parker*                      s/ *Sabrina A. Talukder*
Warrington Parker*                           Sabrina A. Talukder*
CROWELL & MORING LLP                         Kathryn J. Youker*
3 Embarcadero Center, 26th Floor             Lawyers' Committee for Civil Rights Under
San Francisco, CA 94111                      Law
Tel: (415) 986-2800                          1500 K Street, N.W. Suite 900
wparker@crowell.com                          Washington, D.C. 20005
                                             Telephone: (202) 662-8600
/s/ *Rachel Stevens*                         stalukder@lawyerscommittee.org
Rachel Stevens*                              kyouker@lawyerscommittee.org
CROWELL & MORING LLP
Two Manhattan West
375 Ninth Avenue                             Aneel L. Chablani (No. 6242658)
New York, NY 10001                           Ami D. Gandhi (No. 6282924)
Tel: (212) 590-5430                          Chicago Lawyers' Committee for Civil Rights
rstevens@crowell.com                         25 E. Washington St., Ste. 1300
                                             Chicago, IL 60602
                                             Telephone: (312) 630-9744
                                             achablani@clccrul.org
                                             agandhi@clccrul.org

                                             *Attorneys for Freedom Network USA*
                                             *Admitted Pro Hac Vice*