**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| FREEDOM NETWORK USA,<br><br>     Plaintiff,<br><br>v.<br><br>PRESIDENT DONALD J. TRUMP, OFFICE OF MANAGEMENT AND BUDGET, DIRECTOR OF THE OFFICE OF MANAGEMENT AND BUDGET RUSSELL VOUGHT, U.S. DEPARTMENT OF JUSTICE, OFFICE OF JUSTICE PROGRAMS, OFFICE FOR VICTIMS OF CRIME, ATTORNEY GENERAL OF THE U.S. DEPARTMENT OF JUSTICE PAMELA BONDI,<br><br>     Defendants. | Case No. 1:25-cv-12419<br><br>Judge: Hon. Matthew F. Kennelly<br><br>JURY TRIAL DEMANDED |

<u>**AMENDED MOTION FOR PRELIMINARY INJUNCTION**</u>

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ....................................................................................................................1

FACTUAL BACKGROUND ...................................................................................................3

I.    CONGRESS PROVIDED FUNDS THROUGH THE TVPA TO COMBAT
      THE TRAFFICKING OF DIVERSE GROUPS OF PEOPLE.........................................3

II.   FREEDOM NETWORK'S TVPA GRANT FUNDING EFFECTUATES
      CONGRESS'S GOALS...................................................................................................4

III.  EXECUTIVE ORDER 14151 AND EXECUTIVE ORDER 14173
      DECLARE THE END OF ALL DEI ...............................................................................6

IV.   THE GOVERNMENT'S TARGETING OF "DEI" .........................................................7

V.    THE GOVERNMENT CENSORS AND UNDERMINES FREEDOM
      NETWORK'S FEDERALLY AND PRIVATELY FUNDED WORK.............................8

VI.   OVC UNILATERALLY ISSUES UNAUTHORIZED NEW FUNDING
      CONDITIONS FOR TVPA GRANTS.............................................................................9

VII.  THE HARM TO FREEDOM NETWORK ....................................................................11

LEGAL STANDARD AND STANDING.................................................................................12

ARGUMENT...........................................................................................................................14

I.    FREEDOM NETWORK IS LIKELY TO SUCCEED ON THE MERITS
      OF ITS CHALLENGE ..................................................................................................14

      A.    THE EOS AND NEW FUNDING CONDITIONS VIOLATE THE
            SEPARATION OF POWERS AND THE SPENDING CLAUSE ....................14

      B.    THE NEW FUNDING CONDITIONS VIOLATE THE
            ADMINISTRATIVE PROCEDURE ACT.......................................................15

      C.    THE EOS AND NEW FUNDING CONDITIONS VIOLATE THE
            FIRST AMENDMENT ...................................................................................16

            1.    THEY ARE OVERBROAD…………………………………………16

2.      THE EOS AND NEW FUNDING CONDITIONS REGULATE VIEWPOINTS**……………………………………………………**17

3.      THE J21 CERTIFICATION PROVISION AND NOFO CERTIFICATION PROVISION REGULATE PRIVATE SPEECH…18

4.      THE J21 CERTIFICATION PROVISION AND NOFO CERTIFICATION PROVISION CURTAIL ADVOCACY………….18

D.      THE EOS AND NEW FUNDING CONDITIONS VIOLATE THE FIFTH AMENDMENT BECAUSE THEY ARE UNCONSTITUTIONALLY VAGUE ............................................................19

II.      FREEDOM NETWORK WILL BE IRREPARABLY HARMED ABSENT RELIEF ....................................................................................................................19

III.      THE BALANCE OF HARMS AND THE PUBLIC INTEREST WEIGH IN FAVOR OF AN INJUNCTION ...................................................................20

IV.      FREEDOM NETWORK IS ENTITLED TO COMPLETE RELIEF AS TO EXECUTIVE ORDERS AND THE NEW FUNDING CONDITIONS........................21

CONCLUSION......................................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*ACLU of Ill. v. Alvarez*,
679 F.3d 583 (7th Cir. 2012) .................................................................20

*Agency for Int'l Dev. v. All for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013)...................................................................................18

*Am. Hosp. Ass'n v. Kennedy*,
No. 2:25-CV-00600-LEW, 2025 WL 3754193 (D. Me. Dec. 29, 2025)................................22

*Bevis v. City of Naperville*,
85 F.4th 1175 (7th Cir. 2023) ...........................................................13

*Brown v. Kemp*,
86 F.4th 745 (7th Cir. 2023) ......................................................13, 16

*California v. U.S. Dep't of Transp.*,
788 F. Supp. 3d 316 (D.R.I. 2025)..........................................................16

*Career Colleges & Schs. of Texas v. United States Dep't of Educ.*,
98 F.4th 220 (5th Cir. 2024), *cert. granted in part sub nom. Dep't of Educ. v.
Career Colleges & Schs. of Texas*, 145 S. Ct. 1039 (2025)....................................22

*Chicago Women in Trades v. Trump*,
25 C 2005, 2025 WL 3034056 (N.D. Ill. Oct. 30, 2025)..................................21, 23

*Chicago Women in Trades v. Trump*,
778 F. Supp. 3d 959 (N.D. Ill. 2025) ............................................. *passim*

*City of Arlington v. FCC*,
569 U.S. 290 (2013)......................................................................15

*City of Chicago v. Barr*,
961 F.3d 882 (7th Cir. 2020) ............................................................15

*City of Chicago v. Dept. of Justice*,
No. 25 C 13863, 2026 WL 114294 (N.D. Ill. Jan. 15, 2026) ..............................13, 15, 16, 20

*City of Chicago v. Noem*,
25 CV 12765, 2025 WL 3251222 (N.D. Ill. Nov. 21, 2025)......................................15, 16, 20

*City of Chicago v. Sessions*,
888 F.3d 272 (7th Cir. 2018) ...........................................................14

*City of Seattle v. Trump,*
   No. 2:25-cv-01435-BJR, 2025 WL 3041905 (W.D. Wash. Oct. 31, 2025) ...........................13

*Cnty. of Santa Clara v. Noem,*
   25-cv-08330-WHO, 2025 WL 3251660 (N.D. Cal. Nov. 21, 2025) ....................15, 16, 19, 20

*Ctr. for Individual Freedom v. Madigan,*
   697 F.3d 464 (7th Cir. 2012) ................................................................................................19

*Encino Motorcars, LLC v. Navarro,*
   579 U.S. 211 (2016).............................................................................................................16

*Ezell v. City of Chicago,*
   651 F.3d 684 (7th Cir. 2011) ................................................................................................19

