UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| FREEDOM NETWORK USA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 25 C 12419 |
| v. | ) | |
| | ) | Judge Kennelly |
| PRESIDENT DONALD J. TRUMP, | ) | |
| OFFICE OF MANAGEMENT AND | ) | |
| BUDGET, DIRECTOR OF THE OFFICE | ) | |
| OF MANAGEMENT AND BUDGET | ) | |
| RUSSELL VOUGHT, U.S. DEPARTMENT | ) | |
| OF JUSTICE PROGRAMS, OFFICE FOR | ) | |
| VICTIMS OF CRIME, ATTORNEY | ) | |
| GENERAL OF THE U.S. DEPARTMENT | ) | |
| OF JUSTICE PAMELA BONDI, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S AMENDED MOTION FOR A PRELIMINARY INJUNCTION**

**Table of Contents**

Table of Authorities .............................................................................................. iii

Introduction ...........................................................................................................1

Background ............................................................................................................2

    Human Trafficking Grants ...............................................................................2

    Alleged DOJ Interference with Freedom's Grant ............................................3

    Prior Proceedings ............................................................................................6

Argument ...............................................................................................................7

    I.      Likelihood of Success on the Merits.......................................................7

          A.    Funding Restrictions ....................................................................7

              1.  No Article III Jurisdiction to Challenge Funding Restrictions ................8

              2.  First Amendment Claim Lacks Merit ......................................................9

              3.  Due Process Claim Lacks Merit ............................................................11

              4.  Separation-of-Powers and Spending Clause Claim Lacks Merit............13

              5.  APA Claim Lacks Merit .........................................................................16

          B.    Certification Condition................................................................18

              1.  No Standing to Challenge Certification Condition................................18

              2.  First Amendment Claim Lacks Merit ....................................................20

               3.  Due Process Claim Lacks Merit ............................................................21

               4.  Separation-of-Powers and Spending Clause Claim Lacks Merit............21

    II.    The TRO Should Be Vacated ...............................................................22

    III.   Plaintiff Has Failed to Demonstrate Irreparable Harm ..........................24

    IV.   The Balance of the Equities Favors Denying the Motion........................25

Conclusion ..............................................................................................................................26

ii

**Table of Authorities**

Cases

*Abbott Labs. v. Gardner*, 387 U.S. 136 (1967) .................................................................. 8

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013) .......................... 9, 25

*Air Espana v. Brien*, 165 F.3d 148 (2d Cir. 1999)................................................................. 17

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470 (9th Cir. 1985) .................... 25

*Am. Pub. Health Ass'n, 145 S. Ct. 2658 (Mem. 2025)*............................................................ 8, 26

*Bevis v. City of Naperville, Illinois*, 85 F.4th 1175 (7th Cir. 2023)................................................ 7

*Caribbean Marine Servs. Co. v. Baldridge*, 844 F.2d 668 (9th Cir 1988) .................................... 24

*Chicago v. Noem*, 2025 WL 3251222 (N.D. Ill, Nov. 21, 2025)................................................... 17

*City of Los Angeles v. Barr*, 929 F.3d 1163 (9th Cir. 2019)........................................................ 16

*Climate United Fund v. Citibank, N.A.*, 2025 WL 2502881 (D.C. Cir. Sept. 2, 2025)................. 14

*Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497 (N.D. Cal. 2017)....................................... 22

*Chicago Women in Trades v. Trump,* 2025 WL 1331743 (N.D. Ill. May 7, 2025) ...................... 10

*Chicago Women in Trades v. Trump,* 778 F. Supp.3d 959 (N.D. Ill. 2025) .......................... *passim*

*Dalton v. Specter*, 511 U.S. 462 (1994) ............................................................................... 13, 14

*Dep't of Educ. v. California*, 145 S. Ct. 966 (2025)...................................................................... 8

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ........................................................... 14, 22

*F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012)....................................................... 12

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021) ............................................................ 17

*Gizzo v. Ben-Habib*, 44 F. Supp. 3d 374 (S.D.N.Y. 2014) .......................................................... 12

*Higher Education v. Trump*, 167 F.4th 86............................................................................ passim

*Illinois Republican Party v. Pritzker*, 973 F.3d 760 (7th Cir. 2020) ............................................ 24

*Johnson v. United States*, 576 U.S. 591 (2015)................................................................. 13

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ............................................................... 8

*Maynard v. Cartwright*, 486 U.S. 356 (1988) .................................................................. 13

*McClelland v. Katy Ind. Sch. Dist.*, 63 F.4th 996 (5th Cir. 2023) ................................... 12

*Morton v. Ruiz*, 415 U.S. 199 (1974) .............................................................................. 15

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ...................... 17

*Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569 (1998)..........................................10, 11, 23

*Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175 (2024) .................................................... 10

*Nat'l Urban League v. Trump*, 783 F.Supp.3d 61 ..................................................... passim

*New Vision Photography Program, Inc., v. District of Columbia*, 54 F. Supp. 3d 12
    (D.D.C. 2014) ............................................................................................................ 12, 24

*Nken v. Holder*, 556 U.S. 418 (2009)........................................................................... 7, 26

*Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.*, 944 F.2d 597
    (9th Cir. 1991)................................................................................................................ 25

*Rust v. Sullivan*, 500 U.S. 173 (1991) .............................................................................. 9

*San Francisco A.I.D.S. Found. v. Trump*, 786 F. Supp.3d 1184 (N.D. Cal 2025) ............ 18, 20, 22

*Sessions v. Dimaya*, 584 U.S. 148 (2018) ................................................................... 12, 13

*Speech First v. Killeen*, 968 F.3d 628 (7th Cir. 2020)................................................... 18, 19

*Stanley v. Univ. of S. Cal.*, 13 F.3d 1313 (9th Cir. 1994) .............................................. 25

*Trump v. Boyle*, 145 S. Ct. 2653 (2025)......................................................................... 26

*Trump v. Wilcox*, 145 S. Ct. 1415 (2025)...................................................................... 26

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015)............................ 10

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ................................................. 7, 24, 25

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ........................................... 13, 14

Statutes

5 U.S.C. § 704 .................................................................................................................... 17

8 U.S.C. § 1373 ..................................................................................................................... 5

22 U.S.C. § 7105(b)(2) ..................................................................................................... 2, 3

28 U.S.C. §§ 1346 ................................................................................................................ 8

31 U.S.C. § 3729(b)(4) ........................................................................................................ 6

34 U.S.C. §12291(b)(2) ...................................................................................................... 16

42 U.S.C. § 2000d ............................................................................................................... 22

