**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **FREEDOM NETWORK USA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **PRESIDENT DONALD J. TRUMP,** | ) | |
| **OFFICE OF MANAGEMENT AND** | ) | |
| **BUDGET, DIRECTOR OF THE OFFICE** | ) | |
| **OF MANAGEMENT AND BUDGET** | ) | **Case No. 25 C 12419** |
| **RUSSELL VOUGHT, U.S.** | ) | |
| **DEPARTMENT OF JUSTICE, OFFICE** | ) | |
| **OF JUSTICE PROGRAMS, OFFICE** | ) | |
| **FOR VICTIMS OF CRIME,** | ) | |
| **ATTORNEY GENERAL OF THE U.S.** | ) | |
| **DEPARTMENT OF JUSTICE PAMELA** | ) | |
| **BONDI,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

MATTHEW F. KENNELLY, District Judge:

Freedom Network USA, a non-profit coalition of advocates, service providers,

and survivors working to end human trafficking and protect survivors, alleges that

several provisions of Executive Orders 14151 and 14173 and other provisions of the

Notices of Funding Opportunities (NOFOs) for certain grants under the Trafficking

Victims Protection Act (TVPA) violate the First Amendment, the Fifth Amendment, the

separation of powers, and the Spending Clause. Freedom Network also alleges that

the NOFO conditions violate the Administrative Procedure Act (APA). Freedom

Network filed an emergency motion for a temporary restraining order on February 23,

2026, which the Court granted after a hearing on February 24, 2026. The Court then

extended that order through March 24, 2026.  Freedom Network has filed a motion for a preliminary injunction.  For the reasons below, the Court grants Freedom Network's motion for a preliminary injunction in part.

**Background**

Freedom Network USA describes itself as "the nation's largest non-profit coalition of advocates, service providers, and survivors working to end human trafficking and protect survivors . . . by providing equity-driven training and technical assistance to thousands of private and public stakeholders . . . as well as direct services to thousands of survivors each year[.]"  Am. Compl. ¶ 2 (footnote omitted).  Freedom Network provides these services across the nation to thousands of survivors each year and trains thousands of private and public stakeholders nationwide.  Its programs include the Housing Training and Technical Assistance program, which provides "immigration-focused training and technical assistance to housing providers serving immigrant survivors[,]" and the Survivor Reentry Project, "the only national program providing criminal record relief for survivors of human trafficking" and serving those with criminal charges in multiple jurisdictions.  *Id.* ¶¶ 50–51.  Freedom Network is also researching and developing National Standards of Care for service providers regarding the needs of trafficking survivors.

The TVPA defines "sex trafficking" as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purpose of a commercial sex act."  22 U.S.C. § 7102(12).  The TVPA defines "severe forms of trafficking in persons" as "sex trafficking in which a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such

2

act has not attained 18 years of age" or "the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery."  *Id.* § 7102(11).

Under the TVPA, "[s]ubject to the availability of appropriations, the Attorney General may make grants to States, Indian tribes, units of local government, and nonprofit, nongovernmental victims' service organizations to develop, expand, or strengthen victim service programs for victims of human trafficking[.]"  *Id.* § 7105(b)(2)(A).  Grants may be made for victims who are either "between 12 and 24 years of age" and "homeless, in foster care, or involved in the criminal justice system;" "transitioning out of the foster care system;" or "women or girls in underserved populations."  *Id.*  The statute defines "underserved populations" as those who "face barriers in accessing and using victim services, and includes populations underserved because of geographic location, religion, sexual orientation, gender identity, underserved racial and ethnic populations, populations underserved because of special needs (such as language barriers, disabilities, alienage status, or age)[.]"  34 U.S.C. § 12291(a)(46).  The TVPA further provides that "[o]f amounts made available for grants under this paragraph, there shall be set aside" specific percentages:  "three percent for research, evaluation, and statistics;" "[five] percent for training and technical assistance, including increasing capacity and expertise on security for and protection of service providers from intimidation or retaliation for their activities;" and "one percent for management and administration."  22 U.S.C. § 7105(b)(2)(B).

In fiscal year 2025, Congress appropriated $88 million for services for

3

trafficking victims under 22 U.S.C. § 7105(b). The Office for Victims of Crime (OVC) of the Department of Justice (DOJ) administers grants under the TVPA.

The TVPA has a variety of other provisions. These include provisions relating to immigration benefits for immigrants who have been subject to severe trafficking and may serve as witnesses, *id.* § 7105(c)(3), and others relating to the prevention, investigation, and prosecution of trafficking. *Id.* §§ 7104, 7104b, 7109.

Seventy percent of Freedom Network's funding comes through federal funding appropriated by Congress pursuant to the TVPA and awarded through the OVC. Freedom Network has consistently applied for and been awarded federal funding since 2017. It receives federal grant funding of $800,000 for the Survivor Reentry Project, $1.2 million for its National Standards of Care project, and about just under $2 million for the Housing Training and Technical Assistance Project. Freedom Network is also a subrecipient of $150,000 to a federal grant to the Coalition Against Slavery and Trafficking under the Human Trafficking Training and Technical Assistance Program. Freedom Network was previously a subcontractor to the Inner City Fund on its Technical Assistance Collective awarded by the OVC.

In this suit, Freedom Network challenges three provisions of two executive orders and three funding conditions included in DOJ's NOFOs for grants under the TVPA.

## A.     Executive orders

In January 2025, President Trump promulgated two executive orders related to diversity, equity, and inclusion (DEI). *See* Exec. Order No. 14151, Ending Radical and Wasteful Government DEI Programs and Preferencing, 90 Fed. Reg. 8339 (Jan. 20,

4

2025); Exec. Order No. 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, 90 Fed. Reg. 8633 (Jan. 21, 2025).

Executive Order 14151 (the J20 Order) declares a policy of ending "illegal and immoral discrimination programs, going by the name 'diversity, equity, and inclusion' (DEI)." Exec. Order No. 14151, 90 Fed. Reg. 8339, § 1. Executive Order 14173 (the J21 Order) similarly denounces a perceived practice of "critical and influential institutions of American society" adopting "dangerous, demeaning, and immoral race- and sex-based preferences under the guise of so-called [DEI] or 'diversity, equity, inclusion, and accessibility' (DEIA) that can violate the civil-rights laws[.]" Exec. Order No. 14173, 90 Fed. Reg. 8633, § 1. The J21 Order further commands "all executive departments and agencies . . . to terminate all discriminatory and illegal preferences, mandates, policies, programs, activities, guidance, regulations, enforcement actions, consent orders, and requirements . . . [and] to enforce our longstanding civil-rights laws and to combat illegal private-sector DEI preferences, mandates, policies, programs, and activities." *Id.* § 2.

Freedom Network challenges three provisions implementing these policies. First, Freedom Network challenges section 2(b)(i) of the J20 Order (the J20 termination provision). That section provides:

> Each agency, department, or commission head, in consultation with the Attorney General, the Director of OMB [Office of Management and Budget], and the Director of OPM [Office of Personnel Management], as appropriate, shall take the following actions within sixty days of this order: . . . terminate, to the maximum extent allowed by law, all . . . "equity-related" grants or contracts[.]

Exec. Order 14151, 90 Fed. Reg. 8339, § 2(b)(i).

Freedom Network also challenges two provisions of the J21 Order. Section

5

3(c)(iii) of the J21 Order (the J21 termination provision) provides:

> The Director of the Office of Management and Budget (OMB), with the assistance of the Attorney General as requested, shall: . . . Terminate all "diversity," "equity," "equitable decision-making," "equitable deployment of financial and technical assistance," "advancing equity," and like mandates, requirements, programs, or activities, as appropriate.

Exec. Order 14173, 90 Fed. Reg. 8633, § 3(c)(iii). Section 3(b)(iv) of the J21 Order (the J21 certification provision) states that "[t]he head of each agency shall include in every contract or grant award: . . . A term requiring such counterparty or recipient to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." *Id.* § 3(b)(iv).

## B.      Funding conditions

Federal agencies must announce funding opportunities in NOFOs describing the available grant funding. *See* 2 C.F.R. § 200.204. In December 2025, pursuant to the TVPA, DOJ released seven NOFOs related to anti-trafficking work. *See, e.g.*, "OVC FY25 Services for Victims of Human Trafficking," Pl.'s Mot. to Suppl., Ex. A. Freedom Network intends to apply for two of the grants under the NOFO entitled "Services for Victims of Human Trafficking." It will not apply for grants issued under the other NOFOs. It will use the funding to hire more attorneys for its Survivor Project and reduce its waitlist of 100 survivors seeking criminal record relief.

Freedom Network challenges three conditions present in this NOFO. First, the NOFO's so-called immigration enforcement condition defines as unallowable costs that will not be funded:

> any program or activity, at any tier that, directly or indirectly, violates (or promotes or facilitates the violation of) federal immigration law (including 8 U.S.C. § 1373) or impedes or hinders the enforcement of federal immigration law—including by failing to comply with 8 U.S.C. § 1373, give

6

access to DHS agents, or honor DHS requests and provide requested notice to DHS agents.

Pl.'s Mot. to Suppl., Ex. A at 11.  Second, the NOFO's discrimination condition defines as unallowable costs:

any program or activity, at any tier that violates any applicable Federal civil rights or nondiscrimination law.  This includes violations that—(1) indirectly violate the law, including by promoting or facilitating violations; or (2) unlawfully favor individuals in any race or protected group, including on majority or minority, or privileged or unprivileged, basis, within a given area, population, or sector.

