**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| FREEDOM NETWORK USA, LIFE-SPAN, YOUNG WOMEN'S CHRISTIAN ASSOCIATION KALAMAZOO, AND WORKER JUSTICE CENTER OF NEW YORK, <br><br>     Plaintiffs, <br><br> v. <br><br> PRESIDENT DONALD J. TRUMP, OFFICE OF MANAGEMENT AND BUDGET, DIRECTOR OF THE OFFICE OF MANAGEMENT AND BUDGET RUSSELL VOUGHT, U.S. DEPARTMENT OF JUSTICE, OFFICE OF JUSTICE PROGRAMS, OFFICE FOR VICTIMS OF CRIME, ACTING ATTORNEY GENERAL OF THE U.S. DEPARTMENT OF JUSTICE TODD BLANCHE, <br><br>     Defendants. | Case No. 1:25-cv-12419 <br><br> Judge: Hon. Matthew F. Kennelly <br><br> JURY TRIAL DEMANDED |

## <u>SECOND AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF</u>

**NATURE OF THE CASE**

1. This case is about whether the Executive Branch can outlaw diversity, equity and inclusion and censor the use of disfavored words regarding the same.

2. Plaintiff Freedom Network USA ("Freedom Network") is the nation's largest non-profit coalition of advocates, service providers, and survivors working to end human trafficking and protect survivors in the United States. Freedom Network's mission is to fight human trafficking and protect survivors by providing equity-driven training and technical assistance[1] to thousands of private and public stakeholders, ranging from federal law enforcement agencies to case managers in the foster care system, in every state, as well as direct services to thousands of survivors each year, in every state. Freedom Network annually provides anti-human trafficking training and technical assistance to at least 1,000 private and public stakeholders, ranging from city councils to community organizers, throughout the nation.

3. Seventy percent of Freedom Network's funding comes from the federal government through funds appropriated by Congress under the Trafficking Victims Protection Act ("TVPA" or "the Act") and administered by the Department of Justice ("DOJ"). Freedom Network is otherwise privately funded.

4. On October 10, 2025, Freedom Network filed a Complaint because its Congressionally funded mission—to battle the evils of human trafficking whose victims are disproportionately women, children, and immigrants from underserved communities—was under

---

[1] Training and Technical Assistance is defined as in-person and online training, fact sheets, tools, templates, and individualized assistance. It involves on-site support and comprehensive review of the organization's individual policies and procedures to assess how "equitable" or effective they are at accommodating survivors. https://freedomnetworkusa.org/training/ (last visited Oct. 9, 2025).

assault. This mission and the intent of Congress were being strangled by government censorship and threatened by vague governmental anti-equity Executive Orders ("anti-equity EOs").[2]

5.      On February 6, 2026, Freedom Network filed an Amended Complaint because after it filed its original Complaint, the Executive Branch issued Notices of Funding Opportunities ("NOFOs") that include new funding conditions that effectively prohibit Freedom Network from serving the communities Congress intended nonprofit providers to reach. Freedom Network challenged these new funding conditions based on its expectation that they would further thwart Freedom Network's ability to effectuate Congress's intent and to effectuate its own non-federally funded purposes.[3]

6.      Plaintiffs Life-Span, Young Women's Christian Association Kalamazoo ("YWCA Kalamazoo" or "YWCA"), and Worker Justice Center of New York ("WJCNY") (collectively, "New Plaintiffs"), each serve survivors of human trafficking and provide equity- and diversity-related programs and services. To do so, each has relied on TVPA funding administered by DOJ for years, and each has applied for grants pursuant to the NOFOs.

7.      Freedom Network and the New Plaintiffs challenge three provisions of two executive orders and three funding conditions included in seven recent NOFOs. The anti-equity EOs and the NOFOs violate at least two bedrock principles of our constitutional democracy: the

---

[2] Executive Order No. 14151, Ending Radical and Wasteful Government DEI Programs and Preferencing, 90 Fed. Reg. 8339 (Jan. 20, 2025); Executive Order No. 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, 90 Fed. Reg. 8633 (Jan. 21, 2025).

[3] As Freedom Network explained in its Notice of Status of Grant Application filed on March 30, 2026, ECF No. 92, it attempted to apply for the Services for Victims of Human Trafficking grant that is one of the grants referenced in the Court's preliminary injunction order but encountered technical issues with the government website during the submission process before Freedom Network completed the process on the due date. Freedom Network applied for a waiver based on the technical issues that it encountered, and the government rejected its application. The government will not consider Freedom Network for that grant as a result.

First Amendment of the Constitution and the Constitution's separation of powers. Freedom

Network and New Plaintiffs seek to protect and vindicate these Constitutional rights through

injunctive and declaratory relief.

8.      In the executive orders, Freedom Network and New Plaintiffs challenge the

following provisions:

a.      Section 2(b)(i) of Executive Order No. 14151, Ending Radical and Wasteful Government DEI Programs and Preferencing, 90 Fed. Reg. 8339 (Jan. 20, 2025) (the "J20 Termination Provision").

b.      Section 3(b)(iv) of Executive Order No. 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, 90 Fed. Reg. 8633 (Jan. 21, 2025) (the "J21 Certification Provision").

c.      Section 3(c)(iii) of Executive Order No. 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, 90 Fed. Reg. 8633 (Jan. 21, 2025) (the "J21 Termination Provision").

9.      In the seven recent NOFOs, the New Plaintiffs challenge the following funding

conditions (collectively, the "New Funding Conditions"):

a.      The "Discrimination Condition" included in the NOFOs.[4] The

Discrimination Condition directs that grant funding may not be used for "any

program or activity, at any tier that violates any applicable Federal civil rights or

nondiscrimination law," "including by promoting or facilitating violations; or (2)

unlawfully favor individuals in any race or protected group, including on a

majority or minority, or privileged or unprivileged, basis, within a given area,

population, or sector." But neither the NOFOs nor the Department of Justice

---

[4] *See*, *e.g.*, OVC FY25 Specialized Human Trafficking Assistance: Supporting Survivor Engagement in Anti-Trafficking Programming NOFO *available at* https://www.ojp.gov/funding/docs/ovc-2025-172522.pdf) and OVC FY25 Services for Victims of Human Trafficking (*available at* https://www.ojp.gov/funding/docs/ovc-2025-172520.pdf).

("DOJ") elsewhere offer guidance on how to reconcile the Discrimination Condition's prohibitions with the congressional intent of the anti-trafficking work the New Plaintiffs perform which, by its very nature, focuses on underprivileged groups "within a given area, population or sector."

b.      The "Immigration Enforcement Condition" included in the NOFOs.[5] The Immigration Enforcement Condition directs that grant funds may not be used for "any program or activity, at any tier that, directly or indirectly, violates (or promotes or facilitates the violation of) federal immigration law (including 8 U.S.C. § 1373) or impedes or hinders the enforcement of federal immigration law—including by failing to comply with 8 U.S.C. § 1373, give access to DHS agents, or honor DHS requests and provide requested notice to DHS agents." But neither the NOFOs nor DOJ elsewhere offer guidance on how to reconcile the Immigration Enforcement Condition's prohibitions with the anti-trafficking work New Plaintiffs perform which, by its very nature, focuses on supporting immigrants.

c.      The "NOFO Certification Provision."[6] The NOFO Certification Provision requires grant recipients to certify, as a condition for receipt of grant funding, that they "do[] not operate any programs (including programs having

---

[5] *See*, *e.g.*, OVC FY25 Specialized Human Trafficking Assistance: Supporting Survivor Engagement in Anti-Trafficking Programming NOFO *available at* https://www.ojp.gov/funding/docs/ovc-2025-172522.pdf) and OVC FY25 Services for Victims of Human Trafficking (*available at* https://www.ojp.gov/funding/docs/ovc-2025-172520.pdf)

[6] *See*, *e.g.*, OVC FY25 Specialized Human Trafficking Assistance: Supporting Survivor Engagement in Anti-Trafficking Programming NOFO *available at* https://www.ojp.gov/funding/docs/ovc-2025-172522.pdf) and OVC FY25 Services for Victims of Human Trafficking (*available at* https://www.ojp.gov/funding/docs/ovc-2025-172520.pdf).

4

components related to diversity, equity, and inclusion) that violate any applicable Federal civil rights or nondiscrimination laws." But neither the NOFOs nor DOJ elsewhere offer guidance on whether the anti-trafficking work of the type the New Plaintiffs perform, which necessarily focuses on persons from marginalized and underprivileged communities, runs afoul of DOJ's current interpretation of "Federal civil rights or nondiscrimination laws."

10. The New Plaintiffs' missions are tied to the TVPA. On October 28, 2000, Congress enacted this landmark legislation, which represents the first comprehensive federal law in the United States to combat human trafficking[7] through a framework of prevention, protection, and prosecution.

11. Congress has appropriated funds for multiple grants that DOJ has awarded to the New Plaintiffs to effectuate the equity-related goals of the TVPA.

12. On January 20 and 21, 2025, the President signed and issued two Executive Orders that threaten and violate the foundational principles of the Constitution, the Congressional intent of the TVPA, and the ability of nongovernmental victims' service organizations to zealously advocate for survivors. Executive Order 14151, titled "Ending Radical and Wasteful Government DEI Programs and Preferencing" (the "J20 EO") and Executive Order 14173, titled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity" (the "J21 EO"), (collectively, the "anti-equity EOs"), seek to eliminate any efforts to promote diversity,

---

[7] Human trafficking, also known as modern-day slavery, is defined in TVPA as "(a) sex trafficking in which a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act has not attained 18 years of age; or (b) the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery." 22 U.S.C. 7105(B)(i).

5

equity, or inclusion, contravene the Congressional mandates directing their federal financial support, and spread the vast chilling effect of imposing such sweeping restrictions on free speech. Exec. Order No. 14151, 90 Fed. Reg. 8439, attached as Exhibit A. *See also* Exec. Order No. 14173, 90 Fed. Reg. 8663 (Jan 21, 2025); attached as Exhibit B.

13.     The anti-equity EOs and the NOFOs violate at least two bedrock principles of our constitutional democracy: the First Amendment of the Constitution and the Constitution's separation of powers. Plaintiffs seek to protect and vindicate these Constitutional rights through preliminary injunctive and declaratory relief.

14.     There can be no doubt that Congress's goals for the TVPA were equity-related, as its preamble makes clear:

> One of the founding documents of the U.S., the Declaration of Independence, recognizes the inherent dignity and worth of all people. It states that all men are created equal and that they are endowed by their Creator with certain inalienable rights. The right to be free from slavery and involuntary servitude is among those unalienable rights. . . . Current practices of sexual slavery and trafficking of women and children are abhorrent to the principles upon which the United States was founded.

Trafficking Victims Protection Act, 22 U.S.C. § 7101(b)(22).

15.     When it enacted the TVPA, Congress directly expressed that confronting issues of equity[8] is necessary for the implementation of the Act. For example, Congress found that "traffickers primarily target women and girls, who are disproportionately affected by poverty, the lack of access to education, chronic unemployment, discrimination, and the lack of economic

---

[8] Merriam-Webster defines equity as "freedom from disparities in the way people of different races, genders, etc. are treated." https://www.merriam-webster.com/dictionary/equity (last visited Oct. 9, 2025).

opportunities." *Id.* § 7101(b)(4). It also concluded that persons that have immigrated to the United States are also particularly susceptible to trafficking.

16. Congress doubled down on its intent to promote equity when it named the Act's reauthorization legislation "The Frederick Douglass Trafficking Victims Prevention and Protection Reauthorization Act of 2018." This reauthorization bill was specifically introduced on the 183rd anniversary of Frederick Douglass's escape from slavery. Douglass then became a renowned abolitionist "to lead the fight to end slavery, Jim Crow laws, and advance equality and respect."[9]

17. To achieve these equity-related goals, the TVPA, *inter alia*, provides grants to "nonprofit, nongovernmental victims' service organizations to develop, expand, or strengthen victim service programs for victims of human trafficking." 22 U.S.C. §7105(b)(2)(A). Freedom Network is one such victims' services organization and has been awarded multiple grants under the TVPA through DOJ. Life-Span, YWCA Kalamazoo, and WJCNY have also been awarded multiple TVPA-authorized grants by DOJ for years.

18. In implementing the anti-equity EOs, DOJ issued to its grantees a list of approximately 50 words that "cannot appear in any Office for Victim of Crime materials (i.e. web pages, training content, presentations, etc.)" because they are "terms or words in conflict with recent Executive Orders." All of Freedom Network's federally funded work qualifies as "Office for Victim of Crime materials." The DOJ's list of forbidden words violates even the most basic notions of free speech, prohibiting Freedom Network from using words used in

---

[9] Rep. Chris Smith, *Marking the anniversary of Frederick Douglass' self-emancipation from slavery, Smith, Bass joined by descendent of Frederick Douglass to introduce anti-trafficking reauthorization bill named after the renowned abolitionist*, U.S. Rep. Chris Smith (Sept. 3, 2021) ("Smith Press Release"), https://chrissmith.house.gov/news/documentsingle.aspx?DocumentID=4096.

everyday speech such as "fair," "fairness," "pronouns," "identity," "equitable," "gender," and "culture." Here is the list, also attached as Exhibit C:

*Please be aware that the list of terms or words in conflict with recent Executive Orders vary from agency and may also differ within agencies. This list is applicable to your work with OVC TTAC only.*

**DOJ, Office of Justice Programs (OJP) Guidance-**
**Terms that cannot appear in any OVC materials (i.e., web pages, training content, presentations, etc.)**

- Accessibility/Accessible
- AFAB
- AMAB
- Binary gender
- Cis
- Cis (Cisgender)
- Cisgender
- Critical Race Theory
- Culture
- Culturally competent (culturally-competent)
- DEI
- DEIA
- Discrimination/Discriminate/discriminatory
- Disparity
- Diversity/Diverse
- Equity/Equitable
- Ethnic/Ethnicity
- Fair/fairness
- Gender
- Gender Ideology
- Gender norms
- Gender responsive (gender-responsive)
- Gender-affirming care
- Gender dysphoria
- Gender expression
- Gender identity
- Gender nonconforming
- Gender nonconformity
- Gender queer
- Genderfluid
- Holistic/holistically
- Identity
- Inclusion/inclusive
- Integrate/integration
- Intersex
- LGBT
- LGBTQ
- LGBTQI
- LGBTQ+
- Minority populations
- Nonbinary
- Pronouns
- Race/racial
- Sexual orientation
- Toxic/toxicity
- Trans
- Transgender
- Transman
- Transpeople
- Transperson
- Transwoman

*January 31, 2025*

19. DOJ has done more than just publish a list of forbidden words; it has also demanded that Freedom Network not use these words in its presentations, on its website, in its anti-trafficking training materials, or in its oral presentations by human trafficking survivors.

20. These words are necessarily used by Freedom Network in carrying out both its privately funded and its federally funded programs and mission.

21. Indeed, Freedom Network had planned to host a national housing summit in Chicago in late 2025, but Executive Branch censorship and the anti-equity EOs have made such

8

a conference impossible. A substantial majority of Freedom Network's federally funded work has been undertaken in Chicago since it was founded. Therefore, Freedom Network had planned to host its housing summit in Chicago because the need for its equity-driven services has consistently been greater there. Chicago is both a prominent hub of sex and labor trafficking and a center for innovative anti-trafficking initiatives undertaken by Freedom Network and its constituent members.

