UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| FREEDOM NETWORK USA, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 25 C 12419 |
| | ) | |
| PRESIDENT DONALD J. TRUMP, *et al.*, | ) | Judge Kennelly |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

## Table of Contents

Table of Authorities ........ iii

Introduction ........ 1

Background ........ 1

Human Trafficking Grants ........ 1

Alleged DOJ Interference with Plaintiffs' Grants ........ 4

Prior Proceedings ........ 6

Argument ........ 7

I. Plaintiffs Cannot Sue the Non-DOJ Defendants for Reasons Specific to them ........ 7

II. Plaintiffs' Challenges to the Four Funding Restrictions Should Be Dismissed ........ 9

A. No Article III Jurisdiction to Challenge Funding Restrictions ........ 9

B. The Court Properly Rejected First Amendment Challenges ........ 10

C. The Court Properly Rejected the Due Process Challenges ........ 13

D. Separation-of-Powers and Spending Clause Claim Lacks Merit ........ 15

a. Plaintiffs' Challenges Fail Under *Dalton.* ........ 15

b. Plaintiffs Cannot Invoke the Court's Equity Powers ........ 16

c. Plaintiffs' Challenges Fail on the Merits ........ 18

E. APA Claims Lack Merit ........ 21

III. Plaintiffs' Challenges to the Certification Condition Should Be Dismissed ........ 23

A. No Standing to Challenge Certification Condition ........ 23

B. First Amendment Claim Lacks Merit ....................24

C. Due Process Claim Lacks Merit ....................26

D. Separation-of-Powers and Spending Clause Claim Lacks Merit ....................27

Conclusion ....................28

**Table of Authorities**

Cases

*Abbott Labs. v. Gardner*, 387 U.S. 136 (1967) .................................................................. 10

ACT *NOW v. U.S. Dep't of Education*, 2026 WL 1847100 (N.D. Ill. June 26, 2026)........... 10, 12

ACT *NOW v. U.S. Dep't of Education*, 2026 WL 1847509 (N.D. Ill. June 26, 2026). . . . . . . .. . . 12

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013) ...............................11

*Air Espana v. Brien*, 165 F.3d 148 (2d Cir. 1999)......................................................................... 21

*Armstrong v. Exceptional Child Ctr. Inc.*, 575 U.S. 320 (2015) .............................................. 7, 17

*Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32 (1991) ........................ 17

*Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687 (7th Cir. 2012) ................................. 2

*Chicago v. Noem*, 2025 WL 3251222 (N.D. Ill, Nov. 21, 2025).................................................. 21

*Chicago Women in Trades v.* Trump, 2025 WL 1331743 (N.D. Il, May 7, 2025)........................ 16

*City of Los Angeles v. Barr*, 929 F.3d 1163 (9th Cir. 2019)......................................................... 21

*Climate United Fund v. Citibank, N.A.*, 2025 WL 2502881 (D.C. Cir. Sept. 2, 2025)................ 16

*Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497 (N.D. Cal. 2017)........................................ 27

*Comm'n v. Texas*, 605 U.S. 665 (2025)................................................................................. 16, 17

*Commonwealth of Puerto Rico v. United States*, 490 F.3d 50 (1st Cir. 2007) ........................ 17, 18

*Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11 (D.D.C. 2020)........................... *passim*

*Dalton v. Specter*, 511 U.S. 462 (1994) ................................................................................. 15, 16

*Dep't of Educ. v. California*, 604 U.S. 650 (2025)....................................................................... 10

*DeVillier v. Texas*, 601 U.S. 285 (2024)...................................................................................... 17

*Employers Ins. of Wausau v. Browner*, 52 F.3d 656 (7th Cir. 1995) ............................................ 16

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ........................................................ 18, 27

*F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012)...................................................... 14

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021) .......... 22

*Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756 (D.C. Cir. 2022) .......... 17, 18

*Franklin v. Massachusetts*, 505 U.S. 788 (1992) .......... 8

*Gizzo v. Ben-Habib*, 44 F. Supp. 3d 374 (S.D.N.Y. 2014) .......... 14

*Grupo Mexicano De Desarrollo v. All. Bond Fund*, 527 U.S. 308 (1999) .......... 8

*Higher Education v. Trump*, 167 F.4th 86 (4th Cir. 2026) .......... *passim*

*Johnson v. United States*, 576 U.S. 591 (2015) .......... 15

*Knick v. Township of Scott*, 588 U.S. 180 (2019) .......... 17

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) .......... 9

*Maynard v. Cartwright*, 486 U.S. 356 (1988) .......... 14

*McClelland v. Katy Ind. Sch. Dist.*, 63 F.4th 996 (5th Cir. 2023) .......... 14

*Metropolitan Transportation Auth. v. Duffy*, 2026 WL 588117 (S.D.N.Y. Mar. 3, 2025) .......... 17

*Morton v. Ruiz*, 415 U.S. 199 (1974) .......... 18

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) .......... 22

*Murthy v. Missouri*, 144 S.Ct. 1972 (2024) .......... 8

*Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569 (1998) .......... 12, 13

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658 (2025) .......... 10

*Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175 (2024) .......... 11, 12

*Nat'l Urban League v. Trump*, 783 F.Supp.3d 61 (D.D.C. 2025) .......... *passim*

*New Vision Photography Program, Inc., v. District of Columbia*, 54 F. Supp. 3d 12 (D.D.C. 2014) .......... 14

*Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995) .......... 12

*Rust v. Sullivan*, 500 U.S. 173 (1991) .......... 11

*San Francisco A.I.D.S. Found. v. Trump*, 786 F. Supp.3d 1184 (N.D. CA. 2025) .......... 23, 25, 27

*Sessions v. Dimaya*, 584 U.S. 148 (2018) .......... 14, 15

*Speech First v. Killeen*, 968 F.3d 628 (7th Cir. 2020) .......... 23, 24

*Spuhler v. State Collection Serv., Inc.*, 983 F.3d 282 (7th Cir. 2020) .......... 8

*State of Mississippi v. Johnson*, 71 U.S. 475 (1866) .......... 8

*Chicago Women in Trades v. Trump*, 778 F. Supp.3d 959 (N.D. Ill 2025) .......... *passim*

*Trump v. CASA, Inc.*, 145 S.Ct. 3545 (2025) .......... 7

*Walker v. Tex. Div. Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015) .......... 12

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) .......... 15, 16

Statutes

5 U.S.C. § 702 .......... 18

5 U.S.C. § 704 .......... 21

8 U.S.C. § 1373 .......... 5

22 U.S.C. § 7105(b)(2) .......... 2

28 U.S.C. §§ 1346 .......... 10

31 U.S.C. § 3729(b)(4) .......... 6, 7

34 U.S.C. §12291(b)(2) .......... 19

42 U.S.C. § 2000d .......... 27

U.S.C. § 2000d-1 .......... 25

Rules

Fed. R. Civ. P. 10(c) .......... 2

Regulations

2 C.F.R. Part 200 .......... 22

2 C.F.R. §200.300(a) .......... 22, 27

2 C.F.R. § 200.303(b) ..... 21

Other Authorities

Executive Order 14,151 ..... 4

Executive Order 14,173 ..... 4, 5, 6

## Introduction

Plaintiffs are four organizations that provide training and other services to human trafficking victims and rely primarily on grants from the Department of Justice to do so. These grants contain provisions that allow DOJ to review and approve all of plaintiffs' funded work before being used. Plaintiffs now complain about DOJ's administration of these grants in two ways. First, plaintiff Freedom Network alleges DOJ is interfering with Freedom's use of its grant funds by directing Freedom to remove diversity and equity references from its funded work product. Second, all plaintiffs allege that DOJ is planning to include provisions in future grants that will prohibit them from using grant funds to violate federal law. Plaintiffs claim this interference is unreasonable and unconstitutional and ask this court to enjoin two executive order provisions and two future grant provisions that supposedly cause this interference. These challenges to DOJ's funding restrictions should be dismissed because DOJ's actions are (1) permitted under the express terms of the grants and therefore reasonable; (2) consistent with Congressional statues authorizing and funding these grants; and (3) impact only plaintiffs' federally funded work, which does not infringe on any constitutional rights.

