UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| FREEDOM NETWORK USA, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 25 C 12419 |
| | ) | |
| v. | ) | Judge Kennelly |
| PRESIDENT DONALD J. TRUMP, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' REPLY MEMORANDUM**
**IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

Plaintiffs' opposition to defendants' motion to dismiss offers no basis for enjoining provisions in Executive Orders 14,173 ("J21") and 14,151 ("J20") that are under challenge in this litigation. Dkt. 137 (Resp.). Accordingly, the court should dismiss this action based on the jurisdictional and merits arguments presented in defendants' opening memorandum as well as the additional arguments presented below. Dkt. 123 (Mem.).

Pertinent facts were set forth in defendants' moving brief and are adopted by reference here. Mem. at 1-7. As that brief described in greater detail, plaintiffs are challenging termination provisions of J20 and J21, as well as two related funding conditions that *might* apply to future successful applicants for grants at issue in this litigation. These four clauses are collectively referred to as Funding Restrictions. The remaining provisions plaintiffs challenge — namely, the certification provision found in J21 and the corresponding funding condition that will apply to each successful future applicant — are collectively referred to as a Certification Condition.

**Argument**

**I. Lack of Standing**

**A. Non-DOJ Defendants**

At the outset, plaintiffs do not challenge dismissal of the President as a defendant. Resp. at 8-10. Rather, they solely challenge dismissal of OMB as a defendant. *Id.* Because this

challenge, as further discussed below, fails to show that they have standing with respect to OMB, the court should reject it.

Plaintiffs first contend that defendants' argument "is based only on a single inapposite case." *Id.* at 8. In particular, they contend that *Spuhler v. State Collection Serv., Inc*., 983 F.3d 282 (7th Cir. 2020) is "inapposite" because "it is a summary judgment case" with "no application," because "it involved a claim against a bill collector," and because "the court did not decide the case on the standing argument Defendants present here." Resp. at 8. A review of that case shows, however, that it is amply pertinent in the context of a standing-related challenge because it discusses, at length, the fundamental principles underlying this circuit's jurisprudence on the question of requirements plaintiffs must meet in order to demonstrate standing at various stages of litigation. *Spuhler v. State Collection Serv., Inc*., 983 F.3d at 285-86 (overviewing Article III standing requirements throughout litigation at length). Especially pertinently, *Spuhler* articulates a well-established principle that plaintiffs must allege *facts* of "a concrete and particularized injury that is both fairly traceable to the challenged conduct and likely redressable by a judicial decision." *Id.* at 284 (internal citation omitted). Because these principles do not turn on whether defendants are governmental agencies and because plaintiffs do not explain why the procedural posture in *Spuhler* renders them inapplicable, their argument that *Spuhler* is of no relevance is without merit.

Plaintiffs next contend that they have established standing because terminations under the J20 termination provision are to be effectuated "'in consultation with . . . the Director of OMB, . . . as appropriate.'" Resp. at 9 (quoting termination provision). At a minimum, this argument is insufficient to support plaintiffs' standing to challenge any provisions apart from the J20 termination provision. Further, contrary to plaintiffs' theory that the cited language indicates that any "decisions (and any injuries) therefore flow from the work of all" defendants, *id.*, the phrase "as appropriate" merely confers *discretion* on certain individuals to engage in consultation prior to terminating an equity-related award, rather than a mandatory duty to do so. *La Cuna de Aztlan*

*Sacred Sites Prot. Circle Advisory Comm. v. U.S. Dep't of the Interior*, 2013 WL 4500572 at *9 (C.D. Ca. Aug. 16, 2013) ("The words 'as appropriate' demonstrate that the extent of information gathering in this regulation is committed to the discretion of the agency.").