*FCC v. Fox Television,*
   567 U.S. 239 (2012).............................................................................................................19

*Grayned v. City of Rockford,*
   408 U.S. 104 (1972).............................................................................................................19

*Gresham v. Peterson,*
   225 F.3d 899 (7th Cir. 2000) ................................................................................................19

*Housing Auth. of the City & Cnty. of S.F. v. Turner,*
   25-cv-08859-JST, 2025 WL 3187761 (N.D. Cal. Nov. 14, 2025) ...................................15, 20

*Int'l Ass'n of Fire Fighters, Loc. 365 v. City of E. Chicago,*
   56 F.4th 437 (7th Cir. 2022) ................................................................................................19

*Koala v. Khosla,*
   931 F.3d 887 (9th Cir. 2019) ................................................................................................17

*Koontz v. St. Johns River Water Mgmt. Dist.,*
   570 U.S. 595 (2013).............................................................................................................13

*Massachusetts v. EPA,*
   549 U.S. 498 (2007).............................................................................................................13

*Nat'l Endowment for the Arts v. Finley,*
   524 U.S. 569 (1998).............................................................................................................17

*Nat'l Rifle Ass'n of Am. v. Vullo,*
   602 U.S. 175 (2024).............................................................................................................17

*New York v. United States,*
   505 U.S. 144 (1992).............................................................................................................15

*Nken v. Holder*,
   556 U.S. 418 (2009)................................................................................................20

*Ohio v. EPA*,
   603 U.S. 279 (2024)................................................................................................16

*Reno v. ACLU*,
   521 U.S. 844 (1997)................................................................................................16

*Rosenberger v. Rector and Visitors of Univ. of Va.*,
   515 U.S. 819 (1995)................................................................................................17

*State of Ill. v. FEMA*,
   801 F. Supp. 3d 75 (D.R.I. 2025)............................................................................16

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014)................................................................................................13

*Thakur v. Trump*,
   148 F.4th 1096 (9th Cir. 2025) ...............................................................................18

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021)................................................................................................13

*Trump v. CASA, Inc.*,
   606 U.S. 831 (2025)................................................................................................23

*United States v. Williams*,
   553 U.S. 285 (2008)................................................................................................19

*Washington State Assoc. of Head Start v. RFK Jr.*,
   C25-781-RSM, 2026 WL 35858 (W.D. Wash. Jan. 6, 2026)................................13

**Statutes**

5 U.S.C. § 706(2)(C) ......................................................................................................15

8 U.S.C. § 1373 ..............................................................................................................10

22 U.S.C. § 7101 (Supp. V 2008) ...............................................................................3, 10

22 U.S.C. § 7101 (Supp. V 2018) ...............................................................................3, 10

22 U.S.C. § 7101(a) ..........................................................................................................3

22 U.S.C. § 7101(b)(2)(A) ................................................................................................3

22 U.S.C. § 7105(b)(2) (Supp V. 2013)......................................................................3, 10

22 U.S.C. § 7105(b)(2)(B)(ii) ................................................................3, 10, 15

22 U.S.C. § 7105(b)(2)(B)(ii) (Supp V. 2022) ....................................3, 10,

22 U.S.C. § 7105(b)(A) ..........................................................................10

22 U.S.C. § 7115(b)(1) ......................................................................10, 16

34 U.S.C. § 12291(b)(2) ..........................................................................16

34 U.S.C. § 12991(b)(2) ..........................................................................10

**Other Authorities**

2 C.F.R. § 200.208(a) ...............................................................................16

2 C.F.R. § 200.208(d)(2) ...........................................................................16

U.S. Const. art. I, § 8, cl. 1 ......................................................................14

U.S. Const. art. I, § 9, cl. 7 ......................................................................14

**INTRODUCTION**

The Executive Branch cannot usurp Congress's Power of the Purse to force its viewpoint on organizations that receive federal funding. Nor can the Executive Branch censor private speech. And yet two Executive Orders and newly issued funding conditions run roughshod over these fundamental constitutional principles, depriving Freedom Network USA of its constitutional rights, and suffocating its efforts to combat human trafficking and protect survivors.

Freedom Network is the nation's largest non-profit coalition of advocates, service providers, and survivors working to end human trafficking and protect survivors by providing equity-driven training and technical assistance to public and private stakeholders, from city councils to community organizers, across the nation. The majority of Freedom Network's funding comes from grants issued pursuant to the Trafficking Victims Protection Act ("TVPA"), a statute passed and funded by Congress to fight human trafficking and address the harms caused by this modern-day slavery, for all trafficking victims, regardless of race, gender, identity, or immigration status.

Executive Order 14151, entitled "Ending Radical and Wasteful Government DEI Programs and Preferencing" (the "J20 EO"), and Executive Order 14173, entitled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity" (the "J21 EO") (collectively, the "EOs"), coerce federal grantees and contractors such as Freedom Network to accept a worldview in which any effort to promote Diversity, Equity and Inclusion ("DEI") is "illegal and immoral." Defendants' enforcement of these EOs demonstrates that the Executive Branch's view of "illegal DEI" is overbroad, diverges from Congress's intent, and is contrary to existing law, leaving the terms unmoored and therefore unclear and compliance uncertain.

1

For example, following issuance of the EOs, the Department of Justice ("DOJ") has issued the "DOJ, Office of Justice Programs (OJP) Guidance," which lists 50 prohibited terms—"Terms that cannot appear in any [government] materials (i.e., web pages, training content, presentations, etc.)." Words included in this list are "race," "gender," "sexual orientation," and "discrimination"; the same words that Congress used when it enacted the TVPA.[1] The EOs, and the government's subsequent implementation of them, have restrained Freedom Network's ability to fulfill the goals of its federal grants and its privately funded efforts.

Beyond and in addition to the EOs, DOJ has imposed new funding conditions on all go-forward grants issued under the TVPA, prohibiting grant recipients from, among other things, engaging in "illegal DEI" programming and "indirectly" violating, or "promoting" violations of, anti-discrimination law; requiring applicants to certify as to the same under penalty of the False Claims Act; and compelling cooperation with federal immigration enforcement activities (the "New Funding Conditions").

The EOs and New Funding Conditions violate the Separation of Powers and the Spending Clause because the Executive Branch is placing conditions on spending that Congress did not give it the power to do. In fact, the New Funding Conditions are contrary to Congressional intent and require Freedom Network to violate terms of the TVPA, which by its very nature focuses on underprivileged groups, including women, children, and immigrants. As such, the New Funding Conditions also violate the Administrative Procedure Act.