U.S.C. § 2000d-1 ................................................................................................................ 20

Regulations

2 C.F.R. Part 200 ................................................................................................................ 17

2 C.F.R. §200.300(a) ..................................................................................................... 18, 22

2 C.F.R. § 200.303(b) ......................................................................................................... 16

Other Authorities

Executive Order 14,151 ................................................................................................4, 11, 14

Executive Order 14,173 .................................................................................................. passim

**Introduction**

Plaintiff Freedom Network provides training and other services to human trafficking victims and relies primarily on grants from the Department of Justice. These grants contain provisions that allow DOJ to review and approve all of Freedom's funded work before being used. Plaintiff now complains about DOJ's administration of Freedom's current and future grants in two ways. First, it alleges DOJ is interfering with Freedom's use of the grant funds by (1) directing Freedom to remove diversity and equity references from its funded work product, and (2) planning to include provisions into future grants that will prohibit Freedom from using grant funds to violate federal law. Freedom claims this interference is unreasonable and unconstitutional and asks this court to enjoin two executive order provisions and two future grant provisions that supposedly cause this interference. These challenges to DOJ's funding restrictions should be rejected because defendants' actions are (1) permitted under the express terms of the grants and therefore reasonable; (2) consistent with Congressional statues authorizing and funding these grants; and (3) impact only Freedom's federally-funded work, which does not infringe on its constitutional rights.

Freedom also challenges DOJ's certification condition, which will be included in future grants and requires grantees to certify that all their programs comply with federal anti-discrimination laws and to acknowledge that such compliance is material for purposes of the False Claims Act. These claims should be rejected, as held recently by the Fourth Circuit and two district courts cases, because the certification condition covers only speech or conduct that is *illegal* and therefore is not protected by the constitution.

Finally, the court should vacate its recent TRO because Freedom faces no immediate harm from DOJ's proposed three grant provisions, which will apply only if and when Freedom receives and accepts a grant award.

1

**Background**

**Human Trafficking Grants**

The Department of Justice, through its Office for Victims of Crime ("OVC"), administers discretionary competitive grant programs that address harms to human trafficking victims. These are grant programs that OVC created under the Trafficking Victims Protection Act, 22 U.S.C. § 7105(b)(2) ("TVPA"), a statute passed and funded by Congress to fight human trafficking and to address the harms caused by it. Under the TVPA, Congress authorized the Attorney General to create grant programs to assist victims of human trafficking and provided it discretion to decide who receives the grants and under what terms and conditions. *Id.*

Plaintiff Freedom Network is a nonprofit that provides training and technical assistance to public and private entities across the nation to end human trafficking and protect survivors. Most of Freedom's funding is from TVPA grants issued by OVC. Freedom was awarded and is currently working under three OVC grants, including: (1) the *Housing Training and Technical Assistance Program* grant ("Housing Grant"), which provides training and technical assistance to housing providers implementing safe and stable housing models for trafficking survivors (D. Ex. 1[1]); (2) the *Services for Victims of Human Trafficking Program* grant ("Survivor Services Grant"), which provides trafficking survivors with relief from their criminal record (D. Ex. 2); and (3) the *National Standard of Care Program* grant ("SOC Grant"), whose purpose is to "promote uniform service standards that will ensure consistent quality of care to trafficking survivors" (D. Ex. 3). Freedom is also a subrecipient to a federal grant to the Coalition Against Slavery and Trafficking ("CAST") under the Human Trafficking Training and Technical Assistance Program, which provides support to attorneys and social service providers assisting trafficking survivors with legal needs. D. Ex. 4.

---

[1] "D. Ex. __" refers to the referenced Exhibit, attached to defendants' memorandum in opposition to plaintiff's amended motion for a preliminary injunction.

2

Finally, Freedom was a subcontractor for Inner City Fund ("ICF"), which maintains a contract with OVC to manage and operate OVC's website for the Training and Technical Assistance Center ("TTAC").[2]

OVC exercised its discretion in creating and administering TVPA training and technical assistance programs by including two provisions in the funding agreements that provide OVC significant oversight of the awardee's work. First, all of Freedom's grants include a product-review-and-approval provision, which requires the grantee to submit to OVC for review any training or other work product at least 60 days before its intended publication and to correct the product in response to comments generated by OVC ("OVC Review Provision"). D. Exs. 1-5.[3] Second, two of Freedom's grants (Housing Grant and SOC Grant) were made as cooperative agreements, which provide for even greater involvement by OVC in the grant deliverables by advising the grantee that OVC will "provide input and re-direction to the project, as needed, in consultation with the recipient, and will actively monitor the project by methods including, but not limited to, ongoing contact with the recipient, and oversight and monitoring of the project ("COOP Provision").[4]

**Alleged DOJ Interference with Freedom's Grants**

In its amended complaint, Freedom complains that OVC interfered with Freedom's *current* federal funding and will interfere with *future* funding it expects to receive. *First*, Freedom claims

---

[2] OVC's TTAC website is a government website providing training and technical assistance for organizations serving victims of human trafficking. https://www.ovcttac.gov/. The statement of work to ICF's contract for TTAC is attached as D. Ex. 5.

[3] For example, the OVC Review Provision is contained in Condition 42 of the Housing Grant. D. Ex. 1 at 15.

[4] The COOP Provision is contained in Condition 48 in Freedom's Housing Grant and Condition 36 in its SOC Grant. See D. Ex. 1 at 18; D. Ex. 3 at 15.

3

it has been harmed over the past year in connection with its existing grants due to OVC's implementation of two executive orders issued in January 2025. Am. PI at 8-9; Decl. ¶¶ 47-78, 108-138.[5] Executive Order 14,151, *Ending Radical and Wasteful Government DEI program and Preferencing* ("EO 14151") directs agencies to "terminate to the maximum extent allowed by law, . . . 'equity-related' grants or contracts." *Id.* § 2(b)(i). Executive Order 14,173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, ("EO 14,173") directs the Office of Management and Budget to terminate government-wide diversity and equity "mandates, requirements, programs, [and] activities." *Id.* § 3(c)(iii). Both EO provisions limit how agencies can use federal funds by directing them to terminate funding and programing related to diversity, equity, and inclusion (collectively, "EO Funding Restrictions"). Freedom challenges both EO provisions because they allegedly caused OVC to "censor" and otherwise interfere with Freedom's funded activity. Am. PI at 8-9.