*Id.*  Finally, the NOFO includes a certification provision, which mirrors the J21 certification provision and states that:

Compliance with Federal civil rights and nondiscrimination laws is material to the government's decision to make any award and payment under this program, including for purposes of the False Claims Act, and each recipient will be required to certify (in its acceptance of the conditions of the award) that it does not operate any programs (including programs having components related to diversity, equity, and inclusion) that violate any applicable Federal civil rights or nondiscrimination laws.

*Id.* at 30.  The False Claims Act, 31 U.S.C. § 3729, provides that a person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government" is "liable to the United States government for a civil penalty . . . plus 3 times the amount of damages which the Government sustains because of the act of that person."  31 U.S.C. § 3729(a)(1)(G).

Parties that apply for and are awarded grant funding will be required to comply with certain terms and conditions.  As best as the Court can tell, the final grant conditions related to the NOFO have not been released and are not part of the record in this case.

**C.      Impact of the Executive Orders and NOFO conditions**

On January 31, 2025, Freedom Network received an email from a DOJ subcontractor, Inner City Fund, containing a list of words that "cannot appear in any Office for Victim of Crime materials (i.e. web pages, training content, presentations, etc.)" because they are "terms or words in conflict with recent Executive Orders." *See* Am. Compl., Ex. C (listing words including DEI, diversity, gender, identity, LGBTQ, minority populations, race/racial, pronouns, and trans).  The list was entitled "DOJ-Office of Justice Programs (OJP) Guidance." *Id.*  Freedom Network submits that all its federally funded work is prohibited from using these words, some of which appear in its mission statement and "in every single training it provides as a national training and technical assistance provider."  Am. Compl. ¶ 93.

Freedom Network alleges that OVC ordered it to remove specific terms, including "colonial systems," "oppression," and "restorative justice," from a privately funded, survivor-led presentation.  Mot. for Prelim. Inj. at 8.  OVC also asked Freedom Network to remove the terms "ethnic groups," "disabilities," "hearing and/or vision loss," and "cultural responsiveness" from a form assessing grants provided under Freedom Network's Housing Training and Technical Assistance Project.  *Id.* at 8–9.  OVC sought to approve the attendees, goals, group discussion questions, and language of the invitation and save-the-date for Freedom Network's May 2025 Housing Summit.  OVC also told Freedom Network it could not host a webinar on housing for immigrant survivors that would address race and gender equity.

Freedom Network explains that stakeholders pulled out of its annual Anti-Trafficking Conference to avoid having their own federal funding withdrawn.  As a

8

result, the conference generated half the revenue of prior conferences. Potential attendees are similarly concerned about the risk to their funding if they attend Freedom Network's upcoming 2026 conference. Two members of Freedom Network's board of directors have resigned due to concerns about their employers' federal funding, and two subcontractors have terminated subcontracts with Freedom Network.

Looking forward, Freedom Network plans to apply for two grants under the NOFO entitled Services for Victims of Human Trafficking to support its Survivor Reentry Project. It has already submitted an SF-424 form (a prerequisite to a funding application describing the nature of its project) and its co-Executive Director submitted in the present case a sworn declaration explaining that it intended to submit a second SF-424 and applications for two grants, due on March 18, 2026. *See* Second Suppl. Bruggerman Decl. ¶¶ 6, 8. The grant application requires Freedom Network to submit a proposal abstract explaining the proposed project's purpose, geographic scope, target population, activities, and expected outcomes. Freedom Network contends that it cannot submit an effective grant application without describing that its "projects will serve women, immigrants, and persons of color because statistically they are disproportionately arrested as a direct result of their trafficking victimization." *Id.* ¶ 10. Freedom Network maintains that, to apply for these grants, it must use some of the terms that OVC has prohibited under the Executive Orders. An applicant cannot modify its application after submission and must certify that it "will comply with all award requirements and all federal statutes and regulations applicable to the award[,]" including the NOFO conditions. *Id.* ¶ 19.

Freedom Network says that its grant application will proceed through a peer

review process, which "will have to consider the extent to which an application is consistent with DOJ's requirements as reflected in the New Funding Conditions." *Id.* ¶ 22. It claims that it faces a choice between altering its speech in its application to attempt to comply with the NOFO conditions or risking negative assessment in the peer review process.

With or without federal grant funding, Freedom Network anticipates that it will close its doors in 2026. Without federal funding, the organization will exist for a mere six weeks on private funding. With federal grant funding under the NOFO conditions, Freedom Network maintains that it will still face serious financial uncertainty because of the potential for denied reimbursement requests or False Claims Act investigations, requiring it to reserve private funding in the case of denied reimbursements, reduce its staff, and serve fewer trafficking survivors.

### E.    Procedural history

On October 10, 2025, Freedom Network filed the present lawsuit seeking declaratory and injunctive relief under the Constitution and the APA. OVC issued the Services for Victims of Human Trafficking NOFO in December 2025. Freedom Network moved for a preliminary injunction that same month. Freedom Network amended its complaint and motion for a preliminary injunction in February 2026.

Under the First Amendment, Freedom Network challenges the Executive Orders and funding conditions as overbroad and discriminating on the basis of viewpoint. It also alleges that the J21 certification provision and the NOFO certification condition infringe on free speech and create an unconstitutional condition on protected speech. Freedom Network additionally claims that the executive orders

10

and the NOFO conditions are unconstitutionally vague and run afoul of the Due Process Clause. Freedom Network also asserts claims under the Spending Clause and the separation of powers regarding the Executive Orders and NOFO conditions. And it challenges the NOFO conditions under the APA, contending that they are contrary to law, in excess of statutory authority, arbitrary and capricious, and contrary to constitutional right.

In February 2026, Freedom Network moved for a temporary restraining order and a preliminary injunction. On February 24, 2026, after a hearing in which both sides presented argument, the Court granted motion for a temporary restraining order. Dkt. 74. At the conclusion of the March 11 hearing on the preliminary injunction motion, the Court extended its temporary restraining order until March 24, 2026 to permit consideration of the arguments and issues.

## Discussion

### A. Jurisdiction

The Court begins, as it must, with jurisdiction. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).

The government primarily argues that Freedom Network lacks Article III standing to bring its challenges. Article III of the Constitution "confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). A dispute is a case or controversy appropriate for resolution by a federal court only if a plaintiff has a "personal stake" in the matter, *i.e.*, Article III standing. *Id.*; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

To establish standing, a plaintiff must show that it has "suffered, or will suffer,

11

an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Murthy v. Missouri*, 603 U.S. 43, 57 (2024). A plaintiff must demonstrate standing for each claim it presses, and for each form of relief that it seeks. *Id.* at 61. And it must do so "with the manner and degree of evidence required at the successive stages of litigation." *Id.* at 58. At the preliminary injunction stage, a plaintiff must make a "clear showing" that it is "likely" to establish each element of standing. *Id.*

In this case, Freedom Network must demonstrate that it likely has standing to seek an injunction against each of the provisions that it challenges. Because the parties have not yet taken discovery, allegations of injury resulting from the government's conduct may suffice. *See Lujan*, 504 U.S. at 561. In support of its standing to challenge the Executive Order provisions, Freedom Network contends that the threat of enforcement has forced it to self-censor or risk losing grant funding and has chilled others from collaborating with Freedom Network or attending its events, causing further monetary harm. Freedom Network advances a similar theory of standing to challenge the NOFO conditions, alleging that they force it to choose between self-censorship or forfeiting the opportunity for millions of dollars in critical funding.

Self-censorship is a cognizable harm that can confer standing. *See Brown v. Kemp*, 86 F.4th 745, 761 (7th Cir. 2023). Monetary harm, *e.g.*, from loss of grant funding or chilled stakeholders, readily qualifies, too. *See TransUnion*, 594 U.S. at 425. Under Freedom Network's theory, these claimed injuries are also fairly traceable to the government's challenged conduct and likely to be redressed by the injunction

12

sought. *See Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump* (*NADOHE*), 167 F.4th 86, 99 (4th Cir. 2026). The Court's analysis thus focuses on the government's responses.

The government contends that Freedom Network lacks standing to challenge the J20 termination provision because it does not face a "genuine threat" of enforcement. Defs.' Resp. at 8. That is so, the government says, because Freedom Network has retained its grants, and even had some extended, even though the J20 termination provision has been in place for over a year. The Court does not agree. Standing may be predicated on a risk of future enforcement if the threatened enforcement is sufficiently imminent. *See Brown*, 86 F.4th at 761 (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158–59 (2014)). That requirement is satisfied if a plaintiff's intended course of conduct is arguably protected and is arguably proscribed by the challenged provision. *See id.* at 762; *cf. Steel Co.*, 523 U.S. at 89 (stating that jurisdiction is not defeated by the possibility that the plaintiff ultimately lacks a cause of action, unless the claim is wholly insubstantial and frivolous). That is the case here: Freedom Network wishes to include equity-related messaging in its programming, conduct that is at least arguably protected by the First Amendment but at least arguably proscribed by the J20 termination provision.

The government seeks to infer otherwise from the fact that Freedom Network's grants have not yet been terminated, but that may merely reflect that the Executive Orders have been effective in chilling Freedom Network. Indeed, though Freedom Network may rely on its pleadings at this stage, it has produced evidence of OVC requiring it to remove equity-related messaging in several recent programs to avoid

13

violating the Executive Orders.  The government argues that OVC was entitled to do this regardless of the Executive Orders because it has independent supervisory authority under the terms of the grant, but that is beside the point.  Regardless of whether OVC acted within its authority under the terms of the grant, its invocation of the Executive Orders supports Freedom Network's concern that continuing with its desired equity-related messaging risks running afoul of the Executive Orders and losing its grants.  The Court therefore concludes that Freedom Network has established that it likely has standing to challenge the J20 termination provision.