22.     The list of words that Freedom Network is forbidden to use reveals the true intent of the anti-equity EOs: to punish and banish equity-related speech and conduct that is disfavored by the Executive Branch and to thwart Congressional intent to promote equity-related laws and programs, such as the TVPA.

23.     A slate of seven NOFOs released in December 2025 operationalize the edicts announced in the anti-equity EOs to chill and ultimately eliminate the New Plaintiffs' federally and privately funded programming. These NOFOs include an unprecedented certification provision as well as funding conditions unilaterally imposed by DOJ and wholly unrelated to the TVPA, and make the New Plaintiffs' congressionally mandated work impossible. For example, the Immigration Enforcement Condition places the New Plaintiffs in an irreconcilable conflict with their statutory and programmatic obligations. Under the NOFOs, the New Plaintiffs must "honor" DHS requests that may require disclosure of survivors' personally identifying information in direct violation of the Violence Against Women Act ("VAWA") confidentiality provisions incorporated into the TVPA at 34 U.S.C. § 12291(b)(2), which permit disclosure only with informed, written, and time-limited consent in narrow circumstances. In short, these NOFOs endanger diversity, equity, and inclusion programs and "activities" with the threat of government investigation and criminal prosecution.

24. Yet, while human trafficking is illegal under the TVPA, diversity is not illegal; equity is not illegal; inclusion is not illegal. In fact, in enacting and reauthorizing the TVPA, Congress declared that equity is a key component of the fight against modern-day slavery. Using equity-related words or embedding equity-driven values in programs that fight human trafficking does not violate any laws. Precluding the New Plaintiffs from using equity-related words or values actually impedes their ability to protect survivors and prevent trafficking.

25. Standing on their own, these NOFOs are statutorily and constitutionally improper; their impact is exacerbated when coupled with the anti-diversity EOs. Collectively, the challenged language of the NOFOs and the EOs violates bedrock principles of our democracy, including the constitutional right of free speech under the First Amendment, the Fifth Amendment, and the Separation of Powers and Spending Clause provisions of our Constitution. They also violate the New Plaintiffs' statutory rights, including those under the Administrative Procedure Act ("APA").

## JURISDICTION AND VENUE

26. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a), and because the Defendants are United States officials, 28 U.S.C. § 1346(a)(2).

27. Venue is proper in this district because this action is against an officer, employee, and/or agency of the United States and a substantial part of the events or omissions giving rise to the claim occurred and continue to occur in this judicial district. 28 U.S.C. § 1391(e).

## THE PARTIES

**A. Plaintiff Freedom Network USA**

28. Freedom Network is a not-for-profit 501(c)(3) organization headquartered in Washington, D.C., and founded in 2001. Freedom Network's history and mission are intertwined

with the TVPA. Freedom Network's founding leaders worked with members of Congress of both political parties to help pass the TVPA. Freedom Network's mission is to prevent human trafficking and protect survivors by providing equity-driven training and technical assistance as well as direct services to survivors in all 50 states. Its core organizational value is "equity," which Freedom Network defines as "creat[ing] spaces and efforts that are inclusive, [to] meet people where they are at."[10] Seventy percent of Freedom Network's budget is federally funded, and since it was founded, Freedom Network has undertaken a substantial majority of its federally funded work in Chicago.

### B.      Plaintiff Life-Span

29.      Life-Span is a not-for-profit 501(c)(3) headquartered in Chicago, Illinois, founded in 1978. Life-Span's mission is to provide comprehensive services for survivors of domestic violence, sexual assault, and human trafficking, and their children, enabling them to live without violence, build upon their strengths and become self-sufficient. Life-Span's work is grounded in a human rights framework, which advances an equity-centered approach to domestic and sexual violence and human trafficking, recognizing these harms not as isolated incidents but as systemic injustices driven by structural inequities, and working to ensure that all survivors—particularly those historically underserved—have meaningful access to safety, autonomy, and justice. Life-Span's goal is to assist survivors throughout Cook County, Illinois (with a focus on Chicago) in overcoming the underlying vulnerabilities that traffickers exploit, such as poverty, lack of housing, and legal issues.

---

[10] https://freedomnetworkusa.org/about-us/ (last visited Oct. 9, 2025)

11

### C.     Plaintiff YWCA Kalamazoo

30.     YWCA Kalamazoo is a not-for-profit 501(c)(3) headquartered in Michigan and is a Freedom Network member. YWCA Kalamazoo's mission is to eliminate racism, empower women, and promote peace, justice, freedom, and dignity for all. Racial and gender equity work are at the core of YWCA Kalamazoo's mission and day-to-day work. Since 2016, YWCA Kalamazoo has been among the few providers nationally of comprehensive anti-trafficking services and housing open to all genders and trafficking experiences. YWCA Kalamazoo is the only emergency and long-term housing provider in the Midwest region that is open to males and labor trafficking survivors. It also operates the only comprehensive anti-trafficking services program in Michigan, offering the full continuum of direct services to all survivors, which includes specialized anti-trafficking case management, legal representation, and trauma-informed therapy. Much of YWCA Kalamazoo's day-to-day work is closely connected to Chicago because Kalamazoo sits along the I-94 corridor, a major route frequently used in human trafficking between Detroit and Chicago. YWCA Kalamazoo has permanent staff and board members located in Chicago since many of its clients require regular travel, outreach, and services to Chicago. YWCA Kalamazoo also receives referrals from Chicago since it is among the few providers nationally of comprehensive anti-trafficking services and housing open to all genders and trafficking experiences.

### D.     Plaintiff WJCNY

31.     WJCNY is a not-for-profit 501(c)(3) headquartered in New York. Founded in 1981, WJCNY is the only statewide nonprofit law firm that provides free direct services to farmworkers and low-wage workers in upstate New York, regardless of their immigration status. WJCNY has a 26-year history litigating claims arising out of extreme forms of labor

12

exploitation, including human trafficking claims under the TVPA. Equity is indivisible from WJCNY's guiding vision that every worker should be treated with dignity and respect, free from coercion and fear of reprisals. WJCNY's work reaches the greater Chicago area. For example, WJCNY's work involves a substantial investigation into a labor trafficking scheme that partially occurred in the greater Chicago area. WJCNY has been invited to Freedom Network's Chicago-based conferences as a member organization, and WJCNY staff have served as speakers at several conferences in the Chicago area.

### E. Defendants

32. Defendant Donald J. Trump is the President of the United States of America. He issued the anti-equity EOs. He is sued in his official capacity.

33. Defendant DOJ is directed to implement the anti-equity EOs in various ways and DOJ has proceeded to do so. DOJ provides grant funding to Freedom Network and New Plaintiffs, either directly or indirectly.

34. Defendant Todd Blanche is the Acting U.S. Attorney General, and he leads the DOJ. He is sued in his official capacity.

35. OMB is the agency that is called on to enforce the anti-equity EOs. Section 2(a) of the J20 EO states: "The Director of the Office of Management and Budget (OMB), assisted by the Attorney General and the Director of the Office of Personnel Management (OPM), shall coordinate the termination of all discriminatory programs, including illegal DEI and 'diversity, equity, inclusion, and accessibility' (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear." Section 3(c) of the J21 EO states: "The Director of the Office of Management and Budget (OMB), with the assistance of the Attorney General as requested, shall: (i) Review and revise, as appropriate, all Government-

13

wide processes, directives, and guidance; (ii) Excise references to DEI and DEIA principles, under whatever name they may appear, from Federal acquisition, contracting, grants, and financial assistance procedures to streamline those procedures, improve speed and efficiency, lower costs, and comply with civil-rights laws; and (iii) Terminate all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities, as appropriate."

36. Defendant Russell Vought is the Director of the Office of Management and Budget. He is sued in his official capacity.

## FACTUAL ALLEGATIONS

**I.      The TVPA Protects Victims of Human Trafficking Who Are Disproportionately Vulnerable Women and Children From Underserved Communities.**

37. The TVPA combats human trafficking by focusing on three pillars: protecting survivors of trafficking, prosecuting traffickers, and preventing human trafficking. The TVPA is equity driven in that it seeks to address the inequities that cause people to become victims and that stand in the way of obtaining a life after being victims.

38. Congress found it imperative to address how traffickers "lure women and girls" who are "disproportionately affected by poverty . . . and discrimination . . . into their networks through false promises of decent working conditions." 22 U.S.C. § 7101(b)(4). It concluded that "no comprehensive law exists in the Unites States that penalizes the range of offenses involved in trafficking . . . so . . . traffickers typically escape deserved punishment." 22 U.S.C. § 7101(b)(14). It found that "adequate services and facilities do not exist to meet victims' needs regarding health care, housing, education, and legal assistance, which safely reintegrate trafficking victims." 22 U.S.C. § 7101(b)(18).

39.     As a result, Congress awarded federal grants to non-profit and non-governmental victims' service organizations to address these systemic disparities, including the gaps in victim services that traffickers exploit. Congress also mandated that 5% of all awarded grants be set aside for research, training and technical assistance on protecting survivors, prosecuting traffickers, and preventing trafficking. 22 U.S.C. § 7105(b)(2)(B)(i)-(ii).

40.     In addition, Congress recognized the unique and heightened barriers immigrant survivors face in accessing TVPA protections. When Congress enacted the TVPA, it found that "because victims are often illegal immigrants, they are repeatedly punished more harshly than traffickers themselves" due to a "lack of familiarity with laws . . . subject[ion] to coercion and intimidation including physical detention . . . and because they fear forcible removal to countries in which they will face retribution." 22 U.S.C. § 7101(b)(4), (17)-(20). Congress recognized that these conditions create unique barriers for immigrant survivors to report trafficking or cooperate with law enforcement, which mitigates the prevention of trafficking for all survivors in the United States. In response, the TVPA and its reauthorizations deliberately prioritize immigrant survivors through tailored safeguards—including trafficking-specific immigration relief, relaxed reporting requirements, and enhanced confidentiality protections—to ensure that immigrant survivors can meaningfully access the TVPA's protections. 8 C.F.R. § 214.11

41.     In the 25 years since the passage of the TVPA, Congress expanded its focus on systemic disparities across all three pillars with each subsequent reauthorization.[11] While Congress has consistently maintained a focus on vulnerable women and girls, it has also recognized that "victims of human trafficking can include men, women, and children who are

---

[11] The TVPA has been reauthorized six times in 2003, 2005, 2008, 2013, 2018, 2022.

diverse with respect to race, ethnicity, and nationality, among other factors." 22 U.S.C. § 7101 (Supp. V 2018).

42. Furthermore, Congress specifically noted that "more accurate and comprehensive data on the prevalence of human trafficking is needed" to prevent trafficking. 22 U.S.C. § 7105(b)(2) (Supp. V 2018). As such, congressional reauthorizations have prioritized funding for grants to conduct equity-related research, such as the economic causes of trafficking, the connection between homelessness and trafficking, and impediments to accessing victims' services. *See* 22 U.S.C. § 7101 (Supp. V 2008); 22 U.S.C. § 7105(b)(2) (Supp. V 2013); 22 U.S.C. § 7101 (Supp. V 2018); 22 U.S.C. § 7105(b)(2)(B)(ii)) (Supp. V 2022).

43. Congress has also consistently reauthorized mandates for funding for training and technical assistance centered on addressing systemic disparities. For example, the TVPA has authorized grants on training and technical assistance for residential treatment facilities for minors who have been trafficked, improving access to victim services in the criminal and civil legal system, anti-trafficking programs in schools, developing victim service programs in state juvenile justice agencies, and more. *See* 22 U.S.C. § 7101 (Supp. V 2005); 22 U.S.C. § 7101 (Supp. V 2008); 22 U.S.C. § 7105(b)(2)(B) (Supp. V 2018); 22 U.S.C. § 7105(b)(2)(B) (Supp. V 2022).

44. The Frederick Douglass Trafficking Victims Prevention and Protection Reauthorization Act of 2018 is unique from the other authorizations. This reauthorization bill was introduced on the 183rd anniversary of Frederick Douglass's escape from slavery. Following his escape, Douglass became a renowned abolitionist "to lead the fight to end slavery, Jim Crow

laws, and advance equality and respect."[12] In honor of Douglass's accomplishments, Congress permanently incorporated the U.S. Advisory Council on Human Trafficking as part of the federal government's commitment to survivor-informed policies. The U.S. Advisory Council on Human Trafficking is comprised of survivor leaders (individuals who are former victims of human trafficking) who provide advice and recommendations on anti-trafficking policies to federal agencies and government officials.[13] The survivor leaders serve as subject matter experts based on their lived experiences of trafficking.[14]

45.     For the past twenty-five years, Congress has delineated the priorities and scope of TVPA-authorized funding. *See* 22 U.S.C. § 7105(b). DOJ's role in this context is administrative, not legislative, and is delineated by a Congressional mandate to solicit grant applications through NOFOs and make awards within congressional limits.

46.     Section 7105(b)(2)(A) of the TVPA directs the Attorney General to provide grants "to develop, expand, [and] strengthen victim service programs for victims of human trafficking, including programs that provide trauma-informed care or housing options to such victims who are between (i) 12 and 24 years of age who are (I) homeless, in foster care, or (II)

---

[12] Smith Press Release. https://chrissmith.house.gov/news/documentsingle.aspx?DocumentID=4096.

[13] U.S. Dep't of State, U.S. Advisory Council on Human Trafficking, https://www.state.gov/u-s-advisory-council-on-human-trafficking (last visited Oct. 9, 2025).

[14] At the release of the U.S. Department of State's 2017 *Trafficking in Persons Report*, Ivanka Trump stated "here in the United States, we have our own Advisory Council on Human Trafficking, comprised exclusively of survivors. We cannot meaningfully address this pervasive issue without the brave voice of survivors at the table. They can help us understand what they experienced and they will play a leading role in solving this pressing crisis." Remarks by Ivanka Trump, U.S. Dep't of State (June 27, 2017), https://www.state.gov/united-states-advisory-council-on-human-trafficking-annual-report-2017/.

17

involved in the criminal justice system, (ii) transitioning out of the foster care system; or (iii) women and girls in underserved populations."

47.     "Underserved populations" is defined in 34 U.S.C. § 12291(a)(46) as "populations who face barriers in accessing and using victim services, and includes populations underserved because of geographic location, religion, sexual orientation, gender identity, underserved racial and ethnic populations, populations underserved because of special needs (such as language barriers, disabilities, alienage status, or age), and any other population determined to be underserved by the Attorney General or by the Secretary of Health and Human Services, as appropriate."

48.     Congress's commitment to underserved populations and immigrant survivors remained steadfast in 2025, when it appropriated $88 million for trafficking victim services under 22 U.S.C. § 7105(b). The Senate Committee report urged even greater support for immigration survivors, recommending $95 million for services benefiting "U.S. citizens, lawful permanent residents, and foreign national victims of trafficking."[15]

49.     Nothing in the statute grants DOJ authority to impose additional conditions or certification requirements.

## II.     Freedom Network's Mission, Programming, and Federal Funding.

### A.     Freedom Network's Mission

50.     Freedom Network is the nation's largest coalition of advocates, service providers, and survivors working to end human trafficking and protect survivors. Freedom Network annually provides training and technical assistance to at least 1,000 private and public

---

[15] U.S. Senate Committee on Appropriations, Report of Dep'ts of Justice, Science, and Related Agencies, https://www.appropriations.senate.gov/imo/media/doc/FY25%20CJS%20Senate%20Report.pdf.

stakeholders, ranging from city councils to community organizers, in at least 48 states. Freedom Network's mission and position as a national training and technical assistance provider requires the incorporation of the voices and experiences of survivor-leaders. Survivor-leaders develop, review, and lead Freedom Network's training and technical assistance and programming. They ensure that all training and technical assistance and programming address the realities survivors endure. As a result, Freedom Network's advocacy reflects the lived experiences of over one hundred survivor-leaders. Freedom Network's ability to effectuate its mission, programming, and training and technical assistance depends on its ability to facilitate the speech of survivor leaders across every program, training, and presentation.