Plaintiffs also challenge DOJ's certification condition, which will be included in future grants and requires grantees to certify that all their programs comply with federal anti-discrimination laws and to acknowledge that such compliance is material for purposes of the False Claims Act. These claims should be dismissed because the certification condition covers only speech or conduct that is *illegal* and therefore is not protected by the Constitution.

## Background

### Human Trafficking Grants

The Department of Justice, through its Office for Victims of Crime ("OVC"), administers discretionary competitive grant programs that address harms to human trafficking victims. These

are grant programs that OVC created under the Trafficking Victims Protection Act, 22 U.S.C. § 7105(b)(2) ("TVPA"), a statute enacted and funded by Congress to fight human trafficking and to address the harms caused by it. Under the TVPA, Congress authorized the Attorney General to create grant programs to assist victims of human trafficking and provided it discretion to decide who receives the grants and under what terms and conditions. *Id.*

Plaintiffs are all nonprofits that provide direct services or training and technical assistance to public and private entities to end human trafficking and protect survivors. SAC, ¶¶ 28-31.[1] Plaintiff Freedom Network performs most of its work under TVPA grants issued by OVC. Freedom was awarded funding to perform work under three OVC grants, including: (1) the *Housing Training and Technical Assistance Program* grant ("Housing Grant"), which provides training and technical assistance to housing providers implementing safe and stable housing models for trafficking survivors (SAC, ¶¶ 73-76; D. Ex. 1[2]); (2) the *Services for Victims of Human Trafficking Program* grant ("Survivor Services Grant"), which provides trafficking survivors with relief from their criminal record (SAC, ¶¶ 67-69; D. Ex. 2); and (3) the *National Standard of Care Program* grant ("SOC Grant"), whose purpose is to "promote uniform service standards that will ensure consistent quality of care to trafficking survivors" (SAC, ¶¶ 70-72; D. Ex. 3). Freedom is also a subrecipient to a federal grant to the Coalition Against Slavery and Trafficking under the

---

[1] "SAC, ¶ __" refers to the referenced paragraph in plaintiffs' second amended complaint (Dkt. 103).

[2] "D. Ex. __" refers to the referenced Exhibit attached to this memorandum. While the exhibits attached to this memorandum are not exhibits to the second amended complaint itself, the court may consider these documents as part of the pleadings because plaintiffs refer to them in the pleadings. Fed. R. Civ. P. 10(c); *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) ("It is well settled that in deciding a Rule 12(b)(6) motion, a court may consider 'documents attached to a motion to dismiss . . . if they are referred to in the plaintiff's complaint and are central to his claim.'") (citation and quotation marks omitted).

Human Trafficking Training and Technical Assistance Program, which provides support to attorneys and social service providers assisting trafficking survivors with legal needs. SAC ¶¶ 77-79; D. Ex. 4. Finally, Freedom was a subcontractor for Inner City Fund ("ICF"), which maintains a contract with OVC to manage and operate OVC's website for the Training and Technical Assistance Center ("TTAC").[3] SAC, ¶ 66.

OVC exercised its discretion in creating and administering TVPA training and technical assistance programs by including two provisions in the funding agreements that provide OVC significant oversight of the awardee's work. First, all of Freedom's grants include a product-review-and-approval provision, which requires the grantee to submit to OVC for review any training or other work product at least 60 days before its intended publication and to correct the product in response to comments generated by OVC ("OVC Review Provision"). *See e.g.,* D. Ex 3 at 7. Second, two of Freedom's awards (Housing Grant and SOC Grant) were made as cooperative agreements, which by nature, include greater involvement by OVC in the grant deliverables by advising the grantee that OVC will "provide input and re-direction to the project, as needed, in consultation with the recipient, and will actively monitor the project by methods including, but not limited to, ongoing contact with the recipient" and oversight and monitoring of the project.[4]

Three additional plaintiffs joined this lawsuit under the second amended complaint: (1) Life-Span, (2) Young Women's Christian Association Kalamazoo ("YWCA Kalamazoo"), and (3)

---

[3] OVC's TTAC website is a government website providing training and technical assistance for organizations serving victims of human trafficking. https://www.ovcttac.gov/. The statement of work to ICF's contract for TTAC is attached as D. Ex. 5.

[4] The cooperative agreement condition is found in Condition 48 in Freedom's Housing Grant and Condition 36 in its SOC Grant. See D. Ex. 1 at 18; D. Ex. 3 at 15.

Worker Justice Center of New York ("WJCNY") (collectively, "New Plaintiffs"). SAC, ¶¶ 80-88. New Plaintiffs provide direct services to victims of human trafficking and have also received past federal funding from DOJ for their anti-trafficking work. New Plaintiffs applied for one or more of the FY 2025 TVPA grants, which have not yet been awarded. All New Plaintiffs applied for the 2025 Survivor Services Grant, and one of the New Plaintiffs, YWCA Kalamazoo, also applied for the 2025 Housing Grant.[5] SAC, ¶¶ 186, 191, 196. Each of these applications was solicited through a Notice of Funding Opportunity ("NOFO"), which was released by OVC in December 2025 and contains terms and conditions that may be contained in the final grant award. SAC, ¶¶ 117-123.

**Alleged DOJ Interference with Plaintiffs' Grants**

Plaintiffs complain that OVC interfered with Freedom's *current* federal funding and will interfere with *future* funding that the New Plaintiffs expect to receive. *First*, plaintiff Freedom claims it has been harmed over the past year in connection with its existing grants due to OVC's implementation of two executive orders issued in January 2025. SAC, ¶¶ 89-103. Executive Order 14,151, *Ending Radical and Wasteful Government DEI program and Preferencing*, directs agencies to "terminate to the maximum extent allowed by law . . . 'equity-related' grants or contracts." *Id.* § 2(b)(i) ("J20 Order"). Executive Order 14,173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, directs the Office of Management and Budget to terminate government-wide diversity and equity "mandates, requirements, programs, [and] activities." *Id.* § 3(c)(iii) ("J21 Order"). Both termination provisions limit how agencies can use federal funds by directing them to terminate funding and programing related to diversity, equity, and inclusion (collectively, "EO Funding Restrictions"). Freedom challenges both EO Funding

[5] OVC issued five additional NOFOs authorized under the TVPA, for which no plaintiffs applied. SAC, ¶¶ 117 186, 191, 196.