Moreover, plaintiffs' opposition briefing fails to articulate *facts* of "a concrete and particularized injury that is both fairly traceable to the challenged conduct and likely redressable by a judicial decision." *Spuhler* at 284. In particular, plaintiffs allege no facts about (a) whether any official engaged in a "consultation" concerning a relevant grant or contract with them, (b) the details of such consultation, (c) how the consultation harmed plaintiffs, and (d) how the court can redress an "injurious" consultation or what such relief might look like. Instead, plaintiffs rely on *Perkins Coie LLP v. U.S. Dep't of Justice*, 780 F.Supp.3d 227 (D.D.C. 2025) for the proposition that, in cases involving implementation of an executive order, proper defendants encompass all agencies that are "charged with implementing an executive order's directives." Resp. at 9. Adopting this argument would confer standing on plaintiffs to sue all agencies and agency heads throughout the Executive Branch. J21 § 3 (requiring, among other items, that "the head of each agency" include certain terms in every award going forward by way of effectuating compliance). Moreover, even such adoption would not suffice with respect to OMB since the director of OMB, as noted above, is solely engaged with consultations as needed and is not otherwise charged with implementing any directives that pertain to the challenged grants. Because standing doctrine, as the Seventh Circuit reminds in *Spuhler*, requires more particularized showings for each defendant and for each challenge, plaintiffs' failure to plead the specific facts outlined above compels the conclusion that they have failed to articulate how and why they have standing with respect to OMB, even if their interpretation of the language of the J21 termination provision were correct.

Plaintiffs' final standing-related argument with respect to non-DOJ defendants is that "OMB has affirmatively acted to enforce the EOs" by issuing Memorandum M-25-13, dated January 27, 2025. Resp. at 9. At the outset, this memorandum is now rescinded. Matthew J.

Vaeth, *Memorandum for Heads of Executive Departments and Agencies*, Office of Management and Budget (Jan. 29, 2025), available at https://www.whitehouse.gov/wp-content/uploads/2025/03/M-25-14-Rescission-of-M-25-13.pdf ("OMB Memorandum M-25-13 is rescinded.") (last visited on September 17, 2026).[1] And even before it was rescinded, the memorandum made no reference to any terminations or certifications; instead, it merely tasked federal agencies with comprehensive reviews to determine whether the work of federal funding recipients aligned with the current administration's priorities.[2] Because plaintiffs do not explain how and why ordering this comprehensive review violates law, the mere issuance of Memorandum M-25-13 cannot provide proper basis for their claim that they have standing to sue OMB. To the extent that plaintiffs ground their argument in the idea that the reviews OMB requested via this memo were bound to result in decisions that would cause them injury, courts have held that "the mere possibility that some agency might make a legally suspect decision" on funding "does not justify an injunction against enforcement of a policy" that may otherwise be properly implemented. *Building & Constr. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002).

Lastly, dismissal of non-DOJ defendants is appropriate because plaintiffs do not argue that the relief they seek is in any way contingent on the presence of those defendants in this suit. *Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 35 (D.D.C. 2020) (dismissing President as a defendant where complete relief could come from others). Because there is thus no indication that plaintiffs would be prevented from obtaining the full relief they seek if the court enjoined DOJ

---

[1] Under *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013), courts may consider "documents referenced in the pleading if they are central to the claim" on a motion to dismiss.

[2] Matthew J. Vaeth, *Memorandum From the Acting Director, Office of Management and Budget on Temporary Pause of Agency Grant, Loan, and Other Federal Financial Assistance Programs*, Office of Management and Budget (Jan. 27, 2025), available at https://www.presidency.ucsb.edu/documents/memorandum-from-the-acting-director-office-management-and-budget-temporary-pause-agency ("This memorandum requires Federal agencies to identify and review all Federal financial assistance programs and supporting activities consistent with the President's policies and requirements.") (last visited on September 17, 2026).

alone from implementing the provisions plaintiffs are challenging, the non-DOJ defendants are unnecessary to this suit and should be dismissed.

**B. The Scope of the J21 Termination Provision**

This court previously properly found that plaintiffs were not entitled to a preliminary injunction with respect to the J21 termination provision. Dkt. 90 at 17. While plaintiffs are correct that a different standard applies to a preliminary injunction motion, Resp. at 10, and that the court recognized as much when it noted that its view "may change later in the case," Dkt. 90 at 17, their briefing offers no new information that would warrant such change.