In addition, the EOs and New Funding Conditions violate Freedom Network's First Amendment rights: they are viewpoint specific, they impose unconstitutional conditions, and

---

[1] *See* Appendix A.

2

they are vague and overbroad. And because they are vague, they also violate the Due Process Clause.

Our Constitution does not allow this. The government's implementation of the EOs and the New Funding Conditions threatens Freedom Network's ability to fulfill its mission, the goals of its federal grants, and its privately funded work, and has already caused Freedom Network the loss of partners and money. Thus, Freedom Networks requests a preliminary injunction.

## FACTUAL BACKGROUND

### I. CONGRESS PROVIDED FUNDS THROUGH THE TVPA TO COMBAT THE TRAFFICKING OF DIVERSE GROUPS OF PEOPLE

Congress enacted the TVPA to create a comprehensive response to modern slavery and human trafficking by focusing on protecting survivors, prosecuting traffickers, and preventing trafficking. 22 U.S.C. § 7101(a). Congress understood that "[t]raffickers primarily target women and girls, who are disproportionately affected by poverty, the lack of access to education, chronic unemployment, discrimination, and the lack of economic opportunities in countries of origin." *Id.* § 7101(b)(4). Congress has since recognized that women and girls are not the only victims and expanded the scope of the TVPA to include "men, women, and children who are *diverse with respect to race, ethnicity, and nationality*." 22 U.S.C. § 7101 (Supp. V 2018) (emphasis added); *see also* 22 U.S.C. § 7101 (Supp. V 2008); 22 U.S.C. § 7105(b)(2) (Supp V. 2013); 22 U.S.C. § 7105(b)(2)(B)(ii) (Supp V. 2022).

To effectuate the TVPA's purpose, Congress "provides grants to nonprofit, nongovernmental victims' service organizations to develop, expand, or strengthen victim service programs for victims of human trafficking." 22 U.S.C. § 7101(b)(2)(A). Congress signaled the importance of these grants by designating the funds "to remain available until expended . . . for victims' services programs for victims of trafficking." *Id.* §§ 7101-114.

3

## II.     FREEDOM NETWORK'S TVPA GRANT FUNDING EFFECTUATES CONGRESS'S GOALS

Over seventy percent of Freedom Network's funding comes from grants administered by DOJ's Office for Victims of Crime ("OVC"). These grants are funded by congressionally appropriated TVPA funds that Freedom Network uses for nationwide programs. Declaration of Jean Bruggeman dated December 18, 2025 ("Bruggeman Decl.") ¶¶ 7, 46.

Freedom Network has a ***Housing Training and Technical Assistance Program*** grant to train housing providers "to implement housing models that provide survivors with 'safe, stable housing and appropriate trauma-informed, victim-centered, and culturally responsive housing policies and practices that prioritize the autonomy and protect survivors' confidentiality and safety." Bruggeman Decl. ¶¶ 40-41. Freedom Network regularly uses words like "accessibility," "immigration," "culturally competent," "race," "gender," "equity," and "inclusion" in its training materials to address why housing providers must prioritize survivor confidentiality, safety, and autonomy and to communicate the unique needs of survivors. *Id.* ¶¶ 8, 70; *see also id.* ¶¶ 131, 140.

Freedom Network has a ***Services for Victims of Human Trafficking Program*** grant that funds its Survivor Reentry Project. This project provides trafficking survivors with criminal record relief. Bruggeman Decl. ¶¶ 32-33. Freedom Network regularly uses words like "race," "equity," and "discrimination" in its Survivor Project trainings to explain how and why survivors require criminal record relief and why Black women, due to biases embedded in the criminal justice system, are more likely to have criminal convictions resulting from trafficking despite constituting a smaller percentage of survivors. *Id.* ¶¶ 12, 13, 131; *see also id.* ¶ 140. The Survivor Project has consistently served immigrant survivors. Supp'l Bruggeman Decl. ¶ 16.

Freedom Network has a ***National Standard of Care Program*** grant whose purpose is to "promote uniform service standards that will ensure consistent quality of care and reduce potential harm to trafficking survivors . . . [across] a comprehensive array of direct services, including case management, housing, legal, behavioral health, economic empowerment, and other services."[2] Bruggeman Decl. ¶ 10. OVC requires Freedom Network to have a technical working group comprised of a "diverse cadre of [survivors] with lived experience" to ensure that the standards of care reflect the needs and lived experiences of survivors of all backgrounds.[3] The technical working group routinely uses words like "race," "culture," "gender," "diversity," "equity," and "inclusion" in developing the standards of care in services for survivors. *Id.* ¶¶ 16, 68; *see also id.* ¶ 38. The National Standards of Care project has specific sections on best practices for working with immigrant survivors. Supp'l Bruggeman Decl. ¶ 17.

Freedom Network is also a subrecipient of a federal grant awarded to the Coalition Against Slavery and Trafficking ("CAST") under the ***Human Trafficking Training and Assistance Program***. Bruggeman Decl. ¶ 30. This program provides support to attorneys and social service providers assisting trafficking survivors with legal needs. CAST subcontracts with Freedom Network to provide the training and technical assistance developed under the purview of Freedom Network's Survivor Reentry Project. *Id.* ¶¶ 44-46.

Finally, Freedom Network was (until the EOs) a subcontractor to the Inner City Fund on its Technical Assistance Collective awarded by OVC. This contract recently expired but was impacted by the EOs while it was active, as set forth below. *Id.* ¶ 31.

---

[2] Office for Victims of Crime, https://ovc.ojp.gov/program/human-trafficking/standards-of-care (last visited Feb. 19, 2026).

[3] Office for Victims of Crime, https://ovc.ojp.gov/sites/g/files/xyckuh226/files/media/document/o-ovc-2022-171283.pdf (last visited Feb. 19, 2026).

Freedom Network also receives non-federal funds through a variety of sources. *See id.* ¶¶ 27-28. Freedom Network's privately funded programs include stakeholder-specific training and technical assistance and its flagship annual conference that generates revenue for Freedom Network. *Id.* ¶¶ 28, 109, 126.

## III.   EXECUTIVE ORDER 14151 AND EXECUTIVE ORDER 14173 DECLARE THE END OF ALL DEI

The J20 EO declared that all programs promoting diversity, equity, and inclusion constitute "illegal and immoral discrimination." J20 EO § 1. The J21 EO declared programs supporting diversity, equity, and inclusion "dangerous, demeaning and immoral." J21 EO § 1. Neither EO defines "DEI," "DEIA," "diversity," "equity," "equity-related," "inclusion," or "accessibility." Freedom Network seeks a preliminary injunction as to the following sections of the EOs:

- Section 2(b)(i) of the J20 EO, which instructs the Director of the Office of Management and Budget ("OMB") and heads of agencies to terminate all "equity-related grants and contracts" (the "J20 Termination Provision").