Freedom admits that OVC has not terminated any of Freedom's grants over the past year due to the EO Funding Restrictions and, in fact, OVC has even extended several of them. Am. PI, Decl. ¶¶ 36, 38. Plaintiff, nevertheless, claims that OVC's implementation of the EO Funding Restrictions frustrated its ability to satisfy the grants' requirements. Am. PI at 8-9. For example, Freedom claims that OVC has demanded changes to Freedom's federally-funded work product, including presentations it expected to be given at a national conference Freedom hosts.[6] It also

---

[5] "Am. PI __" refers to plaintiff's amended motion for preliminary injunction. "Am. PI, "Decl. ¶ __" refers to the referenced paragraphs in Jean Bruggeman's 12/18/25 Declaration, attached to plaintiff's amended motion for preliminary injunction.

[6] *See* Am. PI at 8, Decl. ¶¶ 58-60 (directing grantees that work on "Catalyst" project be paused due to EO directives and that grantees should not proceed on any "public-facing" training materials or presentations until OVC has reviewed them); *id.* at ¶¶ 63-65 (alleging that OVC denied Freedom approval to present its grant-funded training at a conference because the presenter would not agree to limit discussion of pronouns or diverse identities).

claims OVC interfered with a federally-funded housing summit in Minnesota by demanding to review information about conference presentations and other material.[7] Freedom further alleges that OVC issued guidance that listed 50 prohibited terms that cannot appear in any "OVC materials" (*i.e.*, web pages, training content, presentations, etc., that are owned, operated, or produced by OVC). Am. PI at 2; Decl. ¶¶ 52-53. This guidance was directed only to ICF and its subcontractors (including Freedom), for public-facing work performed under the ICF contract for inclusion in OVC's TTAC website. In other words, the restrictions regarding this list of 50 words applied only to OVC's own website and the materials referenced therein, not to any work performed by Freedom or others under their TVPA grants. *Id.*[8]

*Second,* Freedom claims that OVC is interfering with *future* grants it is applying for because the grant awards may contain three provisions identified in the Notice of Funding Opportunity ("NOFO") for these grants. Am. PI at 9-11. Two of the NOFO provisions advise the applicant that grant funds cannot be used to violate certain federal laws that may apply, including (1) immigration laws, such as, but not limited to 8 U.S.C. § 1373, and (2) applicable anti-discrimination laws (collectively, "NOFO Funding Restrictions"). Am. PI 9-11; D. Ex. 6 at 11.[9]

---

[7] Freedom alleges that OVC's request to review summit materials is outside the scope of the Housing Grant. See Am. PI at 8, Decl. ¶¶ 71-2. In fact, the email exchange cited makes clear that the summit was funded as part of Freedom's Housing Grant and that Freedom was simply questioning whether the "save-the-date" and the "invitation materials" requested by OVC were outside the scope of the grant's OVC Review Provision. Decl. ¶¶ 71-72; P. Ex. 11 to Decl.

[8] Contrary to Freedom's allegations, all of the so-called "interference" was not only connected with Freedom's funded work but was also consistent with the funding terms Freedom agreed to that allowed OVC input into and control over Freedom's work product — grant provisions that Freedom does not mention in any of its filings. Am. PI, Decl. ¶¶ 47-78, 108-138.

[9] Exhibit 6 is a copy of the NOFO for OVC FY25 Services for Victims of Human Trafficking, which is the NOFO for which plaintiff will submit an application. This NOFO can also be accessed through https://www.ojp.gov/funding/docs/ovc-2025-172520.pdf.

Neither relates to any programs beyond those that are federally-funded, and neither requires the grantee to certify anything to apply for the grant. These two NOFO Funding Restrictions are contained in all NOFOs that OVC will issue in FY 2025, but the decision as to whether they will be included in the actual grant award will vary depending on the type of grant and will not be decided until the grants are actually awarded.

The third challenged provision in the NOFO is the nondiscrimination certification Condition ("NOFO Certification Condition"), which is a condition that is required under EO 14173, § 3(b)(iv),[10] and *will be* included in every grant award under the grant's general terms and conditions. D. Ex. 6 at 23. The NOFO Certification Condition requires grant recipients to certify that all their programs comply with federal anti-discrimination laws, and to acknowledge that such compliance is material to the federal government's payment decisions for the purposes of the False Claims Act, 31 U.S.C. § 3729(b)(4). *Id.* As explained below, none of these three NOFO provisions will apply unless and until an applicant receives *and* accepts a grant award. *See infra*, p. 22-24.

**Prior Proceedings**

Freedom filed an amended complaint, challenging the four funding restrictions described above (the two EO Funding Restrictions and the two NOFO Funding Restrictions, collectively, "Funding Restrictions") as well as the nondiscrimination certification condition (both the EO Certification Condition and the NOFO Certification Condition, collectively, "Certification Condition"). Dkt. 69. Freedom claims that all challenged provisions violate the Constitution's First and Fifth Amendment, separation-of-powers and Spending Clause, as well as the APA. *Id.*

---

[10] EO 14,173 requires agencies to include in every contract and grant a provision requiring the grantee "to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws" and agree that the certification will be material to government payment decisions. *Id.* § 3(b)(iv).

6

On February 20, 2026, Freedom filed an amended preliminary injunction motion. Dkt. 70. It then filed a TRO on February 23, 2026, claiming more immediate relief based on the three challenged NOFO provisions. Dkt. 71. In support of its TRO, Freedom claims that the challenged NOFO provisions will somehow take effect immediately upon submitting a grant application, which occurred for one of the NOFOs on February 24, 2026. This court granted Freedom's TRO motion on February 24, 2026, and temporarily enjoined application of the three provisions. Dkt. 74.

## Argument

Plaintiff is not entitled to any emergency relief. A preliminary injunction is "'an extraordinary remedy never awarded as of right.'" *Bevis v. City of Naperville, Illinois*, 85 F.4th 1175, 1188 (7th Cir. 2023) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). The movant "'must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Bevis*, 85 F.4th at 1188 (quoting W*inter*, 555 U.S. at 20). For the first factor, the movant must make a "'strong' showing that reveals how it proposes to prove its case." *Id.* For the second factor, "a mere possibility of irreparable harm will not suffice." *Id.* Finally, when "the Government is the opposing party," the assessment of "harm to the opposing party" and "the public interest" merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiff cannot satisfy these requirements.

## I.      Likelihood of Success on the Merits

We first address Freedom's challenges to the four Funding Restrictions, which all direct agencies and grantees how to spend federal funds, and then address Freedom's challenges to the Certification Condition, which reaches beyond the scope of the grant funds. We then explain in

7

connection with Freedom's TRO why there is no harm from the three challenged NOFO provisions until Freedom is awarded and accepts a grant, which will not occur before June 2026.