The government advances a similar argument regarding the J21 certification provision.  According to the government, the certification provision only requires Freedom Network to certify compliance with the federal civil rights laws.  And because Freedom Network does not intend to violate those laws, the government says that any risk of enforcement is speculative.

Freedom Network, however, alleges otherwise.  According to Freedom Network, the J21 certification provision has been and will be enforced against conduct that fits the government's vision of illegal DEI, even if the conduct does not in fact violate the civil rights laws.  It is possible that the government is right and that Freedom Network is wrong, but that goes to the merits of Freedom Network's challenge.  For purposes of standing, it is sufficient if the J21 certification provision *arguably* reaches beyond the federal civil rights laws and proscribes Freedom Network's desired conduct.

It does.  The J21 certification provision's text requires a grantee "to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-

14

discrimination laws." Exec. Order 14173, 90 Fed. Reg. 8633, § 3(b)(iv)(B). If that were all, a straight-faced argument could be made that the provision proscribes "programs promoting DEI" only when such programs violate the federal anti-discrimination laws. *See NADOHE*, 167 F.4th at 103. But context muddies that interpretation. The Executive Orders contain sweeping language condemning a perceived widespread practice of "illegal DEI" that, according to the Executive Orders, violates the civil rights and anti-discrimination laws but has so far avoided scrutiny. And the government acknowledged at oral argument that it has not defined how the scope of the federal civil rights and anti-discrimination laws have changed or what "illegal DEI" means. Mar. 3, 2026 Tr. 47:13–49:11. That suggests that the Executive Orders may be operating on a particular vision of the anti-discrimination laws. If so, then a grantee would have to ask whether its conduct violates the Executive's understanding of the civil rights and anti-discrimination laws going forward. After all, that is what would trigger enforcement.

This ambiguity presents a dilemma for a grantee like Freedom Network, which risks losing federal funding as well as liability under the False Claims Act. As the Fourth Circuit has noted, "[a] 'person of ordinary firmness faced with this situation would steer clear of any speech or activities arguably promoting [DEI].'" *NADOHE*, 167 F.4th at 98. Moreover, regardless of the best interpretation of the text of the Executive Orders, Freedom Network has plausibly alleged that the government has taken a wider enforcement posture that might sweep in Freedom Network's desired course of conduct. That suffices to establish that it likely has standing to challenge the J21 certification provision.

15

The government presents a different argument regarding the final Executive Order provision at issue—the J21 termination provision. According to the government, that provision only affects government agencies and "government-wide DEI 'programming for the government.'" Defs.' Resp. at 8. Because Freedom Network is not a government agency and does not allege that it conducts government-wide programming, the J21 termination provision does not apply to it.

This Court agreed with that reading in a preliminary assessment in another case. Though the text of the J21 termination provision does not itself contain a clear limitation to internal government affairs, it is nested within a section titled "Terminating Illegal Discrimination in the Federal Government," alongside provisions "focus[ed] on internal government agency processes and programs." *See Chi. Women in Trades v. Trump* (*CWIT I*), 773 F. Supp. 3d 592, 601 (N.D. Ill. 2025); Exec. Order 14173, 90 Fed. Reg. 8633, § 3. The Court therefore concluded, in ruling on a motion for a temporary restraining order, that this provision likely did not reach private parties. *CWIT I*, 773 F. Supp. 3d at 601. As a result, the Court concluded, the plaintiffs in that case likely lacked standing to challenge the provision. *Id.* The Court later adopted that same interpretation and conclusion in its preliminary injunction ruling in the same case, noting that the parties had not raised any new arguments regarding the issue. *Chi. Women in Trades v. Trump* (*CWIT II*), 778 F. Supp. 3d 959, 977 (N.D. Ill. 2025).

Here, too, Freedom Network offers no reason for the Court to depart from its previous understanding of the J21 termination provision. And other courts that have addressed the issue have agreed with this Court's reading, at least on the limited records available in those cases. *See, e.g.*, *Nat'l Urban League v. Trump*, 783 F.

16

Supp. 3d 81 (D.D.C. 2025); *S.F. A.I.D.S. Found. v. Trump*, 786 F. Supp. 3d 1184, 1209 (N.D. Cal. 2025) (noting that reading the J21 termination provision "to apply externally would render it duplicative" of the J20 termination provision).[1] The Court therefore remains of the view, at this preliminary stage and with minimal briefing on this specific point, that the provision is unlikely to affect private parties like Freedom Network. That understanding may change later in the case if, for example, targeted briefing or evidence provides a reason to read the provision differently. At this time, however, Freedom Network has not met its burden to show that it likely has standing to challenge the J21 termination provision.

Turning to the funding conditions, the government contends that Freedom Network lacks standing to challenge them because they do not apply, and therefore cannot harm Freedom Network, until it receives and accepts a grant offer. According to the government, it is uncertain whether Freedom Network will even receive a grant offer and be confronted with the funding conditions in the first place. Moreover, the government says, OVC has not yet decided whether to impose two of the funding conditions—the discrimination condition and the immigration-enforcement condition—as conditions in the final grant awards. As a result, the government argues, Freedom Network's alleged injuries are too speculative to support standing and that the claim is not yet ripe for adjudication. *See Abbott Lab'ys v. Gardner*, 387 U.S. 136 (1967) (explaining that the ripeness doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements").

---

[1] The Fourth Circuit has applied the same reasoning to a reporting requirement in the same section, but it is plausible that the termination provision could be more likely to reach private parties. *See NADOHE*, 167 F.4th at 97–98.

17

Both issues in this case "boil down to the same question." *See Susan B. Anthony List*, 573 U.S. at 157 n.5.

The problem with the government's argument is that it omits a key harm that Freedom Network faces now. Freedom Network seeks to enjoin the funding conditions not only because it does not wish to have them attached to any grant award it receives, but also because the conditions will influence the process by which grant applicants are selected for a grant offer. According to Freedom Network, it faces a dilemma now: (a) apply with the project ideas that it wants to pursue, thus running the risk of being disadvantaged or disqualified by the funding conditions during the review process, or (b) give up on its desired mission and tailor its application in accordance with the funding conditions to preserve its chance at receiving federal funding. *See* Suppl. Bruggerman Decl. ¶ 36.

The government does not dispute that Freedom Network is forced to choose between these harms now. It instead justifies the situation as the product of the government's right to "favor certain views in selecting who to award [funding]. . . without violation the [C]onstitution." Defs.' Resp. at 23. That is a serious argument on the merits, but it does not deprive Freedom Network of standing or render its claims unripe.

There is another wrinkle. Freedom Network seeks to enjoin the funding conditions in seven NOFOs, but it only intends to apply for grants under one—the Services for Victims of Human Trafficking NOFO. The funding conditions in the other NOFOs do not affect Freedom Network's ability to apply for grants. And unlike the Executive Orders, they do not harm Freedom Network by chilling others' association

18

with it.  If one of Freedom Network's collaborators receives a grant under one of the other NOFOs, the funding conditions may discourage the would-be collaborator from using those funds in a joint project with Freedom Network.  But that chilling effect—and the accompanying harm to Freedom Network—would happen only if and when the prospective collaborator receives and accepts the grant.  This possibility, at this stage, is too speculative to support Freedom Network's standing to challenge the funding conditions in NOFOs that will not directly affect its grant applications.

In short, Freedom Network has standing to challenge the funding conditions in the Services for Victims of Human Trafficking NOFO—the one NOFO that will affect Freedom Network's grant applications according to its allegations—but it lacks standing to challenge the funding conditions in the other NOFOs.

Finally, the government asserts that Freedom Network's challenges to the funding conditions must be brought before the Court of Federal Claims.  The Tucker Act provides the Court of Federal Claims with exclusive jurisdiction over claims against the United States for more than $10,000 that are "founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(i); *E. Enters. v. Apfel*, 524 U.S. 498, 520 (1998).  The government reasons that any issues with the funding conditions are contractual in nature and therefore fall within the scope of the Tucker Act.

The government's position overlooks an important limitation:  the Court of Federal Claims lacks jurisdiction to award equitable relief.  *See, e.g.*, *Richardson v.*

19

*Morris*, 409 U.S. 464, 465 (1973). And where the Court of Federal Claims lacks jurisdiction, it cannot have exclusive jurisdiction. *See Tootle v. Sec'y of the Navy*, 446 F.3d 167, 177 (D.C. Cir. 2006). Freedom Network seeks to enjoin enforcement of the funding conditions to define its obligations going forward, not to recover money from the government. That is a claim for equitable relief, *see Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002), that is appropriately filed before this Court, not the Court of Federal Claims.

In sum, Freedom Network has established that it likely has standing to seek an injunction against the J20 termination provision, the J21 certification provision, and all the funding conditions in the Services for Victims of Human Trafficking NOFO. Freedom Network has not established that it likely has standing to challenge the J21 termination provision or the funding conditions in other NOFOs. The claims for which Freedom Network has established it likely has standing are ripe for adjudication now, and those claims seek equitable relief within this Court's jurisdiction.