51. Freedom Network and its members serve thousands of survivors each year, in every state. Effectuating Freedom Network's core organizational value of equity means that its day-to-day work is rooted in the reality that trafficking does not impact all communities equally and that the limited legal and social services available do not reach all survivors equally.

52. Traffickers prey on vulnerabilities by using threats and violence, taking advantage of gaps in the social safety net, and exploiting legal systems for their own gain. This creates a vicious cycle where those who are more vulnerable to trafficking are less likely to access, or to be able to access, the services they need before, during, or after trafficking to escape the circumstances that made them vulnerable. As a result, they are more likely to be subjected to multiple rounds of trafficking throughout their lifetime. But with accurate and effective training and technical assistance, stakeholders can get the skills they need to ensure that trafficking victims can receive equal and nondiscriminatory treatment regardless of an individual's trafficking history, thereby addressing the vulnerabilities that traffickers exploit.

19

53. Freedom Network's four nationwide equity-driven programs—three of which are federally funded—help to fill the gaps in services that traffickers exploit.

54. Through its **Housing Training and Technical Assistance program**, Freedom Network provides training and technical assistance to housing providers that are new to serving survivors. The program works exclusively with organizations that have been awarded grants through the Office for Victims of Crime Housing Grant program. The Housing grantees (approximately 60 to 80 grantees in any given year) operate in almost all 50 states. Housing instability is considered the primary risk factor for being trafficked and the primary barrier to seeking safety for both children and adults, rendering survivors vulnerable to being re-trafficked. Freedom Network routinely provides immigration-focused training and technical assistance to housing providers serving immigrant survivors.

55. Freedom Network runs the **Survivor Reentry Project** ("Survivor Project"), which is the only national program providing criminal record relief for survivors of human trafficking, including those that are immigrant survivors. The Survivor Project exclusively serves survivors with criminal charges in more than one jurisdiction. Trafficking survivors are regularly arrested and prosecuted for crimes resulting from their trafficking experience. Criminal record relief prevents trafficking because criminal records tend to block survivors from obtaining employment, educational and professional opportunities, secure housing, and financial freedom. It is nearly impossible for survivors to break the cycle of vulnerability and trafficking without criminal record relief.

56. In 2024, the Survivor Project supported 200 survivors in almost every state. Freedom Network currently represents 140 survivors with a combined total of 1,200 criminal charges and it has a waitlist of approximately 100 survivors in over 20 states. Several active

cases are with immigrant survivors. Over 75% of the Survivor Project's clients are Black even though Black survivors account for 40% of sex trafficking survivors in the U.S. For example, DOJ found in a two-year study that 40% of all sex trafficking survivors are Black women (the highest rate of all racial groups);[16] and Black women are more likely to be subjected to arrests, incarceration, and conviction that are connected to their trafficking offenses than white survivors.

57.     Freedom Network is researching and developing the first **National Standards of Care** for service providers that are specific to the needs of trafficking survivors. Misinformed practices can cause long-lasting harm and have proven to render survivors vulnerable to further exploitation and trafficking. A comprehensive National Standards of Care will allow service providers, ranging from pediatricians to law enforcement to child welfare advocates, to align their programs, thereby ensuring that survivors receive the best appropriate care, regardless of where in the United States they access services. Several sections include standards of care specific to immigrant survivors.

### B.     Freedom Network's Presence in Chicago

58.     Freedom Network has undertaken a substantial majority of its work in Chicago because the need for its equity-driven services has consistently been greater there. Chicago is a prominent hub of sex and labor trafficking and a center for innovative anti-trafficking initiatives. The city has had disproportionately higher rates of trafficking for the past decade, according to World Population Review[17] and the National Human Trafficking Hotline.[18] Chicago is the

---

[16] Bureau of Justice Statistics, U.S. Dep't of Justice, *CS-HTI 08-10* (Oct. 21, 2020), *available at* https://bjs.ojp.gov/content/pub/pdf/cshti0810.pdf.

[17] https://worldpopulationreview.com/state-rankings/human-trafficking-statistics-by-state (last visited Oct. 9, 2025)

[18] https://humantraffickinghotline.org/en (last visited Oct. 9, 2025)

undisputed trafficking epicenter in Illinois. Illinois House Republicans recently stated that "[w]ith major highways, airports, and a large metropolitan hub in Chicago, the state is an unfortunate crossroads for traffickers. Vulnerable groups such as children, individuals in foster care, and people experiencing homelessness are often targeted, lured by false promises and manipulated into dangerous situations."[19]

59.     For this reason, Freedom Network's equity-oriented work with survivors and stakeholders in Chicago has become a national model for local anti-trafficking initiatives. Moreover, for the past five years, Freedom Network has consistently provided more training and technical assistance to Office for Victims of Crime housing grantees in Chicago than in other cities. Through its Survivor Project, Freedom Network has worked on vacating or expunging at least 72 Illinois criminal charges. Currently, Freedom Network has seven active criminal record relief cases in Chicago and four out of the 100 waitlisted survivors are Chicago residents. Also, several Chicago-based survivor-leaders and local anti-trafficking service providers are formally part of the National Standards of Care project to ensure that Chicago is represented in the final National Standards of Care product.

60.     Freedom Network had planned to host a national housing summit in Chicago in December 2025. Freedom Network initially chose Chicago because its unhoused population has rapidly increased in the past three years, which Freedom Network believes is one of the root causes of a spike in trafficking in the area. Freedom Network believed that a Chicago-based

---

[19] Brad Stephens, *Illinois Legislators Continue to Target Human Trafficking,* THE CAUSE BLOG https://www.thecaucusblog.com/2025/01/illinois-legislators-continue-to-target.html (last visited Oct. 9, 2025)

housing summit would have helped address the surge of trafficking. The anti-equity EOs made it impossible to hold that summit in Chicago.

### C.  Freedom Network Federal Grants and Funding

61.  Freedom Network's 2024 annual budget was $2,292,444.52. As of February 6, 2026, approximately 70% of Freedom Network's annual budget originated from the federal government. As of February 6, 2026, Freedom Network operated as a direct federal grantee, a subcontractor, and a subrecipient. Freedom Network's 2025 annual budget was $1,470,323. Approximately 74% of Freedom Network's 2024 annual budget originated from the federal government.

62.  As of February 6, 2026, approximately 15% of Freedom Network's budget originated from three non-federal revenue streams: (1) membership fees to join Freedom Network's national coalition; (2) attendance fees for Freedom Network's annual conference; (3) and fees paid by private stakeholders to Freedom Network for the development of tailored and individualized anti-trafficking training. The remainder of Freedom Network's activities are funded by private donors and grants from non-federal sources. All of Freedom Network's non-federal sources of revenue are harmed by the anti-equity EOs.

63.  Freedom Network's federal funding is awarded through DOJ's Office for Victims of Crime via authorizations under the TVPA. The Office for Victims of Crime falls under the Office of Justice Program at the DOJ. The TVPA requires the Office for Victims of Crime to provide funding for services to victims of severe forms of human trafficking. 22 U.S.C. § 7105(f)(1).

64.  As of February 6, 2026, the Office for Victims of Crime funded the following programs and activities: (1) Services for Victims of Trafficking; (2) the Human Trafficking

23

Training and Technical Assistance Program; and (3) the Anti-Trafficking Housing Assistance Program.

65.     As of February 6, 2026, Freedom Network was also a subcontractor on the Human Trafficking Training and Technical Assistance Program awarded to the Coalition Against Slavery and Trafficking.

66.     Freedom Network was recently a sub-contractor on the Office for Victims of Crime Technical Assistance Collective awarded by Office for Victims of Crime to Inner City Fund. This contract recently expired but was impacted by the Executive Orders while it was active.

**D.      The Office for Victims of Crime's Services for Victims of Human Trafficking Program Funds the Survivor Project**

67.     Freedom Network receives $800,000 in federal funding to support the Survivor Project. The grant is funded from October 1, 2023, through September 30, 2026. As of February 6, 2026, there was approximately $395,000 remaining on this grant, which is dispersed to Freedom Network on a reimbursement basis. Freedom Network subcontracts this grant to 12 survivor leaders who serve as consultants to the project through independent contractor agreements.

68.     The funding awarded to the Survivor Project is authorized by the TVPA and administered through the Office for Victims of Crime's Services for Victims of Human Trafficking program. The funds from this grant were appropriated in the Consolidated Appropriations Act of 2023, which directs "$2,416,805,000 to remain available until expended, *inter alia*, $95,000,000 for victim services programs for victims of trafficking, as authorized by

24

section 107(b)(2) of the Victims of Trafficking Act, by the TVPRA of 2005, or programs authorized under Public Law 113-4." Pub. L. No. 117-328, 136 Stat. 4534, 4535 (2022).

69.     In enacting the TVPA, Congress specifically acknowledged that "victims of severe forms of trafficking should not be inappropriately incarcerated, fined, or otherwise penalized solely for unlawful acts committed as a direct result of being trafficked." In the 2023 House Appropriations Committee Report, the Office for Victims of Crime was directed to use appropriated funds for direct representation on vacatur and expungement convictions resulting from trafficking because "[c]riminal convictions often disqualify victims from numerous Federal programs and impede their recovery.[20]

### E.     The Office for Victims of Crime's Human Trafficking Training and Technical Assistance Program Funds the National Standards of Care Project

70.     Freedom Network received a $1.2 million grant from the Office for Victims of Crime's Human Trafficking Training and Technical Assistance Program to support its National Standards of Care project. The grant is funded from October 1, 2022, to September 30, 2026. The National Standards of Care grant is overseen by both the Office for Victims of Crime at DOJ and the Office of Trafficking in Persons at the Department of Health and Human Services. The grant is disbursed on a reimbursement basis. As of February 6, 2026, approximately $395,000 remained on the grant. Freedom Network also supports 26 survivor-leaders and organizations as subcontractors who serve as consultants through independent contractor agreements. All 26 subcontracted survivor-leaders and organizations are part of the technical working group of the National Standards of Care project.

---

[20] S. Rep. No. 118-198, at 122 (2024), reprinted in *Congress.gov*, https://www.congress.gov/committee-report/118th-congress/senate-report/198/1.

71.     Funding for the National Standards of Care project is authorized by the TVPA. The funds from this grant were appropriated in the Consolidated Appropriations, 2022, Public Law 117-103, Division B, Title II, which provides "for grants, contracts, cooperative agreements, and other assistance authorized by . . . the Victims of Trafficking and Violence Protection Act of 2000 (Public Law 106-386) . . . $2,213,000,000, to remain available until expended, inter alia, $88,000,000 for victims of trafficking, as authorized by section 107(b)(2) of Public Law 106-386, for programs authorized under Public Law 109-164, or programs authorized under Public Law 113-4." Pub. L. No. 117-103, 136 Stat. 124, 125 (2022).

72.     In enacting the TVPA, Congress specifically included language addressing the need to fund victim services because it found that the lack of these services exacerbates the cycle of trafficking. *See generally* 22 U.S.C. § 7101(18). However, Congress also noted that "victims of trafficking have faced unintended obstacles in the process of securing needed assistance." 22 U.S.C. § 7101(3). The grant program effectuates Congress's intent by addressing inequitable access to survivor-friendly service providers across the country. Service providers can engage in practices that may unintentionally harm survivors if they lack proper training. The National Standards of Care project is meant to address this disparity by "reduc[ing] potential harm to trafficking survivors and promot[ing] uniform standards that will ensure consistent quality of care" across "a comprehensive array of direct services, including case management, housing, legal, behavioral health, economic empowerment, and other services."[21] Freedom Network is the only organization in the country to receive the Office for Victims of Crime grant award to research and develop the National Standards of Care.

---

[21] https://ovc.ojp.gov/sites/g/files/xyckuh226/files/media/document/o-ovc-2022-171283.pdf

26

**F.**      **The Office for Victims of Crime's Anti-Trafficking Housing Assistance Program Funds the Housing Training and Technical Assistance Project**

73.      Freedom Network received $1,999,999.00 as a federal grantee to support the Housing Training and Technical Assistance Project. The grant is funded from October 1, 2023, through September 30, 2026, and is administered through the Office for Victims of Crime's Anti-Trafficking Housing Assistance Program. Freedom Network subcontracts this grant to three organizations, one subject matter expert, and survivor leaders who serve as consultants on the project through independent contractor agreements.

74.      The funds from the grant are authorized by the TVPA, and were appropriated in the Consolidated Appropriations, 2023, Public Law 117-328, Division B, Title II, which provides that "$2,416,805,000, to remain available until expended, inter alia, $95,000,000 for victims services programs for victims of trafficking, as authorized by section 107(b)(2) of the Victims of Trafficking Act, by the TVPRA of 2005, or programs authorized under Public Law 113-4." Pub. L. No. 117-382, 136 Stat. 4534, 4535 (2022).

75.      Inequitable access to safe, secure, and long-term housing is widely considered one of the most consequential disparities faced by survivors and addressing that disparity is one of the most effective solutions to prevent trafficking. In enacting the TVPA, Congress specifically noted that housing services and facilities "did not exist to meet victims' needs . . . to safely reintegrate." 22 U.S.C. § 7101(18).

76.      Freedom Network is one of many Office for Victims of Crime grantees; however, it is the only Office for Victims of Crime grantee that is the sole recipient of a training and technical assistance grant to help housing providers address the disparities survivors face in accessing housing. These housing providers have not worked with survivor populations before.

27

Freedom Network was intentionally chosen and specifically funded by the Office for Victims of Crime to be the sole grantee to ensure that all other Office for Victims of Crime housing grantees have "safe, stable housing and appropriate trauma-informed, victim-centered, and culturally responsive" housing policies and practices that prioritize the "autonomy and protect the safety and confidentiality" of survivors.[22]

G.   **Freedom Network is a Subrecipient to the Coalition Against Slavery and Trafficking's Grant Under the Human Trafficking Training and Technical Assistance Program**

77.   Freedom Network receives $150,000 as a subrecipient to a federal grant awarded to the Coalition Against Slavery and Trafficking under the Human Trafficking Training and Technical Assistance Program. The agreement is from October 1, 2023, through October 1, 2026. As of February 6, 2026, there was approximately $100,000 remaining on this grant that is dispersed on a reimbursement basis.

78.   Through the grant, Coalition Against Slavery and Trafficking offers free support to attorneys and social service providers assisting trafficking survivors with legal needs. Coalition Against Slavery and Trafficking partners with Freedom Network to provide the training and technical assistance developed under the purview of Freedom Network's Survivor Project.

79.   Freedom Network is contracted with Coalition Against Slavery and Trafficking to improve the technical skillset of legal and social service providers nationwide on understanding the legal barriers survivors face, both before, during, and after their trafficking experiences.