Restrictions because they allegedly caused OVC to "censor" and otherwise interfere with Freedom's funded activity. SAC, ¶¶ 122-24.

Freedom admits that OVC has not terminated any of Freedom's grants over the past year due to the EO Funding Restrictions and, in fact, OVC has even extended several of them. SAC, ¶¶ 122-24. It nevertheless claims that OVC's implementation of the EO Funding Restrictions frustrated Freedom's ability to satisfy the grants' requirements. *Id.* For example, Freedom claims that OVC has demanded changes to Freedom's federally funded work product, including presentations it expected to give at a national conference that Freedom hosts. *Id.* It also claims OVC interfered with a federally funded housing summit in Minnesota by demanding to review information about conference presentations and other material. SAC, ¶ 136. Freedom further alleges that OVC issued guidance that listed 50 prohibited terms that cannot appear in any "OVC materials" (*i.e.*, web pages, training content, presentations, etc., that are owned, operated, or produced by OVC). *Id.* at ¶ 126.

*Second,* New Plaintiffs claim that OVC is interfering with *future* grants they are applying for because the grant awards may contain three provisions identified in the NOFOs for these grants. SAC, ¶¶ 117-123, 145-48. Two of the NOFO provisions advise the applicant that grant funds cannot be used to violate certain federal laws that may apply, including (1) immigration laws, such as, but not limited to 8 U.S.C. § 1373, and (2) applicable anti-discrimination laws (collectively, "NOFO Funding Restrictions"). SAC, ¶¶ 120-121; P. Ex. D at 11.[6] Neither relates to any programs beyond those that are federally funded. Moreover, the government will not decide whether these

[6] "P. Ex. __" refers to the referenced exhibit attached to plaintiffs' second amended complaint. P. Ex. D is a copy of the NOFO for OVC FY25 Services for Victims of Human Trafficking, which is the NOFO for which New Plaintiffs submitted an application. This NOFO can also be accessed through https://www.ojp.gov/funding/docs/ovc-2025-172520.pdf.

two NOFO Funding Restrictions will be included in particular TVPA grants until those grants are actually awarded.

The third challenged provision in the NOFOs is the nondiscrimination Certification Condition ("NOFO Certification Condition"), which is a condition that is required under the J21 Order[7] and *will be* included in every grant award under the grant's general terms and conditions. SAC, ¶ 119; P. Ex. D at 30. The NOFO Certification Condition requires grant recipients to certify that all their programs comply with federal anti-discrimination laws, and to acknowledge that such compliance is material to the federal government's payment decisions for the purposes of the False Claims Act, 31 U.S.C. § 3729(b)(4). *Id.* As explained below, none of these three NOFO provisions will apply unless and until an applicant receives *and* accepts a grant award.

**Prior Proceedings**

Plaintiff Freedom Network filed an initial complaint in 2025 (Dkt. 1) and a second amended complaint in May 2026 (Dkt. 103), which added the three New Plaintiffs. In their second amended complaint, plaintiffs challenge the four funding restrictions described above (the two EO Funding Restrictions and the two NOFO Funding Restrictions, collectively, "Funding Restrictions") as well as the certification condition (both the EO Certification Condition and the NOFO Certification Condition, collectively, "Certification Condition"). Plaintiffs claim that all challenged provisions violate the Constitution's First and Fifth Amendment, separation-of-powers and Spending Clause, as well as the APA. SAC, Cts. I-X.

[7] The J21 Order requires agencies to include in every contract and grant a provision requiring the grantee "to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws" and agree that the certification will be material to government payment decisions. EO 14,173, § 3(b)(iv).

Plaintiffs sue the President and two agencies and their heads—DOJ and its Attorney General,[8] and OMB and its Director. Plaintiffs allege that only one defendant, DOJ, has acted against them by (1) interfering with Freedom's ability to satisfy its existing TVPA grants; and (2) including the three challenged conditions in FY 2025 TVPA NOFOs. Plaintiffs seek declarations that the four Funding Restrictions and the Certification Condition are unlawful and unconstitutional, a preliminary and permanent injunction enjoining the defendants from enforcing them, and attorney fees and costs. SAC, at p. 78-79.

The court entered a preliminary injunction in March 2026 (Dkt. 90), finding a likelihood of success on (1) the First Amendment challenge to the Certification Condition; (2) the separation-of-powers and Spending Clause challenges to Certification Condition and the Funding Restrictions; and (3) the APA challenges to the Funding Restrictions. Dkt. 90. The injunction regarding the three NOFO Conditions was originally limited to the Services NOFO and then extended to the Housing NOFO after filing the second amended complaint. *Id.*; Dkt. 116.

## Argument

### I. Plaintiffs Cannot Sue the Non-DOJ Defendants for Reasons Specific to Them.

The court should dismiss the President as well as OMB and its Director based on considerations particular to those parties. First, plaintiffs lack both standing and a cause of action to sue the President. Plaintiffs identify no statutory cause of action to bring any challenge in the complaint. *See generally* SAC. In the absence of one, a court's power to enforce the Constitution stems from its equity powers under the Judiciary Act of 1789, not an implied right of action contained in the Constitution itself. *Trump v. CASA*, *Inc.*, 145 S.Ct. 3545, 3547 (2025); *Armstrong v. Exceptional Child Ctr. Inc.*, 575 U.S. 320, 324-27 (2015) (the "ability to sue to enjoin

[8] Defendants Office of Justice Programs and Office for Victims of Crime are components of DOJ.

unconstitutional action by state and federal officers is the creation of courts of equity"); 33 Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. Judicial Review § 8307 (2d ed. 2024 update). But those equity powers can only encompass powers that were "traditionally accorded by courts of equity," *Grupo Mexicano De Desarrollo v. All. Bond Fund*, 527 U.S. 308, 319 (1999), and there is no tradition of equitable relief against the President, *State of Mississippi v. Johnson*, 71 U.S. 475, 501 (1866); *see also Franklin v. Massachusetts*, 505 U.S. 788 (1992); *id.* at 827 (Scalia, J., concurring in part and in the judgment) ("apparently unbroken historical tradition supports the view" that courts may not order the President to "perform particular executive" acts).

Second, plaintiffs fail to establish standing to sue the non-DOJ defendants, even though "for every defendant, there must be at least one plaintiff with standing to seek an injunction." *Murthy v. Missouri*, 144 S.Ct. 1972, 1988 (2024). This action challenges three executive order provisions and agency action implementing them by including conditions in TVPA NOFOs, but plaintiffs sue the non-DOJ parties merely because the President directed them to implement the executive orders in various ways. SAC ¶¶ 35-36. That is not enough; plaintiffs need *facts* for each defendant showing "a concrete and particularized injury that is both fairly traceable to the challenged conduct and likely redressable by a judicial decision." *Spuhler v. State Collection Serv., Inc.*, 983 F.3d 282, 284 (7th Cir. 2020). Plaintiffs point to no specific unlawful act by any non-DOJ defendant under any executive order provision that caused them a redressable injury. Thus, the non-DOJ defendants should be dismissed. *See Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 35 (D.D.C. 2020) (dismissing the President as a defendant based on recognition that litigation disrupts effective government and plaintiffs could obtain their requested relief from other defendants).