Rather, plaintiffs revisit the language of J21 to argue that this court was incorrect to conclude that J21 is solely oriented towards internal government processes. Resp. at 10. The only provision they rely on for this argument, J21 § 3(c)(i)-(iii), compels the director of OMB to engage in three types of activities: (1) "Review and revise, as appropriate, all Government-wide processes, directives, and guidance;" (2) "Excise references to DEI and DEIA principles . . . from Federal acquisition, contracting, grants, and financial assistance procedures;" and (3) "Terminate all 'diversity,' 'equity,' 'equitable decision-making' 'equitable deployment of financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities, as appropriate." Tellingly, plaintiffs do not bother arguing that the first two categories of activities involve anything other than effectuation of internal changes within the government. And plaintiffs do not explain why it makes sense to interpret the third category as reaching beyond the first two, as opposed to interpreting all three categories as consistent in their scope. As this court has observed: "Though the text of the J21 termination provision does not itself contain a clear limitation to internal government affairs, it is nested . . . alongside provisions focused on internal government agency processes and programs." Dkt. 90 at 16. That the three are consistent in their scope is additionally supported by the fact that all three are grouped in a section titled "Terminating Illegal Discrimination in the Federal Government." *Id.*

The only argument plaintiffs offer in favor of interpreting the third category as reaching beyond internal processes is their sense that the third category of activities parallels certain external activities ordered under J20 § 2(b)(i). Resp. at 10. But the mere fact that the two may be parallel does not automatically convert J21 § 3(c)(iii) into an outward-looking provision. Indeed, a parallel relationship would suggest that J21 § 3(c)(iii) provides for internal changes to governmental processes to ensure consistency with the external activities ordered under J20 § 2(b)(i)). Because plaintiffs thus offer no reason for this court to amend its earlier understanding of the scope of J21, the court need not deviate from its prior conclusions.

## II. Basis for Dismissal Under *Trump v. Am. Fed'n of Gov't Employees*

This action should be dismissed based on *Trump v. Am. Fed'n of Gov't Employees*, 145 S. Ct. 2635 (July 8, 2025). There, plaintiffs relied on the Separation-of-Powers Clause, among other arguments, to challenge an executive order and an associated agency memorandum that instructed agencies to carry out federal workforce reductions "consistent with applicable law." *Id.* (Sotomayor, J., concurring). The Supreme Court found "the Government likely to succeed on its argument that" the executive order and memo were lawful because the "Executive Order directs agencies to plan reorganizations and reductions in force 'consistent with applicable law'" and the memorandum "reiterates as much." *Id*. While this holding involved interim rather than final relief, the Court's determinations "on the interim legal status of a major new federal statute or executive action . . . often constitute a form of precedent (*de jure* or *de facto*) that provides guidance throughout the United States during the years-long interim period until a final decision on the merits." *Trump v. CASA*, *Inc.*, 145 S. Ct. 2540, 2570 (June 27, 2025) (Kavanaugh, J., concurring).[3]

[3] *See also Trump v. Boyle*, 145 S. Ct. 2653 (July 23, 2025) ("Although our interim orders are not conclusive as to the merits, they inform how a court should exercise its equitable discretion in like cases.").

In common with plaintiffs in that case, plaintiffs here have mounted pre-enforcement challenges to executive orders directing agencies to engage in implementation consistent with law. As defendants' moving brief explained in greater detail, the funding conditions promulgated pursuant to the termination provisions of J20 and J21 might not even be incorporated in the final grant awards. Mem. at 5-6; 21. The Court was presented with a similar uncertainty in *Trump v. Am. Fed'n of Gov't Employees* since, as Justice Sotomayor emphasized in her concurrence, the reorganization "plans themselves [were] not before this Court" such that the Court "had no occasion to consider whether they can and will be carried out consistent with the constraints of law." *Am. Fed'n*, 145 S. Ct. at 2635. Further, both J20 and J21 expressly require that actions taken to implement these orders' provisions be lawful. J20 § 2(b)(i) (mandating federal agencies to "terminate, *to the maximum extent allowed by law*, all DEI, DEIA, and 'environmental justice' offices and positions" and other related initiatives) (emphasis added); J21 § 2 (ordering all executive departments and agencies "to terminate all discriminatory and *illegal* preferences, mandates, policies, programs, activities, guidance, regulations, enforcement actions, consent orders, and requirements") (emphasis added). Given these parallels, a determination that plaintiffs' claims bear dismissing at this time is appropriate.