- Section 3(b)(iv) of the J21 EO, which requires a certification that Freedom Network does not operate any programs promoting DEI because it orders all executive agencies to "include in every contract or grant award" a certification, enforceable through the False Claims Act ["FCA"], that the contractor and grantee "does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws" (the "J21 Certification Provision").

- Section 3(c)(iii) of the J21 EO ("J21 Termination Provision"), which orders the OMB Director, with the assistance of the Attorney General, to "[t]erminate all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities, as appropriate."

Freedom Network also challenges any other provision of the EOs that the government asserts justifies its actions alleged in the Complaint.

## IV.   THE GOVERNMENT'S TARGETING OF "DEI"

On February 5, 2025, the Attorney General issued a memorandum declaring that, pursuant to the J21 EO, even "*policies relating to*" DEI and DEIA "violate longstanding Federal civil-rights laws." Mem. from Att'y Gen. Pam Bondi, *Ending Illegal DEI and DEIA Discrimination and Preferences* 1 (Feb. 5, 2025) [available at https://perma.cc/KH9Y-A2VQ]. This Memo vowed that DOJ would "investigate, eliminate, and penalize illegal DEI and DEIA *preferences, mandates, policies, programs, and activities* in the private sector and in educational institutions that receive federal funds." *Id*. (emphasis added).

On May 19, 2025, the Deputy Attorney General issued a second memorandum designating "DEI programs that assign benefits or burdens [based] on race, ethnicity, or national origin" as unlawful. Mem. from Todd Blanche, Deputy Att'y Gen., to DOJ Offices, Divisions, and U.S. Attorneys, *Civil Rights Fraud Initiative* 1 (May 19, 2025) [available at https://perma.cc/3W6K-FGHA]. "DEI" was not defined.

On July 29, 2025, DOJ, through the Attorney General, issued a third memorandum asserting that "the application of federal antidiscrimination laws to programs or initiatives that may involve discriminatory practices, including those labeled as Diversity, Equity, and Inclusion ('DEI') programs," again without defining "DEI." Mem. From Att'y Gen. Pam Bondi, *Guidance for Receipts of Federal Funding Regarding Unlawful Discrimination* 2 (July 29, 2025) [available at https://www.justice.gov/ag/media/1409486/dl (last visited Feb. 19, 2026)] (the "July 29 Memo"). The July 29 Memo states that "recipients of federal funds should ensure federal funds do not support third-party programs that discriminate" while designating the term "cultural competence" as an example of potential "unlawful proxy discrimination." *Id*. It also encouraged reports of "violations" so that they could be addressed by the government. *Id.* at 9.

7

V.      **THE GOVERNMENT CENSORS AND UNDERMINES FREEDOM NETWORK'S FEDERALLY AND PRIVATELY FUNDED WORK**

The government's implementation of the EOs has significantly restrained Freedom Network's ability to fulfill the goals of its federal grants and its privately funded efforts. For example, "cultural competency," which the government now holds out as an example of unlawful discrimination if used as a proxy, is an outright requirement in the notice of funding opportunities, scope of approved work, and award letter for each of Freedom Network's three federal grants. Bruggeman Decl. ¶¶ 62, 86. There are many more instances in the record before the Court of how the EOs restrain Freedom Network's work.[4] Five examples are provided here:

On February 25, 2025, OVC ordered CAST and Freedom Network to censor a privately funded survivor-led presentation regarding the Survivor Project at Freedom Network's 2025 National Annual Anti-Trafficking Conference. OVC demanded, among other things, that the terms "colonial systems" and "oppression" be removed, and the term "restorative justice" be replaced with "alternative programming," to ensure that the presentation did not run afoul of the EOs. *Id.* ¶ 111 (Ex. 13).

On April 17, 2025, before a May 2025 Housing Summit organized by Freedom Network, OVC demanded to approve attendees, the goals of the summit, the group discussion questions, and the words in the invitation and save the date. *Id.* ¶ 71. OVC informed Freedom Network that immigration and "DEI-related" topics "could not be entertained" due to the EOs. OVC did not explain what it meant by "DEI-related" topics. *Id.* ¶ 74. (Ex. 11).

On April 18, 2025, OVC directed Freedom Network to delete from a Housing Training and Technical Assistance assessment form sections that used the terms "ethnic groups,"

---

[4] *See* Bruggeman Decl. ¶¶ 47-78; 108-138; *id.*, Ex. 2.

"disabilities," "hearing, and/or vision loss," and "cultural responsiveness." *Id.* ¶ 70. Freedom Network used these terms to assess whether a housing provider's policies and procedures were reaching all survivors seeking shelter, regardless of their race, gender, and identity. *Id.* ¶ 70. (Ex. 10).

On June 23, 2025, OVC instructed Freedom Network it could not provide a webinar on housing for immigrant survivors discussing the topics of race and gender equity. *Id.* ¶ 75.

On July 10, 2025, CAST asked OVC why the OVC denied its Survivor Project training for failing to comply with the EOs when OVC approved a similar Survivor Project training for a different conference. The trainings were under the same CAST-Freedom Network subcontract, were reviewed by the same grant administrator, and used the same equity-focused content and terminology. *Id.* ¶ 64. OVC said it permitted the second Survivor Project training because it was facilitated by a presenter who would not discuss pronouns or diverse identities. *Id.* ¶ 65.

## VI.    OVC UNILATERALLY ISSUES UNAUTHORIZED NEW FUNDING CONDITIONS FOR TVPA GRANTS

On December 30, 2025, DOJ issued seven Notices of Funding Opportunities ("NOFOs") that include the New Funding Conditions for TVPA-authorized grant programs, which would effectively prohibit Freedom Network from serving the communities and purposes for which Congress designated TVPA funds. Supp'l Bruggeman Decl. ¶¶ 2, 11, 20, 41-42.

The ***Discrimination Condition*** directs that grant funding may not be used for "any program or activity, at any tier that violates any applicable Federal civil rights or nondiscrimination law," "including by promoting or facilitating violations; or (2) unlawfully favor individuals in any race or protected group.[5] Neither the NOFOs nor DOJ offer guidance on

---

[5] *See* Exs. A and B to Supp'l Bruggeman Decl.

how to reconcile the Discrimination Condition's prohibitions with the TVPA, which, by its very nature, focuses on underprivileged groups, including women, children, and immigrants. Supp'l Bruggeman Decl. ¶¶ 10, 23; 22 U.S.C. § 7105(b)(A); *see also* 22 U.S.C. § 7101 (Supp. V 2018); 22 U.S.C. § 7101 (Supp. V 2008); 22 U.S.C. § 7105(b)(2) (Supp V. 2013); 22 U.S.C. § 7105(b)(2)(B)(ii)) (Supp V. 2022).