### A. Funding Restrictions

In *Chicago Women in Trades v. Trump*, 778 F. Supp.3d 959, 985-992 (N.D. Ill. 2025) ("*CWIT*"), this court previously rejected similar challenges to one of the same EO Funding Restrictions at issue in this case (the termination provision in EO 1415). For the same reasons, the court should reject all challenges to the four Funding Restrictions at issue here.

### 1.      No Article III Jurisdiction to Challenge Funding Restrictions

Freedom has no standing to challenge any of the four Funding Restrictions because there is no injury-in-fact. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). As for the Funding Restriction in EO 14173, which requires termination of all government-wide DEI mandates and programs, § 3(c)(iii), Freedom is neither a government agency nor alleges it conducts government-wide DEI "programming for the government." *See CWIT*, 778 F. Supp.3d at 977 (rejecting standing for CWIT to challenge EO 14173, § 3(c)(iii)); *Nat'l Urban League v. Trump*, 783 F.Supp.3d 61, 81 (D.D.C. 2025) ("*NUL*"). As for both EO Funding Restrictions, none of Freedom's grants have been terminated, and there is no genuine threat of termination. Not only has Freedom retained its federal grants for over a year since the EOs were issued, but DOJ has even extended some of them. Moreover, even if the alleged grant-interference complaints constitute an injury-in-fact, this injury is, at most, a breach of contract. However, even that is doubtful since the grant expressly requires the grantee to submit for review to OVC any training or other work product and to correct the product in response to OVC's comments or directives. In any event, disputes arising out of OVC's interference with current grant funding or future grant terminations belong only in the Court of Federal Claims based on Tucker Act principles. 28 U.S.C.

§§ 1346, 1491; *see also NIH v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658 (Mem. 2025); *Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (per curiam).

Additionally, Freedom's challenges to the NOFO provisions are unripe for review for two reasons. *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967) (citation omitted) ("A case is fit for adjudication when the action in controversy is final and not dependent on future uncertainties."). As explained, OVC has not yet made a decision on whether the two NOFO Funding Restrictions will be included in the grant awards, and if so, in what form. Moreover, we won't know if Freedom has standing to challenge any of the three NOFO provisions until grant awards are made.

### 2. First Amendment Claim Lacks Merit.

Plaintiff argues that the EO and NOFO Funding Restrictions violate the First Amendment because they are vague, overbroad, and amount to viewpoint discrimination. Am. PI at 16-18. These claims fail for the same reasons this court rejected similar claims in the *CWIT* case — because the Funding Restrictions pertain to the government acting as *patron* to subsidize speech, as opposed to when it acts as sovereign to *regulate* it. *CWIT*, 778 F. Supp.3d at 985-989. "The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest . . . . In so doing, the government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other." *Rust v. Sullivan*, 500 U.S. 173, 193 (1991). Thus, as a "general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds. This remains true when the objection is that a condition may affect the recipient's exercise of its First Amendment rights." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) ("AID") (collecting cases).

The First Amendment can prohibit unconstitutional conditions on federal funding, but no violation occurs when the government specifies "the activities" it "wants to subsidize" and does

not "leverage funding to regulate speech outside the contours of the programs itself." *AID*, 570 U.S. at 214-15. Here, none of the Funding Restrictions prohibits use of federal funds based on a grantee's speech or activities outside the scope of the funded activities — *i.e.*, they do not prohibit entities from engaging in protected speech on their "own time and dime." *Id.* at 218. Accordingly, the Funding Restrictions do not impose viewpoint discrimination or an unconstitutional condition on Freedom's speech. *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump* (*Diversity Officers*) No. 25-1189 at 7 (4th Cir. Mar. 14, 2025) (Harris, J., concurring); *see also NUL*, 783 F. Supp.3d at 98-101; *CWIT*, 778 F. Supp.3d at 986-7.[11]

Nor can Freedom show the Funding Restrictions are unlawful based on the First Amendment coercive threat framework articulated in *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 198 (2024), which instead applies to government *coercion* when the government is acting as "sovereign," not funding limitations when the government is acting as "patron." Courts have applied the coercive threat framework when government officials send targeted communications threatening investigations and prosecutions, not when the government chooses whether to subsidize certain speech. *Id.* As this court and others have found, this coercive threat framework does not apply to mere funding limitations. *CWIT*, 778 F. Supp.3d at 986 (distinguishing *Vullo*).

Finally, insofar as Freedom contends that the EO Funding Restrictions impose a chilling effect on protected speech by being *vague*, that contention lacks merit when applied to funding decisions. The Supreme Court in *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569 (1998), rejected

---

[11] Much of the speech at issue in this case is essentially the government's own speech. *See Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015) ("When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says."). Although procured by grants and contracts, the funded content identified in the complaint by Freedom and other grantees constitutes training that is placed on government websites or presented to the public to protect victims of human trafficking.

application of any demanding vagueness standard to government funding decisions. It concluded that when the government acts "as patron," it does not infringe on constitutionally protected speech even when it articulates funding standards with "imprecision." *Id.* at 589. Rather, "as it bears upon First Amendment concerns, the vagueness doctrine addresses the problems that arise from government regulation of expressive conduct," not "government grant programs." *Id.* at 599 (Scalia, J., concurring). As a result, no First Amendment concern exists even though, "as a practical matter," federal funding recipients "may conform their speech to what they believe to be" the "decisionmaking criteria in order to acquire funding." *Id.* at 588; *CWIT*, 778 F. Supp.3d at 987 (citing *Finley*).

### 3. Due Process Claim Lacks Merit.

None of challenged provisions are unconstitutionally vague for the same reasons this court rejected similar due process claims in *CWIT*. *CWIT*, 778 F. Supp.3d at 987-89. Starting with the EO Funding Restrictions, and even assuming that courts can apply the vagueness doctrine to render void the President's directives to his own subordinates, none of that direction is unconstitutionally vague. This court correctly found that the terms "equity-related" and "to the maximum extent allowed by law" contained in EO 14151, § 2(b)(i) are not unconstitutionally vague. *Id.* When "the Government is acting as a patron rather than as a sovereign," as in the federal funding context here, "the consequences of imprecision are not constitutionally severe." *Finley*, 524 U.S. at 589. *See also, See National Association of Diversity Officers in Higher Education v. Trump*, 167 F.4th 86, 101-2 (4th Cir. 2026) ("*NADOHE"*), (applying *Finley* and rejecting plaintiff's due process challenge to the termination provision in EO 14151); *NUL*, 783 F. Supp.3d at 95-96. So too should this court find there is nothing unconstitutionally vague in the EO Funding Restriction concerning termination of government-wide DEI programs in EO 14173 § 3(c)(iii). And to the extent future grant awards contain the two challenged NOFO Funding Restrictions, it can hardly be considered

11

unconstitutionally vague in the context of federal funding to remind grantees not to use federal funds to violate applicable federal laws passed by Congress.