## B.      Standard for motion for a preliminary injunction

To obtain a preliminary injunction, the movant "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Bevis v. City of Naperville*, 85 F.4th 1175, 1188 (7th Cir. 2023) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). When, as here, the government is a party to the suit, "assessing the harm to the opposing party and weighing the public interest . . . merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The party seeking an injunction "carries the burden of persuasion" on each of these

20

points. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

### 1.   Likelihood of success on the merits

#### a.   First Amendment

##### i.   Certification provisions

Freedom Network challenges two certification provisions that apply to TVPA grants awarded by OVC.[2]  First, Freedom Network argues that section 3(b)(iv) of the J21 Order—the J21 certification provision—unconstitutionally infringes on its First Amendment rights because the provision regulates its conduct outside of the contours of federal grant funding.  Second, Freedom Network advances the same argument against the NOFO certification provision.[3]

"The Government can, without violating the Constitution, selectively fund a program to encourage certain activities . . . without at the same time funding an alternative program which seeks to deal with the problem another way." *Rust v. Sullivan,* 500 U.S. 173, 193 (1991).  But the government may not impose a condition

---

[2] Freedom Network asserts claims under both the Constitution and the APA.  The Court addresses the APA claims, including claims of agency action contrary to the Constitution, below.  Freedom Network has demonstrated a likelihood of success on the merits of the APA claims.  Still, to ensure a complete record in the event of an appeal, the Court also addresses each claim under the Constitution in its own right except for Freedom Network's Fifth Amendment claim related to the certification provisions.  Because Freedom Network has demonstrated that it is likely to succeed on the merits of its First Amendment claim challenging the certification provisions, the Court need not address the unsettled law regarding whether grantees have a property interest in federal grants.

[3] The NOFO certification provision reflects OVC's implementation of the J21 certification provision.  Exec. Order No. 14173, 90 Fed. Reg. 8633, § 3(b)(iv).  The NOFO certification provision requirements also state that the grant recipient must certify that it "does not operate any programs (including programs having components related to diversity, equity, and inclusion) that violate any applicable Federal civil rights or nondiscrimination laws."  Pl.'s Mot. to Suppl., Ex. A at 30.

on its funding that affects "protected conduct outside the scope of the federally funded program." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.* (*AID*), 570 U.S. 205, 218 (2013). And the government may not attempt to use its funding power to regulate beyond the scope of the funded program and avoid First Amendment scrutiny in the process. *Id.* at 214–15 (noting the government cannot "seek to leverage funding to regulate speech outside the contours of the program itself").

The Court addressed the J21 certification provision in *CWIT II*. As the Court explained in its preliminary injunction ruling in that case, the government may not "reach outside" the federal program to influence speech. *CWIT II*, 778 F. Supp. 3d at 983 (quoting *AID*, 570 U.S. at 214). The government acknowledges that the J21 certification provision and NOFO certification provision are not limited to grantees' speech within their federally funded programs. Mar. 3, 2026 Tr. 35:14–35:17.

Perhaps recognizing that it cannot rely on its broad discretion that applies within the ambit of federal funding decisions, the government instead argues that both certification provisions are permissible because they only require a grantee to certify that it is not breaking the law. Laws and regulations may run afoul of the First Amendment as unconstitutionally vague when "their scope is uncertain and . . . they tend to produce large chilling effects." *Brown,* 86 F.4th at 771. The concern with vagueness is "predicated on the danger that an overly broad statute, if left in place, may cause persons whose expression is constitutionally protected to refrain from exercising their rights for fear of criminal sanctions." *Id.* (quoting *Massachusetts v. Oakes*, 491 U.S. 576, 581 (1989)).

As the Court noted in *CWIT II*, how to comply with the requirement that a

22

grantee "not operate any programs promoting DEI that violate any applicable Federal antidiscrimination laws" is left entirely to the grantee's imagination. *CWIT II*, 778 F. Supp. 3d at 984. The J21 Order includes sweeping language that "Illegal DEI and DEIA policies not only violate the text and spirit of our longstanding Federal civil-rights laws, they also undermine our national unity, as they deny, discredit, and undermine the traditional American values of hard work, excellence, and individual achievement in favor of an unlawful, corrosive, and pernicious identity-based spoils system." Exec. Order No. 14173, 90 Fed. Reg. 8633, § 1. This language, and other similar language in the J21 Order, signals an expansion in the types of conduct that the Executive now believes violates the federal civil rights and discrimination laws. The problem is that grantees are left without any information to shed light on the types of conduct that may now constitute "illegal DEI." The government has had multiple opportunities in this case and others to explain on what the J21 Order means when it refers to "illegal DEI" and "programs promoting DEI." Rather than do so, the government acknowledged at oral argument that it has not defined how the scope of the federal civil rights and anti-discrimination laws has changed or what "illegal DEI" means. Mar. 3, 2026 Tr. 47:13–49:11.

Freedom Network and other grantees are thus put in a difficult and perhaps impossible position. Without any guidance on what programs may "promote DEI," Freedom Network must attempt to revise its programs to comply with the certification provisions, decline to make a certification and thus lose its grants (and not receive any grants in the future), or risk making a certification that the government will deem false, subjecting Freedom Network to liability under the False Claims Act.

23

For these reasons, the Court concludes that Freedom Network is likely to succeed on its claims that the J21 certification provision and NOFO certification provision violate its First Amendment rights.

### ii. Other challenged provisions

Freedom Network also argues that the J20 termination provision, the NOFO discrimination condition, and the NOFO immigration enforcement condition violate the First Amendment because they are overbroad and regulate viewpoints. The government responds that these provisions are constitutional because the government is acting as patron to subsidize speech and may selectively fund a program to encourage certain activities to the exclusion of others.

The Court acknowledges that cases governing the "constitutionality of government programs that subsidize[] speech expressing a particular viewpoint" "implicate a notoriously tricky question of constitutional law." *Matal v. Tam*, 582 U.S. 218, 239 (2017). In *Rust*, *supra*, the plaintiffs challenged a federal statute that provided federal funding for family-planning services. The statute stated that "[n]one of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning." *Rust*, 500 U.S. at 178. The agency determined that this prohibition required a ban on "counseling, referral, and advocacy" within the project. *Id.* at 184. The restriction was intended to ensure that the grant funds would "be used only to support preventive family planning services, population research, infertility services, and other related medical, informational, and educational activities." *Id.* at 178–79 (quoting H.R. Conf. Rep. No. 91–1667, p. 8 (1970)). The plaintiffs challenged the facial validity of the regulation. *Id.* at 183. The Court

24

overruled the plaintiffs' challenge.  It concluded that the statutory restriction and related regulations did not violate the First Amendment because they were "designed to ensure that the limits of the federal program [were] observed."  *Id.* at 193.  The Court stated that the government had not discriminated on the basis of viewpoint but instead "merely chose[] to fund one activity to the exclusion of the other."  *Id.* at 193. Thus the "general rule" is that "the Government may choose not to subsidize speech[.]"  *Id.* at 193.

The Court later explained that *Rust* relied on the rationale that the counseling activities of the doctors under the relevant statute amounted to government speech. *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 541 (2001).  The Court stated in *Velazquez* "that viewpoint-based funding decisions can be sustained in instances in which the government is itself the speaker or instances, like *Rust*, in which the government used private speakers to transmit specific information pertaining to its own program."  *Id.* (internal citations omitted).  "[W]hen the government establishes a subsidy for specified ends[,]" "certain restrictions may be necessary to define the limits and purposes of the program."  *Id.* at 543.

The key question for this Court is whether TVPA-related speech, even if undertaken as part of a federally funded grant, is governmental or private speech. The Supreme Court has identified three primary factors for courts to consider when answering this question:  (1) whether the medium has historically been used to "communicate[ ] messages from the States"; (2) whether the medium is "often closely identified in the public mind with the State," *i.e.*, whether it is reasonably interpreted as "conveying some message on the [Government's] behalf"; and (3) whether the

25

government maintains direct, editorial control over the message's content. *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 210–13 (2015) (internal quotations and alterations omitted).

The government argues that the relevant grant funding promotes government speech because it maintains editorial control over materials that are presented to the public. The government appears to rely on funding condition 39 of the grant award for an OVC FY 2023 Services for Victims of Human Trafficking grant. This condition requires the grant recipient to "submit to OJP for review and approval any product (e.g., curricula, training materials, publications, reports, videos, or any other written, web-based, or audio-visual, or other materials) that will be developed and published under this award, 60 days before its intended publication." Defs.' Resp., Ex. 2 at 16. The condition also states that all such products must also include a statement that includes the following language: "The opinions, findings, and conclusions or recommendations expressed in this _____ are those of the contributors and do not necessarily represent the official position or policies of the U.S. Department of Justice." *Id.* at 17. This condition appears to give the government direct editorial control over the message's content. Although the government has expressly stated that any speech published by Freedom Network or its collaborators is private, not governmental, speech, the Court does not think that this disclaimer alone can support finding TVPA related speech is private. Additionally, the government asserts that it does not know what provisions will be included in the final grant awards. Thus it would be logically inconsistent for the Court to now rely on a provision that may or not be in the final grant award as the determinative factor on whether the speech at issue

26

is governmental or private.

Based on the current record, it appears that only government entities, educational organizations, public housing organizations, nonprofit organizations, and other units of local government may apply for TVPA grant funding. *See* Pl.'s Mot. to Suppl., Ex. A at 9. TVPA funding thus flows through entities that have historically been used to communicate messages from the government and that are reasonably interpreted as conveying a message on the government's behalf. Although Freedom Network is a nonprofit organization, it is stepping into a similar role when conducting trainings and programs to share the government's TVPA-related message with other individuals and organizations. The Court thus concludes, for purposes of the present motion for preliminary injunction, that Freedom Network's speech related to TVPA grant funding is governmental speech.