---

[22] https://ovc.ojp.gov/sites/g/files/xyckuh226/files/media/document/o-ovc-2023-171705.pdf

**III.    The New Plaintiffs' Mission, Programming, and Federal Funding.**

   **A.    Life-Span**

80.    Life-Span provides comprehensive services for survivors of domestic violence, sexual assault, and human trafficking, and their children, enabling them to live without violence, build upon their strengths and become self-sufficient. Life-Span's goal is to assist survivors in overcoming the underlying vulnerabilities that traffickers exploit, such as poverty, lack of housing, and legal issues. Based in Cook County, Illinois, with a focus on Chicago, Life-Span offers integrated legal advocacy and trauma-informed counseling within a single service framework. Life-Span collaborates with law enforcement agencies, hospitals, community-based organizations, and other victim service providers to identify and support trafficking survivors.

81.    Life-Span has relied on federal funding consistently for approximately 30 years. Approximately 35% of Life-Span's budget for fiscal year 2026 comes from federal government funding. Life-Span has been a grant recipient for TVPA authorized funding awarded by DOJ's Office of Justice Programs for approximately 24 years. Life-Span is a current subrecipient of the Violence of Crime Act Human Trafficking Services grant, a TVPA-authorized grant that is awarded by OVC.

   **B.    YWCA Kalamazoo**

82.    YWCA Kalamazoo's mission is to eliminate racism, empower women, and promote peace, justice, freedom, and dignity for all. YWCA Kalamazoo operates the only shelters (both emergency and transitional) in Michigan and Illinois open to all survivors of trafficking, including men and labor trafficking survivors, who are routinely excluded by most other providers.

29

83. Since 2016, YWCA Kalamazoo has operated the only comprehensive anti-trafficking services program in Michigan, offering the full continuum of direct services to survivors of all forms of trafficking regardless of trafficking type or the age or gender of the survivors. YWCA Kalamazoo is a primary victim services referral partner of Homeland Security Investigations (HSI) in Michigan and co-leads the Kalamazoo County Human Trafficking Task Force alongside local and federal law enforcement.

84. YWCA Kalamazoo was a direct federal grantee for two OVC grants that recently closed: Fiscal Year ("FY") 2022 Housing Assistance Grants for Victims of Human Trafficking and FY 2023 Services for Victims of Human Trafficking, both authorized by the TVPA. YWCA Kalamazoo also receives funds pursuant to other federal statutes and programs, including the Victims of Crime Act, Family Violence Prevention and Services Act, Temporary Assistance for Needy Families, and Emergency Food and Shelter Program Awards.

### C. WJCNY

85. WJCNY is a nonprofit law firm that provides direct services to farmworkers and low-wage workers in upstate New York. WJCNY has a 26-year history litigating claims arising out of extreme forms of labor exploitation, including human trafficking claims under the TVPA. No other entity in New York state provides free civil legal services to low-wage workers, regardless of immigration status.

86. WJCNY's staff conducts outreach activities including on-site visits to employer-provided farm labor camps and other agricultural worker housing. WJCNY investigates complaints and provides legal representation to help survivors escape traffickers in the short term and break the cycle of poverty, exploitation, and trafficking in the long term.

87. WJCNY also provides a wide range of civil legal services covering labor and employment, housing, public benefits, social programs, trafficking, discrimination, taxes, healthcare, gender-based violence, and immigration. Because WJCNY serves clients with any immigration status in employment disputes, it routinely helps clients apply for TVPA-authorized immigration relief. In addition, WJCNY partners with local and state law enforcement authorities on multi-regional task forces and assists workers in reporting labor abuses to the New York State Attorney General and criminal law enforcement authorities. Several WJCNY labor trafficking investigations have led to prosecutions under the TVPA because of the joint efforts between WJCNY and DOJ.

88. WJCNY has relied on federal funding since 2002. WJCNY's anti-trafficking work has been partially funded by the OVC's Specialized Services for Trafficking Victims grant from 2017 to 2020, and its Services for Victims of Human Trafficking grant from 2022 to 2026. WJCNY has had several federal grants cancelled since the release of the Executive Orders. Since the announcement of the Executive Orders in January 2025, WJCNY made the strategic decision not to apply for federal grants to protect the organization from further financial precarity. As a result, unlike prior years, WJCNY currently does not have any federal funding as part of its budget.

## IV.    The Anti-Equity EOs and Their Implementation

### A.    President Trump Signs the J20 EO

89. On January 20 and 21, 2025, the President signed and issued the J20 EO and the J21 EO.

90. The stated "Purpose and Policy" of the J20 EO is to reverse the Biden Administration's purported "forced illegal and immoral discrimination programs, going by the

31

name 'diversity, equity and inclusion' (DEI), into virtually all aspects of the Federal Government" and to end "DEIs [sic] infiltration of the Federal Government." J20 EO § 1.

91.     The J20 EO directs Trump Administration officials, consisting of the Director of OMB, assisted by the Attorney General, and the Director of the Office of Personnel Management ("OPM"), to "coordinate the termination of all discriminatory programs, including illegal DEI and 'diversity, equity, inclusion, and accessibility' (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear." *Id.* § 2(a).

92.     The J20 Termination Provision further instructs, *inter alia*, "[e]ach agency, department, or commission head, in consultation with the Attorney General, the Director of OMB, and the Director of OPM" to within 60 days of the order "terminate, to the maximum extent allowed by law, all DEI, DEIA, and 'environmental justice' offices and positions (including but not limited to 'Chief Diversity Officer' positions); all 'equity' actions, initiatives, or programs, 'equity-related' grants or contracts; and all DEI or DEIA performance requirements for employees, contractors, or grantees." *Id.* § 2(b)(i).

93.     The J20 EO does not define "DEI," "DEIA," "diversity," "equity," "equity-related," "inclusion," or "accessibility."

94.     The J20 EO also requires that each executive agency, department, or commission head provide the OMB Director with a list of all:

> (A) Agency or department DEI, DEIA, or "environmental justice" positions, committees, programs, services, activities, budgets, and expenditures in existence on November 4, 2024, and an assessment of whether these positions, committees, programs, services, activities, budgets, and expenditures have been misleadingly relabeled in an attempt to preserve their pre-November 4, 2024 function;

> (B) Federal contractors who have provided DEI training or DEI training materials to agency or department employees; and
>
> (C) Federal grantees who received Federal funding to provide or advance DEI, DEIA, or "environmental justice" programs, services, or activities since January 20, 2021.

*Id*. § 2(b)(2)(A-C).

95.     In sum, the J20 EO prohibits (1) "diversity, equity, and inclusion" programs, mandates, policies, preferences, factors, goals, requirements, and activities; (2) "diversity, equity, inclusion, and accessibility" programs, mandates, policies, preferences, factors, goals, requirements, and activities; (3) "environmental justice" offices and positions; (4) "equity" actions, initiatives, or programs; (5) "equity-related" grants or contracts; and (6) "DEI" or "DEIA" performance requirements. In addition to the above prohibitions, the J20 EO states that any such programs are "illegal and immoral" and "discriminatory." *Id.* §§ 1, 2.

**B.      President Trump Signs the J21 EO**

96.     The J21 EO declares programs supporting diversity, equity, and inclusion "that can violate the civil-rights laws of this Nation" to be "dangerous, demeaning, and immoral." J21 EO § 1.

97.     The purported "[p]urpose" of the J21 EO is to end "'diversity, equity, and inclusion' (DEI) or 'diversity, equity, inclusion, and accessibility' (DEIA) that can violate [United States] civil-rights laws." *Id.* § 1.

98.     The J21 EO further claims that "[i]llegal DEI and DEIA policies . . . undermine our national unity" and "threaten the safety of American men, women, and children." *Id.*

99.     The J21 EO declares:

> It is the policy of the United States to protect the civil rights of all Americans and to promote individual initiative, excellence, and hard work. I therefore order all executive departments and agencies

(agencies) to terminate all discriminatory and illegal preferences, mandates, policies, programs, activities, guidance, regulations, enforcement actions, consent orders, and requirements. I further order all agencies to enforce our longstanding civil-rights laws and to combat illegal private-sector DEI preferences, mandates, policies, programs, and activities.

*Id.* § 2.

100.     The J21 EO requires every agency head to "include in every contract or grant award: (A) a term requiring the contractual counterparty or grant recipient to agree that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code," [23] and "(B) a term requiring such counterparty or recipient to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws" (the "J21 Certification Provision"). *Id.* § 3(b)(iv).

101.     The J21 EO further orders the OMB Director, with the Attorney General's assistance, to "[e]xcise references to DEI and DEIA principles, under whatever name they may appear, from Federal acquisition, contracting, grants, and financial assistance procedures" and to "[t]erminate all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities, as appropriate." *Id*. § 3(c)(ii-iii) (the "J21 Termination Provision," referred to with the J20 Termination Provision as the "Termination Provisions").

---

[23] 31 U.S.C. § 3729 is also known as the False Claims Act, which directs that a person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government" is "liable to the United States government for a civil penalty . . . plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1)(G).

34

102. Section 4(a) of the J21 EO directs the heads of all agencies to "take all appropriate action with respect to the operations of their agencies to advance in the private sector the policy of individual initiative, excellence, and hard work," which the J21 EO implies is inconsistent with the principles of diversity, equity, inclusion, and accessibility. *Id.* § 4(a).

103. In sum, the J21 EO directs subordinate executive officials to "recommend actions . . . to align agency or department" enforcement, litigating positions, and other regulations to conform with the viewpoint that promoting ideas of diversity, equity, inclusion, and accessibility or environmental justice is "illegal and immoral." *See, e.g.*, *id.* §§ 1, 2(b)(ii), and 2(b)(iii).

### C. DOJ Issues a List of Forbidden Words and Declares All DEI Illegal

104. Following the issuance of the anti-equity EOs, DOJ began subjecting Freedom Network to intrusive oversight, scrutiny, and censorship of its programming.

105. On January 31, 2025, Freedom Network received an email from a DOJ Office of Justice Program subcontractor forwarding a DOJ-issued list of approximately 50 words that, as a result of the Executive Orders, "cannot appear in any Office for Victim of Crime materials (i.e. web pages, training content, presentations, etc.)." The DOJ's list of forbidden words, described as "terms or words in conflict with recent Executive Orders," is reproduced above, but includes the most common of words used in everyday speech such as "fair," "fairness," "pronouns," "identity," "equitable," "gender," and "culture."[24]

106. Freedom Network uses several of these "forbidden terms" in every single training it provides as a national training and technical assistance provider. Three of the forbidden terms

---

[24] *See supra* ¶ 18.

("race," "equity," "oppression") are listed on Freedom Network's website in its organizational mission and values. Banned terms like "accessibility," "racial," or "fairness" are not merely common words used in everyday speech; for Freedom Network, they are words necessary to communicate and address the lived experiences of survivors.

107.    Not being able to freely use these terms or to allude to these concepts frustrates Freedom Network's core mission to provide training and technical assistance that prevents trafficking and centers the lived experiences of survivors.

108.    Forbidding use of these terms also derails Freedom Network's ability to effectuate Congress's intent to address systemic disparities that render certain populations more vulnerable to trafficking. When it enacted the TVPA, Congress specifically found "discrimination" as a gap that traffickers exploit for their gain, but "discrimination" is a forbidden term in the DOJ-issued list.

109.    The list of words that Freedom Network cannot use is the only definitive guidance provided as to the scope of the anti-equity EOs. Otherwise, Freedom Network has received different, confusing, and conflicting interpretations by DOJ of what constitutes prohibited conduct under the anti-equity EOs. DOJ has pronounced that all DEI is illegal. DOJ has provided guidance that some of the Freedom Network grant requirements that the government drafted and dictated may be unlawful.

110.    Despite the Executive Branch threats and vagueness, Freedom Network refuses to adjust its core mission and organizational values. It refuses to abandon the Congressional intent and promise of the TVPA. To do otherwise would mean abandoning Freedom Network's mission as a direct service provider and its ability to provide accurate training and technical assistance to meet the needs of survivors as Congress intended.

111. These terms and the activities authorized by Congress, now apparently forbidden by Defendants under threat of termination of federal grants or prosecution under the False Claims Act, are aspirational ideals that are fundamental to achieving the goals of our constitution, our civil rights laws, and the Congressional intent of the TVPA.

112. Not only is speech related to these issues protected speech under the First Amendment, but the anti-equity EOs also violate the separation of powers by thwarting Congress's effort to combat human trafficking, which "primarily target[s] women and girls, who are disproportionately affected by poverty, the lack of access to education, chronic unemployment, discrimination, and the lack of economic opportunities." The anti-equity EOs are an "attempt to place new conditions on federal funds," which is an "improper attempt to wield Congress's exclusive spending power and is a violation of the Constitution's separation of powers principles."[25]

113. On February 5, 2025, the DOJ announced that the J21 EO made clear that *all* DEI and DEIA is illegal. In a memorandum to all DOJ employees entitled "Ending Illegal DEI and DEIA Discrimination and Preferences" (the "February 5 Memo"), then-Attorney General Bondi wrote: "[o]n January 21, 2025, President Trump issued Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8633 (Jan. 21, 2025), making clear that policies relating to 'diversity, equity, and inclusion' ('DEI') and 'diversity, equity, inclusion, and accessibility' ('DEIA') violate the text and spirit of our longstanding Federal civil-rights laws."[26] The memorandum further states that "the Department of Justice's

---

[25] *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d, 497, 531 (N.D. Cal. 2017)

[26] Memorandum from Att'y Gen. Pam Bondi, Ending Illegal DEI and DEIA Discrimination and Preferences (Feb. 5, 2025), available at https://perma.cc/KH9Y-A2VQ

Civil Rights Division will investigate, eliminate, and penalize illegal DEI and DEIA preferences, mandates, policies, programs, and activities in the private sector and in educational institutions that receive federal funds." The letter does not define "DEI" or "DEIA" or explain what is "illegal DEI."

114. A different memorandum issued by DOJ on May 19, 2025, indicated that DEI and DEIA is sometimes illegal. Then-Deputy Attorney General Todd Blanche announced a new DOJ "Civil Rights Fraud Initiative" (the "May 19 Memo"). The memo describes the False Claims Act as a "weapon" for DOJ to employ, and it promises to "vigorous[ly] enforce[]" the False Claims Act "against those who defraud the United States by taking its money while knowingly violating civil rights laws."[27] The memo broadly characterizes as unlawful any "DEI programs that assign benefits or burdens [based] on race, ethnicity, or national origin," but DOJ still failed to define DEI or "illegal DEI." The May 19 Memo also states that the False Claims Act "is implicated when a federal contractor or recipient of federal funds knowingly violates civil rights laws . . . and falsely certifies compliance with such laws."

115. Soon after, the DOJ explicitly stated that one of the grant requirements written by the government that appears in each of Freedom Network's three federal funding programs—"cultural competency"—is potentially unlawful. On July 29, 2025, the Office of the Attorney General issued a Memorandum for all Federal Agencies titled "Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination"[28] (the "July 29 Memo"). The July 29

---

[27] Memorandum from Todd Blanche, Deputy Att'y Gen., to DOJ Offices, Divisions, and U.S. Attorneys (May 19, 2025), available at https://perma.cc/3W6K-FGHA.