## II. Plaintiffs' Challenges to the Four Funding Restrictions Should Be Dismissed.

The court should dismiss the challenges to the four Funding Restrictions and indeed has already rejected most of them in its prior decision. The four Funding Restrictions consist of the termination provisions in the J20 Order and the J21 Order as well as the two NOFO Funding Restrictions (immigration and nondiscrimination provisions). All four Funding Restrictions share a common analytical framework in that they impose governmental limitations relating to grantees' use of federal funding. Below, the defendants request that the court dismiss the already-rejected challenges to the Funding Restrictions, including for the reasons it rejected them before, as well as the remaining challenges based on the separation-of-powers and Spending Clause and based on the APA.

### A. No Article III Jurisdiction to Challenge Funding Restrictions

Plaintiffs have no standing to challenge any of the four Funding Restrictions because there is no injury-in-fact. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). As for the termination provision in the J21 Order, which requires termination of all government-wide DEI mandates and programs, § 3(c)(iii), plaintiffs are neither government agencies nor organizations that conduct government-wide DEI "programming for the government." *See Chicago Women in Trades v. Trump*, 778 F. Supp.3d 959, 977 (N.D. Ill 2025) ("*CWIT*") (rejecting standing for CWIT to challenge termination provision in J21Order); *Nat'l Urban League v. Trump*, 783 F.Supp.3d 61, 81 (D.D.C. 2025) ("*NUL*").[9] As for termination provisions in both the J20 and J21 Orders, none of plaintiffs' grants have been terminated, and there is no genuine threat of termination. Finally, even if the alleged grant-interference complaints by Freedom constitute an injury-in-fact, this

[9] This court previously found that Freedom Network lacked standing to challenge the J21 termination provision, which addresses government agencies rather than private parties. Dkt. 90 at 16-17.

injury is, at most, a breach of contract claim, which belongs only in the Court of Federal Claims based on Tucker Act principles. 28 U.S.C. §§ 1346, 1491; *see also See Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658 (2025); *Dep't of Educ. v. California*, 604 U.S. 650 (2025) (per curiam); ACT *NOW v. U.S. Dep't of Education*, 2026 WL 1847100 (N.D. Ill. June 26, 2026) (dismissed for lack of jurisdiction most of plaintiff's challenges to the funding decision, including claims under the APA, those alleging statutory and regulatory violations, and claims for constitutional violations under the due process and separation of powers clauses).

Finally, plaintiffs' challenges to the NOFO immigration and discrimination provisions are unripe for review for two reasons. *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967) (citation omitted) ("A case is fit for adjudication when the action in controversy is final and not dependent on future uncertainties."). As explained, OVC has not yet made a decision on whether these two NOFO Funding Restrictions will be included in the grant awards, and if so, in what form. Moreover, we won't know if plaintiffs have standing to challenge any of the NOFO provisions until grant awards are made.

**B. The Court Properly Rejected First Amendment Challenges.**

This court properly rejected First Amendment challenges to the Funding Restrictions. Dkt. 90 at 24-28. For these and other reasons, the court should dismiss the same First Amendment challenges in the second amended complaint.

Plaintiffs argue that the Funding Restrictions violate the First Amendment because they are vague, overbroad, and amount to viewpoint discrimination. SAC, Cts. I, II. These claims fail because the Funding Restrictions pertain to the government acting as *patron* to subsidize speech, as opposed to when it acts as sovereign to *regulate* it. "The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest . . . . In so doing, the government has not discriminated on the basis of viewpoint;

it has merely chosen to fund one activity to the exclusion of the other." *Rust v. Sullivan*, 500 U.S. 173, 193 (1991). Thus, as a "general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds. This remains true when the objection is that a condition may affect the recipient's exercise of its First Amendment rights." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) ("AID") (collecting cases).

The First Amendment can prohibit unconstitutional conditions on federal funding, but no violation occurs when the government specifies "the activities" it "wants to subsidize" and does not "leverage funding to regulate speech outside the contours of the programs itself." *AID*, 570 U.S. at 214-15. Here, none of the Funding Restrictions prohibits use of federal funds based on a grantee's speech or activities outside the scope of the funded activities — *i.e.*, they do not prohibit entities from engaging in protected speech on their "own time and dime." *Id.* at 218. Accordingly, the Funding Restrictions do not impose viewpoint discrimination or an unconstitutional condition on plaintiffs' speech. *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump* (*Diversity Officers*) No. 25-1189 at 7 (4th Cir. Mar. 14, 2025) (Harris, J., concurring); *see also NUL*, 783 F. Supp.3d at 98-101; *CWIT*, 778 F. Supp.3d at 986-7.

Nor can plaintiffs show the Funding Restrictions are unlawful based on the First Amendment coercive threat framework articulated in *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 198 (2024), which instead applies to government *coercion* when the government is acting as "sovereign," not funding limitations when the government is acting as "patron." Courts have applied the coercive threat framework when government officials send targeted communications threatening investigations and prosecutions, not when the government chooses whether to subsidize certain

speech. *Id.* As this court and others have found, this coercive threat framework does not apply to mere funding limitations. *CWIT*, 778 F. Supp.3d at 986 (distinguishing *Vullo*).[10]

Finally, insofar as plaintiffs contend that the Funding Restrictions impose a chilling effect on protected speech by being *vague*, that contention lacks merit when applied to funding decisions. The Supreme Court in *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569 (1998), rejected application of any demanding vagueness standard to government funding decisions. It concluded that when the government acts "as patron," it does not infringe on constitutionally protected speech even when it articulates funding standards with "imprecision." *Id.* at 589. Rather, "as it bears upon First Amendment concerns, the vagueness doctrine addresses the problems that arise from government regulation of expressive conduct," not "government grant programs." *Id.* at 599 (Scalia, J., concurring). As a result, no First Amendment concern exists even though, "as a practical matter," federal funding recipients "may conform their speech to what they believe to be" the "decisionmaking criteria in order to acquire funding." *Id.* at 588; *CWIT*, 778 F. Supp.3d at 987 (citing *Finley*).

---

[10] This court rejected plaintiffs' First Amendment claims relating to the Funding Restrictions after applying the three-part test in *Walker v. Tex. Div. Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 201 (2015) and concluding that TVPA-related speech is government speech, not private speech. Dkt. 90 at 25-28. Defendants agree with the court's ultimate conclusion but for different reasons. The *Walker* case did not involve speech and government funding, but rather addressed the issue of whether a state license plate constituted government speech and thus allowed the state to restrict specialty license plate designs requested by car owners. As such, the Supreme Court did analyze the case under *Rust* and its progeny, which considers all government-funded programs to constitute government speech for purposes of the First Amendment analysis, unless the program being funded is intended to create a limited public forum for private speech. *See Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995) (involving a First Amendment government funding analysis in the context of a *limited public forum*). The government's position that the *Walker* holding and its three-part test is inapplicable to government funding cases is consistent with a recent decision in this district involving a similar case challenging on First Amendment grounds the government's funding restrictions based on a grantee's DEI-related use of federal funds. *See* ACT *NOW v. U.S. Dep't of Education*, 2026 WL 1847509 (N.D. Ill. June 26, 2026).