## III. Plaintiffs' Challenges to the Funding Restrictions

### A. Plaintiffs' First Amendment Challenge to the Funding Restrictions

This court previously held that plaintiffs were not likely to succeed on their First Amendment claims with respect to any of the Funding Restrictions they are challenging here. Dkt. 90 at 28 ("the Court concludes that Freedom Network is not likely to succeed on its First Amendment claims related to the J20 termination provision, the NOFO discrimination condition, and the NOFO immigration enforcement condition."). Plaintiffs suggest that this finding is of little import because "at the motion-to-dismiss stage, the Court must accept Plaintiffs' well-pleaded allegations as true and draw reasonable inferences in their favor." Dkt. 137 at 13. But plaintiffs

never explain why the difference in the pleading standard is pertinent in this particular context. As the opinion reflects, the court found that the "key question" was "whether TVPA-related speech, even if undertaken as part of a federally funded grant, is governmental or private speech." Dkt. 90 at 25. The court then concluded that, because the TVPA funding "flows through entities that have historically been used to communicate messages from the government," plaintiffs' "speech related to TVPA grant funding" qualified as government speech. *Id.* at 27. This conclusion is plainly premised on court's understanding of applicable law, rather than court's failure to credit allegations in plaintiffs' complaint. Tellingly, plaintiffs point to no specific allegations that the court failed to appropriately credit in order to overcome the conclusion that the speech related to TVPA grant funding qualifies as government speech. The difference in the pleading standard is accordingly of no import as a practical matter, and a dismissal of plaintiffs' First Amendment claims with respect to the Funding Restrictions is an appropriate effectuation of the court's earlier finding that plaintiffs have little chance of success on those claims.

**B. Plaintiffs' Fifth Amendment Challenge to the Funding Restrictions**

As with the First Amendment challenge involving the Funding Restrictions, plaintiffs offer arguments that, as a practical matter, are not responsive to the reasoning underlying this court's earlier ruling. This court found that plaintiffs were not likely to succeed on their Fifth Amendment claims because possible non-compliance penalties were neither "criminal" nor "regulatory" but instead "solely concern[ed] whether Freedom Network will receive certain grant funding." Dkt. 90 at 29. The court accordingly concluded: "Although . . . all these provisions certainly include vague language, the Court must follow binding authority stating that such vagueness is less constitutionally severe in the context of government funding." *Id.* (internal quotations and citations omitted). In an attempt to reverse this conclusion, plaintiffs assert that (1) they have a "protected interest" and thus "protectible rights at stake;" (2) defendants have "applied the EO in an arbitrary manner;" (3) Due Process Clause applies to Executive Orders; and (4) "there is no

authority suggesting that the government can act in this arbitrary and capricious manner." Dkt. 137 at 16-18. None of these arguments are responsive to this court's stated reason for concluding that plaintiffs are unlikely to succeed: namely, that where "the only impact is federal funding, the consequences of imprecision are not constitutionally severe." Dkt. 90 at 29 (internal quotations and citations omitted). This court accordingly need not revisit its earlier finding, and plaintiffs' Fifth Amendment challenge warrants dismissal consistent with that finding.