The ***Immigration Enforcement Condition*** directs that grant funds may not be used for "any program or activity . . . that . . . violates (or promotes or facilitates the violation of) federal immigration law (including 8 U.S.C. § 1373) or impedes or hinders the enforcement of federal immigration law—including by failing to comply with 8 U.S.C. § 1373, give access to DHS agents, or honor DHS requests and provide requested notice to DHS agents."[6] In addition to its vagueness, this condition appears to require grantees to violate the Violence Against Women Act's ("VAWA") confidentiality provisions set forth in 34 U.S.C. § 12991(b)(2), which are incorporated in the TVPA. *See* 22 U.S.C. § 7115(b)(1). Moreover, the Immigration Enforcement Condition places Freedom Network in an untenable position because compliance with the VAWA is an express NOFO Program Requirement, and any violation subjects Freedom Network to suspension or termination of federal funds. Supp'l Bruggeman Decl. ¶¶ 22-28.

The ***NOFO Certification Provision*** requires grant recipients to certify that they "do[] not operate any programs (including programs having components related to diversity, equity, and

---

[6] *See*, *e.g.*, OVC FY25 Specialized Human Trafficking Assistance: Supporting Survivor Engagement in Anti-Trafficking Programming NOFO *available at* https://www.ojp.gov/funding/docs/ovc-2025-172522.pdf) and OVC FY25 Services for Victims of Human Trafficking (*available at* https://www.ojp.gov/funding/docs/ovc-2025-172520.pdf) (last visited Feb. 19, 2026).

inclusion) that violate any applicable Federal civil rights or nondiscrimination laws."[7] Neither the NOFOs nor DOJ offer guidance on whether Freedom Network's anti-trafficking work, which necessarily focuses on persons from marginalized and underprivileged communities, runs afoul of DOJ's current interpretation of "Federal civil rights or nondiscrimination laws." Supp'l Bruggeman Decl. ¶¶ 19-20, 23.

## VII.    THE HARM TO FREEDOM NETWORK

Freedom Networks' harms are not limited to censorship, resisting censorship, and risking the loss of federal funds for not self-censoring due to the EOs and the New Funding Conditions. Beginning as early as January 21, 2025, several stakeholders decided that the risk of being associated with Freedom Network's equity-driven mission and having their federal funding terminated because of the EOs was so great that they could not attend Freedom Network's Anti-Trafficking Conference. Freedom Network reimbursed the full conference fee to any stakeholder that paid in full but could not attend. *See* Bruggeman Dec. ¶ 121.

Several conference attendees relayed that their federal funders from other federal agencies discouraged or outright disapproved their attendance at the conference because the term "inclusion" was in the conference title. *Id.* ¶ 122. Other attendees were discouraged, many by their private funders, from attending based on fears of losing current or future funding. *Id.* As a result, Freedom Network's 2025 conference had the lowest attendance in recent history and generated less than half of the revenue of past conferences. *Id.* ¶¶ 124, 126.

---

[7] *See*, *e.g.*, OVC FY25 Specialized Human Trafficking Assistance: Supporting Survivor Engagement in Anti-Trafficking Programming NOFO *available at* https://www.ojp.gov/funding/docs/ovc-2025-172522.pdf) and OVC FY25 Services for Victims of Human Trafficking (*available at* https://www.ojp.gov/funding/docs/ovc-2025-172520.pdf) (last visited Feb. 19, 2026).

The EOs have also negatively impacted Freedom Network's 2026 National Annual Anti-Trafficking Conference, titled "We Keep Us Safe: Collective Action in a Resilient Anti-Trafficking Movement." Potential attendees who receive grants under the TVPA have already voiced concern to Freedom Network about attendance. And OVC has informed its grantees that they will need to obtain OVC's formal approval to attend the conference. Freedom Network and the grantees anticipate such approval will be denied based on the EOs. *Id.* ¶¶ 127-128.

Finally, two members of Freedom Network's Board of Directors whose employers rely on federal funding resigned from the Board because they believed their association with Freedom Network placed their employers' federal funding at risk. *Id.* ¶¶ 90, 95. And two subcontractors terminated their subcontracts because Freedom Network resisted the government's censorship. *Id.* ¶ 95.

In addition, the New Funding Conditions leave Freedom Network with the near-impossible choice of (1) accepting grants with the New Funding Conditions, which contravene their ability to carry out the TVPA's congressionally mandated purposes; or (2) foregoing the funding and potentially ceasing to serve trafficking victims. Either option subjects Freedom Network to severe budgetary uncertainty, derails privately funded programming, and results in fewer survivors being served nationwide. Supp'l Bruggeman Decl. ¶¶ 30-41. Although the New Funding Conditions nominally do not go into effect unless Freedom Network accepts a grant, at the time Freedom Network submits its application it must explain how it will address and comply with all the NOFO conditions, including the New Funding Conditions; failing to do so risks having its applications denied. *Id.* ¶ 36.

## LEGAL STANDARD AND STANDING

To obtain a preliminary injunction, Freedom Network must establish standing and demonstrate that (1) it is likely to succeed on the merits, (2) it will be irreparably harmed absent

an injunction, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. *Bevis v. City of Naperville*, 85 F.4th 1175, 1188 (7th Cir. 2023). This Court and others have already concluded that preliminary injunctions are warranted in challenges to the EOs and NOFOs. *See, e.g.*, *City of Chicago v. Dept. of Justice*, No. 25 C 13863, 2026 WL 114294 (N.D. Ill. Jan. 15, 2026); *Chicago Women in Trades v. Trump*, 778 F. Supp. 3d 959 (N.D. Ill. 2025) ("*CWIT*"); *Washington State Assoc. of Head Start v. RFK Jr.*, C25-781-RSM, 2026 WL 35858 (W.D. Wash. Jan. 6, 2026); *City of Seattle v. Trump*, No. 2:25-cv-01435-BJR, 2025 WL 3041905 (W.D. Wash. Oct. 31, 2025). As explained below, an injunction is warranted in this case as well.

Freedom Network has standing to challenge the Termination and Certification Provisions of the EOs and the New Funding Conditions. Freedom Network (1) has "suffered a concrete and particularized injury that is either actual or imminent," (2) "the injury is fairly traceable to the defendant," and (3) "it is likely that a favorable decision will redress that injury." *Massachusetts v. EPA*, 549 U.S. 498, 517 (2007).