Freedom's due process challenge should also be rejected for three additional reasons. *First*, a "void-for-vagueness challenge is ultimately a due-process claim," so "a plaintiff must allege that he was deprived of a constitutionally-protected property or liberty interest," but Freedom alleges no such deprivation from any executive order provision. *McClelland v. Katy Ind. Sch. Dist.*, 63 F.4th 996, 1013 (5th Cir. 2023). And Freedom lacks any property interest in its "'ordinary' or 'routine' government contracts" and grants. *NUL*, 783 F. Sup.3d at 93-94; *Gizzo v. Ben-Habib*, 44 F. Supp. 3d 374, 385 (S.D.N.Y. 2014); *New Vision Photography Program*, *Inc.*, *v. District of Columbia*, 54 F. Supp. 3d 12, 29 (D.D.C. 2014) ("The Supreme Court has never held that government contracts for goods and services create property interests protected by due process.") (citation omitted). Additionally, no provision implicates protected speech for reasons discussed above.

*Second*, the vagueness doctrine addresses "two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *F.C.C. v. Fox Television Stations*, *Inc.*, 567 U.S. 239, 253 (2012). Thus, courts have traditionally applied vagueness doctrine to *statutes* that *proscribe conduct* because the doctrine "guarantees that ordinary people have 'fair notice' of the conduct that a *statute proscribes*," *Sessions v. Dimaya*, 584 U.S. 148, 156 (2018) (plurality) (emphasis added), and otherwise limit the doctrine's reach to statutes and regulations governing primary conduct. *FCC v. Fox Television Stations*, *Inc.*, 567 U.S. 239, 253 (2012). No purpose of the doctrine is implicated, however, when the President provides directives to his subordinates. *NUL,*

12

783 F.Supp.3d at 94-95 (rejecting Fifth Amendment vagueness challenges to EO Termination provision).

*Third*, the only appropriate posture for Freedom's vagueness challenges is an as-applied one. "Objections to vagueness under the Due Process Clause rest on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk." *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988). No specific case is at issue for Freedom's *facial* challenge. While the Supreme Court recognized a rare exception permitting facial vagueness challenges in *Johnson v. United States*, 576 U.S. 591 (2015), that exception has only been applied once outside the criminal context, and even there, the Court justified its extension to a civil deportation statute by explaining that "deportation is a particularly severe penalty, which may be of greater concern to a convicted alien than any potential jail sentence," *Dimaya*, 584 U.S. at 157. Thus, the exception does not apply to the President's directives to his subordinates.

### 4. Separation-of-Powers and Spending Clause Claim Lacks Merit.

Freedom's separation-of-powers and Spending Clause challenges to the Funding Restrictions fail at the threshold because they are not constitutional claims under *Dalton*. In any event, these claims fail both facially and as applied because Congress granted DOJ discretion to impose reasonable limitations on how TVPA grants are spent.

*First*, *Dalton v. Specter*, 511 U.S. 462 (1994), forecloses plaintiff's ability to raise statutory arguments with constitutional dressing. There, the Supreme Court reversed a federal circuit court that had "reasoned, relying primarily on *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), that whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine." *Id.* at 471. The Court stated this reasoning was incorrect because the Supreme Court's "cases do not support the proposition that every action by

13

the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Id.* at 472. Instead, the Court "often distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* Therefore, "claims simply alleging that the President [or an executive officer] has exceeded his statutory authority are not 'constitutional' claims, subject to judicial review." *Id.* at 473; *see Climate United Fund v. Citibank, N.A.*, , 2025 WL 2502881, at *10 (D.C. Cir. Sept. 2, 2025) (citing cases); *New York v. NSF*, No. 25-cv-4452, 2025 LEXIS 148779 (S.D.N.Y. Aug. 1, 2025). Because plaintiff's constitutional claims focus entirely on its contention that OVC has not acted consistent with its statutory appropriations obligations, such claims are untenable under *Dalton*.[12]

*Second*, this court has already found in *CWIT* that a facial challenge to the Funding Restriction in EO 14151, § 2(b)(i) fails because plaintiff cannot show that the provision "conflicts with *every* statute that appropriates funds for grants," as it must to succeed on any facial challenge. *CWIT*, 778 F. Supp.3d at 990 (citing *Ezell v. City of Chicago*, 651 F.3d 684, 698 (7th Cir. 2011)). For this same reason, Freedom's facial challenge to the EO Funding Restriction concerning government-wide DEI programs in EO 14173 § 3(c)(iii) also fails, to the extent Freedom has standing to challenge it.

*Third*, Freedom's as-applied challenges to each of the four Funding Restrictions fail because they do not violate any Congressional statute. Indeed, Congress provided DOJ, the same agency that investigates and prosecutes violations of federal human trafficking laws, with discretion to both create and administer grant programs under the TVPA. This includes the discretion to set

---

[12] This court rejected defendants' *Dalton* argument in *CWIT* based on its conclusion that, as related WANTO grant at issue in that case, Congress left no discretion to the Executive and mandated it spend funds for "equity-related" purposes. *CWIT*, 2025 WL 1331743, at*5 (N.D. IL, May 7, 2025). As explained above, Congress issued no such mandates related to grants authorized under the TVPA, and thus, *Dalton* should apply.

14

goals and priorities for the program, select grantees, determine how much funding each grantee receives, and determine what activities should be funded. *See e.g. Morton v. Ruiz*, 415 U.S. 199, 230-231 (1974) (When Congress provides limited funding to cover services for non-federal entities, the agency administering the funding must, in the absence of statutory direction from Congress, be able to create classifications and eligibility requirements to allocate the limited funding). Neither the appropriations act nor the underlying TVPA statute limits the type of grant programs OVC can create or how it should administer them. Thus, Congress did not implicitly or expressly require OVC to spend money under TVPA grant programs that would fund equity-related projects or allow grantees to use the funds to violate applicable federal laws.