The Court also addressed the J20 termination provision in *CWIT* and found that the plaintiff was unlikely to succeed on its contention that the provision violated its First Amendment rights. As the Court explained, at this juncture, it appears that the provision concerns a decision to no longer fund equity-related programs. *CWIT II,* 778 F. Supp. 3d at 985–87. The provision requires agencies to terminate all "equity-related" federal grants, but it does not prohibit equity-related activities outside of a grantee's federally funded programs. Exec. Order No. 14151, 90 Fed. Reg. 8339, § 2(b)(i). The First Amendment does not prohibit the government from choosing to no longer support equity-related programs, as it did in the Executive Order and NOFO. *Rust*, 500 U.S. at 193.

Because the Court has concluded that the J20 termination provision, NOFO

27

discrimination provision, and NOFO immigration enforcement condition are funding decisions that involve governmental speech, any vagueness concerns are "not constitutionally severe." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998). Freedom Network is correct that that the provisions may cause the organization to conform its "speech to what [it] believe[s] to be the decisionmaking criteria in order to acquire funding." *Id.* at 588–89. But, unlike the certification provisions, these provisions do not invoke a criminal or other regulatory penalty; thus any vagueness concerns are not akin to the chill that occurs from a vague "criminal statute or regulatory scheme." *Id.* Because the consequences of grant funding decisions are significantly less severe than a criminal or regulatory sanction, it is less likely that speech will be stifled. *Id.* at 588.

For these reasons, the Court concludes that Freedom Network is not likely to succeed on its First Amendment claims related to the J20 termination provision, the NOFO discrimination condition, and the NOFO immigration enforcement condition.

### b.    Fifth Amendment

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). An enactment may be void for vagueness if it contains "terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its applications." *Gresham v. Peterson*, 225 F.3d 899, 907 (7th Cir. 2000) (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 629 (1984)). To avoid triggering the void-for-vagueness doctrine, an enactment "must articulate terms 'with a reasonable degree of clarity' to reduce the risk of arbitrary enforcement and allow individuals to

28

conform their behavior to the requirements of the [enactment]." *Id.* (quoting *Roberts*, 468 U.S. at 629). The Fifth Amendment's void-for-vagueness doctrine is concerned with "lack of notice" and "may be overcome in any specific case where reasonable persons would know that their conduct is at risk." *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988).

The Supreme Court's discussion in *Finley*, analyzed in the previous section, applies with equal force to Freedom Network's Fifth Amendment claim. If the J20 termination provision, NOFO discrimination condition, and NOFO immigration enforcement condition invoked criminal or regulatory penalties, the Court would face a different case. Instead, these provisions solely concern whether Freedom Network will receive certain grant funding. When the only impact is federal funding, "the consequences of imprecision are not constitutionally severe." *Finley,* 524 U.S. at 589. Although the lack of clarity in the J20 termination provision, NOFO discrimination condition, and NOFO immigration condition is concerning, and all these provisions certainly include vague language, the Court must follow binding authority stating that such vagueness is less "constitutionally severe" in the context of government funding. *See Finley*, 524 U.S. at 589 ("In the context of selective subsidies, it is not always feasible . . . to legislate with clarity."); *see also Kilborn v. Amiridis*, 131 F.4th 550, 565 (7th Cir. 2025) ("The degree of vagueness that the Constitution tolerates ... depends in part on the nature of the enactment." (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982))).

For these reasons, the Court concludes that Freedom Network is not likely to succeed on the merits of its claim that the J20 termination provision, NOFO

29

discrimination condition, and NOFO immigration condition violate the Fifth Amendment.  Given this determination, the Court need not address the parties' arguments regarding whether Freedom Network holds an underlying property right to its grants.

### c.      Separation of powers and Spending Clause

Freedom Network challenges the J20 termination provision, the J21 certification provision, and the three contested NOFO conditions as violating the separation of powers and the Spending Clause.[4]  Freedom Network argues that Congress drafted the TVPA to address human trafficking and specified that the primary victims of trafficking are underserved populations, women, and girls.  It contends that the Executive Branch may not modify Congress's expressed intent to benefit these populations, including by adding grant conditions that prohibit equity-related activities.  More broadly, Freedom Network says that Congress did not specify that funding could be withheld from TVPA grantees because their activities relate to equity and diversity or might indirectly promote violations of immigration laws, so the Executive may not require grantees to certify that they will not engage in these activities.

The Constitution provides for the separation of powers, the structural division of "the federal power among the three branches—the Legislative, the Executive, and the Judicial—placing both substantive and procedural limitations on each." *Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 272 (1991).  Within this structural division, the Constitution vests in Congress the power to

---

[4] The Court addresses these two constitutional claims in tandem because Freedom Network and the government have done the same, presenting nearly identical arguments on both claims.

legislate and the power of the purse. U.S. Const. art. I, §§ 1, 8. Congress exercises these powers when it enacts appropriations statutes to allocate federal funding. The Spending and Appropriations Clauses ensure "that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents or the individual pleas of litigants." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 428 (1990). Although executive agencies administer Congressional appropriations, executive agencies' "power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). In particular, unless delegated authority by Congress, the Executive Branch may not "condition the payment of . . . federal funds on adherence to its political priorities." *City of Chicago v. Sessions*, 888 F.3d 272, 283 (7th Cir. 2018); *see City of Chicago v. Barr*, 961 F.3d 882, 892 (2020).

As explained above, Congress provided that "the Attorney General may make grants" to state, local, and nonprofit entities "to develop, expand, or strengthen victim service programs for victims of human trafficking [.]" 22 U.S.C. § 7105(b)(2)(A). These grants must provide services to victims who are either "between 12 and 24 years of age" and "homeless, in foster care, or involved in the criminal justice system;" "transitioning out of the foster care system;" or "women or girls in underserved populations." *Id.*

Congress did not provide the Executive with the discretion to condition these grants on any other factors. It is true, as the government contends, that the grant

31

funding provisions of the TVPA and related appropriations statutes are relatively broad. *See id.* *Compare* Consolidated Appropriations Act, Pub. L. No. 118-42, Div. C, Title II, 138 Stat. 25, 147 (2024) (providing "$88,000,000 for victim services programs for victims of trafficking, as authorized by section 107(b)(2) of the Victims of Trafficking Act, by the TVPRA of 2005, or programs authorized under Public Law 113–4 [Violence Against Women Reauthorization Act of 2013] [.]"), *with City of Chicago v. U.S. Dep't of Homeland Sec.*, No. 25 C 5463, 2025 WL 3043528, at *16–17 (N.D. Ill. Oct. 31, 2025) (Kennelly, J.) (discussing mandatory language in appropriations provision for "sheltering and related activities provided by non-Federal entities" (quoting Consolidated Appropriations Act, Pub. L. No. 117-328, Div. F, Title II, 136 Stat. 4459, 4730 (2022)). But "[i]f Congress meant to incorporate [compliance with] all" federal immigration and anti-discrimination law as a condition for funding under the TVPA, Congress would have to say something to that effect. *Barr*, 961 F.3d at 899. Congress did not state in the TVPA or elsewhere that DOJ could withhold funding to entities that engage in DEI-related activities or whose activities directly or indirectly promote the violation of immigration laws.

The TVPA provides an example of exactly how Congress makes clear that it wishes to condition federal grants on compliance with specific conditions. The TVPA orders the Executive Branch to ensure that it does not fund projects involving human trafficking:

> The President shall ensure that any grant, contract, or cooperative agreement provided or entered into by a Federal department or agency under which funds are to be provided to a private entity, in whole or in part, shall include a condition that authorizes the department or agency to terminate the grant, contract, or cooperative agreement, or take any of the other remedial actions authorized under section 7104b(c) of this title,

[monitoring and investigation of trafficking in persons,] without penalty, if the grantee or any subgrantee, or the contractor or any subcontractor, engages in, or uses labor recruiters, brokers, or other agents who engage in—(1) severe forms of trafficking in persons; (2) the procurement of a commercial sex act during the period of time that the grant, contract, or cooperative agreement is in effect; (3) the use of forced labor in the performance of the grant, contract, or cooperative agreement; or (4) acts that directly support or advance trafficking in persons, including the following acts . . . ."

22 U.S.C. § 7104(g); *see also id.* § 7104a(a) (providing that agencies may not "enter into a grant, contract, or cooperative agreement if the estimated value of the services required to be performed under the grant, contract, or cooperative agreement outside the United States exceeds $500,000" unless the recipient creates a plan for compliance with section 7104(g) and certifies compliance on an annual basis).

Clearly, Congress knew how to specify that no federal grant funding should be provided to entities engaging in particular types of activity:  in the instance just quoted, it did so by requiring inclusion of a trafficking termination condition in *every federal grant to a private entity*.  Congress also prohibited the use of funds appropriated under the TVPA "to promote, support, or advocate the legalization or practice of prostitution," and it required organizations providing certain services to certify "in either a grant application, a grant agreement, or both, that it does not promote, support, or advocate the legalization or practice of prostitution."  *Id.* § 7110(g); *see* Mar. 3, 2026 Tr. 20:11–21:5.  By contrast, the government has not shown that Congress, in the TVPA or another statute, similarly required the J20 termination condition, the J21 certification condition, or any of the three challenged NOFO conditions.