[28] U.S. Department of Justice, Office of the Attorney General, *Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination* (July 29, 2025), https://www.justice.gov/ag/media/1409486/dl

Memo "clarifies the application of federal antidiscrimination laws to programs or initiatives that may involve discriminatory practices, including those labeled as Diversity, Equity, and Inclusion ('DEI') programs." However, the July 29 Memo again fails to define diversity, equity, or inclusion or "illegal DEI." It does, however, explicitly identify the term "cultural competence" as an example of an "unlawful proxy discrimination."[29] This memo adds to the confusion because while "cultural competence" is flagged as an "unlawful proxy for discrimination," it is outright required across all three of Freedom Network's federal grants.

116.    The July 29 Memo also explicitly states that "recipients of federal funds should ensure federal funds do not support third-party programs that discriminate."

### D.    DOJ's Recent NOFOs and the New Funding Conditions

117.    On December 28, 2025, DOJ released seven anti-trafficking-related NOFOs for FY 2025.[30] Each of the New Plaintiffs has applied for one or more NOFOs, two of which are attached as Exhibit D and E.

118.    The New Funding Conditions contained in the NOFOs—the Discrimination Condition, the Immigration Enforcement Condition, and the NOFO Certification Provision—are, to the New Plaintiffs' knowledge, unprecedented in DOJ grantmaking history using TVPA-authorized funding.

119.    First, all seven NOFOs contain the NOFO Certification Provision, requiring grantees to certify that "[c]ompliance with Federal civil rights and nondiscrimination laws is

---

[29] *Id.* at 2 ("Facially neutral criteria . . . that function as proxies for protected characteristics violate federal law if designed or applied with the intention of advantaging or disadvantaging individuals based on protected characteristics.").

[30] *See* https://ovc.ojp.gov/funding/current-funding-opportunities.

material to the government's decision to make any award and payment under this program, including for purposes of the False Claims Act, and each recipient will be required to certify (in its acceptance of the conditions of the award) that it does not operate any programs (including programs having components related to diversity, equity, and inclusion) that violate any applicable Federal civil rights or nondiscrimination laws."[31] The NOFO Certification Provision is also incorporated into the Office of Justice Program's General Terms and Conditions, which that grantees must agree to upon accepting an award.

120. Second, all seven NOFOs contain the Immigration Enforcement Condition, which states that grant funds cannot be used for, and grantees will not be reimbursed for "any program or activity, at any tier that, directly or indirectly, violates (or promotes or facilitates the violation of) federal immigration law (including 8 U.S.C. § 1373) or impedes or hinders the enforcement of federal immigration law—including by failing to comply with 8 U.S.C. § 1373, give access to DHS agents, or honor DHS requests and provide requested notice to DHS agents."[32] DOJ has not provided any guidance regarding the Immigration Enforcement Condition.

121. Finally, the seven NOFOs contain the Discrimination Condition, which states that grant funds cannot be used for, and grantees will not be reimbursed for "any program or activity, at any tier that violates any applicable Federal civil rights or nondiscrimination law. This includes violations that – (1) indirectly violate the law, including by promoting or facilitating violations; or (2) unlawfully favor individuals in any race or protected group, including on a majority or minority, or privileged or unprivileged, basis, within a given area, population, or

---

[31] *See e.g.*, Exhibit D at 30; Exhibit E at 30.

[32] *See e.g.*, Exhibit D at 11; Exhibit E at 11.

sector."[33] DOJ has not provided any further guidance or explanation about the Discrimination Condition.

122.    Both the Immigration Enforcement Condition and the Discrimination Condition have been implemented in every Office for Victims of Crime NOFO released in Fiscal Year 2025.[34]

123.    The New Funding Conditions mark the consummation of DOJ's decision-making process: Defendants have made a final decision to impose the New Funding Conditions on all Office for Victims of Crime grants this year. The imposition of the New Funding Conditions also determines rights or obligations and produces legal consequences. They preclude organizations from receiving an award if they do not agree to the conditions and, once agreed to, they subject grantees to possible FCA liability or severe budgetary uncertainty.

## V.    The Impact of the Anti-Equity EOs and NOFOs on Freedom Network and New Plaintiffs.

### A.    The Impact on Freedom Network's Federally Funded Programs.

124.    On January 28, 2025, the DOJ's Office of Justice Programs notified its grantees that the disbursement of federal funds would be paused due to the January 27, 2025 Memorandum issued by the Office of Management and Budget ("OMB Memo").[35] The OMB Memo instructed all federal agencies, as of January 28, 2025, to "temporarily pause all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders, including, but not limited to,

---

[33] *See e.g.*, Exhibit D at 11; Exhibit E at 11.

[34] https://ovc.ojp.gov/funding/expired-funding-opportunities.

[35] Memorandum M-25-13, Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs, Office of Mgmt. & Budget (Jan. 27, 2025), M-25-13-Temporary-Pause-to-Review-Agency-Grant-Loan-and-Other-Financial-Assistance-Programs.pdf

financial assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal."[36]

125.    On January 28, 2025, the Office for Victims of Crime sent an email to all Anti-Trafficking Housing Assistance program grantees that stated that "in the spirit of this directive [the OMB Memo], federal staff have been directed to cancel any/all upcoming meetings with grantees since you are unable to disburse funds to pay for time spent on grant related activities and do not expect you to be unpaid for your work . . . we wait for further direction and guidance from Office of Justice Programs leadership."[37]

126.    On February 18, 2025, Inner City Fund, a longtime contractor to the Office for Victims of Crime Training and Technical Assistance Program and an organization that until recently subcontracted with Freedom Network, sent a list of approximately 50 terms that cannot appear in any Office for Victims of Crime materials to a different subcontractor. This list, which is reproduced *supra* at paragraph 18 and attached as Exhibit C, was prepared by the Office of Victims of Crime on January 31, 2025.

127.    Freedom Network understands that the list was DOJ-approved because it includes the words "DOJ-OJP [Office of Justice Programs] Guidance" in the title and it was sent to the subcontractor by Inner City Fund. Other subcontractors under the Inner City Fund - Office for Victims of Crime Training and Technical Assistance Program grant received the same list. Freedom Network understood that the Inner City Fund subcontract would be terminated if it used any of the terminology on the list.

---

[37] Email to OVC-HT Housing Grantees from DOJ Victim Justice Program Specialist, Jan. 28, 2025 (on file with counsel).

42

128. On February 21, 2025, the Office of Justice Programs hosted a call with Inner City Fund and Inner City Fund subcontractors stating that subcontractors "must be cautious" of specific terminology used in light of the anti-equity EOs, referencing the terms on the list.

129. On February 24, 2025, the Office for Victims of Crime instructed Freedom Network via email to identify and remove all Office of Justice Programs-funded website material that was not aligned with the Executive Orders, specifically referencing the J21 EO.

130. On February 24, 2025, the Office for Victims of Crime demanded over the phone that the Literature Review for the National Standards of Care project be taken off the Freedom Network website because it did not comply with the anti-equity EOs. The Literature Review identified a lack of culturally responsive services as well as a lack of standards on diversity, equity, and inclusion as primary gaps in existing resources for trafficking survivor service providers.

131. On February 25, 2025, Coalition Against Slavery and Trafficking told Freedom Network to remove training and technical assistance materials, created pursuant to past and current federal grants, from the Freedom Network website because content mentioning race equity, DEIA, and restorative justice was not in compliance with the J20 EO. Coalition Against Slavery and Trafficking's instruction to Freedom Network to remove training and technical assistance materials was made at the direction of the Office for Victims of Crime.

132. On March 6, 2025, the Office of Justice Programs paused a Freedom Network training series, referencing the "adjustments required by the executive orders" and stating that the work was being paused because the "Office for Victims of Crime has been given new directives." The goal of this training series was to provide all Office for Victims of Crime grantees training on having a trauma-informed, victim centered approach to working with

different victims of crime. Freedom Network understood "new directives" to mean the anti-equity EOs.

133.    On March 7, 2025, Office of Justice Programs sent an email to its grantees that stated: "[Office of Justice Programs] funds may not be used to provide presentations, trainings, or to publicly release publications or products that do not align with the [anti-equity EOs]."[38] The email informed grantees that they cannot release any public-facing materials until the Office of Justice Programs grant manager reviewed and approved the materials, including previously approved materials and other deliverables specified in the original award application.

134.    On March 17, 2025, the Office for Victims of Crime instructed Freedom Network to delete terminology related to equity from a housing training and technical assessment form. Freedom Network developed the form to send to all Office for Victims of Crime housing grantees with the intent of understanding what might impede survivors' access to housing services. The Office for Victims of Crime ordered Freedom Network to delete sections of the assessment form that used the terms "ethnic groups," "disabilities," "hearing, and/or vision loss," and "cultural responsiveness."

135.    On March 20, 2025, the Office for Victims of Crime demanded that Freedom Network conform its Survivor Project material so that all pronoun use complied with the anti-equity EOs.

136.    On April 17, 2025, the Office for Victims of Crime sent an email to Freedom Network regarding an upcoming housing summit in Minneapolis, Minnesota, scheduled for May 29, 2025. The Office for Victims of Crime demanded access to and the right to approve the list

---

[38] Email to The Coalition to Abolish Slavery & Trafficking from Anti-Trafficking Training and Technical Assistance Coordinator, Office for Victims of Crime, Mar. 7, 2025 (on file with counsel).

of attendees, the goals of the summit, the questions for listening sessions, the precise language for the invitation, and all correspondence regarding the summit.

137.    On June 23, 2025, Freedom Network discussed with the Office for Victims of Crime over the phone that several Office for Victims of Crime housing grantees had requested a webinar on housing for immigrant survivors, which would require discussing race and gender equity. The Office for Victims of Crime expressed that it was not possible because of the political climate and anti-equity EOs. The Office for Victims of Crime had never previously rejected a webinar topic that was explicitly requested by one of its housing grantees. The Office for Victims of Crime did not provide any further clarification despite Freedom Network's request.

**B.      The Impact on Freedom Network's Non-Federally Funded Programs.**

138.    The explicit censoring of equity-driven speech and content as well as the chilling effects of the anti-equity EOs described above has also spread to Freedom Network's non-federally funded work and detrimentally impacted its privately funded annual conference.

139.    Freedom Network's annual conference is one of the largest anti-trafficking conferences in the country and is funded through registration fees paid by the participants, private sponsorships, and exhibitor fees. The conference is open to the public, with a significant number of participants attending through support from non-federal dollars.

140.    Last year's conference, titled "Sharing Power: Building Inclusive Communities," was held virtually from Washington, D.C., on March 26-27, 2025. The conference was meant to lift the voices of subject matter experts and survivor leaders, and to elevate evidence-based approaches tailored to the unique needs of survivors with diverse identities.

45

141. On February 25, 2025, the Office for Victims of Crime directed Freedom Network via email to remove terms like "oppression" from a survivor-led presentation for the conference and to guarantee that the speakers would "stick to the notes and not answer questions that fall out of line with the Executive Orders." The Office for Victims of Crime further censored Freedom Network by demanding that the term "restorative justice" be replaced with "alternative programming" in the conference presentation.

142. The Office for Victims of Crime also censored the presentations of other organizations it funds due to the anti-equity EOs. For example, the Office for Victims of Crime directed one of its funded organizations to change terminology in its presentation on the labor trafficking of men and boys. The presenters ultimately withdrew their presentation from the conference.

143. As a result of Freedom Network's refusal to silence survivors, the Office for Victims of Crime demanded that the Survivor Project presentation at the national conference be withdrawn and removed from the conference agenda while "Office for Victims of Crime waits for guidance from General Counsel and DOJ Leadership on the best way to proceed" consistent with the anti-equity EOs.

144. In addition, the J21 Certification Provision will force Freedom Network to certify that "it does not operate *any* programs (including programs having components related to diversity, equity, and inclusion) that violate any applicable Federal civil rights or nondiscrimination laws" (emphasis added).

46

### C. Impact on Life-Span's Federally Funded and Non-Federally Funded Programs.

145.    Because Life-Span does not know what qualifies as "diversity," "equity," or "inclusion" under the J21 Certification Provision and the NOFO Certification Provision, it must carry out its day-to-day work under the constant threat of a False Claims Act investigation. As both a direct recipient and subrecipient of federal funds, its equity-driven mission creates ongoing uncertainty about whether any of its services—even outside of the anti-trafficking work—could be deemed noncompliant.

### D. Impact on YWCA Kalamazoo's Federally Funded and Non-Federally Funded Programs.

146.    In light of the EOs, some corporate sponsors tied to YWCA Kalamazoo's privately funded work asked if YWCA Kalamazoo would be willing to change how it publicly presents itself as an equity-driven organization. YWCA Kalamazoo refuses to change its equity-driven mission statement or specific terms on its website such as "oppression," "anti-racist," "equity," and "women." As a result, YWCA Kalamazoo experienced funding delays when a corporate sponsor revisited whether they would continue to fund equity work under this administration, and when a private funder advised against using the word "equity" in the funding application. The New Funding Conditions already had a tangible chilling effect on YWCA Kalamazoo's partnerships. At least 14 landlords in the transitional housing program have opted out of the partnership for fear that YWCA Kalamazoo could not pay rent or utilities on time in light of the volatility of federal funding. In addition, some law enforcement agencies have stopped sending referrals or answering YWCA Kalamazoo's calls since the NOFOs were released, meaning that YWCA has lost trusted contacts to which it can report traffickers or large-scale trafficking schemes.

47

**E.      Impact on WJCNY's Federally Funded and Non-Federally Funded Programs.**

147.    In response to the New Funding Conditions, WJCNY requested 70% less federal funding than it has historically requested based on a fear that DOJ will deny reimbursement requests based on WJCNY's lawful equity-related activities. That reduction in funding means that WJCNY cannot hire a case manager, immigration attorney, or both which it otherwise could have hired. Not only will fewer survivors be served, but the survivors that are served will receive fewer in-house services that they need to break the long-term cycle of poverty, exploitation, and trafficking.

148.    The Immigration Enforcement Condition has already had chilling effects on WJCNY's longstanding partnerships with state and federal agencies as well as law enforcement agencies. Prior to the NOFOs, WJCNY routinely referred clients to such agencies to prompt civil investigations into trafficking schemes and for victim services. However, WJCNY has stopped referring clients to these agencies for fear that a clients' confidential information—or the clients themselves—will be referred to ICE. State and federal agencies as well as law enforcement agencies have simultaneously stopped referring immigrant low-wage workers to WJCNY.

## VI.     There Is No Guidance as to What Constitutes DEI that Would Violate Laws

149.    Despite Freedom Network's repeated requests, the Office for Victims of Crime has failed to specify the forms of DEI that are prohibited or what falls within the ambit of "promoting" DEI that would render Freedom Network and the New Plaintiffs' activities unlawful either under the anti-equity EOs or the NOFOs. It remains nearly impossible for Freedom Network and the New Plaintiffs to determine what terminology is forbidden and what is prohibited.

48

150. The anti-equity EOs and the NOFOs recast conditions on funding that were not present when the grants were first awarded and were not present when Congress authorized TVPA grants. Freedom Network is at least mid-way through performance of many of its federal grants and has explicitly focused on diversity, equity, and inclusion at all stages of the grant process, consistent with the TVPA. Likewise, the New Plaintiffs are currently performing or have recently performed work funded by federal grants and have applied for new grants that would have the same focus given Congress's mandate. But the thrust of the anti-equity EOs, the NOFOs, and the oversight from the Office for Victims of Crime indicate that what was once permissible regarding diversity, equity, and inclusion has utterly changed. However, what constitutes unlawful DEI remains entirely unknown to Freedom Network and the New Plaintiffs. Even the so-called "guidance" provided in the July 29 Memo fails to define diversity, equity, and inclusion despite citing "DEI" and "DEIA" programs as "violating the text and spirit of our longstanding Federal civil-rights laws."