**C. The Court Properly Rejected the Due Process Challenges.**

None of the Funding Restrictions are unconstitutionally vague for the same reasons this court rejected similar due process claims previously in this case and in *CWIT*. Dkt. 90 at 28-30; *CWIT*, 778 F. Supp.3d at 987-89. Starting with the EO Funding Restrictions, and even assuming that courts can apply the vagueness doctrine to render void the President's directives to his own subordinates, none of that direction is unconstitutionally vague. This court correctly found that the terms "equity-related" and "to the maximum extent allowed by law" contained in the J20 Order are not unconstitutionally vague. Dkt. 90 at 28-30. When "the Government is acting as a patron rather than as a sovereign," as in the federal funding context here, "the consequences of imprecision are not constitutionally severe." *Finley*, 524 U.S. at 589. *See National Association of Diversity Officers in Higher Education v. Trump*, 167 F.4th 86, 101-2 (4th Cir. 2026) ("*NADOHE")*, (applying *Finley* and rejecting plaintiff's due process challenge to the termination provision in the J20 Order); *NUL*, 783 F. Supp.3d at 95-96. So too should this court find there is nothing unconstitutionally vague in the EO Funding Restriction concerning termination of government-wide DEI programs in the J21 Order (assuming plaintiffs have standing to challenge the J21 Order). And to the extent future grant awards contain the two challenged NOFO Funding Restrictions, it can hardly be considered unconstitutionally vague in the context of federal funding to remind grantees not to use federal funds to violate applicable federal laws passed by Congress.[11]

Plaintiffs' due process challenges to the Funding Restrictions should also be dismissed for three additional reasons. *First*, a "void-for-vagueness challenge is ultimately a due-process claim," so "a plaintiff must allege that he was deprived of a constitutionally-protected property or liberty

[11] This court previously rejected Freedom's due process claims regarding the Funding Restrictions, concluding that although each restriction contained vague language, it was less "'constitutionally severe' in the context of government funding." Dkt. 90 at 28-29. The court did not reach defendants' additional three arguments raised here. *Id.*

interest," but plaintiffs allege no such deprivation from any executive order provision. *McClelland v. Katy Ind. Sch. Dist.*, 63 F.4th 996, 1013 (5th Cir. 2023). And plaintiffs lack any property interest in its "'ordinary' or 'routine' government contracts" and grants. *NUL*, 783 F. Sup.3d at 93-94; *Gizzo v. Ben-Habib*, 44 F. Supp. 3d 374, 385 (S.D.N.Y. 2014); *New Vision Photography Program, Inc.*, *v. District of Columbia*, 54 F. Supp. 3d 12, 29 (D.D.C. 2014) ("The Supreme Court has never held that government contracts for goods and services create property interests protected by due process.") (citation omitted). Additionally, no provision implicates protected speech for reasons discussed above.

*Second*, the vagueness doctrine addresses "two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *F.C.C. v. Fox Television Stations*, *Inc.*, 567 U.S. 239, 253 (2012). Thus, courts have traditionally applied the vagueness doctrine to *statutes* that *proscribe conduct* because the doctrine "guarantees that ordinary people have 'fair notice' of the conduct that a *statute proscribes*," *Sessions v. Dimaya*, 584 U.S. 148, 156 (2018) (plurality) (emphasis added), and otherwise limit the doctrine's reach to statutes and regulations governing primary conduct. *FCC v. Fox Television Stations*, *Inc.*, 567 U.S. 239, 253 (2012). No purpose of the doctrine is implicated, however, when the President provides directives to his subordinates. *NUL,* 783 F.Supp.3d at 94-95 (rejecting Fifth Amendment vagueness challenges to the termination provision in the J20 Order).

*Third*, the only appropriate posture for plaintiffs' vagueness challenges is an as-applied one. "Objections to vagueness under the Due Process Clause rest on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk." *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988). No specific case is at issue for plaintiffs'

*facial* challenge. While the Supreme Court recognized a rare exception permitting facial vagueness challenges in *Johnson v. United States*, 576 U.S. 591 (2015), that exception has only been applied once outside the criminal context, and even there, the Court justified its extension to a civil deportation statute by explaining that "deportation is a particularly severe penalty, which may be of greater concern to a convicted alien than any potential jail sentence," *Dimaya*, 584 U.S. at 157. Thus, the exception does not apply to the President's directives to his subordinates.

**D. Separation-of-Powers and Spending Clause Claim Lacks Merit.**

Plaintiffs' separation-of-powers and Spending Clause challenges to the Funding Restrictions should be dismissed, and the court should reconsider its conclusion that plaintiffs are likely to succeed on these claims.[12] As explained below, all purported separation-of-powers and Spending Clause challenges to the Funding Restrictions should be dismissed for three reasons: (1) they are not *constitutional* challenges; (2) even if they were constitutional challenges and sought no "money damages," they would fail because the APA provides a path of judicial review; and (3) they fail on the merits because Congress granted DOJ discretion to impose reasonable limitations on how TVPA grants are spent.

**a. Plaintiffs' Challenges Fail Under *Dalton*.**

The Supreme Court's decision in *Dalton v. Specter*, 511 U.S. 462 (1994), forecloses plaintiffs' ability to raise statutory arguments with constitutional dressing. There, the Court reversed a federal circuit court that had "reasoned, relying primarily on *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), that whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine." *Id.* at 471. The Court

[12] This court previously found that Freedom was likely to succeed on its challenges to the Funding Restrictions under the separation-of-powers and Spending Clause, but it did not address whether the court can exercise its equitable jurisdiction over plaintiffs' non-statutory constitutional claims, as explained herein. Dkt. 90 at 30-40.

stated this reasoning was incorrect because the Supreme Court's "cases do not support the proposition that every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Id.* at 472. Instead, the Court "often distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* Therefore, "claims simply alleging that the President [or an executive officer] has exceeded his statutory authority are not 'constitutional' claims, subject to judicial review." *Id.* at 473; *see Climate United Fund v. Citibank, N.A.*, 2025 WL 2502881, at *10 (D.C. Cir. Sept. 2, 2025) (citing cases); *New York v. NSF*, No. 25-cv-4452, 2025 LEXIS 148779 (S.D.N.Y. Aug. 1, 2025). Because plaintiffs' constitutional claims focus entirely on the contention that OVC has not acted consistent with its statutory obligations, such claims are untenable under *Dalton*.[13]

**b. Plaintiffs Cannot Invoke the Court's Equity Powers.**

Plaintiffs' purported separation-of-powers and Spending Clause claims also fail even if they were constitutional challenges and sought no "money damages." In such case, these claims arise under the court's equity powers and must be dismissed because the APA provides a path of judicial review. *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665 (2025).