### C. Spending and Separation-of-Powers Challenges to the Funding Restrictions

#### 1. TVPA and Agency Discretion

Plaintiffs' sole outstanding constitutional claims with respect to the Funding Restrictions — namely, their Separation-of-Powers and Spending Clause provisions — merit dismissal because the grant-authorizing section of the TVPA, 22 U.S.C. § 7105(b)(2), imbues the agency component charged with administering grants plaintiffs have applied for[4] with discretion to impose funding conditions over and above any restrictions found in the TVPA's own statutory language. The permissive language that recurs throughout the provisions that address these grants supports this conclusion. Most pertinently, these provisions declare that, "subject to the availability of appropriations, the Attorney General *may* make grants . . . to develop, expand, or strengthen victim service programs for victims of human trafficking[.]" 22 U.S.C. § 7105(b)(2)(A) (emphasis added). For trafficking-related grants that can only be awarded for law enforcement operations or to a task force, the regulatory scheme further provides that the Attorney General "*may* give priority to any applicant that . . . [attests] that the grant funds will be used" for purposes such as assisting with the prevention of trafficking, strengthening efforts to prosecute those who benefit from

---

[4] As discussed in defendants' moving brief, the Department of Justice's Office for Victims of Crime administers discretionary competitive grant programs that address harms to human trafficking victims. Mem. at 1-3.

trafficking, and taking affirmative measures to avoid prosecuting victims "for any offense that is the direct result of their victimization." 22 U.S.C. § 7105(b)(2)(D) (emphasis added).

This permissive language stands in sharp contrast to other provisions, indicating that the absence of mandatory language within the provisions that address awarding of grants issued under 22 U.S.C. § 7105(b)(2)(A) is intended to confer on agency a degree of discretion as to how to allocate funding that is appropriated for those grants. *See, e.g.,* 22 U.S.C. § 7105(b)(1)(B)(ii) (mandating that "in each fiscal year . . . the Secretary of Health and Human Services *shall* make grants for a national communication system to assist victims of severe forms of trafficking in persons in communicating with service providers") (emphasis added); 22 U.S.C. § 7105(b)(1)(E)(iv) (providing that "the Secretary of Health and Human Services *shall* consider statements from State and local law enforcement officials" that an identified victim has been willing to assist with certain law enforcement efforts in considering whether to certify that person for specialized services funded through grants available under the TVPA) (emphasis added); 22 U.S.C. § 7105(b)(2)(B) (providing for fixed percentages that "*shall* be set aside" for designated purposes from "amounts made available for grants under this paragraph") (emphasis added).

For Fiscal Year 2025, Congress appropriated "$88,000,000 for victim services programs for victims of trafficking, as authorized by section 107(b)(2) of the Victims of Trafficking Act, by the TVPRA of 2005, or programs authorized under Public Law 113-4." Full-Year Continuing Appropriations Act, 2025 (Pub. L. No. 119-4, Div. A, §§ 1101(a)(2), 1301(4), 139 Stat. 9, 10–11, 17; Pub. L. No. 118-42, 138 Stat. 147). Defendants accordingly had discretion to choose among these authorities so long as the funds were used for service programs aimed at assisting victims of human trafficking. In imposing conditions at issue in this litigation, DOJ elected to rely on 22 U.S.C. § 7105(b)(2)(A), which, as outlined above, provides that "the Attorney General may make grants . . . to develop, expand, or strengthen victim service programs for victims of human trafficking." This grant of authority necessarily allows the Attorney General to shape the structure

of the grant program, including emphasizing particular needs (such as housing or legal services) and establishing the permissible uses of funds. The Attorney General subsequently exercised this mandate by, as one example, issuing a notice of a funding opportunity whose primary focus is to secure "rapid rehousing" through "transitional housing and supportive services that assist human trafficking victims in moving as quickly as possible into permanent housing."[5] So long as the resulting grant program can be understood to "develop, expand, or strengthen victim service programs for victims of human trafficking," 22 U.S.C. § 7105(b)(2)(A), both the appropriations language and the authorizing statute are satisfied. The agency has thus utilized its discretion in a way that is not contrary to the statute's purposes, even if it is contrary to plaintiffs' own sense as to how that statute ought to be implemented.