Freedom Network has demonstrated a particularized injury. The government has censored speech. Its threatened enforcement has caused Freedom Network to face self-censorship, loss of associations, and loss of money. *See, e.g.*, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014); *Brown v. Kemp*, 86 F.4th 745, 761 (7th Cir. 2023); *CWIT*, 778 F. Supp. 3d at 979.

The New Funding Conditions similarly require self-censorship. They require Freedom Network to violate the law and curtail its mission. Moreover, Freedom Network is harmed because it is forced to either accept a potentially unconstitutional condition or forfeit millions in critical funding. *See Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 606–07 (2013) (holding that the plaintiff suffered a "constitutionally cognizable injury" where he refused to waive his constitutional rights and was therefore denied a discretionary benefit); *TransUnion*

*LLC v. Ramirez,* 594 U.S. 413, 415, 435 (2021) (noting that a "material risk of future harm can satisfy the [injury-in-fact] requirement," should the "risk of harm [be] sufficiently imminent and substantial.").

Because these injuries are the result of the EOs and the New Funding Conditions, an injunction would redress those injuries.

## ARGUMENT

## I.  FREEDOM NETWORK IS LIKELY TO SUCCEED ON THE MERITS OF ITS CHALLENGE

### A.  The EOS and New Funding Conditions Violate the Separation of Powers and the Spending Clause

The Constitution commits the spending power to Congress, not the President. *See* U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause); U.S. Const. art. I, § 8, cl. 1 (Spending Clause). Congress's authority under the Spending Clause is broad and cannot be usurped by the President via executive action by unilaterally placing conditions on grants. *See, e.g.*, *City of Chicago v. Sessions*, 888 F.3d 272, 283 (7th Cir. 2018). The EOs and the New Funding Conditions violate these bedrock constitutional principles.

Congress imposed the conditions for Freedom Network grants. Congress did not delegate to the Executive Branch this authority or the authority to add or change the conditions attendant to those grants.

None of Congress's conditions include the New Funding Conditions. None prohibit "DEI"-related topics, the promotion of "DEI," or the words that defendants claim Freedom Network cannot use. To the contrary, Congress itself used many of the words now forbidden by the Executive Branch in the statutory language and legislative history of the TVPA.[8]

---

[8] See Appendix A.

14

Moreover, the conditions are unrelated to the purpose of the federal funding as proven by the fact that the New Funding Conditions would require Freedom Network to violate specific provisions of the TVPA protecting survivor confidentiality. *See* Factual Background § VI.

The EOs and New Funding Conditions are therefore unconstitutional. They exceed the authority granted to the Executive Branch. *See, e.g.*, *New York v. United States*, 505 U.S. 144, 172 (1992); *City of Chicago*, 2026 WL 114294 at *10 (enjoining the NOFOs at issue in this case); *City of Chicago v. Noem,* 25 CV 12765*,* 2025 WL 3251222 (N.D. Ill. Nov. 21, 2025) (granting preliminary injunction as to the EOs at issue in this case and similar funding conditions); *Cnty. of Santa Clara v. Noem*, 25-cv-08330-WHO, 2025 WL 3251660 (N.D. Cal. Nov. 21, 2025) (same); *Housing Auth. of the City & Cnty. of S.F. v. Turner*, 25-cv-08859-JST, 2025 WL 3187761 (N.D. Cal. Nov. 14, 2025) (same); *see also City of Chicago v. Barr,* 961 F.3d 882, 931 (7th Cir. 2020) (affirming grant of preliminary injunction); *CWIT*, 778 F. Supp. 3d at 979 ("To abide by separation of powers, the Executive Branch must respect congressional appropriations; it lacks the authority to condition the payment of grants on its political priorities, except when Congress has delegated such authority.").

### B.    The New Funding Conditions Violate the Administrative Procedure Act

Under the Administrative Procedure Act ("APA"), a court should set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). Agency action that exceeds the scope of, or is inconsistent with, Congressional intent violates the APA. *City of Arlington v. FCC*, 569 U.S. 290, 297-98 (2013).

Such is the case with the New Funding Conditions. These conditions conflict with the TVPA, which seeks to protect persons from underserved groups, including on the basis of geography, gender, immigration status, and race. *See, e.g.*, 22 U.S.C. § 7105(b)(2)(B)(ii). Compliance with the Immigration Enforcement Condition, moreover, requires Freedom Network

15

to violate the VAWA confidentiality provisions incorporated into the TVPA. *See* 22 U.S.C.

§ 7115(b)(1) (incorporating conditions under 34 U.S.C. § 12291(b)(2)). Accordingly, the New

Funding Conditions are contrary to law and violate the APA. *See City of Chicago*, 2026 WL

114294, at *9-10; *Noem*, 2025 WL 3251222, at *5-6; *Cnty. of Santa Clara*, 2025 WL 3251660, at

*28-29 *California v. U.S. Dep't of Transp*., 788 F. Supp. 3d 316, 322 (D.R.I. 2025) (holding that

agency lacked authority "to impose immigration enforcement conditions"); *State of Ill. v. FEMA*,

801 F. Supp. 3d 75 (D.R.I. 2025) (finding similar conditions violate the APA).

Lastly, the New Funding Conditions are arbitrary and capricious. They are neither

reasonable nor reasonably explained. *Ohio v. EPA*, 603 U.S. 279, 292 (2024); *Encino Motorcars,
LLC v. Navarro*, 579 U.S. 211, 221 (2016) (when an "agency has failed to provide even that

minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of

law"). And they are wholly unrelated to the programs intended by the TVPA. *See* 2 C.F.R.

§ 200.208(a); 2 C.F.R. § 200.208(d)(2).

### C.     The EOS and New Funding Conditions Violate the First Amendment

#### 1.     *They are Overbroad*

The EOs and New Funding Conditions are unconstitutionally overbroad. Their scope is

uncertain. They are vague. *Kemp*, 86 F.4th at 771; *see also Reno v. ACLU*, 521 U.S. 844, 871-72

(1997). Demonstrably, the EOs and New Funding Conditions "fail[] to provide people of

ordinary intelligence a reasonable opportunity to understand what conduct [they] prohibit."

*Kemp,* 86 F.4th at 772. Demonstrably, "they "authorize[s] . . . arbitrary and discriminatory

enforcement." *Id.*

The government has made no attempt to define what is or is not prohibited by the EOs

and New Funding Conditions. The government has censored topics. The government has

censored words. The government has claimed that "policies" that promote DEI violate anti-

discrimination law. "[T]the government's view of what is illegal . . . has changed significantly with the new Administration—even though the government has not . . . and has been unwilling to . . . define how it has changed." *CWIT*, 778 F. Supp. 3d at 984.