Nor does Freedom point to any applicable Congressional directive to the contrary.[13] Nowhere does Congress indicate that TVPA grants (or even some portion of them) must be directed to assist human trafficking victims of only a particular race or gender or immigration status. Nor does Congress require that training and technical assistance provided with TVPA funding must include certain equity-related language. The fact that Congress may have used certain equity-related words in the statute or legislative history, *see* Am. PI, Appendix. A, does not mean that federally-funded training must use those same words. Thus, while Freedom may wish to provide services to only certain genders or races of trafficking victims, and to infuse DEI language into its training, this is not required by Congress.[14]

---

[13] Freedom claims that Congress has recognized that women and girls are not the only victims of trafficking and has "expanded the scope of the TVPA to include 'men, women, and children who are diverse with respect to race, ethnicity, and nationality.'" Am. PI. at 3. But this language merely acknowledges the diversity of trafficking victims. It does not suggest, much less require, that grant programs must serve only certain genders or races of trafficking victims or that they include diversity, equity, or inclusion initiatives.

[14] Freedom claims that the immigration NOFO Funding Restriction conflicts with the confidentiality requirement under the Violence Against Women Act of 1994, 34 U.S.C. §12291(b)(2) ("VAWA Confidentiality Provision"). Am. PI. at 10. Indeed, both the VAWA

15

Finally, Freedom claims that Funding Restrictions are unrelated to the purpose of the federal funding. Am. PI at 115. But the reasonable relation requirement is a "low-threshold," and "not demanding." *City of Los Angeles v. Barr*, 929 F.3d 1163, 1175 (9th Cir. 2019). The Supreme "Court has never struck down a condition on federal grants based on th[e] relatedness prong." *Id.*

There is no need for this court to break new ground, as agencies have long applied grant restrictions like the two NOFO Funding Restrictions prohibiting use of federal funds to violate federal law to further all manner of purposes and objectives. *See, e.g.*, 2 C.F.R. § 200.303(b) (requiring all recipients of federal grants to "[c]omply with the U.S. Constitution, Federal statutes, regulations, and the terms and conditions of the Federal award"). This is certainly true when the provisions at issue are simply funding limitations that restrict the use of federal funds, rather than funding *conditions* that may apply beyond the funded work.

### 5. APA Claim Lacks Merit.

Relying primarily on arguments made in support of its separation-of-powers' claims (i.e., the NOFO Funding Restrictions conflict with, and are unrelated to, the TVPA), Freedom also alleges that the challenged NOFO provisions violate the APA. Am. PI at 15-16. These claims should be rejected as an initial matter because they do not constitute final agency action as required under APA. *See* 5 U.S.C. § 704; *Air Espana v. Brien*, 165 F.3d 148, 152 (2d Cir. 1999) ("The APA explicitly requires that an agency action be final before a claim is ripe for review."). As explained, OVC has made no final decision as to whether and in what form it will include the two NOFO

---

Confidentiality Provision and the immigration Funding Restriction currently appear in OVC's anti-trafficking NOFOs. However, whether grantees must comply with either provision depends on whether OVC includes them as formal requirements in the final grant award. Because awards have not yet been issued, it is premature to determine which conditions will apply to specific awards, the form those conditions will take, and whether any conflict exists between those conditions. If OVC issues an award containing provisions that appear to conflict, as Freedom predicts, OVC will provide guidance to resolve the conflict.

16

Funding Restrictions in the final awards.[15]  However, even if the court were to reach the merits of Freedom's APA claims, they would fail for the same reasons explained above — these NOFO Funding Restrictions are related to, and consistent with, the TVPA.

Additionally, a decision to include NOFO Funding Restrictions in the final awards would not be arbitrary or capricious.  Judicial review under the APA's arbitrary-and-capricious standard "is deferential, and a court may not substitute its own policy judgment for that of the agency."  *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). That review is "narrow."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  All that is required is for the agency to "act[] within a zone of reasonableness."  *Prometheus*, 592 U.S. at 423.

There is nothing new nor arbitrary and capricious about prohibiting grantees from using federal funds to violate applicable federal law — which is all the two challenged NOFO Funding Restrictions require.  The authority to withhold payments from grantees based on noncompliance with federal law is well established in the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 2 C.F.R. Part 200, which broadly recognize agency authority to withhold, terminate, suspend, disallow, or recover federal funding.  *See* 2 C.F.R. §200.300(a) (DOJ must administer federal awards in a manner that ensures "that Federal funding is expended and associated programs are implemented in full accordance with the U.S. Constitution, applicable Federal statutes and regulations.").  Freedom's existing grant agreements confirm that if an award recipient is noncompliant with, among other things, "applicable federal

---

[15]  These provisions are included in the NOFO under "Unallowable Uses of Funds" to advise applicants that they may be included in the final grant award.  D. Ex. 6, at 11.  They are not contained in the "General Conditions" for FY 2025 awards (accessed through "Legal Overview-FY 2025 Awards" at D. Ex. 6, p. 30), which lists the conditions that *will be* incorporated into the TVPA grant awards.  *See Chicago v. Noem*, 2025 WL 3251222 at *6 (N.D. Ill, Nov. 21, 2025), (noting that conditions contained in the agency's "Standard Terms and Conditions" *will be* contained in all agency grants issued in the 2025 fiscal year, thereby establishing a final agency decision for APA purposes).

17

statutes," the agency can "take other remedies," including "actions to disallow costs, recover funds, wholly or partly suspend or terminate the award, initiate suspension and debarment proceedings, withhold further federal awards, or take other remedies that may be legally available."

The NOFO Funding Restrictions, again, do not impose new obligations, nor do they extend those obligations outside the scope of the grant funds. Although these provisions may have been worded differently in the past, DOJ has long required that recipients not use federal funds to violate applicable law. Thus, these are not "new conditions" but rather are reminders of eminently reasonable funding limitations.

## B. Certification Condition

This court should reject Freedom's challenges to the Certification Condition on both jurisdictional grounds and on the merits for the reasons set forth below and those contained in three recent cases issued since the court's decision in *CWIT*. *See NADOHE*, 167 F.4th at 102-4; *NUL*, 783 F. Supp.3d at 102-104; *San Francisco A.I.D.S. Found. v. Trump*, 786 F. Supp.3d at 1222.

### 1. No Standing to Challenge Certification Condition

Freedom lacks standing to challenge the Certification Condition because certifying compliance with federal civil rights laws is not an injury-in-fact. Plaintiffs bringing pre-enforcement challenges under the First Amendment "must make one of two showings to establish an injury in fact." *Speech First v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020). "*First*, a plaintiff may show an intention to engage in a course of conduct arguably affected by a policy, and that he faces a credible threat [that] the policy will be enforced against him when he does." *Id.* (emphasis added). "*Second*, a plaintiff may show a chilling effect on his speech that is objectively reasonable, and that he self-censors as a result." *Id.* (emphasis added).