The Court concludes that Freedom Network is likely to succeed on its claims that the J20 termination condition, the J21 certification condition, and the NOFO

33

discrimination and certification conditions violate both the separation of powers and the Spending Clause.  The aims of the TVPA and its grant-related provisions have no relationship to the conditions that DOJ seeks to attach to the grants.  The government identifies no authority in the TVPA or another statute that requires the certifications at issue here, conditions grants on compliance with anti-discrimination laws, or prohibits federal grant recipients from engaging in equity-related work.  Rather, in the TVPA, Congress did not reference federal anti-discrimination laws or employ the term "DEI" at all; did not specify that grant recipients should or should not conduct DEI; and did not prohibit "'equity-related' grants."  Exec. Order 14151, 90 Fed. Reg. 8339, § 2(b)(i); *see* Exec. Order 14173, 90 Fed. Reg. 8633, §§ 3(c)(iii), 3(b)(iv).  Indeed, the TVPA expressly recognizes that trafficking "victims are predominantly women and girls[,]" 22 U.S.C. § 7101(b), and it provides grants to support victims who are "women or girls in underserved populations[,]"  *id.* § 7105(b)(2)(A)(iii).  But even if Congress had been silent on the identity of trafficking victims, the challenged provisions of the Executive Orders and the discrimination and certification provisions of the NOFOs "have nothing to do with the grant programs, as established by Congress," to which DOJ seeks to attach the conditions.  *City of Chicago v. Noem*, No. 25 C 12765, 2025 WL 3251222, at *7 (N.D. Ill. Nov. 21, 2025) (Shah, J.).  The imposition of conditions that are not authorized by Congress in the enabling acts for the grants or any other federal statute violates the separation of powers and the Spending Clause.  *See id.* at *8 (holding that similar grant conditions in DHS's Standard Terms and Conditions likely violated the separation of powers).

Freedom Network has similarly demonstrated a likelihood of success on its

separation-of-powers and Spending Clause claims with respect to the NOFO immigration enforcement condition. The condition purports to prohibit funding that "directly or indirectly, violates (or promotes or facilitates the violation of) federal immigration law . . . or impedes or hinders the enforcement of federal immigration law—including by failing to . . . give access to DHS agents, or honor DHS requests and provide requested notice to DHS agents." Pl.'s Mot. to Suppl., Ex. A at 11. The TVPA, on the other hand, notes that "[e]xisting laws often fail to protect victims of trafficking, and because victims are often illegal immigrants in the destination country, they are repeatedly punished more harshly than the traffickers themselves." 22 U.S.C. § 7101(b)(17). Congress stated that "[v]ictims of severe forms of trafficking should not . . . [be] penalized solely for unlawful acts committed as a direct result of being trafficked, such as using false documents, entering the country without documentation, or working without documentation." *Id.* § 7101(b)(19). And Congress acknowledged that traffickers exploit their victims by "[d]estroying, concealing, removing, confiscating, or otherwise denying an employee access to that employee's identity or immigration documents." *Id.* § 7104(g)(4)(A).

Congress stated in mandatory language that "[f]ederal agencies shall expand benefits and services to victims of severe forms of trafficking in persons in the United States, and aliens classified as a nonimmigrant under section 1101(a)(15)(T)(ii) of title 8, without regard to the immigration status of such victims." 22 U.S.C. § 7105. That provision sits in tension with the NOFO immigration enforcement condition's restriction on direct or indirect promotion or facilitation of violation of immigration laws, which could be understood to prohibit providing services to undocumented immigrants. The

NOFO immigration enforcement condition seeks to ensure full enforcement of immigration law, including against victims of human trafficking, which is contrary to Congress's intent in the TVPA and thus runs afoul of the separation of powers and the Spending Clause.[5]  Again, other courts have reasoned similarly.  *See also, e.g.*, *City of Chicago v. U.S. Dep't of Just.*, No. 25 C 13863, 2026 WL 114294, at *5 (N.D. Ill. Jan. 15, 2026) (holding that immigration condition placed on grants under the COPS Act violated the separation of powers and the Spending Clause); *California v. U.S. Dep't of Transp.*, 788 F. Supp. 3d 316, 322 (D.R.I. 2025) ("Congress did not authorize or grant authority to the Secretary of Transportation to impose immigration enforcement conditions on federal dollars specifically appropriated for transportation purposes.").

The Court does not discount the President's duty and authority to enforce the federal anti-discrimination and immigration laws.  *See* U.S. Const. art. II § 3.  But the power of the purse is not a tool for the Executive Branch to enforce the law absent authorization from Congress.  *Barr*, 961 F.3d at 887 ("The executive branch has

---

[5] Freedom Network also argues that the immigration enforcement condition would require it to violate the Violence Against Women Act's (VAWA) confidentiality provision, which states that "grantees and subgrantees under this subchapter shall protect the confidentiality and privacy of persons receiving services" and shall not disclose personally identifying information collected through the provision of services, or shall only disclose this information with "informed, written, reasonably time-limited consent" by the individual.  *See* 34 U.S.C. § 12291(b)(2).  The TVPA allows the Attorney General or the Secretary of Health and Human Services to subject grants under the TVPA to this condition.  22 U.S.C. § 7115(b)(1).  The VAWA confidentiality provision is incorporated into the NOFOs.  *See* Defs.' Resp. at 15–16 n.16.  Because Freedom Network prevails on other arguments regarding the unconstitutionality of the immigration enforcement condition, the Court will not reach this argument, in part because a challenge based on VAWA confidentiality hinges on a chain of arguably speculative events, including a request for information from the government regarding a Freedom Network service recipient.

significant powers over immigration matters; the power of the purse is not one of them.").  In dozens of similar cases challenging conditions placed on federal funding, no court has cited a broad authority in the U.S. Code allowing the Executive Branch to condition funding on compliance with anti-discrimination laws.  Nor has the government identified an authorization from Congress for conditioning funding in the manner of the Executive Order provisions or the NOFO conditions.

The government contends that Freedom Network's Spending Clause claims fail because the challenged conditions are reasonably related to the purpose of the funding, a low threshold that the Supreme Court has never used to strike a condition on a federal grant.  *See City of Los Angeles v. Barr*, 929 F.3d 1163, 1175 (9th Cir. 2019).  But funding conditions must still "bear some relationship to the purpose of the federal spending."  *New York v. United States*, 505 U.S. 144, 167 (1992).  Each of the challenged conditions are completely unrelated to, and indeed are at odds with, the TVPA.  The TVPA does not use the terms equity or DEI.  And, in contrast to the immigration enforcement condition's prohibition on any costs that may indirectly promote the violation of immigration laws, the TVPA provides that victims of trafficking should receive benefits regardless of their immigration status.  In short, the challenged conditions are not reasonably related to the TVPA grants.

The government reminds the Court that it rejected a facial challenge to the J20 termination provision in *Chicago Women in Trades* and urges the Court to reject a facial challenge to the J20 termination provision for the same reason here.  *CWIT II*, 778 F. Supp. 3d at 990.  The Court agrees that Freedom Network has not shown that this provision "conflicts with *every* statute that appropriates funds for grants," as a

37

facial challenge requires. *Id. (citing Ezell v. City of Chicago*, 651 F.3d 684, 698 (7th Cir. 2011)). Yet Freedom Network has established a likelihood of success on its challenge related to its grants under the TVPA, as explained above.

The government asserts that Freedom Network's claims are foreclosed by *Dalton v. Spector*, 511 U.S. 462 (1994). The Court recently summarized *Dalton* and related cases from the Ninth and D.C. Circuits. *See City of Chicago*, 2025 WL 3043528, at *13. In the context of a challenge to the President's decision to close a naval shipyard, *Dalton* held that "not . . . every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Dalton*, 511 U.S. at 472. "[C]laims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims." *Id.* at 473. Yet much like the separation-of-powers claim in *City of Chicago v. United States Department of Homeland Security*, Freedom Network does not merely claim that the government violated the TVPA. Rather, it cites the TVPA in claiming that the Executive Branch usurped Congress's power of the purse and violated the separation-of-powers. Operating from the position that Freedom Network's claims are statutory rather than constitutional, the government argues that Freedom Network has not identified a statute violated by the challenged Executive Order and NOFO provisions. Freedom Network need not do so; it asserts claims under the Constitution that are not foreclosed by *Dalton*.

Finally, the government notes that agencies have a longstanding practice of requiring funding recipients to "[c]omply with the U.S. Constitution, Federal statutes, regulations, and the terms and conditions of the Federal award[.]" 2 C.F.R. §

38

200.303(b).  But Freedom Network is understandably unsure of what it needs to do to comply with federal anti-discrimination law in this moment.  The Executive Orders seem to drastically modify the meaning of "discrimination," contending that "[t]he Biden Administration forced illegal and immoral discrimination programs, going by the name 'diversity, equity, and inclusion' (DEI) . . . [resulting in] shameful discrimination.  That ends today."  Exec. Order No. 14151, 90 Fed. Reg. 8339, § 1. And although the J21 Order cites the Civil Rights Act of 1964, the President appears to have a different understanding of civil rights laws from past administrations.  As other courts have concluded, "it does not appear that any other President has attempted to comprehensively override understanding of federal anti-discrimination law in the way this Administration seeks to through Executive Orders."  *County of Santa Clara v. Noem*, No. 25 C 8330, 2025 WL 3251660, at *40 (N.D. Cal. Nov. 21, 2025); *see, e.g.*, *City of Chicago*, 2026 WL 114294, at *6 ("[T]he Administration's anti-DEI interpretation does not further federal anti-discrimination law but is actually 'inconsistent with well-established legal precedent.'" (quoting *City of Seattle v. Trump*, 808 F. Supp. 3d 1204, 1216 (W.D. Wash. 2025)).  "Plaintiffs are at the mercy of Defendants' interpretation of federal antidiscrimination laws, regardless of how those laws are interpreted by the courts."  *Martin Luther King, Jr. County v. Turner*, 798 F. Supp. 3d 1224, 1249 (W.D. Wash. 2025).