151. The few "examples" the July 29 Memo provides only exacerbate Freedom Network's fear and confusion about DEI and "illegal DEI." For example, "cultural competence" is cited as an example of "unlawful proxy discrimination" in the July 29 Memo, yet is an outright requirement in the each of the notice of funding opportunities (for both the staff at the grant organization and the project proposal) for Freedom Network's federal grants, and that term is discussed at length in both the approved scope of work and the award letter for each of Freedom Network's federal grants.

152. Freedom Network has repeatedly sought clarification and guidance from the Office of Justice Program and the Office for Victims of Crime on if, how, and why its work implicates the anti-equity EOs. However, the Office for Victims of Crime has ignored Freedom

49

Network's inquiries or stated that it does not have any additional guidance to share. For example, the Office for Victims of Crime's response to Freedom Network's questions about how a Survivor Project presentation at its national conference conflicted with the anti-equity EOs was that "in the absence of Office for Victims of Crime leadership and clear direction, we've been told to ensure these items fall within the scope" of the Executive Orders,[39] and the "[Office for Victims of Crime] waits for guidance from General Counsel and DOJ Leadership on the best way to proceed" to be consistent with the Executive Orders.[40]

153.    The lack of information about the DOJ's interpretation of the anti-equity EOs has made it unclear whether Freedom Network will satisfy its upcoming grant deliverables. The final National Standard of Care product, which is meant to be the culmination of two years of survivor-led research, is currently being held indefinitely by the Office for Victims of Crime without a publication date, in violation of the grant deliverables. Despite Freedom Network's repeated attempts to clarify if the equity-related terminology and concepts will be censored, the Office for Victims of Crime's only response has been that it cannot provide any guidance. As a result, Freedom Network does not know if the final equity-driven National Standards of Care product will suffice as an adequate grant deliverable or if it will be published at all.

154.    Freedom Network fears that its federally funded programs will continue to be censored, and may be investigated, eliminated, or penalized following the directives in the February 5 Memo and the May 19 Memo that make clear DOJ's intent to aggressively target organizations that promote DEI, even as DOJ fails to define DEI.

---

[39] Email to The Coalition to Abolish Slavery & Trafficking from Anti-Trafficking Training and Technical Assistance Coordinator, Office for Victims of Crime, Feb. 25, 2025 (on file with counsel).

[40] Email to The Coalition to Abolish Slavery & Trafficking from Anti-Trafficking Training and Technical Assistance Coordinator, Office for Victims of Crime, Feb. 27, 2025 (on file with counsel).

155. Freedom Network also fears that the "Third Party Scrutiny" section of the July 29 Memo may implicate the 42 survivor-leaders and organizations that are formally subcontracted under all three grants. Freedom Network fears that the July 29 Memo will chill other stakeholders from attending its trainings and conferences, implementing its training and technical assistance, and referring survivors to Freedom Network's programs.

156. This places Freedom Network in a state of perpetual fear of losing its federal funding, and of incurring potential False Claims Act civil and criminal penalties, if it promotes "equitable" treatment of anyone under the law—even if that means nothing more than advocating for objectively fair treatment, equal opportunity, and compliance with federal civil rights law.

157. Freedom Network and the New Plaintiffs are left in a state of fear and confusion because Defendants have continuously failed to define what "promoting" programs related to "diversity," "equity,' or "inclusion" means, or to explain what is "illegal" about diversity, equity, and inclusion as related to the J21 Certification Provision and the NOFO Certification Provision.

158. Plaintiffs do not understand what is prohibited conduct under the New Funding Conditions because DOJ has failed to provide any guidance on any of the New Funding Conditions. Plaintiffs also do not know how to reconcile the TVPA's commitment to including underserved populations and VAWA confidentiality provisions with the New Funding Conditions.

## VII. Plaintiffs are Harmed by the EOs and the NOFOs

### A. Freedom Network Is Harmed by the EOs

159. Freedom Network's speech has been chilled. Every word in every communication, training and technical assistance material, or event that is remotely connected to

closed or active federal grants appears subject to government oversight. As a result, Freedom Network now believes that it is not a matter of "if" its federal grants will be terminated, but "when."

160. The loss of current and future federal funding for any of Freedom Network's programs will be felt across the entire country. Freedom Network's main programs will be forced to shut down in their entirety because they rely exclusively on federal funding. The National Standards of Care project, the Housing Training and Technical Assistance Program, and the Survivor Project are nationwide in scope and reach all 50 states. Each program is also the only program of its kind and cannot be swiftly or easily replaced by another entity because Freedom Network is the sole national leader for each program.

161. The thousands of survivors and private and public stakeholders Freedom Network reaches every year in all 50 states will suffer if these programs cease to exist. Housing providers, case managers, hospital workers, law enforcement agencies, teachers, criminal defense attorneys, and other service providers will not have the tools they need to identify survivors and effectively address their needs. Survivors will, in turn, not receive the most critical services they need to break the cycle of vulnerability and trafficking.

162. The loss of federal funding would irreparably damage Freedom Network because it simply does not have the financial reserves to switch its federally funded work to non-federal funding sources. Freedom Network's federally funded programs do not overlap with the programs funded by Freedom Network's non-federal funding streams.

163. Freedom Network also cannot simply opt out of the federal funding because Freedom Network is at least midway through performance of its grants. Salaries, trainings, staff health care plans, and more have been budgeted years in advance based on the presumption that

52

Freedom Network could rely on these grants. Failure to meet grant deliverables or opting out of a grant impacts Freedom Network's ability to qualify for and be in good standing for federal funding in the future.

164. Freedom Network operates with a small, dedicated team of 14 staff across the country, including in Chicago, whose salaries are primarily funded through federal grants. It would have to immediately lay off its program staff for any canceled grant and dramatically reduce non-grant program staff who are mostly funded through private funds.

165. The loss of any additional staff members would decimate Freedom Network's organizational capacity because it has already lost four critical non-staff members due to Freedom Network's refusal to self-censor under the anti-equity EOs. Two board members and two members of the National Standards of Care technical working group decided to leave Freedom Network in March 2025. All four informed Freedom Network that their decision was based on concerns that their continued association with Freedom Network's equity-driven mission could harm them and their employers, who are also federal grantees. One person even said that it was too "dangerous" for them to associate with Freedom Network's equity-driven mission. Freedom Network has faced difficulty replacing these non-staff members, in part, because of the climate of fear caused by the anti-equity EOs and Freedom Network's refusal to eliminate equity as a core organizational value.

166. The anti-equity EOs have already adversely impacted all Freedom Network's federally funded projects. Freedom Network believed it had no choice but to obey the Office for Victims of Crime's directive to remove the National Standards Literature Review from its website for fear of losing federal funding and the chances of publishing the final National Standards of Care product altogether. Furthermore, Freedom Network believes that all of its

federal funding might be terminated at any moment because the Office for Victims of Crime monitors every communication under the Housing Training and Technical Assistance project for compliance with the anti-equity EOs.

167. The anti-equity EOs have forced Freedom Network into a perpetual state of uncertainty regarding whether it can take on new referrals or move forward with any of the 100 survivors currently on the Survivor Project waiting list. The Survivor Project is managed by Freedom Network attorneys, who have been placed in the difficult position of either violating the grant terms by stopping services or violating their duty of zealous advocacy if Freedom Network accepts new cases they cannot complete due to the termination of funding.

168. Freedom Network's non-federally funded work has also suffered because of the anti-equity EOs. Freedom Network did not move forward with the Survivor Project presentation with federal monies at its annual conference due to the interference of the Office for Victims of Crime because it believes that efforts to control survivor speech would not only compromise the survivors' First Amendment rights but also compromise the survivors' autonomy. Such censorship of the survivor experience mimics the dynamics of power and control of a trafficker, which Freedom Network fundamentally opposes. Rather than use the federal funding as Congress intended and fearing the repercussions of using federal funds in a manner contrary to the instructions of DOJ, Freedom Network turned to a private funding source for the Survivor Project presentation—the Survivor Project's emergency fund.

169. Freedom Network had to use all of the money available in the Survivor Project's emergency fund, which is exclusively supported by private monies, to move forward with the presentation. Those funds were previously earmarked to support clients in the Survivor Project experiencing medical emergencies.

170. Freedom Network's 2025 annual conference had one of the lowest attendances in its 24-year history as a direct result of the anti-equity EOs. Several organizations told Freedom Network their federal grant administrators and private funders discouraged them from attending the conference because the term "inclusion" was in the conference title. Other organizations told Freedom Network they did not send participants to the conference because they feared that reporting their attendance to the Office for Victims of Crime and private funders would impact opportunities for future funding. As a result, although approximately 700 organizations are typically represented at the conference each year, ultimately only 300 organizations attended in 2025. While the annual conference typically generates approximately $200,000 in revenue every year in registration and fees, this year's conference generated less than $100,000 in revenue.

171. If Freedom Network is compelled to self-censor in all the ways that the Executive Branch has demanded to comply with the anti-equity EOs, its federally funded and non-federally funded work would be further harmed.

172. As a national training and technical assistance provider, Freedom Network's reputation depends on providing consistent, effective, and evidence-based advice to service providers. But the anti-equity EOs make it impossible for Freedom Network to continue doing so. For example, at the direction of DOJ, Freedom Network is not allowed to respond to questions during federally funded training if the answers could conceivably invoke the principles of diversity, equity, or inclusion. As such, Freedom Network is literally silenced. This not only harms Freedom Network's reputation but also prevents Freedom Network from fulfilling its duty to provide accurate and evidence-based training to service providers.

173. The most important National Standards of Care grant deliverable for Freedom Network is the final publication of the National Standards of Care product. The final product is

the culmination of two years' worth of intensive work by Freedom Network's survivor-consultants, technical working group, and other researchers. The final product is intended to be posted on the Office for Victims of Crime website as the national model for standards of care and disseminated to federal grantees in all 50 states. Freedom Network now expects the Office for Victims of Crime will censor equity-related terminology and concepts in the final product. Such changes would fundamentally alter the National Standards of Care and undermine Congress's equity-related intent in establishing accurate and effective national standards for combating human trafficking.

174.    Furthermore, the Office for Victims of Crime's insistence that it approve the training and technical assistance materials prior to distribution and its announcement that it has paused all review of Freedom Network's materials has hindered Freedom Network's ability to complete its grant deliverables under its federal grants.

### B.    The NOFOs Harm the New Plaintiffs

175.    Additionally, the NOFOs harm the New Plaintiffs. The NOFOs seek to regulate non-federally funded activities. They suffer the same infirmities as the anti-diversity EOs. They impose new, unauthorized conditions. And the Immigration Enforcement Condition would force the New Plaintiffs to act contrary to Congressional mandates.

176.    The New Plaintiffs lack sufficient notice as to what is prohibited or required of federal grantees under the New Funding Conditions, including how DOJ defines "diversity," "equity," or "inclusion" for the NOFO Certification Provision, or what constitutes a "program" or "program with components" relating to these terms. This uncertainty is compounded by the TVPA's statutory commitment to fostering diversity, equity, and inclusion to prevent trafficking, protect survivors, and prosecute traffickers, making it unclear how New Plaintiffs can comply

56

with the New Funding Conditions without risking violation of their obligations under federal law.

177.    The vagueness of the NOFO Certification Provision leaves the New Plaintiffs uncertain about what activities may be deemed unlawful in their daily operations.

178.    Further, the New Plaintiffs have no clarity about what DOJ considers a "program" or "program with components" relating to diversity, equity, and inclusion. As a result, the New Plaintiffs cannot determine how to comply with the NOFO Certification Provision or reconcile these vague requirements with the established goals of the TVPA.

179.    The New Plaintiffs do not understand what DOJ requires under the Discrimination Condition, as key terms such as "indirectly or directly violat[ing] the law," "promoting or facilitating violations," or "unlawfully favor[ing] different groups" remain undefined. The New Plaintiffs also lack clarity about what DOJ considers "majority" and "minority" groups, who is "privileged or unprivileged," and what constitutes a "given area," "population," or "sector."

180.    The confusion is compounded by the TVPA's statutory mandate to reach underserved populations and DOJ's failure to provide any guidance on how these obligations can be reconciled.

181.    The New Plaintiffs' confusion regarding both the NOFO Certification Provision and the Discrimination Condition is intensified by DOJ's sudden 180-degree change in its interpretation of federal anti-discrimination law. Efforts to promote diversity, equity, and inclusion—long considered lawful and encouraged under the TVPA's mandate to serve underserved populations—now appear impermissible.

57

182. The New Plaintiffs do not understand what is prohibited and required under the Immigration Enforcement Condition. The terms "including," "promote," "impedes," and "hinders" are not defined. It is also unclear what qualifies as prohibited conduct under the broad sweep of the terms "honor," "access," and "notice" for DHS security requests. For example, the New Plaintiffs have no notice if assistance provided to immigrant clients could fall within the scope of "including," "promoting," or "facilitating" violations of federal immigration law.

183. The Immigration Enforcement Condition places the New Plaintiffs in an irreconcilable conflict with their statutory and programmatic obligations. Under the NOFOs, the New Plaintiffs must "honor" DHS requests that may require disclosure of survivors' personally identifying information in direct violation of the VAWA confidentiality provisions incorporated into the TVPA at 34 U.S.C. § 12291(b)(2), which permit disclosure only with informed, written, and time-limited consent in narrow circumstances. Compliance with the VAWA Confidentiality Provision is an express NOFO Program Requirement, and any violation subjects the New Plaintiffs to suspension or termination of federal funds. Yet DOJ has provided no guidance on how to reconcile this discrepancy. Without further clarification, the New Plaintiffs are forced to choose between violating clients' federally protected rights and losing federal funding or potentially violating the Immigration Enforcement Condition and losing federal funding.

184. Moreover, the New Plaintiffs have received no guidance on how, as nonprofits, they are expected to "comply with 8 U.S.C. § 1373," a statute that applies to state and local governments, or how to reconcile the Immigration Enforcement Condition with the DOJ Financial Guide, which expressly includes two trafficking-related exceptions omitted from the Conditions.

58

### 1. The NOFOs Harm Life-Span

185. When Life-Span was deciding whether to apply for grants pursuant to the NOFOs, the New Funding Conditions placed Life-Span in a double-bind: either forgo an application and the federal funding Life-Span has relied on for nearly 30 years, or apply for and accept an award with the New Funding Conditions, operating under the constant threat of denied reimbursements and False Claims Act investigations.

186. Ultimately, on March 17, 2026, Life-Span submitted an application for the FY25 Services for Victims of Trafficking grant, in part because this Court's preliminary injunction order was in place, prohibiting DOJ from using the New Funding Conditions to evaluate grant applications under the NOFO. The FY25 Services for Victims of Trafficking NOFO is attached as Exhibit D.