Plaintiffs' challenge seeks non-statutory review under the court's equity powers. But non-statutory review provides a "catch-all remedy" only when "*no statute specifies a path of judicial review*." *Employers Ins. of Wausau v. Browner*, 52 F.3d 656, 662 (7th Cir. 1995) (emphasis added). Because non-statutory review "could become an easy end-run around the limitations" of "judicial-

[13] This court rejected defendants' *Dalton* argument in *CWIT* based on its conclusion that, as related to the WANTO grant at issue in that case, Congress left no discretion to the Executive and mandated it spend funds for "equity-related" purposes. *CWIT*, 2025 WL 1331743, at*5 (N.D. IL, May 7, 2025). As explained above, Congress issued no such mandates related to grants authorized under the TVPA, and thus, *Dalton* should apply.

review statutes," the Supreme Court has "strictly limited" it. *Nuclear Regul.*, 605 U.S. at 681. Indeed, a non-statutory review claim "is essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *Id.* at 681-2; *see also Armstrong*, 575 U.S. at 327-28 (the power of federal courts of equity to enjoin unlawful executive action is subject to limitations).

Importantly, the Supreme Court recently held that non-statutory review is "unavailable if, as is usually the case, a statutory review scheme provides aggrieved persons 'with a meaningful and adequate opportunity for judicial review,' or if a statutory review scheme forecloses all other forms of judicial review." *Nuclear Regul.*, 605 U.S. at 681 (quoting *Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991)); *see also Metropolitan Transportation Auth. v. Duffy*, 2026 WL 588117, at *61-62 (S.D.N.Y. Mar. 3, 2025) (based on decision in *Nuclear Regul.*, court dismissed *ultra vires* count because plaintiffs had meaningful and adequate opportunity for judicial review under the APA). This is a usual case where a statutory path of judicial review exists.

First, if plaintiffs bring disguised contractual claims, only the Court of Federal Claims can provide a path of judicial review. *DeVillier v. Texas*, 601 U.S. 285, 293 (2024) (reversing non-statutory exercise of jurisdiction where the plaintiff had an available statutory "cause of action" for compensation that it did not exercise); *Knick v. Township of Scott*, 588 U.S. 180, 201 (2019) (non-statutory equitable relief was unavailable because of availability of a statutory "adequate provision" for obtaining relief under the Tucker Act); *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 763-764 (D.C. Cir. 2022).

Second, if plaintiffs bring constitutional allegations seeking no "money damages, they would have a different "means of vindicating [their] rights without non-statutory review: the APA." *Commonwealth of Puerto Rico v. United States*, 490 F.3d 50, 59-60 (1st Cir. 2007). The APA allows plaintiffs seeking "relief other than money damages" to seek "judicial review" on whether

final agency action, 5 U.S.C. § 702, and agency action leading up to it, § 704, is "contrary to constitutional rights," § 706(2)(B). But if "the APA" can "provide adequate relief," as the APA could here, "an equitable remedy via non-statutory review ought not be available." 33 Fed. Prac. & Proc. Judicial Review § 8307 (2d ed.) (May 22, 2025 update); *Ctr. for Biological Diversity*, 453 F. Supp. 3d at 48 ("The Court doubts that Plaintiffs can bring an equitable claim when a statutory cause of action is available to it" under the APA); *Fed. Express Corp.*, 39 F.4th at 763.

Plaintiffs have not shown that either mechanism for review—under the APA or the Tucker Act—is "constitutionally insufficient" such that it "must have a non-statutory cause of action to vindicate" its rights. *Puerto Rico*, 490 F.3d at 60.

**c. Plaintiffs' Challenges Fail on the Merits.**

This court has already found that a *facial* challenge to the termination provision in the J20 Order fails because plaintiff cannot show that the provision "conflicts with *every* statute that appropriates funds for grants," as it must to succeed on any facial challenge. Dkt. 90 at 37-38; *CWIT*, 778 F. Supp.3d at 990 (citing *Ezell v. City of Chicago*, 651 F.3d 684, 698 (7th Cir. 2011)). For this same reason, plaintiffs' facial challenge to the J21 termination provision concerning government-wide DEI programs also fails, to the extent plaintiffs have standing to challenge it.

Plaintiffs' *as-applied* challenges to each of the Funding Restrictions fail because these restrictions do not conflict with any Congressional statute. Indeed, Congress provided DOJ — the same agency that investigates and prosecutes violations of federal human trafficking laws — with discretion to both create and administer grant programs under the TVPA. This includes the discretion to set goals and priorities for the program, select grantees, determine how much funding each grantee receives, and determine what activities should be funded. *See e.g. Morton v. Ruiz*, 415 U.S. 199, 230-231 (1974) (explaining that when Congress provides limited funding to cover services for non-federal entities, the agency administering the funding must, in the absence of

statutory direction from Congress, be able to create classifications and eligibility requirements to allocate the limited funding). Neither the appropriations act nor the underlying TVPA statute limits the type of grant programs OVC can create or how it should administer them. Thus, Congress did not implicitly or expressly require OVC to spend money under TVPA grant programs that would fund equity-related projects or allow grantees to use the funds to violate applicable federal laws.

Nor can plaintiffs point to any applicable Congressional directive to the contrary.[14] Nowhere does Congress indicate that TVPA grants (or even some portion of them) must be directed to assist human trafficking victims of only a particular race or gender or immigration status. Nor does Congress require that training and technical assistance provided with TVPA funding must include certain equity-related language. The fact that Congress may have used certain equity-related words in the statute or legislative history, does not mean that federally funded training must use those same words. Thus, while plaintiffs may wish to provide services to only certain genders or races of trafficking victims, and to infuse DEI language into its training, this is not required by Congress.[15]

---

[14] Plaintiffs claim that Congress has recognized that women and girls are not the only victims of trafficking and has "expanded the scope of the TVPA to include 'men, women, and children who are diverse with respect to race, ethnicity, and nationality.'" SAC, ¶ 15. But this language merely acknowledges the diversity of trafficking victims. It does not suggest, much less require, that grant programs must serve only certain genders or races of trafficking victims or that they include diversity, equity, or inclusion initiatives.

[15] Plaintiffs claim that the immigration NOFO Funding Restriction conflicts with the confidentiality requirement under the Violence Against Women Act of 1994, 34 U.S.C. §12291(b)(2) ("VAWA Confidentiality Provision"). SAC, ¶ 23. Indeed, both the VAWA Confidentiality Provision and the immigration Funding Restriction currently appear in OVC's anti-trafficking NOFOs. However, whether grantees must comply with either provision depends on whether OVC includes them as formal requirements in the final grant award. Because awards have not yet been issued, it is premature to determine which conditions will apply to specific awards, the form those conditions will take, and whether any conflict exists between those conditions. If OVC issues an award containing provisions that appear to conflict, as Freedom predicts, OVC will provide guidance to resolve the conflict.

This court noted in its previous opinion that Congress expressly required DOJ to include certain conditions that prohibit the distribution of TVPA funding to grantees who promote prostitution or engage in human trafficking, but it did not similarly require DOJ to include the Funding Restrictions challenged by plaintiffs in this case. Dkt. 90 at 32-34. However, Congress's directive that the agency must include certain conditions in funding agreements does not mean that Congress implicitly denied the agency discretion to likewise include additional funding restrictions when administering the grant program. This court acknowledged that the TVPA funding provisions created by Congress 'are "relatively broad," and as explained above, provide DOJ with significant discretion in deciding program goals, as well as selecting grantees, award amounts, and funded activities. Dkt. 90 at 31-32. Given this discretion, DOJ is entitled to impose additional funding restrictions, as long as they do not conflict with the goals of the TVPA or any funding conditions Congress imposed.[16] Additionally, DOJ is not using the "power of the purse" as a tool to enforce anti-discrimination and immigration laws. Dkt. 90 at 36. The two NOFO Funding Restrictions (immigration and nondiscrimination) do not require grantees to take any affirmative steps to enforce these federal laws, but simply prohibit grantees from using federal funds in ways that violate these laws.