**2. Availability of a Statutory Path of Review.**

Even if plaintiffs were correct that the TVPA constrains the agency's ability to condition funding as it has chosen to do here, their constitutional claims should nonetheless be dismissed in light of the availability of the Tucker Act or (alternatively) the Administrative Procedure Act ("APA") to provide a path of review. *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665 (2025). It is well settled, as briefed in greater detail in defendants' moving brief, Mem. at 16-18, that the non-statutory review plaintiffs seek here is "available only for the narrow purpose of obtaining injunctive relief against agency action taken in excess of its delegated powers and contrary to a specific prohibition in the law." *Fed. Express Corp. v. U.S. Dep't of Commerce*, 39 F.4th 756, 765 (D.C. Cir. 2022) (internal citation omitted). To properly allege such claims, the plaintiff must show "there is no alternative procedure for review." *Id.* at 763 (overviewing additional applicable conditions). Because the Tucker Act or (alternatively) the APA does provide a path of review

[5] Office for Victims of Crime, *OVC FY25 Housing Assistance for Victims of Human Trafficking*, Office of Justice Programs (Dec. 30, 2025), at 9, available at https://www.ojp.gov/funding/docs/ovc-2025-172519.pdf (last visited on September 18, 2026).

here, plaintiffs' constitutional claims merit dismissal.

While plaintiffs contend that the holding in *Nuclear Regul. Comm'n v. Texas* is inapplicable due to the specificity of the regulatory scheme at issue in that case, that holding articulates parameters of permissible non-statutory review that apply well beyond the specific facts that were before the Court in that litigation. In particular, the Court found that such review is unavailable: (1) where the claim is limited to the concern that the "agency has arguably reached a conclusion which does not comport with the law," (2) "if, as is usually the case, a statutory review scheme provides aggrieved persons with a meaningful and adequate opportunity for judicial review," and (3) "if a statutory review scheme forecloses all other forms of judicial review." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. at 681 (internal quotations and citations omitted).

Here, plaintiffs identify no *specific prohibition* in the TVPA that the agency is exceeding with its implementation of either J20 or J21. There is likewise no indication that the TVPA precludes a statutory review of plaintiffs' claims. And while plaintiffs contend that their constitutional claims "are not ones the APA can address," Resp. at 20, their identified reasons do not stand up to scrutiny. Their first identified reason — that proceeding under the APA would not allow them to obtain a ruling that the challenged provisions are unconstitutional — fails to explain why such relief is a necessity and why relief available under the APA is inadequate. *Id.* at 20 (arguing that the APA cannot address their claims because they "seek prospective injunctive relief . . . that the challenged executive action is unconstitutional, facially and as-applied."). Their second identified reason — that their constitutional claims are not foreclosed because the President's actions are not reviewable under the APA, *id.* — is irrelevant in light of the fact that, as explained in the defendants' moving brief, the President is not a proper defendant. Mem. at 7-8. (Plaintiffs, as noted elsewhere in this brief, *see supra* at 1, do not contest this point in their opposition briefing.) As to their final identified reason — that "courts have allowed non-statutory claims that agency action has violated the Constitution," Resp. at 20 — the Supreme Court's ruling

in *Nuclear Regul. Comm'n v. Texas* sets forth parameters for instances where such causes of action are applicable. Because this litigation does not fit within those parameters, plaintiffs' constitutional claims should be dismissed.

## IV. Plaintiffs' Challenges to the Certification Condition

### A. Plaintiffs' First Amendment Challenge to the Certification Condition

As set forth more fully in defendants' moving brief, plaintiffs' First Amendment challenge rests on a misreading of the Certification Condition, which requires grant recipients to certify that they do not "operate any programs promoting DEI *that violate any applicable Federal anti-discrimination laws*." J21 § 3(b)(iv)(B) (emphasis added); Mem. at 24-26. Multiple courts have found this language consistent with the Constitution. *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 2025 WL 4936000 at *3 (4th Cir. Mar. 14, 2025) (Harris, J., concurring) (the Certification Provision applies "only to conduct that violates existing federal anti-discrimination law" and does not "purport to establish the illegality of all efforts to advance" DEI); *Nat'l Urb. League v. Trump*, 783 F. Supp.3d 61, 102-103 (D.D.C., 2025) (reaching same result on text alone); *San Francisco A.I.D.S. Found. v. Trump*, 786 F. Supp. 3d 1184, 1221-22 (N.D. Cal., 2025) (same). Even if an ambiguity posed serious First Amendment concerns, the canon of constitutional avoidance would require adopting the defendants' narrower reading if it is "fairly possible," even if it is "not the best one." *United States v. Hansen*, 599 U.S. 762, 781 (2023).