As for arbitrary and discriminatory enforcement, that is demonstrated by the two identical conference presentations—one approved, the other not approved. It is proven by the censorship of words without explanation. *See* Factual Background § V.

### 2. The EOs and New Funding Conditions Regulate Viewpoints

The EOs and New Funding Conditions infringe the First Amendment because they discriminate on the basis of viewpoint—both as to federally funded speech and private speech. They prohibit promoting or encouraging diversity, equity, or inclusion, but not anti-DEI activity even if that activity violates anti-discrimination laws.

As to Freedom Network's privately funded programming, "[i]n the realm of private speech or expression, government regulation may not favor one speaker over another." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995); *see also Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024) (noting that "[a]t the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society"). Yet that is the effect of the EOs and New Funding Conditions because Freedom Network is unable to convene stakeholders, present at conferences, or publish material that the Executive Branch considers pro-DEI or somehow violative of the EOs or New Funding Conditions without fear of being accused of violating them.

As for the federally funded programming, "even in the provision of subsidies, the government may not 'ai[m] at the suppression of dangerous ideas.'" *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998) (quoting *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 550 (1983)); *see also Koala v. Khosla*, 931 F.3d 887, 898 (9th Cir. 2019)

17

(analyzing case law). Yet, this is the stated aim of the EOs as also reflected in the NOFOs. This constitutes unconstitutional viewpoint discrimination. *See, e.g.*, *Thakur v. Trump*, 148 F.4th 1096, 1108 (9th Cir. 2025).

3.   ***The J21 Certification Provision and NOFO Certification Provision Regulate Private Speech***

The government's actions also infringe Freedom Network's First Amendment rights because the government is regulating speech that is not funded by federal dollars. The government is using the J21 Certification Provision and the NOFO Certification Provision to control the content and character of Freedom Network's privately funded activity. Neither provision is limited to federally funded conduct on its face. *See CWIT*, 778 F. Supp. 3d at 984 (noting the government's concession that the "Certification Provision attempts to regulate grantees' speech outside of their federally funded programs").

Whatever latitude the government has with respect to federally funded programs, the government may not regulate or seek to influence speech outside the government funded program. *See, e.g.*, *Agency for Int'l Dev. v. All for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 217 (2013) (herein "*AID*"); *CWIT*, 778 F. Supp. 3d at 983. "[L]everag[ing] funding to regulate speech outside of the contours of the federal program itself" is a violation of the First Amendment. *AID*, 570 U.S. at 206.

4.   ***The J21 Certification Provision and NOFO Certification Provision Curtail Advocacy***

As this Court has already concluded, the J21 Certification Provision violates the First Amendment because it prohibits advocacy. *CWIT*, 778 F. Supp. 3d at 984. So too does the NOFO Certification Provision. Like the J21 Certification Provision, the NOFO Certification Provision prohibits "programs promoting" DEI. It is fairly read as an *express* reference to First Amendment-protected speech and advocacy. Even were these provisions "limited to promoting

whatever the government may now contend is 'illegal DEI,' it is a bedrock First Amendment principle that "advocating for violation of the law cannot be proscribed unless it rises to incitement." *Id.* (quoting *Virginia v. Black*, 538 U.S. 343, 359 (2003)).

### D. The EOs and New Funding Conditions Violate the Fifth Amendment Because They Are Unconstitutionally Vague

The EOs and New Funding Conditions violate the Due Process Clause because they are vague. *See* Bruggeman Decl. ¶¶ 83-84; Supp'l Bruggeman Decl. ¶¶ 19-29. They do not let Freedom Network "know what is required of them so they may act accordingly." *FCC v. Fox Television*, 567 U.S. 239, 253 (2012); *see also Gresham v. Peterson*, 225 F.3d 899, 907 (7th Cir. 2000) (The void-for-vagueness doctrine forbids the enforcement of a law that contains "terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application."). To state it another way, the "indeterminacy of precisely" what falls within the ambit of the EOs and New Funding Conditions renders them unconstitutionally vague. *United States v. Williams*, 553 U.S. 285, 306 (2008). As demonstrated by the government's actions, the EOs and the New Funding Conditions' vagueness allows for "arbitrary and discriminatory enforcement." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972); *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 478–79 (7th Cir. 2012); *see also Cnty. of Santa Clara*, 2025 WL 3251660, at \*35-38 (N.D. Cal. Nov. 21, 2025) (finding the NOFOs to be vague).

## II. FREEDOM NETWORK WILL BE IRREPARABLY HARMED ABSENT RELIEF

"When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011) (citation omitted). This is especially true when First Amendment rights are at issue. *See Int'l Ass'n of Fire Fighters, Loc. 365 v. City of E. Chicago*, 56 F.4th 437, 450-51 (7th

Cir. 2022) (noting that irreparable harm is presumed in First Amendment cases.). Freedom

Network has shown that it is likely to succeed on its First Amendment and other constitutional

claims and therefore has demonstrated irreparable harm. In addition, as demonstrated, the EOs

threaten Freedom Network's mission. Freedom Network has lost associations with others. It has

lost money.

The New Funding Conditions too irreparably harm Freedom Network. They violate the

Constitution, and therefore presumptively cause injury. *City of Chicago*, 2026 WL 114294,

at *10; *Noem*, 2025 WL 3251222, at *9. They create the Hobson's choice of foregoing federal

funding or relinquishing constitutional rights and/or risking "arbitrary enforcement" of the New

Funding Conditions. *Cnty. of Santa Clara*, 2025 WL 3251660, at *43: *Turner*, 2025 WL

3187761, at *19. Although the New Funding Conditions may not be enforceable until or unless

Freedom Network accepts a grant, the harm they cause is inflicted *at the time* Freedom Network

applies for a grant. Bruggeman Supp'l Decl. ¶ 36. Moreover, as this court recognized, the

Certification Provision imposes harm now even on parties that are not currently seeking grants.

*See CWIT*, 778 F. Supp. 3d at 994-96.

## III.    THE BALANCE OF HARMS AND THE PUBLIC INTEREST WEIGH IN FAVOR OF AN INJUNCTION

The final two injunction factors (the balance of equities and whether an injunction is in

the public interest) merge when the government is the opposing party. *Nken v. Holder*, 556 U.S.