Freedom does not satisfy the first prong because it does not claim any intent to violate the civil rights laws, which is the only conduct covered. The Certification Condition in this case

18

requires nothing more than a statement that Freedom is complying with laws it was already required to follow. Thus, Freedom has not claimed that it plans to illegally discriminate within the meaning of the Certification Condition, and it has offered no credible reason to believe that the government will nevertheless treat its certification as false and take enforcement action accordingly.

Nor does Freedom satisfy the second standing test in a pre-enforcement First Amendment challenge. It cannot rely on any chill traceable to its erroneous belief that the Certification Condition implicates *every* program that "promotes" DEI. However sincerely felt, fear of adverse action cannot be objectively reasonable if it is based on an objectively incorrect understanding of the law. *See Speech First*, 968 F.3d at 638. To the extent Freedom has changed its behavior because it erroneously believes that the Certification Condition implicates all DEI activities rather than only those that are independently unlawful, it cannot manufacture standing merely by inflicting harm on itself based on its fears of a different executive order than the one the President signed. And even if Freedom had established an objectively reasonable chill as to its non-federally funded speech, it would still lack standing because it has not shown any "self-censor[ship] as a result." *See Speech First*, 968 F.3d at 638. Indeed, its own allegations demonstrate that rather than self-censoring, it has simply responded to directives from OVC about modifying funded content to align with policy objectives in the EOs.

### 2. First Amendment Claim Lacks Merit.

Freedom's First Amendment challenge to the Certification Condition fails on the merits for similar reasons. There is nothing remotely unlawful about requiring recipients of federal grants to affirm that any DEI programs they operate comply with the antidiscrimination laws and to acknowledge that the government considers compliance with such laws are material to its payment decisions.

At bottom, the Certification Condition does not violate the First Amendment because it imposes no new requirements on Freedom's primary conduct. It does not require Freedom to certify that it does not advocate for or promote DEI. *NADOHE*, 167 F.4th at 102-4; *NUL*, 783 F.Supp.3d at 1-2-4; *San Francisco A.I.D.S. Found.*, 783 F. Supp.3d at 102. Nor does it require Freedom to certify that it does not advocate for violations of the law. *NADOHE*, 167 F.4th at 103; *San Francisco A.I.D.S. Found.*, 786 F. Supp.3d at 1222 (while "the First Amendment may protect speech that advocates for violation of law, it does not protect activities that directly violate antidiscrimination law."). Rather, it simply requires Freedom to certify compliance "with federal antidiscrimination laws, which the First Amendment doesn't confer a right to violate." *NADOHE*, 167 F.4th at 103. Such existing antidiscrimination laws include Title VI of the Civil Rights Act of 1964, which applies to all recipients of federal assistance, 42 U.S.C. § 2000d-1—rules that are already binding independent of any certification requirements. *Id.* at 104 (existing federal law "already demands such compliance"). The Certification Condition does nothing more than require a certification that these pre-existing obligations are being honored.

Nor does the Certification Condition require a certification that a grantee's DEI programs conform with some particular interpretation of federal law that the government has yet to announce. Rather, like other longstanding certification requirements, it simply requires entities to acknowledge their existing obligations under already "applicable Federal anti-discrimination laws" and to recognize that they may face liability if they make a knowingly false statement in this respect. If the government "misinterprets federal antidiscrimination law," then Freedom will have ample future opportunity to "challenge that interpretation in a specific enforcement action." *NADOHE*, 167 F.4th at 104. But that remote possibility cannot support a facial First Amendment challenge today.

### 3. Due Process Claim Lacks Merit.

The Fifth Amendment challenge to the Certification Condition is a nonstarter. As the defendants explained above, the vagueness doctrine is inapplicable here. *Supra* at 11-13. Freedom has also identified no protectable property interest in the routine grants or contracts at issue, *supra* at 11-13, and no liberty interest in any speech since the Certification Condition does not apply to speech. Finally, even if the challenge were viable, the Certification Condition is not vague because it concerns compliance with established federal antidiscrimination law, *supra* at 11-13; *see also NUL*, 783 F.Supp.3d at 96 (rejecting vagueness challenge to the Certification Condition).

### 4. Separation-of-Powers and Spending Clause Claim Lack Merit.

Freedom's separation-of-powers and Spending Clause challenge to the Certification Condition is based entirely on the argument that Congress did not authorize DOJ to impose this condition. This claim fails at the threshold because it is a statutory claim disguised as a constitutional one precluded by the Supreme Court's decision in *Dalton*. *See supra* 13-14. In any event, this challenge fails on the merits because OVC is duly authorized, and indeed is *required*, to include conditions to ensure that recipients comply with anti-discrimination law. *See* 2 C.F.R. § 200.300(a).

As an initial matter, any facial challenge to the EO's certification provision, EO 14173 § 3(b)(iv)(B), lacks merit because Freedom cannot show that the provision's requirement that recipients certify that they do not operate illegal DEI programs is unconstitutional in all applications. *See Ezell*, 651 F.3d at 698. Additionally, while "new conditions on federal funds" may implicate separation of powers, *see Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 516 (N.D. Cal. 2017) (emphasis added), no such concern arises when the Executive merely reinforces preexisting legal obligations. Here, the Certification Condition imposes no new requirements, adopts no new construction of any federal antidiscrimination law, and does not declare all DEI to

21

be illegal. *See NADOHE*, 167 F.4th at 102-4; *NUL*, 783 F. Supp.3d at 102-104; *San Francisco A.I.D.S. Found*, 786 F. Supp.3d at 1222. Indeed, OVC is *required* to include conditions to ensure that recipients comply with anti-discrimination law. *See* 42 U.S.C. § 2000d; 2 C.F.R. § 200.300(a); 2 C.F.R. § 200.211(c)(1)(ii); § 200.303(b). The Certification Condition sensibly implements Title VI. That Congress did not specifically spell out in the TVPA that OVC must enforce anti-discrimination laws in connection with TVPA grants does not remove OVC's authority to ensure that recipients follow those laws.[16]

## II.     The TRO Should Be Vacated.

The court entered a TRO on February 24, 2026, based on Freedom's claims that the two NOFO Funding Restrictions concerning immigration and discrimination will cause harm when Freedom applies for these grants. Dkt. 74. On March 2, 2026, Freedom submitted a second supplemental declaration and exhibits in support of its TRO. Dkt. 76. This court should vacate the TRO for all the reasons set forth above responding to Freedom's preliminary injunction motion. Moreover, as explained below, the NOFO Funding Restrictions—assuming they are ultimately included in a grant award— do not apply until an applicant receives and accepts a grant award.[17]

Freedom clarifies in its supplemental filing that it will be harmed in two ways if the NOFO Funding Restrictions remain in the NOFO. *First*, Freedom claims it will be forced to modify its

---

[16] For these same reasons, as well as those above regarding Freedom's APA challenges to the NOFO Funding Restrictions, *supra,* at 17-18, Freedom's APA challenge to the Certification Condition should also be denied. Although the Certification Condition is a condition that extends beyond the scope of the funded programs, these obligations are not new, as Freedom is already required to comply with applicable nondiscrimination laws.