Moreover, the government's citation to regulations that require agencies to ensure grant recipients do not discriminate cannot save the J21 certification provision or NOFO certification condition from a constitutional challenge.  *See* 2 C.F.R. § 200.300 (providing that an agency administering a grant must ensure the funding is

39

"implemented in full accordance with the U.S. Constitution, applicable Federal statutes and regulations—including . . . those prohibiting discrimination"); 42 U.S.C. § 2000d (prohibiting discrimination under federally funded programs).  A regulation cannot cure a violation of the separation of powers or the Spending Clause.  *See, e.g.*, *Colorado v. U.S. Dep't of Just.*, 455 F. Supp. 3d 1034, 1054 n.11 (D. Colo. 2020) (holding that 2 C.F.R. § 200.300 could not give DOJ the authority to impose conditions on grants that the Court held to be in violation of the separation of powers).  These laws do not require the certification conditions, and even if they did, could not save them from a constitutional challenge.

"Allowing an executive agency to impose a condition that is not otherwise ascertainable in the law Congress enacted 'would be inconsistent with the Constitution's meticulous separation of powers.'"  *W. Virginia ex rel. Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1147 (11th Cir. 2023) (quoting *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 362 (5th Cir. 2021)).  The Court concludes that Freedom Network has shown that it is likely to succeed on its separation-of-powers and Spending Clause claims.

### d.    APA

Freedom Network challenges the NOFO conditions for violating the APA because they are contrary to law, in excess of statutory authority, arbitrary and capricious, and contrary to constitutional right.  *See* 5 U.S.C. § 706(2)(A)–(C).  The NOFO conditions are arbitrary and capricious, Freedom Network says, because the government has not explained why DEI-related activities are prohibited and has not explained the shift in DOJ's policy.  Freedom Network also argues that, by requiring

40

certifications and placing conditions on funding that are unrelated to the TVPA, the NOFO conditions are contrary to law and in excess of statutory authority. Finally, Freedom Network reprises its argument regarding the conflict between the NOFO conditions and the First Amendment, Fifth Amendment, Spending Clause, and separation of powers, arguing that the NOFO conditions are contrary to constitutional right.

### i.     Final agency action

The APA permits courts to review only "final agency action for which there is no other adequate remedy in court[.]" 5 U.S.C. § 704. Courts may not review a "preliminary, procedural, or intermediate agency action or ruling[.]" *Id.* Freedom Network maintains that the NOFO conditions are final agency action because the government has "made a final decision to impose the New Funding Conditions on all Office for Victims of Crime grants this year." Am. Compl. ¶ 110. The government contends that the NOFO immigration enforcement and discrimination conditions are not final agency actions, as OVC has not released the conditions that will be included in its awards and has not yet determined whether grant recipients will be required to certify compliance with these two conditions. The NOFO certification provision, however, is required by Executive Order 14173 § 3(b)(iv) and will be included in every TVPA grant award. *See* Suppl. Bruggerman Decl. ¶ 5 (stating that the NOFO certification provision is incorporated into the Office of Justice Programs' General Terms and Conditions for all grantees).

A final agency action has two qualities. It "'mark[s] the consummation of the agency's decisionmaking process' and is '[an action] by which rights or obligations

41

have been determined, or from which legal consequences will flow.'" *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 808 (2024) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78, (1997)). "In other words, § 704 asks whether a 'terminal event' has occurred." *Dubey v. Dep't of Homeland Sec.*, 154 F.4th 534, 537 (7th Cir. 2025) (quoting *Salinas v. R.R. Retirement Bd.*, 592 U.S. 188, 194–95 (2021)). The Supreme Court has explained that it takes a "'pragmatic' approach . . . to finality." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 591 (2016) (quoting *Abbott Lab'ys,* 387 U.S. at 149). As for the second quality of a final agency action, "an action is final when 'its impact is sufficiently direct and immediate and has a direct effect . . . on day-to-day business.'" *Home Builders Ass'n of Greater Chi. v. U.S. Army Corps of Eng'rs*, 335 F.3d 607, 614 (7th Cir. 2003) (quoting *W. Ill. Home Health Care v. Herman*, 150 F.3d 659, 662 (7th Cir. 1998)). "[W]here a regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance, access to the courts under the Administrative Procedure Act and the Declaratory Judgment Act must be permitted." *Abbott Lab'ys.*, 387 U.S. at 153.

All three NOFO conditions amount to final agency action. First, the NOFO demonstrates the consummation of OVC's decision-making process regarding its priorities and considerations in evaluating grant applications. The NOFO states in no uncertain terms that activities violating the immigration enforcement and discrimination conditions are "unallowable costs and [that] certain activities that are out of the program scope and will not be funded." Pl.'s Mot. to Suppl., Ex. A at 11. The NOFO (as well as the Office of Justice Programs' General Terms and Conditions) also makes

clear that grant recipients will have to certify that they do not operate programs "having components related to diversity, equity, and inclusion[.]" *Id.* at 30. Freedom Network explains that grant applicants must explain "how they will comply with the requirements and conditions in the NOFOs . . . [or else] risk denial of their proposal by losing points during the peer review process or being downgraded by the Office of Justice Programs staff for failing to align with the NOFOs' strategic priorities." Suppl. Bruggerman Decl. ¶ 36. Freedom Network anticipates that its grant application will risk a violation of the challenged NOFO conditions in discussing the client population it intends to serve and the problems it seeks to remedy. *See, e.g.*, Second Suppl. Bruggerman Decl. ¶ 14 (describing how Freedom Network's Survivor Reentry Project serves people of color and immigrants, as these are the survivors of human trafficking most "in need of criminal record relief"). Freedom Network's applications cannot be altered without recalling the applications, and it will not have another opportunity to describe its work to OVC. And the government does not dispute that the NOFO conditions will impact the grant review process.

Based on the evaluation of its grant application under the NOFO conditions, Freedom Network may not receive federal funding, which comprises about three-quarters of its budget. If it does receive the funding, it faces looming uncertainty regarding whether to modify its activities or risk a False Claims Act action and termination of its funding. The NOFO conditions thus require an "immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance," both with respect to the grant applications and the organization's activities. *Abbott Lab'ys*, 387 U.S. at 153.

43

"As numerous other courts have likewise explained, the decision to attach the conditions can be final even if the final decision to award the funds and issue the NOFOs is still pending[.]" *Illinois v. Fed. Emergency Mgmt. Agency*, 801 F. Supp. 3d 75, 89 (D.R.I. 2025) (footnote omitted). "Without agreeing to the challenged conditions, the [plaintiffs] are effectively barred from applying for and receiving funds which they are legally entitled to seek. And the challenged conditions will potentially change the lawful scope of activities permitted with grant funds, lead to the termination of grant awards," and result in civil or criminal liability under the False Claims Act. *Rhode Island Coal. Against Domestic Violence v. Bondi*, 794 F. Supp. 3d 58, 68 (D.R.I. 2025); *see also Hous. Auth. of S.F. v. Turner*, No. 25 C 8859, 2025 WL 3187761, at *16 (N.D. Cal. Nov. 14, 2025) (holding that plaintiffs challenged final agency action of grant conditions enacted in HUD Policy Terms to which plaintiffs were required to certify compliance under penalty of perjury in SF-424 and other forms).

Although the Court joins the other federal courts that have concluded that recent challenges to federal funding conditions involve final agency action, this case is distinct for two reasons. First, here, unlike in some prior cases, the government has not waived its argument regarding final agency action. *See, e.g.*, *Martin Luther King, Jr. County*, 798 F. Supp. at 884 n.18. Second, two of the challenged conditions in this case, the discrimination and immigration enforcement conditions, appear in a NOFO rather than an agency's standard terms and conditions, which apply to all grants administered by that agency in a given fiscal year, or in conditions for plaintiffs who have already been awarded funding. *See, e.g.*, *Noem*, 2025 WL 3251222, at *6 ("The

44

decision to include the challenged conditions in the DHS Standard Terms and Conditions is a final agency [.]"); *City of Chicago*, 2026 WL 114294, at *10 (agency did not contest final agency action for challenge to grant condition where grants were already awarded to recipients); *S.F. Unified Sch. Dist. v. AmeriCorps*, 789 F. Supp. 3d 716, 731, 740–41 (N.D. Cal. 2025) (describing as final agency action grant conditions that gave "grant recipients three choices: (1) self-certify that their award is compliant; (2) amend the grant to move [the] program into compliance with the executive orders; or (3) relinquish the grant."). Compared to these cases, Freedom Network challenges the discrimination and immigration enforcement conditions at an earlier stage of the funding process. But even so, OVC's action is a final agency action because it marks the consummation of the agency's decision regarding the evaluation criteria for grant applications and has an immediate effect on Freedom Network.