187. Life-Span still altered its language in the grant application out of an abundance of caution in case this Court's order would not be enforced or would be eliminated by a later decision. Unlike prior applications, Life-Span omitted details about the vulnerable populations it serves and how its services are designed to reach them in furtherance of the TVPA. In particular, Life-Span omitted information that it has provided in past applications, such as demographic data showing the gender, race, and immigration backgrounds of its clients, in an effort to avoid triggering the New Funding Conditions.

188. Life-Span also did not seek OVC funding for an immigration attorney, fearing that an attorney that served a specific population could trigger all three New Funding Conditions.

189. Life-Span anticipates it will receive an award based on its approximate 30-year history of being awarded federal funding. Without this Court's order in place, Life-Span will again have to make the agonizing decision to either forgo the funding and serve fewer trafficking

survivors, or accept the award with the New Funding Conditions. Just one denied reimbursement can result in Life-Span having to let go of its entire anti-trafficking program staff in three months, regardless of how other private and federal funding sources are re-arranged. If a False Claims Act investigation were triggered, even if meritless and later dismissed, Life-Span would have to shut down entirely within three months to one year.

### 2.      The NOFOs Harm YWCA Kalamazoo

190.     When YWCA Kalamazoo was deciding whether to apply for grants pursuant to the NOFOs, it had to make a near-impossible choice as a result of the New Funding Conditions: either forgo funding that is a vital—if not the only—lifeline for survivors in the Midwest, or apply for and accept an award with the New Funding Conditions and limit its services to only survivors who are not immigrants. Because serving immigrants could trigger any of the three New Funding Conditions, even one denied reimbursement or False Claims Act investigation could cause the entire organization to shut down within weeks.

191.     Ultimately, on March 18, 2026, YWCA Kalamazoo submitted grant applications for two of the grants titled: (1) OVC FY25 Services for Victims of Human Trafficking, and (2) OVC FY25 Housing Assistance for Victims of Human Trafficking. The OVC FY25 Housing Assistance for Victims of Human Trafficking NOFO is attached as Exhibit E.

192.      YWCA Kalamazoo anticipates that it will receive both awards because it has been awarded funds for these exact grant in FY 2022. YWCA Kalamazoo applied for both the FY2025 Services for Victims of Trafficking Grant and the FY2025 Housing Assistance for Victims of Trafficking, in part because this Court's preliminary injunction order was in place. This Court's order made YWCA Kalamazoo feel more protected from the enforcement of the New Funding Conditions in the evaluation of its applications.

193. However, even with the preliminary injunction in place for one of the grants for which it applied, YWCA Kalamazoo changed the words it used in both grant applications for fear of implicating the New Funding Conditions in the event this Court's order were not enforced or eliminated by a later decision. YWCA Kalamazoo did not use the words "immigration" or "undocumented," and it also avoided using the words "equity," "anti-racist," and "oppression" to describe its mission statement.

194. Without this Court's injunction in place, YWCA Kalamazoo will have to again consider choosing between forgoing the funding and shutting down its anti-trafficking programs entirely or accepting the award and not serving immigrants in its anti-trafficking programs. Closing its doors to immigrants would force YWCA Kalamazoo to betray the organization's mission, staff, survivors, and ultimately the goals of the TVPA.

## C. The NOFOs Harm WJCNY

195. The New Funding Conditions have already forced WJCNY to make a difficult choice before it submitted its grant application as a result of the New Funding Conditions: forgo the federal funding it has relied upon since 2017 and jeopardize its goal of reaching 5,000 low-wage workers, or apply for and accept funding with the New Funding Conditions and risk denied reimbursement and False Claims Act investigations. Either option would force WJCNY to swiftly shutter many of its services.

196. On March 17, 2026, WJCNY successfully submitted a grant application for the FY 2025 "Services for Victims of Trafficking Gran," in part because this Court's injunction order provided safeguards against the enforcement of the New Funding Conditions in the evaluation of the applications. However, WJCNY did not use the words "undocumented" or "culturally competent," as it has in past applications, fearing that the preliminary injunction

61

might not be enforced or changed at a later date. WJCNY also requested 70% less federal funding than it has in past grant applications in case WJCNY's work triggered a denied reimbursement under any of the New Funding Conditions.

152.    Based on its history of receiving TVPA-authorized funds awarded by OVC in the past, WJCNY expects it will receive an award. Without this Court's order in place, WJCNY will have to choose between forgoing the funding or accepting an award with the New Funding Conditions and potentially shutting down many of its services if it triggers a denied reimbursement or a False Claims Act investigation.

## CAUSES OF ACTION

### Count I

**U.S. Constitution, First Amendment**
**Free Speech (Overbreadth and Vagueness)**
**Regarding the Anti-Equity EOs and the New Funding Conditions**

153.    Freedom Network and the New Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs. Freedom Network and the New Plaintiffs state this cause of action against all Defendants, seek preliminary and declaratory relief, and challenge the anti-equity EOs, and any agency action implementing them, both facially and as applied to them.

154.    The First Amendment to the U.S. Constitution provides that the government "shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.

155.    Under the First Amendment overbreadth doctrine, "a statute is facially invalid if it prohibits a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292 (2008). *See also Brown v. Kemp*, 86 F.4th 745, 711-78 (7th Cir. 2023).

156. Under the First Amendment vagueness doctrine, "[i]t is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104 (1972).

157. Neither the anti-equity EOs, the February 5 Memo, the May 19 Memo, the July 29 Memo, nor the NOFOs define diversity, equity, inclusion, "DEI", or diversity, equity, inclusion, and accessibility (DEIA). The Office for Victims of Crime has applied the anti-equity EOs inconsistently and has also refused to define their scope.

158. Former Attorney General Pam Bondi has declared *all* DEI and DEIA illegal. The February 5 Memo states that the anti-diversity EOs "mak[e] clear that policies relating to 'diversity, equity, and inclusion' ('DEI') and 'diversity, equity, inclusion, and accessibility' ('DEIA') 'violate the text and spirit of our longstanding Federal civil-rights laws.'" The February 5 Memo then states that the DOJ will investigate, eliminate, and penalize what it calls "illegal" DEI and DEIA, having though also declared that all DEI and DEIA is illegal.

159. While declaring all DEI and DEIA to be illegal, neither the February 5 Memo nor any other government memo or agency communication has defined those terms. Moreover, as noted, the government has enforced the anti-diversity EOs in an inconsistent manner. As such, the Termination Provisions prohibit Plaintiffs' constitutionally protected speech and also chill Plaintiffs' willingness to engage in constitutionally protected speech out of a credible concern that the equity-centered work Plaintiffs do will be terminated.

160. Plaintiffs are not the first to grapple with the absence of a definition of DEI and DEIA or a lack of understanding of prohibited conduct under the anti-equity EOs. *See City of Chi. v. Noem*, No. 25-cv-12765, 2025 WL 3251222 (N.D. Ill. Nov. 21, 2025); *Cnty. of Santa Clara v. Noem*, No. 25-cv-08330, 2025 WL 3251660 at *40 (N.D. Cal. Nov. 21, 2025) ("[I]t

does not appear that any other President has attempted to comprehensively override understanding of federal anti-discrimination law in the way this Administration seeks to through Executive Orders."); *Am. Public Health Ass'n v. Nat'l Institutes of Health*, No. 25-10787 (D. Mass., ECF 84) (reciting factual allegations and "observ[ing] that neither the EOs, nor any of the policy statements to follow, nor counsel for the Public Officials, has, to date, provided a working definition of Diversity, Equity, and Inclusion"); *Nat'l Ass'n of Diversity Officers in Higher Educ. et al v. Trump*, No. 25-cv-00333 (D. Md., ECF 44 at 54) ("[n]either [EO] gives guidance on what the new administration considers to constitute 'illegal DEI discrimination and preferences,' or '[p]romoting "diversity,"' or 'illegal DEI and DEIA policies,' or what types of 'DEI programs or principles' the new administration considers 'illegal' and is seeking to 'deter[.]'" (citations omitted).

161. Similarly, the J21 Certification Provision chills Plaintiffs' constitutionally protected speech and their willingness and ability to engage in constitutionally protected speech out of a credible concern that Plaintiffs will be subject to civil or criminal liability. The NOFO Certification Provision, Discrimination Condition, and Immigration Enforcement Condition likewise chill the New Plaintiffs' constitutionally protected speech.

162. Accordingly, the Termination Provisions, the J21 Certification Provision, and the NOFOs violate the First Amendment because they are overbroad and vague.

### Count II

**U.S. Constitution, First Amendment**
**Free Speech (Viewpoint Discrimination)**
**Regarding the Anti-Equity EOs and the New Funding Conditions**

163. Freedom Network and the New Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs. Freedom Network and the New

Plaintiffs state this cause of action against all Defendants, seek preliminary and declaratory relief, and challenge the anti-equity EOs, and any agency action implementing them, both facially and as applied to them.

164. The First Amendment provides that the government "shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.

165. Content based regulations "target speech based on its communicative content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

166. The Supreme Court has recognized that "even in the provision of subsidies, the government may not 'ai[m] at the suppression of dangerous ideas.'" *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998) (quoting *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 550 (1983)). And "the government can violate the First Amendment by withholding benefits for a censorious purpose." *Koala v. Khosla*, 931 F.3d 887, 898 (9th Cir. 2019) (discussing *Regan*, 461 U.S. at 548); *Speiser v. Randall*, 357 U.S. 513, 518-19 (1958). Here, the Termination Provisions, J21 Certification Provision, and the New Funding Condition are "not directed towards advancing any legitimate objectives embedded within the programs they burden—as appropriated and determined by Congress—but towards disfavored speech." *S.F. A.I.D.S. Found. v. Trump*, 2025 WL 786 F. Supp. 3d 1184 (N.D. Cal. 2025).

167. The Termination Provisions and the J21 Certification Provision violate the First Amendment because they impermissibly punish and chill the exercise of Plaintiffs' constitutionally protected speech based on its content and viewpoint, specifically speech that is favorable to or in support of diversity, equity, inclusion, and accessibility. The New Funding Conditions similarly impermissibly punish and chill the exercise of the New Plaintiffs' constitutionally protected speech based on its content and viewpoint.

**Count III**

**U.S. Constitution, First Amendment**
**Free Speech (Infringement on Free Speech)**
**Regarding the J21 Certification Provision and**
**the NOFO Certification Provision**

168.    Promoting the concepts of diversity, equity, and inclusion does not violate any federal anti-discrimination law and is protected speech. Even if the J21 Certification Provision and the NOFO Certification Provision are limited to promoting whatever the government may now contend is "illegal DEI," it is still a bedrock First Amendment principle that advocating for violation of the law cannot be proscribed unless it rises to incitement. *Virginia v. Black*, 538 U.S. 343, 359 (2003).

169.    The J21 Certification Provision violates the First Amendment because it impermissibly punishes and chills the exercise of Plaintiffs' constitutionally protected speech. Similarly, the NOFO Certification Provision violates the First Amendment because it impermissibly punishes and chills the exercise of the New Plaintiffs' constitutionally protected speech.

**Count IV**

**U.S. Constitution, First Amendment**
**Free Speech (Unconstitutional Condition)**
**Regarding the J21 Certification Provision and the New Funding Conditions**

170.    Freedom Network and the New Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs. Freedom Network and the New Plaintiffs state this cause of action against all Defendants, seek preliminary and declaratory relief, and challenge the anti-equity EOs, and any agency action implementing them, including

the J21 Certification Provision and the NOFO Certification Provision, both facially and as applied to them.

171. The First Amendment provides that the government "shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.

172. The J21 Certification Provision imposes unconstitutional conditions on Plaintiffs' speech by conditioning federal funds on Plaintiffs' agreement not to engage in protected speech even when engaging in activities that are not funded by the federal government. *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214-15 (2013); *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 548-49 (2001); *FCC v. League of Women Voters*, 468 U.S. 364, 400 (1984). The NOFO Certification Provision similarly imposes unconstitutional conditions on the New Plaintiffs' speech.

173. Although the government may use conditions to "define the federal program," it may not "reach outside" the program to influence speech. *Agency for Int'l Dev.* 570 U.S. at 214.

174. The J21 Certification Provision requires the heads of each agency to include in every contract or grant a requirement to certify that the grantee "does not operate *any* programs promoting DEI that violate any applicable Federal anti-discrimination laws," J21 EO § 3(b)(iv)(B) (emphasis added), while also declaring that "DEI" programs are illegal and immoral, *id.* § 1.

175. Similarly, the NOFO Certification Provision requires that grantees certify that they do "not operate *any* programs (including any such programs having components relating to diversity, equity, and inclusion) that violate any applicable Federal civil rights or nondiscrimination laws." Exhibit D at 11; Exhibit E at 11 (emphasis added).

67

176.    In addition, Freedom Network's three federal grant programs did not originally impose any conditions prohibiting or discouraging diversity, equity, and inclusion. In fact, the opposite is true. As such, the government is imposing an unconstitutional condition. *See Legal Servs. Corp. v. Velazquez*, 531 U.S. 533 (2001); *Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819 (1995).

177.    The J21 Certification Provision and the New Funding Conditions conflict with the purposes of the TVPA and the NOFO grant deliverables. For example, the NOFOs require outreach to survivors in specific groups and regions, training and technical assistance to federal grantees (sometimes involving an immigration focus), and the provision of direct services to vulnerable survivors of all backgrounds and trafficking experiences, which run afoul of the New Funding Conditions.

### Count V

#### U.S. Constitution Fifth Amendment
#### Due Process Clause (Vagueness)
#### Regarding the Anti-Equity EOs and the New Funding Conditions

178.    Freedom Network and the New Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs. Freedom Network and the New Plaintiffs state this cause of action against all Defendants, seek preliminary and declaratory relief, and challenge the anti-equity EOs, and any agency action implementing them, both facially and as applied to them.

179.    The Due Process Clause of the Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

68

180. Due process requires that parties "know what is required of them so they may act accordingly." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Clear guidance ensures "those enforcing the law do not act in an arbitrary or discriminatory way." *Id.*

181. The anti-equity EOs provide no guidance as to what is required of contractors and grantees to allow them to "act accordingly."

182. The Termination Provisions, the J21 Certification Provision, the Discrimination Condition, and the NOFO Certification Provision do not define DEI, DEIA, the terms "indirectly or directly violat[ing] the law," "promoting or facilitating violations," or "unlawfully favor[ing] different groups." Further, DOJ has never specified what it considers to be "majority" and "minority" groups, who is "privileged or unprivileged," or what constitutes a "given area," "population," or "sector."

183. It is also uncertain what is prohibited and required under the Immigration Enforcement Condition in the NOFOs. The terms "including," "promote," "impedes," and "hinders" are not defined. It is also unclear what the terms "honor," "access," and "notice" mean with respect to DHS security requests.

184. Given this, these provisions violate the Due Process Clause.

## Count VI
### *Ultra Vires* – U.S. Const., Article I, § 8 (Spending Clause)
### Regarding the Anti-Equity EOs and the New Funding Conditions

185. Freedom Network and the New Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs. Freedom Network and the New Plaintiffs state this cause of action against all Defendants, seek preliminary and declaratory relief, and challenge the anti-equity EOs, and any agency action implementing them, both facially and as applied to them.