---

16 The only possible conflict this court noted was between the TVPA requirement under § 7105 that agencies expand services to aliens classified as nonimmigrants under 8 U.S.C. 1101(a)(15)(T)(ii) and DOJ's Immigration Restriction, which the court stated "could be understood to prohibit providing services to undocumented immigrants." Dkt. 90 at 35. But even if the Immigration Restriction is ultimately included in the grants at issue, it would not conflict with this TVPA mandate to provide services to aliens classified as nonimmigrants under 8 U.S.C. 1101(a)(15(T)(ii). Such aliens are persons *lawfully* admitted as "T nonimmigrants" and providing services to such persons is a core program objective under the TVPA. Since providing services to such aliens in no way violates immigration laws, there can be no conflict between the TVPA requirement under § 7105 and the Immigration Restriction. Nor have plaintiffs suggested otherwise.

Finally, plaintiffs claim that the Funding Restrictions are unrelated to the purpose of the federal funding. SAC, ¶ 212. But the reasonable relation requirement is a "low threshold," and "not demanding." *City of Los Angeles v. Barr*, 929 F.3d 1163, 1175 (9th Cir. 2019). The Supreme "Court has never struck down a condition on federal grants based on th[e] relatedness prong." *Id.* But there is no need for this court to break new ground, as agencies have long applied grant restrictions like the two NOFO Funding Restrictions prohibiting use of federal funds to violate federal law to further all manner of purposes and objectives. *See, e.g.*, 2 C.F.R. § 200.303(b) (requiring all recipients of federal grants to "[c]omply with the U.S. Constitution, Federal statutes, regulations, and the terms and conditions of the Federal award"). This is certainly true when the provisions at issue are simply funding limitations that restrict the use of federal funds, rather than funding *conditions* that may apply beyond the funded work.

**E. APA Claims Lack Merit.**

Relying primarily on arguments made in support of its separation-of-powers' claims (*i.e.*, the NOFO Funding Restrictions conflict with, and are unrelated to, the TVPA), plaintiffs also allege that the challenged NOFO Funding Restrictions violate the APA. SAC, Cts. VIII-X. These claims should be rejected as an initial matter because they do not constitute final agency action as required under the APA. *See* 5 U.S.C. § 704; *Air Espana v. Brien*, 165 F.3d 148, 152 (2d Cir. 1999) ("The APA explicitly requires that an agency action be final before a claim is ripe for review."). As explained, OVC has made no final decision as to whether and in what form it will include the two NOFO Funding Restrictions in the final awards.[17] However, even if the court were to reach the

[17] These provisions are included in the NOFO under "Unallowable Uses of Funds" to advise applicants that they may be included in the final grant award. P. Ex. D, at 11. They are not contained in the "General Conditions" for FY 2025 awards (accessed through "Legal Overview-FY 2025 Awards" in P. Ex. D. at 30), which lists the conditions that *will be* incorporated into the TVPA grant awards. *See Chicago v. Noem*, 2025 WL 3251222 at *6 (N.D. Ill, Nov. 21, 2025), (noting that conditions contained in the agency's "Standard Terms and Conditions" *will be*

merits of Freedom's APA claims, they would fail for the same reasons explained above — these NOFO Funding Restrictions are related to, and consistent with, the TVPA.

Additionally, a decision to include NOFO Funding Restrictions in the final awards would not be arbitrary or capricious. Judicial review under the APA's arbitrary-and-capricious standard "is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). That review is "narrow." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). All that is required is for the agency to "act[] within a zone of reasonableness." *FCC v. Prometheus*, 592 U.S. at 423.

There is nothing new nor arbitrary and capricious about prohibiting grantees from using federal funds to violate applicable federal law — which is all the two challenged NOFO Funding Restrictions require. The authority to withhold payments from grantees based on noncompliance with federal law is well established in the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 2 C.F.R. Part 200, which broadly recognize agency authority to withhold, terminate, suspend, disallow, or recover federal funding. *See* 2 C.F.R. §200.300(a) (DOJ must administer federal awards in a manner that ensures "that Federal funding is expended and associated programs are implemented in full accordance with the U.S. Constitution, applicable Federal statutes and regulations."). Plaintiffs' existing grant agreements confirm that if an award recipient is noncompliant with, among other things, "applicable federal statutes," the agency can "take other remedies," including "actions to disallow costs, recover funds, wholly or partly suspend or terminate the award, initiate suspension and debarment proceedings, withhold further federal awards, or take other remedies that may be legally available."

contained in all agency grants issued in the 2025 fiscal year, thereby establishing a final agency decision for APA purposes).

The NOFO Funding Restrictions, again, do not impose new obligations, nor do they extend those obligations outside the scope of the grant funds. Although these provisions may have been worded differently in the past, DOJ has long required that recipients not use federal funds to violate applicable law. Thus, these are not "new conditions" but rather are reminders of eminently reasonable funding limitations.[18]

## III. Plaintiffs' Challenges to the Certification Condition Should Be Dismissed.

This court should dismiss plaintiffs' challenges to the Certification Condition on both jurisdictional grounds and on the merits for the reasons set forth below and those contained in three recent cases issued since the court's decision in *CWIT*. *See NADOHE*, 167 F.4th at 102-4; *NUL*, 783 F. Supp.3d at 102-104; *San Francisco A.I.D.S. Found. v. Trump*, 786 F. Supp.3d 1184, 1222 (N.D. CA. 2025).

### A. No Standing to Challenge Certification Condition

Plaintiffs lack standing to challenge the Certification Condition because certifying compliance with federal civil rights laws is not an injury-in-fact. Plaintiffs bringing pre-enforcement challenges under the First Amendment "must make one of two showings to establish an injury in fact." *Speech First v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020). "*First*, a plaintiff may show an intention to engage in a course of conduct arguably affected by a policy, and that he faces a credible threat [that] the policy will be enforced against him when he does." *Id.* (emphasis added).

[18] This court notes that although federal grantees were previously required to comply with federal anti-discrimination laws, the government may be shifting its interpretation of these laws. Dkt. 90 at 47. But plaintiffs are not being asked to sign onto the Administration's policy preferences, or even the Administration's views about the proper interpretation of federal anti-discrimination laws. Plaintiffs are simply agreeing not to violate the laws currently in place. They may disagree with the government's legal interpretations and policy preferences in this area, but that has little to do with the condition, which simply asks funding recipients to certify that they are complying with anti-discrimination laws.

"*Second*, a plaintiff may show a chilling effect on his speech that is objectively reasonable, and that he self-censors as a result." *Id.* (emphasis added).

Plaintiffs do not satisfy the first prong because they do not claim any intent to violate the civil rights laws, which is the only conduct covered. The Certification Condition in this case requires nothing more than a statement that grantees comply with laws they are already required to follow. Thus, plaintiffs have not claimed that they plan to illegally discriminate within the meaning of the Certification Condition, and they have offered no credible reason to believe that the government will nevertheless treat their certification as false and take enforcement action accordingly.