Plaintiffs fight this conclusion by pointing to several actions undertaken by defendants since the issuing of J20 and J21 that presumably indicate defendants' intent to do more than "simply enforce anti-discrimination laws," including the "listing of words and terms that cannot be used," "censoring of training materials," "attempt to control the speech of trafficking survivors," and "inclusion of the New Funding Conditions in FY25 NOFOs." Resp. at 24. This argument ignores that grants issued pursuant to TVPA training and technical assistance programs incorporate a product-review-and-approval provision requiring the grantee to submit work product

for review at least 60 days before its intended publication and to correct the product in response to feedback. Mem. at 3. While plaintiffs may disagree with defendants' recent editorial choices, defendants' authority to present plaintiffs with those choices is consistent with this court's conclusion that plaintiffs' "speech related to TVPA grant funding is governmental speech." Dkt. 90 at 27. And defendants, as discussed at greater length in the moving brief, have the authority to impose conditions on the funding opportunities they choose to make available under the TVPA. Mem. at 18-21. Accordingly, defendants do not violate the First Amendment merely by requesting edits to federally funded work product or by providing guidance regarding the rules to govern future such work product or the grant awarding process.

**B. Plaintiffs' Fifth Amendment Challenge to the Certification Condition**

Plaintiffs' Fifth Amendment challenge fails for the same reasons as their Fifth Amendment challenge to the Funding Restrictions. As described in greater detail elsewhere in this brief, this court has already held that the imprecision of the challenged provisions is not "constitutionally severe" because the only penalties involved concern loss of grant funding, rather than "criminal or regulatory penalties." Dkt. 90 at 29. In doing so, the court squarely rejected arguments plaintiffs reiterate in their briefing — namely, that "the vagueness doctrine does apply" and that there is a "protectible interest" to be vindicated here. Resp. at 25.

While plaintiffs point to the Certification Condition's invoking of the False Claims Act, *id.*, they articulate no basis for a finding that they face a credible enforcement threat under that or any other statute. Enforcing the False Claims Act here would indeed require several steps far removed from what has occurred, such as an agency's decision to place certification terms in a grant or contract that affects plaintiffs, plaintiffs' decision to certify, and circumstances satisfying the requirements of an enforcement action. *See United States ex rel. Health v. Wisconsin Bell, Inc.*, 92 F.4th 654, 659 (7th Cir. 2024) (citing 31 U.S.C. § 3729(a)(1)(A) and discussing its parameters). Absent any allegations that can concretize their alleged fear of criminal prosecution,

plaintiffs' potential liability under the False Claims Act here is far too attenuated to show a sufficiently imminent credible enforcement threat.

### C. Plaintiffs' Separation-of-Powers and Spending Clause Challenges to the Certification Condition

Lastly, plaintiffs' argument that the Certification Condition violates Spending as well as Separation-of-Powers Clause fails under two of the principles explained in greater detail elsewhere in this brief, as well as in defendants' moving brief. First, as with Spending and Separation-of-Powers challenges respecting Funding Restrictions, a non-statutory path of review is available. *See supra* at 11-13; Mem. at 16-18. Second, the certification condition, as defendants noted in their earlier briefing, "imposes no new requirements, adopts no new construction of any federal anti-discrimination law, and does not declare all DEI to be illegal." Mem. at 27 (collecting cases where courts held that the requirement imposed by the Certification Condition was lawful); *see supra* at 13. Plaintiffs' Spending and Separation-of-Powers challenges to the Certification Condition should accordingly be dismissed.

## Conclusion

For the foregoing reasons, defendants request that plaintiffs' complaint be dismissed.

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

By: s/ Jelena Kolic
JELENA KOLIC
JOHN PATRICK MOYNIHAN
Assistant United States Attorneys
219 S. Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 886-2055
(312) 353-7223
jelena.kolic@usdoj.gov
john.moynihan@usdoj.gov