418, 435 (2009). "[I]njunctions protecting First Amendment freedoms are always in the public

interest." *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 590 (7th Cir. 2012) (citation omitted). The "same

may be said of injunctions protecting the separation of powers." *CWIT*, 778 F. Supp. 3d at 993

(citing *City of Chicago v. Barr*, 961 F.3d 882, 918 (7th Cir. 2020)). And should Freedom

Network be forced to decline the OVC grants on account of the New Funding Conditions, it

would lose access to funding that it would not be able to recoup. Accordingly, the balance of harms and public interest factors support an injunction.

## IV.    FREEDOM NETWORK IS ENTITLED TO COMPLETE RELIEF AS TO EXECUTIVE ORDERS AND THE NEW FUNDING CONDITIONS

The basic nature of Freedom Network's work requires it to convene stakeholders and receive referrals from a wide range of stakeholders representing different fields and agencies, such as housing providers, law enforcement agencies, social service agencies, and many grantees funded by other Executive Branch departments. *See* Bruggeman Decl. ¶¶ 8, 22, 23, 132–134, 137. Stakeholders receiving federal funds are required to report activities and attendance at events to their federal grant managers (including at agencies beyond DOJ). *Id.* ¶ 133. Freedom Network's ability to convene stakeholders will remain severely limited if relief is afforded only to Freedom Network because stakeholders will still fear implicating the EOs by associating with Freedom Network. The common thread between the historically low attendance at Freedom Network's 2025 National Annual Anti-Trafficking Conference, the abrupt departure of some of its board members, and the termination of certain subcontracts is the concern that associating with Freedom Network would jeopardize the federal funding of other organizations. *See* Factual Background §§ V, VI, VII.

This Court has already concluded that a nationwide injunction as to the Certification Provision is necessary to provide complete relief to a federal grantee in order to protect its ability to collaborate with other grantees and contractors. *CWIT*, 778 F. Supp. 3d at 994-96; *Chicago Women in Trades v. Trump*, 25 C 2005, 2025 WL 3034056 (N.D. Ill. Oct. 30, 2025). The facts here similarly justify nationwide relief: entities and persons across the country have indicated that they fear continued association and collaboration with Freedom Network as a result of the EOs. *See* Factual Background §§ VII.

21

Nationwide relief is also warranted to enjoin Defendants from enforcing the Termination Provisions and the New Funding Conditions against TVPA grants and contracts. The government has used the EOs to inhibit attendance at Freedom Network's privately funded annual conference. Other federal grantees were discouraged by their federal and private funders from attending because Freedom Network used the word "inclusion." *See* Factual Background §§ VI and VII. And the New Funding Conditions apply to all potential applicants nationwide.

With respect to the scope of relief for Freedom Network's APA claims, as the Fifth Circuit has explained, "Section 705 of the APA authorizes a reviewing court to 'issue all necessary and appropriate process to postpone the effective date of an agency action' that is pending review," and therefore "the scope of preliminary relief under Section 705 aligns with the scope of ultimate relief under Section 706, which is not party-restricted and allows a court to 'set aside' an unlawful agency action." *Career Colleges & Schs. of Texas v. United States Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024), *cert. granted in part sub nom. Dep't of Educ. v. Career Colleges & Schs. of Texas*, 145 S. Ct. 1039 (2025), and *cert. dismissed sub nom. Dep't of Ed. v. Career Colleges & Sch. of TX*, 146 S. Ct. 59 (2025); *see also Am. Hosp. Ass'n v. Kennedy*, No. 2:25-CV-00600-LEW, 2025 WL 3754193, at *9 (D. Me. Dec. 29, 2025).

What this Court feared would happen in *CWIT* were the Certification Provision not enjoined nationally is exactly what is happening to Freedom Network by way of the Termination Provision as well as the New Funding Conditions. The Executive Branch is leveraging its claimed authority over TVPA funds to suppress Freedom Network's First Amendment rights to carry out its mission, consistent with the congressional intent of the TVPA. *See* Factual Background §§ VI and VII. In addition to suffering a deprivation of its constitutional rights,

22

Freedom Network has suffered financially and will likely be forced to cease operations by 2026 under the New Funding Conditions.

And not to lose sight of the purpose of the TVPA and the grants Congress authorized, survivors across the country have and will bear the costs of being stuck in a vicious cycle of vulnerability, exploitation, and trafficking if Freedom Network's work cannot reflect the voices and lived experiences of survivors. To obtain full and complete relief for Freedom Network, a nationwide injunction is appropriate. *Trump v. CASA, Inc.*, 606 U.S. 831 (2025); *CWIT*, 778 F. Supp. 3d at 994-96; *CWIT*, 2025 WL 3034056, at *2–3.

## CONCLUSION

For the foregoing reasons, Freedom Network respectfully requests that the Court grant its motion for a preliminary injunction.

Dated: February 20, 2025                    Respectfully Submitted,

/s/ *Jason P. Stiehl*
Jason P. Stiehl
CROWELL & MORING LLP
300 N. LaSalle Drive
Suite 2500
Chicago, IL 60654
Tel: (312) 840-3108
jstiehl@crowell.com

/s/ *Anuj Vohra*
Anuj Vohra
Keith J. Harrison*
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Tel: (202) 624-2500
avohra@crowell.com
kharrison@crowell.com

/s/ *Warrington Parker*
Warrington Parker*
CROWELL & MORING LLP
3 Embarcadero Center, 26th Floor
San Francisco, CA 94111
Tel: (415) 986-2800
wparker@crowell.com

s/ *Sabrina A. Talukder*
Sabrina A. Talukder*
Kathryn J. Youker*
Lawyers' Committee for Civil Rights Under Law
1500 K Street, N.W. Suite 900
Washington, D.C. 20005
Telephone: (202) 662-8600
stalukder@lawyerscommittee.org
kyouker@lawyerscommittee.org

/s/ *Rachel Stevens*
Rachel Stevens*
CROWELL & MORING LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Tel: (212) 590-5430
rstevens@crowell.com

Aneel L. Chablani (No. 6242658)
Ami D. Gandhi (No. 6282924)
Chicago Lawyers' Committee for Civil Rights
25 E. Washington St., Ste. 1300
Chicago, IL 60602
Telephone: (312) 630-9744
achablani@clccrul.org
agandhi@clccrul.org

*Attorneys for Freedom Network USA*
*\*Admitted Pro Hac Vice*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on February 20, 2026, I electronically filed the foregoing document with the

Clerk of the court of the United States District court for the Northern District of Illinois, using

the CM/ECF filing system, which will forward notice to all counsel of record.

/s/ *Jason P. Stiehl*
Jason P. Stiehl