[17] As a practical matter, the court's resolution on the preliminary injunction motion may also resolve the TRO. However, defendants include this section to address the discrete injury claim raised only in the TRO and to make clear that there are grounds to vacate the TRO and revert to the original preliminary injunction briefing schedule.

action and speech to avoid its grant application from being negatively assessed or rejected. Dkt. 76-1, ¶ 24. Freedom alleges that its application will highlight that it favors women and immigrants and, therefore, it must choose between (1) modifying its application to omit this information; and (2) keeping the information in and being negatively assessed because it may be seen as contrary to the NOFO Funding Restrictions. But as explained above, the government can favor certain views in selecting who to award in competitive grant programs without violating the constitution. *Supra,* at 9-11. Moreover, having to tailor a grant application in order to improve your chances of securing a competitive grant award does not impinge on any constitutional right. *Finley*, 524 U.S. at 588 ("as a practical matter," federal funding recipients "may conform their speech to what they believe to be" the "decisionmaking criteria in order to acquire funding."). Finally, enjoining these provisions does not secure the relief Freedom seeks, as the government has discretion when awarding discretionary competitive grants to disfavor applications that may violate the law or that are inconsistent with agency priorities, even without the two NOFO Funding Restrictions expressly limiting the type of work for which grantees can seek reimbursement.

*Second*, Freedom claims that the NOFO Funding Restrictions somehow apply immediately upon submission of an application, since the application requires Freedom to certify that it "will comply with all award requirements and all federal statutes and regulations applicable to the award." *Id.* ¶ 19.[18] However, the only reasonable interpretation of this language is that the

---

[18] Freedom no longer appears to claim that the NOFO Funding Restrictions apply upon submission of the SF 424, which states in box 21 that the applicant certifies "to the statements contained in the list of certifications" and provides "the required assurances." *See* D. Ex. 7. This is for good reason. Both the Certifications (attached as D. Ex. 8) and the Certified Standard Assurances (attached as D. Ex. 9) are referenced in SF 424 as well as at page 23 of the NOFO and both are accessible through the "Application Resource Guide" referenced therein: https://www.ojp.gov/funding/apply/ojp-grant-application-resource-guide#administrative. The certifications contained in the *Certified Standard Assurances* make clear they are only applicable after an applicant receives and accepts an award. The certifications contained in the *Certifications*

applicant understands *that if it receives and accepts an award*, it will need to comply with all award requirements. Certainly, an applicant is not required to comply with grant terms and award requirements for an award it never receives or accepts. This is particularly true for these two NOFO Funding Restrictions, as they simply advise the grantee how it can spend the grant funds, which is irrelevant if it never receives or accepts an award.

### III. Plaintiff Has Failed to Demonstrate Irreparable Harm.

Plaintiffs seeking the extraordinary remedy of a preliminary injunction must also "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22 (citation omitted). The "possibility" of such harm is insufficient, *id.*, as is "speculative injury". *Id.* at 21. "Neither is a 'better than negligible'" chance. *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020). *See Caribbean Marine Servs. Co. v. Baldridge*, 844 F.2d 668, 674 (9th Cir 1988) (plaintiffs must show both immediacy and likelihood that they will be irreparably harmed absent emergency relief).

Plaintiff has failed to make that showing here because, fundamentally, the harms it asserts are economic. *See, e.g.*, Mot. at 21-22 (describing "budgetary uncertainty" and other "financial" harms). Freedom seeks the payment—on the terms that it prefers—of federal funds pursuant to its contracts with the federal government. The associated injuries plaintiff asserts are thus definitionally not irreparable, *see, e.g.*, *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320-21 (9th Cir. 1994); *Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991), particularly because the plaintiff alleges no "threat of being driven out of business." *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985) (citation omitted).

---

are applicable upon submission of the application, but they only relate to lobbying, debarment, taxes, and drug-free workplace requirements.

24

Plaintiff also asserts that it may face harm from being put to the choice between two equally untenable options: acceding to unlawful and unascertainable conditions, or foregoing grant awards. That argument fails. There is no constitutional violation, and it is always the case that "if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds." *AID*, 570 U.S. at 214. If a party makes the voluntary choice to forego those funds, any resulting economic harm cannot constitute an irreparable injury attributable to the federal government. Nor does plaintiff demonstrate that the acceptance of terms it considers to be "unconstitutional"—but that require them to comply with otherwise applicable federal law— imposes any concrete, imminent harm necessitating preliminary relief.

## IV.     The Balance of the Equities Favors Denying the Motion.

Plaintiff must also demonstrate that "the balance of equities tips in [their] favor" and "an injunction is in the public interest." *Winter*, 555 U.S. at 20 (citation omitted). These "factors merge when the Government is the opposing party." *Nken*, 556 U.S. at 435.

In arguing that the public interest weighs in their favor, plaintiff mostly repackages its on alleged irreparable harm and on the merits. Those arguments fail. On the other hand, granting plaintiff's motion would significantly disrupt OVC's ongoing consideration of grant applications and would prevent OVC from disbursing finite federal funding to thousands of other applicants for these same discretionary grant programs. *See Trump v. Wilcox*, 145 S. Ct. 1415 (2025) (granting request for stay of injunction "to avoid [] disruptive effect[s]" on government operations). Further, a preliminary injunction risks irreparable harm to the government and to the public interest by requiring the payment of money that the government may never recover. *See NIH*, 145 S. Ct. 2658. This decision must "inform how a court should exercise its equitable discretion in like cases." *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025). Therefore, the balance of the equities and public interest favor denying plaintiff's request for relief.

25

**Conclusion**

For the foregoing reasons, the court should deny plaintiff's motion for a preliminary injunction and vacate the TRO.

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

By: s/ Patrick Johnson
    THOMAS P. WALSH
    PATRICK JOHNSON
    Assistant United States Attorneys
    219 S. Dearborn Street, 5th Floor
    Chicago, Illinois 60604
    (312) 353-5327
    (312) 353-5312
    thomas.walsh2@usdoj.gov
    patrick.johnson2@usdoj.gov

26