The government contends that the NOFO conditions may not ultimately attach to the awards, so they cannot be considered final agency action. But an agency's action may be final "notwithstanding the agency's characterization of the [action] as an interim" one and "despite the potential for a different permanent decision, as long as the interim decision is not itself subject to further consideration by the agency." *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 78 (D.C. Cir. 2020). The government has issued the NOFO to govern the grant application process. Nowhere does it suggest that the NOFO will be withdrawn or reissued. The NOFO has shaped Freedom Network's response to the grant applications. In other words, the inclusion of the conditions in the NOFO is a final agency action regardless of whether these conditions attach to the grants themselves. On that separate issue, the government has

45

presented nothing to indicate that DOJ intends to remove the conditions from final awards, which seems unlikely given that these or similarly worded conditions have become commonplace in federal grants of many types. *See, e.g.*, *Noem*, 2025 WL 3251222, at *2 (summarizing similar conditions regarding use of grants for activities related to DEI and programs benefitting undocumented immigrants in the DHS Standard Terms and Conditions for Fiscal Year 2025).

### ii. Merits of APA claims

Freedom Network has demonstrated a likelihood of success on several of its claims under the APA.

The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). A reviewing court must consider whether the agency's action was based on the relevant statutory factors. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Agency action may be arbitrary and capricious when the agency relied on factors not contemplated by Congress, "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* "Judicial review under [the arbitrary and capricious] standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *Prometheus Radio Project*,

46

592 U.S. at 423.

"[A]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change[.]" *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 568 (2025) (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016)). A court must ask "whether an agency changed existing policy" and whether the agency "'display[ed] awareness that it *is* changing position' and offer[ed] 'good reasons for the new policy[.]'" *Id.*

Regarding the NOFO immigration enforcement and discrimination conditions, the government contends that "[t]here is nothing new nor arbitrary and capricious about prohibiting grantees from using federal funds to violate applicable federal law." Defs.' Resp. at 23. At a general level, that is true, but that statement obscures the government's shifting interpretation of anti-discrimination law. Although Freedom Network and other federal grantees were previously required to comply with federal law, as the Court has explained, the challenged conditions represent new and undefined understandings of anti-discrimination law. And the record does not reflect a previous requirement to certify compliance with all federal anti-discrimination law to receive grants under the TVPA. Likewise, no certification regarding False Claims Act liability relating to DEI or any condition related to immigration enforcement was previously required of Freedom Network. The government makes the same argument with respect to the NOFO certification provision, *see* Defs.' Resp. at 28 n.16, and it fails for the same reasons.

The government has provided no explanation for why its position on these matters has changed. And Freedom Network has strong reliance interests, as these

47

grants fund a substantial portion of its budget.  The new conditions and uncertainty as to how these conditions will be enforced require the organization to consider how it will operate without federal funding, which Freedom Network says (and the government offers nothing to dispute) would cause it to cease operations in six weeks.

Freedom Network has established a likelihood of success on its contention that each of the challenged NOFO conditions is arbitrary and capricious.  Additionally, as the Court explained in its analysis of the separation-of-powers, Spending Clause, and certain First Amendment claims above, Freedom Network has shown a likelihood of success on its contention that the challenged conditions are contrary to constitutional right.[6]

### 2.      Irreparable harm

The government argues that Freedom Network's alleged harm is purely economic and thus does not qualify as irreparable for purposes of a preliminary injunction.  This contention does not carry the day given the Court's finding that Freedom Network has established a likelihood of success on its claim that the J21 certification provision and NOFO certification provision violate its First Amendment rights.  "[L]oss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).  When First Amendment rights are at stake, the "quantification of injury is difficult and damages are therefore not an adequate remedy."  *Id.* (citation omitted).

---

[6] Given the likely success of Freedom Network's other APA claims, the Court need not address at this time Freedom Network's claims that the challenged conditions are contrary to law and exceed DOJ's statutory authority under the TVPA.

The Court also finds that Freedom Network is likely to suffer irreparable harm if the certification provisions, J20 termination provision, NOFO discrimination condition and NOFO immigration enforcement condition are enforced because the Court has concluded such enforcement would violate the separation of powers. "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Ezell*, 651 F.3d at 699 (quoting 11A Charles Alan Wright, et al., Federal Practice and Procedure § 2948.1 (2d ed. 1995)). This is especially true when the right in question "protects . . . intangible and unquantifiable interests." *Id.*

The separation of powers is one such interest. By protecting against "the concentration of power" that "would allow tyranny to flourish," it is "one of the most vital of the procedural protections of individual liberty found in our Constitution." *Barr*, 961 F.3d at 892 (quoting *Gundy v. United States*, 588 U.S. 128, 173 (2019) (Gorsuch, J., dissenting)). No further showing of irreparable harm is needed.

### 3.    Balance of equities and public interest

The balance of harms and public interest merge when the government is the opposing party. *Nken*, 556 U.S. at 435. "[I]njunctions protecting First Amendment freedoms are always in the public interest." *Alvarez*, 679 F.3d at 589 (citation omitted). The same may be said of injunctions protecting the separation of powers. *See Barr*, 961 F.3d at 918 (affirming the lower court's conclusion that "the public interest was served by an injunction in that it acts as a check on the executive's encroachment of congressional power that violates the separation of powers").

Accordingly, in a case of this sort, "the balance of harms normally favors

49

granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional." *Alvarez*, 679 F.3d at 589–90. The Court has also concluded that Freedom Network is likely to succeed on its APA claims, and "[t]he public interest is served when administrative agencies comply with their obligations under the APA." *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009).

Furthermore, the issuance of a preliminary injunction will not prevent the government from considering grant applications and disbursing federal funding to grant applicants. The government remains free to process the grant applications and disburse federal funding as long as it does so within the limits set by the Constitution and APA.

For these reasons, the Court concludes that the balance of harms and public interest weighs in favor of granting a preliminary injunction.

## C.    Scope of relief

Freedom Network urges the Court to issue a nationwide injunction because "entities and persons across the country have indicated that they fear continued association and collaboration with Freedom Network as a result of the Executive Orders." Pl.'s Mot. at 28. Freedom Network also argues that nationwide relief is warranted on the NOFO conditions.

The Court concludes that its reasoning from *CWIT* applies to the scope of the remedy in this case. *Chi. Women in Trades v. Trump*, No. 25 C 2005, 2025 WL 3034056, at *4–7 (N.D. Ill. Oct. 30, 2025) ("*CWIT III*"). Freedom Network relies on a network of nationwide collaborators who provide services for trafficking victims. The

J21 certification provision acts as a barrier to Freedom Network's collaboration with these other organizations because the organizations are likely to avoid any association with speech that could violate the provision.

As in *CWIT III*, the Court keeps in mind that "complete relief" is a narrower concept than "universal relief." *CWIT III,* 2025 WL 3034056 at *6. Freedom Network's work focuses on training and programs for organizations that assist trafficking survivors as well as direct services. This work inherently requires collaboration among stakeholders. Thus the Court concludes that Freedom Network, as a plaintiff, presents special considerations for crafting the remedy in this case.

The Court therefore concludes that to afford Freedom Network complete relief, it is necessary, based on the facts of this case, to enjoin enforcement of the J21 certification provision against all recipients of federal funds awarded by the DOJ.

In its most recent filing, Freedom Network expressly argues that it seeks relief with respect to the NOFO conditions under sections 705 and 706 of the APA. Dkt. 86 at 2. The Court recently addressed the relief available under the APA in another case. *See City of Chicago v. U.S. Dep't of Homeland Sec.*, No. 25 C 5463, 2025 WL 3171302, at *2 (N.D. Ill. Nov. 13, 2025) (Kennelly, J). A similar analysis applies here. The text of APA section 706—titled "Scope of review"—provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions" found to be arbitrary and capricious or contrary to law. 5 U.S.C. § 706. The most natural reading of that language is that courts act on the "agency action, findings, and conclusions" themselves. Courts have thus long understood section 706 to authorize "vacatur"—vacating the agency action itself, rather than enjoining enforcement of the

51

action against specific plaintiffs. *See Corner Post*, 603 U.S. at 830–31 (Kavanaugh, J., concurring).

APA section 705 relates to interim relief. That provision states that "a reviewing court[] may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. Like with section 706, this language is naturally read to authorize courts to postpone or stay the agency action itself, rather than enjoining its enforcement as to particular plaintiffs. *Cf. CASA*, 606 U.S. at 873 (Kavanaugh, J., concurring) (noting that courts after CASA may still "preliminarily set[] aside or declin[e] to set aside an agency rule under the APA"). The Court thus concludes that APA section 705 authorizes a stay of the OVC's decision to include the Services for Victims of Human Trafficking NOFO conditions.[7]

In sum, the Court enjoins enforcement of the J21 certification provision against all recipients of federal funding awarded by DOJ and orders a stay under APA section 705 of OVC's decision to include the NOFO certification provision, NOFO discrimination condition, and NOFO immigration enforcement condition in the Services for Victims of Human Trafficking NOFO.[8]

---

[7] As discussed, Freedom Network likely lacks standing to challenge the funding conditions in NOFOs other than the Services for Victims of Human Trafficking NOFO—the one NOFO under which Freedom Network will apply for grants. Thus the analysis of the scope of potential injunctive relief for the funding conditions would likely differ from the analysis of APA vacatur.

[8] The stay of OVC's decision to include the funding conditions in the NOFO includes a stay on any action by OVC to consider the funding conditions when evaluating applications for grants submitted under the Services for Victims of Human Trafficking NOFO.

**Conclusion**

Date:  March 23, 2026

_____

MATTHEW F. KENNELLY
United States District Judge