186.    Article I of the U.S. Constitution exclusively grants Congress the federal spending powers. U.S. Const. art. I § 8, cl. 1; *see also South Dakota v. Dole*, 483 U.S. 203, 206 (1987). The TVPA was congressionally mandated to prevent trafficking, prosecute traffickers, and protect survivors by addressing the disparities vulnerable populations face that render them susceptible to trafficking. 22 U.S.C. § 7101(b)(4)-(20). To achieve these goals, the Act, *inter alia*, provides grants to nonprofit, nongovernmental organizations to develop, expand, or strengthen victim service programs for victims of human trafficking. 22 U.S.C. § 7105(b)(2)(A). The goal of each of the federal funding programs from which Plaintiffs' grants are funded is to address and resolve specific disparities survivors face in the cycle of vulnerability and trafficking.

187.    The J20 Termination Provision purports to direct subordinate executive branch officials to unilaterally "terminate, to the maximum extent allowed by law, all 'equity' actions, initiatives, or programs, 'equity-related' grants or contracts." *See* J20 EO § 2(b)(i). The Constitution does not permit the President or his subordinate executive branch officials to unilaterally terminate "'equity-related' grants and contracts" without express statutory authority. *See, e.g.*, *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986); *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020); *New York v. Trump*, No. 25-cv-00039 (D.R.I. Mar. 6, 2025).

188.    Though the J20 EO purports to limit terminations "to the maximum extent allowed by law," a general statement about nominal adherence to the law does not suffice to evade judicial review.

189.    The J21 Certification Provision requires the head of each executive agency to "include in every contract or grant award," *inter alia*, "[a] term requiring such counterparty or

70

recipient to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." J21 EO § 3(b)(iv).

190. The TVPA established grant programs for specified purposes under 22 U.S.C. § 7105(b). Nothing in the statute authorizes the Executive Branch to impose conditions on that funding beyond those imposed by Congress.

191. The Constitution does not permit the President or his subordinate Executive Branch officials to exercise the spending power and condition grant awards on requiring a compliance condition. "The ability to place conditions on federal grants ultimately comes from the Spending Clause, which empowers Congress, not the Executive, to spend for the general welfare." *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 362 (5th Cir. 2021); *see Illinois v. Fed. Emergency Mgmt. Agency*, 801 F. Supp. 3d 75 (D.R.I. 2025) (holding that similar immigration enforcement conditions attached to federal grants for disaster and emergency relief and management programs pursuant to Executive Order violated the Spending Clause). Thus, the executive branch may not impose conditions on the distribution of funds that Congress has not authorized. *Colorado v. U.S. Dep't of Health & Human Servs.*, No. 1:25-cv-00121, 2025 WL 1426226, at *18 (D.R.I. May 16, 2025) (citing *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018)).

192. The J21 Certification Provision is a new and unauthorized condition.

193. The New Funding Conditions are also new and unauthorized conditions that conflict with the intent of the TVPA. For example, the NOFO Certification Requirement conflicts with the TVPA's commitment to training and technical assistance work related to diversity, equity, and inclusion.

194.     The Discrimination Condition is a new and unauthorized condition that conflicts with the TVPA's requirement to focus on underserved populations on the basis of geography, gender, immigration status, race, and more.

195.     The Immigration Enforcement Condition is a new and unauthorized condition that conflicts with the TVPA's focus on addressing the unique vulnerability of immigrants to trafficking to prevent trafficking, protect survivors, and prosecute traffickers.

196.     The Constitution does not give the Executive Branch the authority to take the actions challenged in this Complaint.

197.     Accordingly, the anti-equity EOs and the New Funding Conditions are *ultra vires* and unconstitutional.

## Count VII

### Violation of Separation of Powers
### Regarding the Anti-Equity EOs and the New Funding Conditions

198.     Freedom Network and the New Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs. Freedom Network and the New Plaintiffs state this cause of action against all Defendants, seek preliminary and declaratory relief, and challenge the anti-equity EOs, and any agency action implementing them, both facially and as applied to them.

199.     The Executive Branch has no authority to dictate government spending or place conditions on the spending power that is vested in the legislative branch.

200.     Article I of the U.S. Constitution exclusively grants Congress the federal spending powers. U.S. Const. art. I § 8, cl. 1; *see also Dole*, 483 U.S. at 206.

201.     The J20 EO violates constitutional separation of powers.

72

202.     Congress has not authorized the Executive Branch to withhold, withdraw, or terminate federal grant moneys from TVPA grant recipients like Plaintiffs, on the basis that the grants involve "equity action plans," "equity actions, initiatives, or programs," or are considered "'equity-related' grants or contracts."

203.     The J21 EO violates constitutional separation of powers.

204.     The Executive Branch, absent Congressional authorization, has no authority to dictate government spending or place conditions on the spending power that is vested in the legislative branch.

205.     The New Funding Conditions violate constitutional separation of powers.

206.     Furthermore, the New Funding Conditions conflict with the intent and language of the TVPA. The NOFO Certification Provision conflicts with the TVPA's commitment to training and technical assistance work related to diversity, equity, and inclusion. The Discrimination Condition conflicts with § 7105(b)'s requirement to focus on underserved populations on the basis of geography, gender, immigration status, race, and more. *See* 22 U.S.C. § 7105(b)(2)(B)(ii). The Immigration Enforcement Condition conflicts with the TVPA's focus on addressing the unique vulnerability of immigrants to trafficking, preventing trafficking, protecting survivors, and prosecuting traffickers. *See* 22 U.S.C. 7101(b)(17), (19)-(20).[41]

207.     Accordingly, the anti-equity EOs and the New Funding Conditions are unconstitutional because they violate constitutional separation of powers.

---

[41] https://uscode.house.gov/view.xhtml?path=/prelim@title22/chapter78&edition=prelim.

**Count VIII**

**Violation of the Administrative Procedure Act:
Contrary to Law and Exceeds Statutory Authority
Regarding the New Funding Conditions**

208. The New Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs. The New Plaintiffs state this cause of action against all Defendants, seek preliminary and declaratory relief, and challenge the New Funding Conditions and any agency action implementing them.

209. The APA provides that a court "shall" "hold unlawful and set aside agency action" found to be "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

210. An agency action is reviewable under the APA if it is a final agency action. 5 U.S.C. § 704. An agency action is final if it "mark[s] the consummation of the agency's decision-making process" and is an action by which "rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (cleaned up).

211. The Discrimination Condition and the Immigration Enforcement Condition have been implemented in every NOFO published by the Office for Victims of Crime in Fiscal Year 2025. The NOFO Certification Provision is listed in the individual seven NOFOs at issue as well as the Office of Justice Program's General Terms and Conditions, which the grantees must agree to upon accepting an award. Accordingly, these conditions constitute final agency action. *See e.g.*, *City of Chi. v. Noem*, No. 25-cv-12765, 2025 WL 3251222 (N.D. Ill. Nov. 21, 2025); *Cnty. of Santa Clara v. Noem*, No. 25-cv-08330, 2025 WL 3251660 (N.D. Cal. Nov. 21, 2025);

74

*California v. U.S. Dep't of Transp.*, 788 F. Supp. 3d 316 (D.R.I. 2025); *Thakur v. Trump*, 148 F.4th 1096, 1108 (9th Cir. 2025).

212. The New Funding Conditions conflict with the Congressionally mandated requirements at § 7105(b). By overlaying certifications and conditions that are wholly unrelated to the TVPA, Defendants violate the statutory mandate to make these grants. *See Planned Parenthood of Greater Washington & N. Idaho v. U.S. Dep't of Health & Hum. Servs.*, 946 F.3d 1100, 1112 (9th Cir. 2020); *Illinois v. Fed. Emergency Mgmt. Agency*, 801 F. Supp. 3d 75 (D.R.I. 2025) (finding similar conditions contrary to law in violation of the APA); *see also Cnty. of Santa Clara v. Noem*, No. 25-cv-08330, 2025 WL 3251660 (N.D. Cal. Nov. 21, 2025).

**Count IX**
**Violation of the Administrative Procedure Act:**
**Arbitrary and Capricious**
**Regarding the New Funding Conditions**

213. The New Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs. The New Plaintiffs state this cause of action against all Defendants, seek preliminary and declaratory relief, and challenge the New Funding Conditions and any agency action implementing them.

214. The APA provides that a court "shall" "hold unlawful and set aside agency action" found to be "arbitrary, capricious, [or] an abuse of discretion. 5 U.S.C. § 706(2)(A).

215. The New Funding Conditions are arbitrary and capricious. Under arbitrary and capricious review, courts must hold unlawful any agency action that is "not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)).

75

216. With respect to the NOFO Certification Provision, Defendants have not explained how diversity, equity, and inclusion have suddenly become objectionable activities.

217. Despite imposing new conditions that directly contradict prior policies, Defendants fail to even acknowledge that the New Funding Conditions reflect a change in policy or to reasonably explain the reasons for that change. *See Santa Clara v Noem,* No. 25-cv-08330, 2025 WL 3251660 (N.D. Cal. Nov. 21, 2025) (finding defendants' argument that federal anti-discrimination conditions have always been attached to federal grant funding unpersuasive because "their interpretation [of federal antidiscrimination law] has starkly changed.").

218. Defendants failed to acknowledge that the New Funding Conditions are a change in DOJ policy or to reasonably explain the reasons for that change. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (when an "agency has failed to provide even that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law").

219. Defendants failed to consider the reliance interests of anti-trafficking non-profits that have relied on TVPA-authorized funding for years as well as the survivors that rely on them for federally funded services. *See Martin Luther King, Jr. Cnty. v. Turner*, 798 F. Supp. 3d 1224, 1253–54 (W.D. Wash. 2025).

220. Nor did they consider how foreclosing grantee efforts to engage with and support these communities will thwart Congress's intent to prevent trafficking, protect survivors, and prosecute traffickers.

221. The Office for Victims of Crime's policy of imposing the New Funding Conditions, and its inclusion of the Funding Conditions in individual NOFOs, must be declared unlawful and set aside as arbitrary and capricious. *City of Fresno*, No. 25-cv-07070, 2025 WL 2721390, at *9 (N.D. Cal. Sept. 23, 2025); *Cnty. of Santa Clara v. Noem*, No. 25-cv-08330,

76

2025 WL 3251660 (N.D. Cal. Nov. 21, 2025; *City of Chi. v. Noem*, 25-cv-12765, 2025 WL 3251222 (N.D. Ill. Nov. 21, 2025) (finding similar certification provision and discrimination condition arbitrary and capricious as applied to DHS grants); *Illinois v. Fed. Emergency Mgmt. Agency*, 801 F. Supp. 3d 75 (D.R.I. 2025) (finding similar immigration enforcement conditions to be arbitrary and capricious as applied to FEMA grants); *Rhode Island Coal. Against Domestic Violence v. Bondi*, 794 F. Supp. 3d 58, 62 (D.R.I. 2025) (finding similar conditions arbitrary and capricious as applied to OVC grants issued under the Violence Against Women Act).

### Count X
**Violation of the Administrative Procedure Act:**
**Contrary to Constitutional Right**
**Regarding the New Funding Conditions**

222.    The New Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs. The New Plaintiffs state this cause of action against all Defendants, seek preliminary and declaratory relief, and challenge the New Funding Conditions and any agency action implementing them.

223.    The APA provides that a court "shall" "hold unlawful and set aside agency action" found to be "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

224.    As discussed above, DOJ's policy of imposing New Funding Conditions violates multiple constitutional commands, including the First Amendment, Fifth Amendment, the

Spending Clause, and the constitutional separation of powers and associated constitutional provisions.

## PRAYER FOR RELIEF

WHEREFORE, Freedom Network and the New Plaintiffs respectfully request the Court enter an order:

a. Declaring that the J20 Termination Provision (§ 2(b)(i)) is unlawful and unconstitutional;

b. Declaring that the J21 Certification Provision (§ 3(b)(iv)) and the J21 Termination Provision (§ 3(c)(iii)) are unlawful and unconstitutional;

c. Declaring unlawful, vacating, and setting aside the New Funding Conditions;

d. Granting a preliminary and permanent injunction enjoining Defendants other than the President from enforcing those sections of the anti-equity EOs and NOFOs that the Court finds unlawful and unconstitutional;

e. Enjoining the policy of imposing the New Funding Conditions, and the inclusion of the New Funding Conditions in any individual notices of funding opportunities and awarded grants, pursuant to 5 U.S.C. § 705;

f. Granting a preliminary and permanent injunction enjoining Defendants, their agents, and all persons acting in concert or participation with Defendants from including the New Funding Conditions in any future NOFOs, and from imposing the "New Funding Conditions as a condition of applying for, or accepting or receiving funds under, an Office for Victims of Crime grant;

g. Declaring that any certification that any organization has or will make pursuant to the NOFO Certification Provision in applying for or accepting an Office for Victims of

Crime grant is null and void and shall not be enforced or in any way held against the applicant;

h. Preliminarily and permanently enjoining Defendants, their agents, and all persons acting in concert or participation with Defendants from enforcing, or encouraging or facilitating enforcement of, the New Funding Conditions where a grantee has agreed to such conditions;

i. Preliminarily and permanently enjoining Defendants, their agents, and all persons acting in concert or participation with Defendants to clarify in any current or future Office for Victims of Crime grant award or disbursement of funds that any certification that any applicant made pursuant to the New Funding Conditions does not apply and that the awardee is not making such a certification in accepting and using the funds, even if the awardee made that certification in applying for the award;

j. Preliminarily and permanently enjoining Defendants, their agents, and all persons acting in concert or participation with Defendants from imposing any certification requirements or funding conditions for future grants that are substantially the same as J21 Certification Provision or the NOFO Certification Provision

k. Awarding Freedom Network and the New Plaintiffs their reasonable attorneys' fees and costs;

l. Issuing such other relief as the Court may deem appropriate.

Plaintiffs request a trial by jury on all issues so triable.

79

Dated: May 18, 2026

Respectfully Submitted,

/s/ *Jason P. Stiehl*
Jason P. Stiehl
CROWELL & MORING LLP
300 N. LaSalle Drive
Suite 2500
Chicago, IL 60654
Tel: (312) 840-3108
jstiehl@crowell.com

/s/ *Anuj Vohra*
Anuj Vohra
Keith J. Harrison*
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Tel: (202) 624-2500
avohra@crowell.com
kharrison@crowell.com

s/ *Warrington Parker*
Warrington Parker*
CROWELL & MORING LLP
3 Embarcadero Center, 26th Floor
San Francisco, CA 94111
Tel: (415) 986-2800
wparker@crowell.com

/s/ *Rachel Stevens*
Rachel Stevens*
CROWELL & MORING LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Tel: (212) 590-5430
rstevens@crowell.com

/s/ *Sabrina A. Talukder*
Sabrina A. Talukder*
Kathryn J. Youker*
Lawyers' Committee for Civil Rights Under
Law
1500 K Street, N.W. Suite 900
Washington, D.C. 20005
Telephone: (202) 662-8600
Facsimile: (202) 783-0857
stalukder@lawyerscommittee.org
kyouker@lawyerscommittee.org

/s/ *Aneel L. Chablani*
Aneel L. Chablani (No. 6242658)
Ami D. Gandhi (No. 6282924)
Chicago Lawyers' Committee for Civil Rights
25 E. Washington St., Ste. 1300
Chicago, IL 60602
Telephone: (312) 630-9744
Facsimile: (312) 630-1127
achablani@clccrul.org
agandhi@clccrul.org

*Attorneys for Freedom Network USA, Life-
Span, Young Women's Christian Association
Kalamazoo, Worker Justice Center of New
York, and Legal Aid Foundation of Los
Angeles
*Admitted Pro hac vice*

80