Nor do plaintiffs satisfy the second standing test in a pre-enforcement First Amendment challenge. They cannot rely on any chill traceable to their erroneous belief that the Certification Condition implicates *every* program that "promotes" DEI. However sincerely felt, fear of adverse action cannot be objectively reasonable if it is based on an objectively incorrect understanding of the law. *See Speech First*, 968 F.3d at 638. To the extent plaintiffs have changed their behavior because they erroneously believe that the Certification Condition implicates all DEI activities rather than only those that are independently unlawful, they cannot manufacture standing merely by inflicting harm on themselves based on their fears of a different executive order than the one the President signed. And even if plaintiffs had established an objectively reasonable chill as to their non-federally funded speech, they would still lack standing because they have not shown any "self-censor[ship] as a result." *See Speech First*, 968 F.3d at 638. Indeed, Freedom's own allegations demonstrate that rather than self-censoring, it has simply responded to directives from OVC about modifying funded content to align with policy objectives in the EOs.

**B. First Amendment Claim Lacks Merit.**

Plaintiffs' First Amendment challenge to the Certification Condition fails on the merits for similar reasons. There is nothing remotely unlawful about requiring recipients of federal grants to

affirm that any DEI programs they operate comply with the antidiscrimination laws and to acknowledge that the government considers compliance with such laws are material to its payment decisions.

At bottom, the Certification Condition does not violate the First Amendment because it imposes no new requirements on plaintiffs' primary conduct. It does not require plaintiffs to certify that they do not advocate for or promote DEI. *NADOHE*, 167 F.4th at 102-4; *NUL*, 783 F.Supp.3d at 102-104; *San Francisco A.I.D.S. Found.*, 783 F. Supp.3d at 102. Nor does it require plaintiffs to certify that they do not advocate for violations of the law. *NADOHE*, 167 F.4th at 103; *San Francisco A.I.D.S. Found.*, 786 F. Supp.3d at 1222 (while "the First Amendment may protect speech that advocates for violation of law, it does not protect activities that directly violate antidiscrimination law."). Rather, it simply requires plaintiffs to certify compliance "with federal antidiscrimination laws, which the First Amendment doesn't confer a right to violate." *NADOHE*, 167 F.4th at 103. Such existing antidiscrimination laws include Title VI of the Civil Rights Act of 1964, which applies to all recipients of federal assistance, 42 U.S.C. § 2000d-1—rules that are already binding independent of any certification requirements. *Id*. at 104 (existing federal law "already demands such compliance"). The Certification Condition does nothing more than require a certification that these pre-existing obligations are being honored.

Nor does the Certification Condition require a certification that a grantee's DEI programs conform with some particular interpretation of federal law that the government has yet to announce. Rather, like other longstanding certification requirements, it simply requires entities to acknowledge their existing obligations under already "applicable Federal anti-discrimination laws" and to recognize that they may face liability if they make a knowingly false statement in this respect. If the government "misinterprets federal antidiscrimination law," then plaintiffs will have ample future opportunity to "challenge that interpretation in a specific enforcement action."

*NADOHE*, 167 F.4th at 104. But that remote possibility cannot support a facial First Amendment challenge today.

In rejecting the above argument in connection with the preliminary injunction order, this court noted that the government has provided no guidance on what "illegal DEI" and "programs promoting DEI" mean, and without such, grantees may be chilled or risk losing grants or become subject to liability under the False Claims Act. Dkt. 90 at 23. However, neither of these terms are contained in the Certification Condition that plaintiffs challenge in this case. Consistent with directive in the J21 Order to include certification conditions in grants *to the extent allowed by law*, the Certification Condition crafted by DOJ for use in TVPA grants makes clear that it only covers DEI programs that violate existing discrimination law and does not suggest that "programs promoting DEI" alone are subject the certification provision. Accordingly, the Certification Condition at issue in this case suffers none of the defects this court highlights and, pursuant to the directive in the J21 Order, DOJ has crafted it consistent with the law, including the First Amendment.

**C. Due Process Claim Lacks Merit.**

The Fifth Amendment challenge to the Certification Condition is a nonstarter. As the defendants explained above, the vagueness doctrine is inapplicable here. *Supra* at 13-15. Plaintiffs have also identified no protectable property interest in the routine grants or contracts at issue and no liberty interest in any speech since the Certification Condition does not apply to speech. Finally, even if the challenge was viable, the Certification Condition is not vague because it concerns compliance with established federal antidiscrimination law. S*upra* at 11-13; *see also NUL*, 783 F.Supp.3d at 96 (rejecting vagueness challenge to the Certification Condition).

**D. Separation-of-Powers and Spending Clause Claim Lacks Merit.**

Plaintiffs' separation-of-powers and Spending Clause challenge to the Certification Condition is based entirely on the argument that Congress did not authorize DOJ to impose this condition. This claim fails at the threshold because it is a statutory claim disguised as a constitutional one precluded by the Supreme Court's decision in *Dalton*. *See supra*, at 13-14. And even if this claim were a constitutional challenge under the court's equity powers, it would still be subject to dismissal because the APA provides a path of judicial review. *See supra,* at 17-18. In any event, this challenge fails on the merits because OVC is duly authorized, and indeed is *required*, to include conditions to ensure that recipients comply with anti-discrimination laws. *See* 2 C.F.R. § 200.300(a).

As an initial matter, any facial challenge to the certification provision in the J21 Order lacks merit because plaintiffs cannot show that the provision's requirement that recipients certify that they do not operate illegal DEI programs is unconstitutional in all applications. *See Ezell*, 651 F.3d at 698. Additionally, while "new conditions on federal funds" may implicate separation of powers, *see Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 516 (N.D. Cal. 2017) (emphasis added), no such concern arises when the Executive merely reinforces preexisting legal obligations. Here, the Certification Condition imposes no new requirements, adopts no new construction of any federal anti-discrimination law, and does not declare all DEI to be illegal. *See NADOHE*, 167 F.4th at 102-4; *NUL*, 783 F. Supp.3d at 102-104; *San Francisco A.I.D.S. Found*, 786 F. Supp.3d at 1222. Indeed, OVC is *required* to include conditions to ensure that recipients comply with anti-discrimination law. *See* 42 U.S.C. § 2000d; 2 C.F.R. § 200.300(a); 2 C.F.R. § 200.211(c)(1)(ii); § 200.303(b). The Certification Condition sensibly implements Title VI. That Congress did not

specifically spell out in the TVPA that OVC must enforce anti-discrimination laws in connection with TVPA grants does not remove OVC's authority to ensure that recipients follow those laws.[19]

## Conclusion

For the foregoing reasons, the defendants request that plaintiffs' second amended complaint be dismissed.

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

By: s/ Patrick Johnson
PATRICK JOHNSON
Assistant United States Attorneys
219 S. Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 353-5327
patrick.johnson2@usdoj.gov

[19] For these same reasons, as well as those above regarding plaintiffs' APA challenges to the NOFO Funding Restrictions, *supra,* at 21-23, plaintiffs' APA challenge to the Certification Condition should also be dismissed. Although the Certification Condition is a condition that extends beyond the scope of the funded programs, these obligations are not new, as plaintiffs are already required to comply with applicable nondiscrimination laws.